## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
| ATHENEX, INC., et al., | Case No. 23-90295 (DRJ) |
| Debtors. [1] | (Joint Administration Requested) |

### DEBTORS' EMERGENCY MOTION FOR (I) ENTRY OF AN ORDER APPROVING (A) BID PROCEDURES; (B) THE FORM AND MANNER OF NOTICE; (C) THE PROCEDURES FOR DETERMINING CURE AMOUNTS FOR EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (II) ENTRY OF AN ORDER APPROVING (A) THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; AND (B) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN CONTRACTS AND UNEXPIRED LEASES

**Emergency relief has been requested.  Relief is requested not later than May 22, 2023.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set or file a written response prior to the date that relief is requested in the preceding paragraph.  Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

Athenex, Inc. and its debtor affiliates, as debtors and debtors in possession in the above-captioned Chapter 11 Cases (collectively, the "Debtors" or the "Company"), file this *Motion for (i) Entry of an Order Approving (a) Bid Procedures; (b) the Form and Manner of Notice; (c) the Procedures for Determining Cure Amounts for Executory Contracts and Unexpired Leases; and (ii) Entry of an Order Approving (a) the Sale of Substantially All of the Debtors' Assets Free and*

---

[1]  A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/athenex. The location of Athenex, Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 1001 Main Street, Suite 600, Buffalo, NY 14203.

*Clear of All Liens, Claims, Encumbrances and Interests; and (b) the Assumption and Assignment of Certain Contracts and Unexpired Leases* (the "Bid Procedures and Sale Motion").[2]

## JURISDICTION

1.      The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334 and the Order of Reference to Bankruptcy Judge from the United States District Court for the Southern District of Texas, dated May 24, 2012. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.      Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory and other bases for the relief requested in the Bid Procedures and Sale Motion are sections 105(a), 363(b), 365, 503(b) and 507(a)(2) of title 11 of the United States Code (the "Bankruptcy Code"), as complemented by Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the Bankruptcy Local Rules.

## BACKGROUND

4.      On May 14, 2023 (the "Petition Date"), each of the Debtors commenced with the Court a voluntary case under chapter 11 of the Bankruptcy Code. The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory committee of creditors has been appointed in these Chapter 11 Cases.

5.      The Debtors are a global oncology-focused biopharmaceutical company dedicated to the discovery, development and commercialization of novel therapies for the treatment of

---

[2]      In support of the Bid Procedures and Sale Motion, the Debtors incorporate the *Declaration of Nicholas K. Campbell in Support of Debtors' Chapter 11 Petitions and First Day Relief* (the "First Day Declaration"). All capitalized terms not expressly defined herein shall have the same meaning as ascribed in the First Day Declaration or the Bid Procedures, as applicable.

cancer, aiming to develop safer and more efficacious cancer medication. The Debtors' mission is to improve the lives of cancer patients by creating more effective, safer and tolerable treatments.

6.     The Company derives its consolidated revenue primarily from (i) the sales of generic injectable products by its Commercial Platform; and (ii) licensing and collaboration projects conducted by the Company's Oncology Innovation Platform, which generates revenue in the form of upfront payments, milestone payments, and payments received for providing research and development services for the Company's collaboration projects and for other third parties. Product sales for the year ended December 31, 2022 was $90.9 million, an increase of $22.4 million, or 33%, as compared to $68.5 million for the year ended December 31, 2021.  License fees and other revenue decreased to $11.9 million for the year ended December 31, 2022, from $26.9 million for the year ended December 31, 2021, a decrease of $14.9 million, or 56%.

7.     The Company's other operating segments include its Cell Therapy segment and Orascovery segment –which businesses and related assets are up for sale pursuant to this Motion. As to the Orascovery segment, Debtor Athenex R&D LLC and its subsidiaries ("Orascovery") develop small molecule oral chemotherapy treatments for neoadjuvant breast cancer and solid tumors, including Oral Paclitaxel as discussed in the First Day Declaration.  As to the Company's Cell Therapy segment, Debtor Kuur Therapeutics Inc. and its subsidiaries ("Cell Therapy") develop biologic and cell therapies for the treatment of high risk neuroblastoma, lymphoma and leukemia, advanced HCC, and genetically driven epithelial cancers. The Company has made significant progress on its Cell Therapy platform, which represents a departure from more commonly used methods for cancer treatment.

8.     Further information regarding the Debtors' business and capital structure and the circumstances leading to the commencement of these Chapter 11 Cases is set forth in the

*Declaration of Nicholas K. Campbell in Support of the Debtors' Chapter 11 Petitions and First Day Relief* (the "First Day Declaration"),[3] filed contemporaneously herewith and incorporated by reference herein.

## PRELIMINARY STATEMENT

9.      The Debtors seek to maximize the value of their assets (the "Assets") for the benefit of the Debtors' estates and all parties in interest.  To that end, the Debtors have been evaluating, and continue to evaluate, all of their strategic options with the input of their key constituents, including Debtors' senior secured lenders.  As set forth in the First Day Declaration, prior to the filing of these cases, the Debtors have been engaged in extensive marketing efforts and dispositions of key assets.  The Debtors have run a formal, investment-banker led marketing process for their APD segment for over twenty (20) months since September 2021.  The Debtors identified a potential stalking horse bidder for APD prior to the Petition Date and intend to continue negotiations post-petition for the possible entry into a stalking horse agreement for APD.  With respect to their Cell Therapy and Orascovery segments, the Debtors engaged Cassel Salpeter & Co. as their investment banker pre-petition and intend to continue a robust post-petition marketing efforts for all of their assets.

10.      By this Motion, the Debtors are requesting crucial relief necessary for them to monetize assets and return the highest and maximum value for their stakeholders.  Specifically, the Debtors are asking for approval of a 45-day marketing process that would enable them to solicit bids on all Assets (except for any assets of Athenex Pharma Solutions, LLC ("APS"), which are not being marketed for sale at this time due to ongoing discussions involving resolution of the

---

[3]     A capitalized term used but not otherwise defined herein shall have the meaning ascribed to it in the First Day Declaration.

Almirall supply agreement as discussed further in the First Day Declaration). The Debtors are willing to entertain all viable proposals for their entire company, certain segments or divisions, or lot bids on assets (including inventory) held by the Debtors (excluding any APS assets).

11.     The Debtors are filing this Motion in order to comply with those milestones set forth in the proposed *Interim Order (i) Authorizing the Debtors to Use Cash Collateral; (ii) Granting Adequate Protection; (iii) Modifying the Automatic Stay; (iv) Scheduling a Final Hearing; and (v) Granting Related Relief* (the "Cash Collateral Order"), which require, among other things, that the Debtors (a) file the Bid Procedures and Sale Motion within one day of the Petition Date; (b) obtain entry of an order approving bid and sale procedures for the sale of substantially all of the Debtors' Assets (the "Bid Procedures") no later than seven days after the Petition Date; (c) obtain entry of the Sale Order within forty-five (45) days of the Petition Date; and (d) close on any sales by not later than fifty (50) days of the Petition Date.

12.     The Debtors will prepare a form asset purchase agreement (the "Form APA") available in the electronic dataroom established by the Debtors in connection with their sale process.[4] To streamline the sale process, Qualified Bidders (as defined below) shall be required to mark the Form APA to show the specific changes to the Form APA that the Qualified Bidder requires.

13.     To maximize the value of the Assets, all bids are subject to higher or better offers through a competitive auction process, as detailed below (the "Bidding Process"). If the Debtors pursue a sale of the Assets, the Debtors contemplate that the Bidding Process will culminate in the sale of all or substantially all of the Debtors' Assets to the Prevailing Purchaser (as defined below)

---

[4]     For the avoidance of doubt, parties may purchase substantially all or any portion or combination of the Assets, and the Debtors intend to provide parties interested in acquiring substantially all of the Assets or any portion or combination thereof with the Form APA.

free and clear of any or all liens, claims and interests (the "Transaction" or the "Sale") pursuant to a sale under section 363 of the Bankruptcy Code for cash and/or the assumption of certain liabilities (collectively, the "Purchase Price"), with all such liens, claims and interests attaching to the Transaction proceeds.

**RELIEF REQUESTED**

14.    By this Bid Procedures and Sale Motion, the Debtors respectfully request, pursuant to Bankruptcy Code sections 105, 363, 503(b), and 507(a)(2) and Bankruptcy Rules 2002, 6004 and 6006, (a) the entry of an order substantially in the form attached hereto (the "Bid Procedures Order"): (i) approving the Bid Procedures, which are attached as Exhibit A to the Bid Procedures Order; (ii) approving the form and manner of notice of transaction (the "Transaction Notice"), substantially in the form attached as Exhibit B to the Bid Procedures Order, that sets forth the Bid Procedures and the date, time, and place for an auction, as required by the Bid Procedures; (iii) approving the form and notice of assumption (the "Assumption Notice"), substantially in the form attached as Exhibit C to the Bid Procedures Order and, if necessary, assignment, of executory contracts and unexpired leases; (iv) establishing procedures for determining cure amounts in connection with the assumption (and, if necessary, assignment) of executory contracts and unexpired leases; and (v) granting such other relief as is fair and equitable; and, if the Debtors pursue a sale of the Assets, (b) the entry of an order (the "Sale Order"): (i) approving the sale of the Debtors' Assets free and clear of liens, claims, and interests; and (ii) authorizing the assumption and assignment of certain executory contracts and unexpired leases; and (iii) granting such other relief as is fair and equitable.

A.      **Approval of the Bid Procedures[5]**

15.      To maximize the value of the Assets for the benefit of the Debtors' estates and parties in interest, the Debtors seek to implement a competitive bidding process designed to generate maximum net value for the Debtors, their creditors and other stakeholders and the estates. Any person wishing to participate in the Bidding Process (each, a "Potential Bidder") must become a Qualified Bidder. As a prerequisite to becoming a Qualified Bidder, a Potential Bidder must:

  a.      Deliver an executed confidentiality agreement in form and substance reasonably acceptable to the Debtors (a "Bidder Confidentiality Agreement"); and

  b.      Be able, as determined by the Debtors, and with the consent of the Agent[6], to consummate a Transaction based upon a Qualifying Bid (as defined below).

16.      If at least one Qualifying Bid acceptable to the Debtors and the Agent is received, the Debtors intend to consummate the Transaction with the Qualified Bidder who makes the highest or best offer for the Assets (the "Successful Bid," and the Qualified Bidder making the Successful Bid then becoming the "Prevailing Purchaser"), as determined by the Debtors with the consent of the Agent and in consultation with the Official Committee of Unsecured Creditors, if appointed (the "Committee") after the conclusion of the Bidding Process. As described more fully in the Bid Procedures attached as Exhibit A to the Bid Procedures Order (the "Bid Procedures"), the Debtors propose a process governed by the following procedures:[7]

---

[5]   All capitalized terms not expressly defined herein shall have the same meaning as ascribed in the Bid Procedures attached as Exhibit A to the Bid Procedures Order.

[6]   As used herein, the term "Agent" shall mean the Prepetition Term Loan Agent as defined in the Cash Collateral Order.

[7]   The following description of the Bid Procedures is only a summary of the terms set forth in the Bid Procedures attached as Exhibit A to the Bid Procedures Order. The following summary is qualified in its entirety by reference to the provisions of the Bid Procedures. In the event of any inconsistencies between the provisions of the Bid Procedures and the terms herein, the terms of the Bid Procedures shall control.

a.  <u>Bid Deadline</u>. A Qualified Bidder that desires to make a bid shall deliver a written or electronic copy of its bid (which shall be a cash bid, or shall be in such other consideration as is acceptable to the Debtors and the Agent) to the Bid Notice Parties identified in the Bid Procedures not later than 5:00 p.m. (prevailing Central Time) on June 12, 2023 (the "<u>Bid Deadline</u>"), unless such date is extended by the Debtors, with the Agent's consent;

b.  <u>Required Bid Materials</u>. To be deemed a "Qualifying Bid," a bid must, among other things:

(i)  <u>Identification of Qualified Bidder</u>. Identify the party submitting the bid (and any equity holders, in the case of a Qualified Bidder which is an entity specially formed for the purpose of effectuating the contemplated transaction) and the representatives thereof who are authorized to appear and act on its behalf for all purposes regarding the contemplated Transaction;

(ii)  <u>Proposed Acquired Property</u>. Identify the Debtors' assets that the Qualified Bidder is bidding on (such specified property is the "<u>Proposed Acquired Property</u>");

(iii)  <u>Purchase Price Allocation</u>. Specify the portion of the aggregate purchase price that is being allocated to each of the Debtors' assets;

(iv)  <u>Irrevocability of Bid</u>. Include a letter stating that the Qualified Bidder's offer is irrevocable until the closing of the Transaction if such Qualified Bidder is the Prevailing Purchaser or the Back-Up Bidder (as defined below), and that the Qualified Bidder agrees to serve as a Back-up Bidder if such bidder's Qualifying Bid is selected as the next highest or otherwise next best bid after the Successful Bid (the "<u>Back-Up Bid</u>," and the Qualified Bidder making the Back-Up Bid, the "<u>Back-Up Bidder</u>");

(v)  <u>Consideration</u>. Identify the cash consideration to be paid for the Proposed Acquired Property, or such other consideration as is acceptable to the Debtors and the Agent;

(vi)  <u>Assumed Liabilities</u>. Identify the Debtors' liabilities that the Qualified Bidder seeks to assume;

(vii)  <u>Identification of Executory Contracts and Unexpired Real Property Leases</u>. Identify the Debtors' executory contracts and unexpired leases with respect to which the Qualified Bidder seeks to receive an assignment.

(viii)  <u>Adequate Assurance Information</u>. Include sufficient financial or other information (the "<u>Adequate Assurance Information</u>") to

DOCS_LA:348906.8 14039/001

establish adequate assurance of future performance with respect to any lease or contract to be Assigned to the Qualified Bidder in connection with the proposed transaction. The bid shall also identify a contact person (with relevant contact information) that counterparties to any lease or contract can contact to obtain additional Adequate Assurance Information;

(ix)    <u>Asset Purchase Agreement</u>. Include an executed copy of an asset purchase agreement providing for purchase of the Proposed Acquired Assets. Such asset purchase agreement shall (A) be substantially in the form of the Form APA; and (B) be delivered together with a draft marked against the Form APA to reflect all variations from the Form APA (the "<u>Qualified Bidder Agreement</u>");

(x)    <u>No Financing or Diligence Contingencies</u>. Include sufficient financial or other information to demonstrate that the bid does not contain any financing contingencies of any kind to closing on the proposed Transaction;

(xi)    <u>Value to the Estate in Excess of Stalking Horse Agreement, if any</u>. To the extent a Stalking Horse Bidder(s) is selected before the Bid Deadline, will result in a value to the Debtors' estates in the Debtors' business judgment, in consultation with the Committee and with the Agent's consent, that is more than the aggregate of the value of the sum of: (A) the cash purchase price of the Stalking Horse Agreement (as defined below); plus (B) the Stalking Horse Bidder(s)'s assumed liabilities in an estimated amount determined by the Debtors with the Agent's consent; plus (C) the sum of the Bid Protections; plus (D) $100,000.

(xii)    <u>Evidence of Financial Ability</u>. Include sufficient evidence of the Qualified Bidder's ability to consummate the Transaction and payment of the purchase price in cash at the date the Transaction is scheduled to close (the "<u>Closing</u>"), including, but not limited to a signed commitment for any debt or equity financing; a bank or other account statement showing the ability of a Qualified Bidder to pay cash for the Proposed Acquired Assets; contact names and numbers for verification of financing sources; and current audited financial statements (or such other form of financial disclosure and credit-quality support or enhancement, acceptable to the Debtors with the Agent's consent and in consultation with the Committee) of the Qualified Bidder or those entities that will guarantee in full the payment obligations of the Qualified Bidder;

(xiii)    <u>Deposit</u>. Include a cash deposit by wire transfer to an escrow agent selected by the Debtors with the Agent's consent (the "<u>Deposit Agent</u>") in an amount equal to 10% of the cash purchase price of the

bid that will constitute liquidated damages of the Debtors if the Qualified Bidder shall default with respect to its offer (the "<u>Good Faith Deposit</u>"). The Qualified Bidder must deliver the Good Faith Deposit on or before the Bid Deadline;

(xiv) <u>No Break-Up Fee</u>. Except for any Stalking Horse Bidder(s), include sufficient information to indicate that the Qualified Bidder is not entitled to any break-up fee, expense reimbursement, or similar type of payment;

(xv) <u>Due Diligence</u>. Include a letter acknowledging and representing that the Qualified Bidder has had an opportunity to conduct any and all due diligence regarding the Assets before making a bid; that it has relied solely upon its own independent review, investigation and/or inspection of any documents and the Assets in making its bid; and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise regarding the Assets, or the completeness of any information provided in connection therewith, except as expressly stated in the Bid Procedures;

(xvi) <u>Corporate Authority</u>. Include sufficient evidence of authorization and approval from the Qualified Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Qualified Bidder Agreement;

(xvii) <u>Regulatory Approvals and Covenants</u>. Identify each regulatory and third-party approval required for the Qualified Bidder to consummate the Transaction, if any, and the time period within which the Qualified Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than thirty (30) days following the execution and delivery of the Qualified Bidder Agreement, those actions the Qualified Bidder will take to ensure receipt of such approvals as promptly as possible); and

(xviii) <u>Consent to Jurisdiction and Authority to Enter Final Orders</u>. State that the Qualified Bidder consents to the jurisdiction of the Court and to the entry of a final judgment or order with respect to the Qualified Bidder's offer, as well as with respect to any aspect of this Bid Procedures and Sale Motion, including the Bid Procedures, and all orders of the Court entered with respect to the Transaction, if it is determined that the Court would lack Article III jurisdiction to enter such final order or judgment absent consent of the parties.

c.      Additionally, each bid must satisfy the other requirements set forth under "Bid Requirements" in the Bid Procedures.

d.      The Debtors, in consultation with the Committee and with the Agent's consent, shall determine whether a competing bid that meets the above requirements and the other requirements set forth in the Bid Procedures constitutes a Qualifying Bid, and such bidder submitting the Qualifying Bid shall constitute a "Qualified Bidder." The Debtors shall notify bidders whether their bids have been determined to be Qualified Bids by no later than 5:00 p.m. (prevailing Central time) on June 14, 2023.

e.      Credit Bid Right. The Bid Procedures provide that the Agent may at any time prior to the conclusion of the Auction, credit bid any portion up to the entire amount of their respective claims, at any time, on any Assets constituting their respective collateral. The Agent shall each be deemed to be a Qualified Bidder without being required to submit a Good Faith Deposit, Qualified Bidder Agreement, or any other deliverable or documentation to the Debtors, the Bid Notice Parties, or their representatives or agents.  Notwithstanding anything to the contrary in the Bid Procedures, in the event the Agent, or any individual member of the Committee becomes a Potential Bidder or Qualified Bidder, such party shall forego all consent and consultation rights otherwise provided in the Bid Procedures until such time as such party is no longer a Potential Bidder or Qualified Bidder.

f.      Auction. If multiple Qualifying Bids are received by the Debtors, the Debtors may conduct an auction (the "Auction") with respect to all or some of the Assets. The Auction, if conducted, shall commence at 10:00 a.m., prevailing Central time, on June 15, 2023.  The Auction, if any, will take place at such location to be set forth in the Transaction Notice or at such later time or other place as agreed by the Agent and the Debtors as approved by order of this Court, and of which the Debtors will notify the Auction participants.

B.      **Stalking Horse Bidder(s), Related Bid Protections and Stalking Horse Agreement(s)**

17.     The Bid Procedures also provide that the Debtors may enter into an agreement (a "Stalking Horse Agreement") in form and substance acceptable to the Agent and in consultation with the Committee, no later June 2, 2023, or such other later date as may be acceptable to the Agent, subject to approval by the Court and higher or otherwise better offers at the Auction, with one or more stalking horse bidders (each, a "Stalking Horse Bidder") to establish a minimum bid at the Auction with respect to all or any portion of the Assets. In the event that one or more Stalking

Horse Bidders are selected, the Debtors shall seek court approval of the Stalking Horse Bidder pursuant to the Bid Procedures, and as described in more detail below.

18.     The Stalking Horse Agreement, subject to the Agent's consent, may contain (a) an expense reimbursement for the reasonable, documented out-of-pocket expenses incurred by the Stalking Horse Bidder(s) in connection with the Stalking Horse Agreement in an aggregate amount not to exceed the lesser of (i) one percent (1%) of the cash portion of the purchase price under the Stalking Horse Agreement, and (ii) $250,000; and (b) a break-up fee for the Stalking Horse Bidder in an amount not to exceed three percent (3%) of the cash portion of the purchase price under the Stalking Horse Agreement ((a) and (b) of this sentence, collectively, the "<u>Bid Protections</u>"), payable only from the proceeds of a Sale with a Qualified Bidder other than the Stalking Horse or otherwise if an alternative transaction is accomplished through a chapter 11 plan following the termination of the Stalking Horse Agreement on account of pursuing the alternative Sale or transaction. The Bid Protections, once approved by the Court, shall be an allowed administrative expense.

19.     The Bid Procedures provide that in the event that the Debtors, subject to the consent of the Agent, and in consultation with the Committee, select one or more parties to serve as the Stalking Horse Bidder(s), upon such selection, the Debtors shall, by June 2, 2023, file with the Court the Stalking Horse Agreement(s) and provide the following parties (collectively, the "<u>Transaction Notice Parties</u>") notice of and an opportunity to object (by June 9, 2023) to the designation of such Stalking Horse Bidder(s) and the Bid Protections set forth in the Stalking Horse Agreement: (a) the United States Trustee for the Southern District of Texas; (b) counsel for any statutory committee appointed in these cases; and (c) persons who have filed a request for notice pursuant to Bankruptcy Rule 2002.

DOCS_LA:348906.8 14039/001

20.     After such notice and absent objection, the Debtors may submit an order to the Court under certification of counsel approving the selection of such Stalking Horse Bidder(s) and the Bid Protections (the "Stalking Horse Order").  To the extent necessary, the Debtors shall be entitled to set an expedited hearing on any objection to the designation of the Stalking Horse Bid promptly following the expiration of any Stalking Horse Objection Deadline, subject to the availability of the Court.

C.     **Approval of the Notice Procedures**

21.     The Debtors wish to proceed to the Auction and the hearing approving the Transaction (the "Sale Hearing") as expeditiously as possible, considering (a) the Debtors' liquidity situation; (b) the deadlines set forth in the Cash Collateral Order; and (c) the deadlines set forth in the Bid Procedures, while providing the requisite notice of the proposed sale as required by Bankruptcy Rules, including Bankruptcy Rule 2002.

22.     Bankruptcy Rule 2002(a) provides, in relevant part, that all creditors must be given at least twenty-one (21) days' notice by mail of a proposed use, sale, or lease of property of the estate other than in the ordinary course of business. Further, Bankruptcy Rule 2002(c) sets forth that the content of such notices must include the time and place of any sale, the terms and conditions of such sale, and time fixed for filing objections.

D.     **Approval of the Transaction Notice**

23.     In accordance with Bankruptcy Rule 2002, the Debtors are required to notify their creditors and other interested parties of the proposed Transaction, including a disclosure of the time and place of the Auction, the terms and conditions of the Transaction, and the deadline for filing any objections to the Transaction, all of which are in the "Transaction Notice" attached as Exhibit B to the Bid Procedures Order.

24.     The Transaction Notice (a) contains the type of information required under Bankruptcy Rule 2002 that is currently known to the Debtors; (b) includes information concerning the Bid Procedures; and (c) is reasonably calculated to provide due, adequate and timely notice to all interested parties of (i) the Auction, (ii) the Bid Procedures; (iii) the Sale Hearing; and (iv) the deadline to object to the Transaction.

25.     Not later than five (5) days after entry of the Bid Procedures Order (the "Mailing Deadline"), the Debtors (or their agents): (a) will serve a copy of the Transaction Notice, as well as a copy of the Bid Procedures and Sale Motion and the Bid Procedures Order, by first- class mail, postage prepaid, or, for those parties who have consented to receive notice by the ECF system, by ECF, upon  the Transaction Notice Parties; and (b) will serve a copy of the Transaction Notice upon all known creditors of the Debtors.

E.     **Approval of the Assumption Notice**

26.     In accordance with Bankruptcy Rule 2002, the Debtors must provide notice of:  (a) the potential assumption (and, as applicable, assignment) of all of the Debtors' executory contracts and unexpired leases (the "Executory Contracts"); (b) the amount reflected in the Debtors' records necessary to cure monetary defaults (the "Cure Amounts") under each Executory Contract that the Debtors believe they might seek to assume and/or assign in connection with a Transaction (the "Designated Contracts"); and (c) the deadline to file objections to such assumption (and, if applicable, assignment), Cure Amounts, and the existence of any defaults and/or adequate assurance of future performance (collectively, the "Contract Notice Items"). The Debtors propose

to serve the Assumption Notice attached as <u>Exhibit C</u> to the Bid Procedures Order, which will contain a list of the Cure Amount related to each Executory Contract.[8]

27.     The Assumption Notice (a) contains the type of information required by Bankruptcy Rule 2002 that is currently known to the Debtors; and (b) is reasonably calculated to provide due, adequate and timely notice to all parties of the Contract Notice Items.

28.     By May 26, 2023, the Debtors (or their agents) shall serve the Assumption Notice by first class United States mail, postage prepaid on:  (a) parties identified on the proposed Master Service List at the addresses set forth therein; and (b) all non-debtor counterparties to Executory Contracts (the "<u>Counterparties</u>"). Such Assumption Notice is proper, due, timely, good, and sufficient notice of, among other things, the proposed assumption (and if applicable, assignment) of the Executory Contracts, the Cure Amounts, and the procedures for objecting thereto.

29.     Except as may otherwise be agreed by the parties to a Designated Contract that is ultimately Assigned (an "<u>Assigned Contract</u>") (with the reasonable consent of the Prevailing Purchaser and the consent of the Agent), or ordered by the Court, the Debtors propose to:  (a) satisfy all valid and undisputed Cure Amounts as provided in the Assumption Notice on the effective date of any sale or chapter 11 plan in which the contract is to be assumed and assigned; and (b) with respect to Designated Contracts for which the Cure Amounts are disputed, if any, pay such Cure Amount as determined by the Court at a hearing to resolve the disputed Cure Amounts (including the Sale Hearing).

30.     At the Sale Hearing, the Debtors will seek Court approval of the assumption and assignment to the Prevailing Purchaser of only those Designated Contracts that have been selected

---

[8]     The listing of a contract or lease on the Assumption Notice or the Supplemental Assumption Notice (as defined herein) is not (a) a request to assume such agreement; or (b) an acknowledgment or admission that such contract or lease is executory pursuant to section 365 of the Bankruptcy Code.

by such Prevailing Purchaser to be assumed and assigned.  The inclusion of a Designated Contract on an Assumption Notice will not (a) obligate the Debtors to assume any Designated Contract listed thereon nor the Prevailing Purchaser to take assignment of such Designated Contract or (b) constitute any admission or agreement of the Debtors that such Designated Contract is an executory contract. The Debtors and their estates reserve any and all rights with respect to any Designated Contract that are not ultimately designated as Assigned Contracts.

F.     **Approval of the Supplemental Assumption Notice**

31.     The Debtors may amend or supplement the Assumption Notice from time to time (the "Supplemental Assumption Notice").  If the Debtors file a Supplemental Assumption Notice, the Debtors will promptly serve a copy of such Supplemental Assumption Notice on the Counterparties to Executory Contracts that are affected by such amendment, supplementation, or modification by first class mail, and in no event will the Debtors serve a Supplemental Assumption Notice such that counterparties to Executory Contracts are served with less than seven (7) days' notice of the proposed Cure Amounts prior to the Sale Hearing.

G.     **Approval of the Objection and Cure Procedures**

32.     The Debtors propose to implement the following procedures (the "Objection and Cure Procedures") with respect to the notices discussed herein and relief  related thereto:

a.     Objections, if any, to the consummation of the Transaction and/or the proposed assumption (and, if applicable, assignment) of the Designated Contracts, including, but not limited to, objections relating to any Cure Amounts and/or adequate assurance of future performance (a "Contract Objection"), must (i) be in writing; (ii) state with specificity the nature of such objection; (iii) if concerning a Cure Amount, set forth a specific default in the Designated Contract and claim a specific monetary amount that differs from the Cure Amount (if any) specified in the Assumption Notice (with appropriate documentation in support thereof); and (iv) comply with the Bankruptcy Rules.

16

b.  Unless otherwise provided herein, objections, if any, must be filed with the Court and served so as to be received by the following parties (the "Objection Notice Parties") no later than **June 9, 2023 at 4:00 p.m. (prevailing Central Time)** (the "Objection Deadline"): (i) counsel to the Debtors, Pachulski Stang Ziehl & Jones LLP, at 440 Louisiana Ave., Suite 900, Houston, Texas, 77002, Attn: Michael D. Warner (mwarner@pszjlaw.com) and at 10100 Santa Monica Blvd., Suite 1300, Los Angeles, California 90067, Attn: Richard M. Pachulski (rpachulski@pszjlaw.com), Debra I. Grassgreen (dgrassgreen@pszjlaw.com), and Shirley S. Cho (scho@pszjlaw.com); (ii) counsel to the Agent, Sullivan & Cromwell LLP, Attn: Ari B. Blaut (blauta@sullcrom.com), Daniel R. Loeser (loeserd@sullcrom.com), Benjamin S. Beller (bellerb@sullcrom.com), Mark E. Dendinger (mark.dendinger@bracewell.com), Jonathan Lozano (jonathan.lozano@bracewell.com); (iii) counsel to the Prevailing Purchaser, if one has been determined; (iv) counsel to any appointed committee; (v) counsel to the Stalking Horse Bidder(s), if any; and (vi) the United States Trustee at the Office of the United States Trustee, 515 Rusk St, #3516, Houston, Texas, 77002 Jana Smith Whitworth (Jana.Whitworth@usdoj.gov) and Ha Nguyen (ha.nguyen@usdoj.gov).

c.  The Debtors may amend or supplement the Assumption Notice from time to time by filing a Supplemental Assumption Notice. If the Debtors file a Supplemental Assumption Notice, the Debtors shall promptly serve a copy of such Supplemental Assumption Notice on the counterparties to Executory Contracts that are affected by such amendment, supplementation, or modification by first class mail, and in no event shall the Debtors serve a Supplemental Assumption Notice such that counterparties to Executory Contracts are served with less than seven (7) days' notice of the proposed Cure Amounts prior to the Sale Hearing. Objections, if any, by counterparties identified in any Supplemental Assumption Notice, must be filed and served upon the Objection Notice Parties seven (7) days after the date of service of the Supplemental Assumption Notice; *provided, however*, that no objections may be made after the Sale Hearing.

d.  If no timely objection to the assumption and assignment of a particular executory contract or unexpired lease is received, then the Cure Amount set forth in the Assumption Notice and/or Supplemental Assumption Notice will be binding on the non-debtor party or parties to the Assigned Contract for all purposes in these cases and otherwise.  All such counterparties to the Assigned Contracts will (i) be forever barred from objecting to the Cure Amounts and from asserting any additional cure or other amounts with respect to the Assigned Contracts; (ii) be deemed to have consented to the assumption and assignment, and (iii) be forever barred and estopped from asserting or claiming against the Debtors or the Prevailing Purchaser that any additional amounts are due or other defaults

exist, that conditions to assumption and assignment must be satisfied under such Assigned Contracts, that adequate assurance is not being provided or that there is any other objection or defense to the assumption and assignment of such Assigned Contracts notwithstanding any anti-alienation provision or other restriction on assumption or assignment in the Designated Contract.

e.    If a Counterparty files an objection to assumption or assignment, whether based on Cure Amount, adequate assurance of future performance, or any other alleged cause or claim, then, to the extent the relevant parties are not able to consensually resolve the  dispute before the Sale Hearing, such dispute will be heard and resolved by the Court at a hearing to resolve the disputed Cure Amounts; *provided, however*, that if an objection relates solely to the Cure Amount (any such objection, a "Cure Dispute"), the Designated Contract may be assumed by the Debtors and assigned to the Prevailing Purchaser provided that the cure amount the Counterparty asserts is required to be paid under Bankruptcy Code Section 365(b)(1)(A) and (B) (or such lower amount as agreed to by the Counterparty) is deposited in a segregated account by the Debtors pending the Court's adjudication of the Cure Dispute or the parties' consensual resolution of the Cure Dispute.

## H.    **Approval of the Proposed Timeline for Sale of Assets**

33.    Pursuant to the milestones set forth in the Cash Collateral Order, the Debtors must (a) file the Bid Procedures and Sale Motion within two days of the Petition Date; obtain entry of an order, with terms and substance acceptable to the Agent, approving the Bid Procedures no later than seven days after the Petition Date; (c) obtain a Bid Deadline of June 12, 2023; and (d) obtain entry of the Sale Order by June 23, 2023.  Consistent with these requirements, the Debtors propose the following timeline (the "Timeline") for the sale process:

| Event | Deadline |
|---|---|
| Bidding Procedures Order Approved | Not later than 7 days after the Petition Date |
| Cure Notices Served | May 26, 2023 |
| Deadline to Designate Stalking Horse Bidders(s) | June 2, 2023 |
| Sale/ Cure Objection Deadline | June 9, 2023 |
| Deadline to Object to Stalking Horse Bidder(s) | June 9, 2023 |
| Bids Due | June 12, 2023 |
| Auction | June 15, 2023 |
| Notice of Winning Bids Filed | June 16, 2023 |

DOCS_LA:348906.8 14039/001

| Event | Deadline |
|---|---|
| Objection to Winning Bidder | June 19, 2023 at 12:00 pm |
| Sale Approval Hearing | June 21, 2023 |
| Sale Order Entered | June 23, 2023 |
| Sale(s) Closed | June 30, 2023 |

34.     The Debtors believe that the proposed timeline is more than sufficient to complete a fair and open sale process and maximize the value received for the Debtors' Assets. The Timeline will provide the Debtors and their advisors sufficient time to solicit (and/or re-solicit) prospective purchasers in advance of the Proposed Bid Deadline set forth in the Timeline, while respecting the necessity to consummate a sale as quickly as possible to maximize the net value obtained for the Debtors' Assets for the benefit of the estates and all constituencies.

## BASIS FOR RELIEF

A.     **The Sale of the Assets May Become Necessary**

35.     The Debtors, in consultation with their advisors, are pursuing a variety of options to successfully navigate these Chapter 11 Cases and no final decision to seek a sale of substantially all of the Assets has been made. To the extent that the Debtors receive one or more Qualified Bids and determine that a sale of the Assets is necessary, such a decision will be based upon the Debtors' sound business judgment, analyzing factors such as their leveraged financial position, any Qualified Bids received and the valuation of the Debtors' business and Assets.

36.     In the event that a going concern sale of the Assets is pursued, the Debtors submit that the proposed Timeline will adequately address the Debtors' liquidity issues by transferring ownership of the Assets to a financially stable buyer with the ability to satisfy the capital requirements of the business so that the business can continue on a going concern basis, while maximizing the value of the Debtors' estates for the benefit of all constituencies. In the absence of a sale or other transaction conducted in accordance with the Timeline, the Debtors will likely face

deterioration in the value of the business and a diminished runway to continue their operations. The Debtors submit that the Successful Bid(s) resulting from the Bid Procedures will constitute the highest and best offer for the Assets. Therefore, to the extent the Debtors pursue the Sale, it will be because such sale will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative. As such, any sale of the Assets as provided for in the Bid Procedures is a valid and sound exercise of the Debtors' business judgment.

B.     **The Form and Manner of the Transaction Notice Should Be Approved**

37.     Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide their creditors with 21 days' notice of the Sale Hearing.  Pursuant to Bankruptcy Rule 2002(c)(1), such notice must include the time and place of the Auction and the Sale Hearing and the deadline for filing any objections to the relief requested herein.

38.     The Debtors submit that notice of this Bid Procedures and Sale Motion and the related hearing to consider entry of the Bid Procedures Order, together with service of the Transaction Notice as provided herein, constitutes good and adequate notice of the Auction, the Sale Hearing and the proceedings with respect thereto in compliance with, and in satisfaction of, the applicable requirements of Bankruptcy Rules 2002, 6004, and 6006.

C.     **The Bid Procedures are Fair and Reasonable and are Designed to Maximize the Value Received for the Assets**

39.     Pursuant to Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be by private sale or auction. Courts have recognized that procedures intended to enhance competitive bidding in a chapter 11 sale process are consistent with the paramount goal of maximizing the value received by the debtor's estate and, are therefore appropriate.  *See, e.g.*, *Gluckstadt Holdings, L.L.C. v. VCR I, L.L.C. (In re VCR I, L.L.C.)*, 922 F.3d 323, 327 (5th Cir. 2019) ("A trustee has a duty to maximize the value of the estate," and he

"must demonstrate that the proposed sale price is the highest and best offer . . . ."); *ASARCO, L.L.C. v. Elliott Mgmt. (In re ASARCO, L.L.C.)*, 650 F.3d 593, 603 (5th Cir. 2011) (affirming the Court's finding that certain expense reimbursement procedures were allowable because they help maximize the estate's assets); *Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564–65 (8th Cir. 1997) ("[A] primary objective of the Code [is] to enhance the value of the estate at hand."); *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the . . . debtor's duty . . . is to obtain the highest price or greatest overall benefit possible for the estate.") (*quoting Cello Bag Co. v. Champion Int'l Corp. (In re Atlanta Packaging Prods., Inc.)*, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988)); *In re Summit Global Logistics, Inc.*, No. 08-11566, 2008 WL 819934, at *14 (Bankr. D.N.J. Mar. 26, 2008) (describing a proposed transaction as one that "maximize[d] value and return to interested parties"). Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling assets from the estate. *See In re ASARCO, L.L.C.*, 650 F.3d at 603 ("The business judgment standard in section 363 is flexible and encourages discretion."); *In re TM Vill., Ltd.*, No. 18-32770, 2019 Bankr. LEXIS 651, at *20 (Bankr. N.D. Tex. Feb. 28, 2019) ("As long as the sale appears to enhance a debtor's estate, court approval of a debtor-in-possession's decision to sell should only be withheld if the debtor's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code.") (quoting *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985)); *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656-57 (S.D.N.Y. 1992) (noting that overbid procedures and break-up fee arrangements that have been negotiated by a debtor are to be reviewed according to the deferential "business judgment"

standard, under which such procedures and arrangements are "presumptively valid"). *See also In re Trans World Airlines Inc.*, No. 01-0056, 2001 WL 1820326, at *10 (Bankr. D. Del. Apr. 2, 2001) ("It is not the function of a bankruptcy court to independently exercise a business judgment as to which proposal among competing proposals should be adopted by the debtor.").

40.     Here, the Debtors have sound business justifications for seeking approval of the Bid Procedures at this time. The Debtors are commencing a bidding process immediately, as the Debtors have limited funding and believe the process is in the best interests of the estates and creditors. The Debtors seek approval of the Bid Procedures in an effort to obtain a bid(s) for the Debtors' Assets which maximizes their value.

41.     The Bid Procedures are the result of good-faith, arm's length negotiations between the Debtors and their key constituents, including the Agent. The Bid Procedures provide an appropriate framework for soliciting offers and will enable the Debtors to analyze and compare all bids received to determine which bid is in the best interest of the Debtors' estates and creditors.

42.     The Bid Procedures provide Potential Bidders with sufficient notice and opportunity for interested parties to acquire the information necessary to submit a timely and informed bid. The Debtors' deteriorating financial position precludes a more extended process, and the Debtors believe that the period between the date of entrance of the Bid Procedures Order and the Bid Deadline provides a reasonable means for maximizing the return from the sale of the Assets. Additionally, to help facilitate and expedite a Potential Bidder's evaluation of the Assets, the Debtors have established an electronic dataroom, which contains the information necessary for a Potential Bidder to perform the due diligence before submitting a bid.

43.     Further, the Bid Procedures provide the Debtors with sufficient opportunity to consider all competing offers and to select the highest or best offer for the completion of a

Transaction. To the extent that the Debtors enter into a Stalking Horse Agreement, such entry ensures fair value by setting a minimum purchase price that is acceptable to the Debtors and the Agent while exposing bids to the marketplace.  Accordingly, the Debtors and all parties in interest can be assured that the ultimate consideration paid for the Assets if a Sale is pursued will be fair, reasonable, and in the best interest of the Debtors' estates and creditors, and sound business reasons exist to approve the Bid Procedures.

44.     Further, section 105(a) of the Bankruptcy Code provides that the Court "may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  As detailed above, approval of the Bid Procedures will greatly assist the Debtors in maximizing the value that they may obtain for the Assets and, therefore, granting the requested relief is "appropriate" under the circumstances.

45.     The Debtors request the Court's approval of the Bid Procedures, including the dates established thereby for an Auction and a Sale Hearing. Accordingly, the Debtors and all parties in interest can be assured that any consideration received by the Debtors for the Assets pursuant to the Bid Procedures will be fair and reasonable, and sound business reasons exist to approve the Bid Procedures.

**D.     Approval of Bid Protections for Stalking Horse Bidders Is Appropriate**

46.     To induce the Stalking Horse Bidder(s) to enter into Stalking Horse Agreements, setting floor prices for the Assets that may be tested in the marketplace, the Debtors may be required to provide Bid Protections. The terms of any Bid Protections shall be subject to Court approval pursuant to a Stalking Horse Order after seven (7) days' notice (*i.e.*, objection deadline of June 9, 2023) to all relevant parties as set forth in the Bid Procedures.

47.     The proposed Bid Protections are fair and reasonable under the circumstances. Any break-up fee and/or any expense reimbursement will be negotiated at arms' length and in good

faith and will be necessary to secure the Stalking Horse Bidder(s)' participation in the proposed

sale Transaction. Courts have long recognized that break-up fees and other termination fees are a

reasonable, normal and, in many cases, necessary component of significant chapter 11 sales. *See,

e.g.*, *In re Acis Capital Mgmt., L.P.*, 604 B.R. 484, 517 (N.D. Tex. 2019) ("Without the Break-Up

Fee, the Trustee would have had no ready, willing, and able partner for the proposed Plan. . . .");

*In re Lincolnshire Campus, LLC*, 2010 WL 5269706 at *2 (Bankr. N.D. Tex. July 23, 2010) ("The

Break-Up Fee . . . induced the Buyer to submit a bid that will serve as a minimum or floor bid on

which the Debtors . . . and other bidders can rely. Accordingly, the Break-Up Fee . . . [is] reasonable

and appropriate and represent[s] the best method for maximizing the value for the benefit of the

Debtors' estates."); *Reliant Energy Channelview LP v. Kelson Channelview LLC (In re Reliant

Energy Channelview LP)*, 594 F.3d 200, 206-07 (3d Cir. 2010); *see also Official Comm. of

Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.),* 147 B.R. 650, 659-

660 (S.D.N.Y. 1992) ("Breakup fees are important tools to encourage bidding and to maximize the

value of the debtor's assets . . . . In fact, because the . . . corporation ha[s] a duty to encourage

bidding, break-up fees can be necessary to discharge [such] duties to maximize values."); *In re

ASARCO, L.L.C. v. Elliott Mgmt. (In re ASARCO, L.L.C.)*, 650 F.3d 593, 603 (5th Cir. 2011)

(affirming a break-up fee that the bankruptcy court found helped to maximize the debtor's estate).

Break-up fees are appropriate where they "provide some benefit to the debtor's estate," including

(a) promoting more competitive bidding, such as by inducing a bid that otherwise would not have

been made and without which bidding would have been limited, and (b) inducing a bidder to

research the value of the debtor and convert the value to a dollar figure on which other bidders can

rely. *Reliant Energy Channelview LP v. Kelson Channelview LLC (In re Reliant Energy

Channelview LP)*, 594 F.3d 200, 206-07 (3d Cir. 2010); *Calpine Corp. v. O'Brien Envtl. Energy,*

*Inc. (In re O'Brien Envtl. Energy, Inc.),* 181 F.3d 527, 537 (3d Cir. 1999); *In re Acis Capital Mgmt., L.P.*, 604 B.R. 484, 517 (N.D. Tex. 2019).

48.     Here, any Bid Protections to be paid under the circumstances described herein will be: (a) actual and necessary costs and expenses of preserving the Debtors' estates within the meaning of Bankruptcy Code sections 503(b) and 507(a)(2); (b) commensurate to the real and substantial benefit conferred upon the Debtors' estates by the Stalking Horse Bidder(s); reasonable and appropriate, in light of the size and nature of the proposed sale transaction and comparable transactions, to the commitments that have been made and the efforts that have been and will be expended by the Stalking Horse Bidder(s); (d) necessary to induce the Stalking Horse Bidder(s) to continue to pursue the sale Transaction and to continue to be bound by any Stalking Horse Agreement; and (e) subject to all parties in interests' rights to object and be heard with respect to approval of such Bid Protections. Indeed, the Bid Protections will enable the Debtors to secure an adequate floor price for their Assets, thereby ensuring that competing bids would be materially higher or otherwise better than the bids reflected in any Stalking Horse Agreement(s) – a clear benefit to the Debtors' estates. Moreover, it is not likely that any Stalking Horse Bidder would agree to act as a stalking horse without the Bid Protections. Without the Bid Protections, the Debtors may lose the opportunity to obtain the highest or best offer for the Assets and would certainly lose the downside protection that will be afforded by the existence of the Stalking Horse Bidder(s) and Stalking Horse Agreement.

49.     Moreover, the Stalking Horse Bidder(s) will have expended, and will continue to expend, considerable time, money and energy in connection with the Transaction and will engage in extended and lengthy good faith negotiations. In particular, any Stalking Horse Agreement will be the culmination of a marketing effort and part of a process undertaken by the Debtors, and the

Debtors' professionals to identify and negotiate a transaction that the Debtors believe to be the highest and best proposal for an acquisition of the Debtors' Assets. Therefore, the Debtors believe that granting any Bid Protections requested by the Debtors pursuant to any Stalking Horse Order(s) will provide a postpetition benefit to the Debtors' estates and maximize the value realized for the benefit of the Debtors' estates, their creditors, and other parties in interest.

50.     Finally, payment of the Bid Protections in the context of a sale to another purchaser that outbids a Stalking Horse Bidder will not diminish the Debtors' estates to the extent they become payable, as the Bid Procedures require that any competing bid must exceed a Stalking Horse Bid by an amount in excess of the break-up fee and expense reimbursement. For the foregoing reasons, any Bid Protections reflect a sound business purpose, are fair and appropriate under the circumstances, and should be approved.

51.     "A break-up fee should constitute a fair and reasonable percentage of the proposed purchase price, and should be reasonably related to the risk, effort, and expenses of the prospective purchaser. When reasonable in relation to the bidder's efforts and to the magnitude of the transaction, break-up fees are generally permissible." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 662 (S.D.N.Y. 1992). *See, e.g.*, *In re Rupari Holding Corp.*, Case No. 17-10793, 2017 Bankr. LEXIS 4042, at *119 (Bankr. D. Del. June 7, 2019) (authorizing a breakup fee of 4%); *In re Edge Petroleum Corp., et al.*, Case No. 09-20644 (Bankr. S.D. Tex.) [Dkt. No. 57] (finding a breakup fee of 3.14% plus expenses was reasonable); *In re Erickson Retirement Cmtys., LLC*, Case No. 09-37010-SGJ (Bankr. N.D. Tex.) [Dkt. No. 272] (finding break-up fee and expenses equal to 3.5% of purchase price reasonable.).  Here, any breakup fee requested by the Debtors will be a fair, reasonable

percentage of the purchase price and therefore appropriate in light of the size and nature of the transaction.

52.     As additional support, section 105(a) of the Bankruptcy Code provides that the Court "may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). As described above, approval of any Bid Protections will greatly assist the Debtors in maximizing the value that that can obtained for all or portions of the Assets. Consequently, granting the requested relief is "appropriate" under the circumstances.

E.     **Approval of the Sale is Warranted Under Bankruptcy Code 363(b)**

53.     If a sale of substantially all of the Debtors' Assets is pursued, at the conclusion of the Sale Hearing, the Debtors will request that the Court enter the Sale Order, approving the sale of the Assets to the Stalking Horse Bidder(s) or such other Qualified Bidder who submits the Successful Bid (with any liens, claims, interests and encumbrances attaching to the net proceeds of the sale with the same force, validity, effect, priority and enforceability as such interest had in the Assets before such sale).[9] The Debtors submit that they will not make such a request unless it is in the best interest of the Debtors' estates and creditors.

54.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). To approve the use, sale, or lease of the property outside the ordinary course of business, the Court need only determine that the Debtors' decision is supported by "some articulated business justification" as established by the Second Circuit in *Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d. Cir. 1983),

---

[9]     To be clear, if the Debtors pursue a Sale, this portion of the relief is requested to be entered after the Sale Hearing in the form of a Sale Order. The Debtors hereby reserve the right to file supplemental pleadings in support of their request for entry of the Sale Order.

which decision has been adopted in this Circuit. *Inst. Creditors of Continental Airlines, Inc. v. Continental Airlines, Inc. (In re Continental Airlines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986); *Cadle Company v. Mims (In re Moore),* 608 F.3d 253, 263 (5th Cir. 2010); s*ee also Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *Fulton State Bank v Schipper (In re Schipper)*, 933 F.2d 513 (7th Cir. 1991); *In re Condere Corp.*, 228 B.R. 615, 628-29 (Bankr. S.D. Miss. 1998); *In re San Jacinto Glass Industries, Inc.*, 93 B.R. 934, 944 (Bankr. S.D. Tex. 1988). Once a debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" *In re S.N.A. Nut Co.*, 186 B.R. 98 (Bonier. N.D. Ill. 1995); *see In re Integrated Res., Inc.*, 147 B.R. at 656 (Bankr. S.D.N.Y. 1992); *Comm. Of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a debtor's management decisions."). *See also In re ASARCO, L.L.C. v. Elliott Mgmt. (In re ASARCO, L.L.C.)*, 650 F.3d 593, 601 (5th Cir. 2011) ("The business judgment standard in section 363 is flexible and encourages discretion."). In evaluating such a sale, a court must balance the need for flexibility with the concern of affected creditors. *In re ASARCO, L.L.C.*, 650 F.3d at 601; *In re Terrace Gardens Park P'ship*, 96 B.R. at 715.

55.      Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under Bankruptcy Code section 363(b)(1). When applying the business judgment standard, courts show great deference to a debtor's business decisions. *In the Matter of ASARCO, L.L.C. v. Elliott Mgmt. (In re ASARCO, L.L.C.)*, 650 F.3d at 601; *In re Terrace Gardens Park P'ship*, 96 B.R. 707, 715 (Bankr. W.D. Tex. 1989).

56.     The Debtors' request for entry of the Sale Order, if any, will be based on their sound business justification for selling the Assets.  Based on a careful review of the Debtors' financial position and the Debtors' ongoing and future business prospects, the Debtors and their advisors have concluded that an expedited sale of the Assets in accordance with the procedures set forth in the Bid Procedures may be the best method to maximize recoveries to the estates. Asset value maximization is a sound business purpose warranting authorization of any proposed sale. For the reasons discussed herein, the Debtors believe that a sale of the Assets may be the best way to maximize value for the benefit of creditors and stem any further deterioration of the going concern value of the company.

57.     The Debtors have proposed a fair and open process for achieving the goal of obtaining the highest or best offer in a sale of the Assets for the benefit of the Debtors' estates and creditors. The sale of the Assets will be subject to competing bids, enhancing the Debtors' ability to receive the highest or otherwise best value for the Assets. Consequently, the fairness and reasonableness of the consideration to be received by the Debtors if a Sale is conducted will ultimately be demonstrated by a "market check" through the auction process, which is the best means for establishing whether a fair and reasonable price is being paid.

58.     For the reasons outlined above, the Debtors assert that any sale of their Assets pursuant to the Bid Procedures will be a sound exercise of their business judgment and supported by the facts and circumstances of these cases.

59.     Moreover, all creditors and parties in interest will receive adequate notice of the Bid Procedures and the Sale Hearing, as set forth herein. Such notice is reasonably calculated to provide timely and adequate notice to the Debtors' major creditor constituencies, those parties most interested in these cases, those parties potentially interested in bidding on the Assets and

others whose interests are potentially implicated by a proposed sale. Accordingly, moving forward with a sale process as soon as possible is in the best interests of the Debtors' creditors and parties in interest.

F.     **The Proposed Sale Satisfies the Requirements of Section 363(f) for a Sale Free and Clear of Interests**

60.     Section 363(f) of the Bankruptcy Code permits a debtor to sell its assets free and clear of all liens, claims, interests, charges and encumbrances (with any such liens, claims, interests, charges, and encumbrances attaching to the net proceeds of the sale with the same rights and priorities therein as in the sold assets). 11 U.S.C. § 363(f). Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any of its five requirements will suffice to permit the sale of the Assets free and clear of the interest. *In re Motors Liquidation Co.*, 829 F.3d 135, 154 (2d Cir. 2016) ("A sale pursuant to § 363(b) may be made 'free and clear of any interest in such property' if any condition on a list of conditions is met."); *Michigan Employment Sec. Comm. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that "Bankruptcy Code §363(f) is written in the disjunctive" and holding that the court may approve the sale free and clear provided that at least one of the subsections of § 363(f) is met.); *In re Ditech Holding Corp.*, 606 B.R. 544, 580 (Bankr. S.D.N.Y. 2019) ("A sale pursuant to section 363(b) may be made 'free and clear of any interest in such property' if the trustee or debtor satisfies any of the conditions set forth in section 363(f).").  If a Sale is pursued, the Debtors believe they will be able to demonstrate at the Sale Hearing that one or more of the conditions in section 363(f) of the Bankruptcy Code have been satisfied.

61.     The Debtors believe that one or more of the tests of section 363(f) are satisfied with respect to the transfer of the Assets as agreed to with a Prevailing Purchaser. First, the Agent may consent to the sale free and clear under section 363(f)(2). In the event it does not, a sale free and

clear may proceed pursuant to section 363(f)(5) of the Bankruptcy Code because the Agent will be paid from the proceeds of the sale and the Debtors will establish at the Sale Hearing that the Agent can be compelled to accept a monetary satisfaction of its claims.

62.     The Debtors propose that all liens, claims, encumbrances, or interests attach to the sale proceeds with the same force, validity, effect, priority and enforceability as such interests had in the Assets before such sale.

G.     **The Bid Procedures Were Designed to Prevent Collusion Among Parties in Interest**

63.     The Bid Procedures require each Qualified Bidder participating in the Auction to confirm that it has not engaged in any collusion with respect to the bidding. Thus, section 363(n) of the Bankruptcy Code governing collusive sales is inapplicable to any sale of the Debtors' Assets pursuant to the Bid Procedures. 11 U.S.C. § 363(n).

H.     **The Prevailing Purchaser Should be Entitled to the Protections of Section 363(m)**

64.     Pursuant to section 363(m) of the Bankruptcy Code, a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims. *See O'Dwyer v. O'Dwyer (In re O'Dwyer),* 611 Fed. App'x 195, 200 (5th Cir. 2015); *Mark Bell Furn. Warehouse, Inc. v. D.M. Reid Assoc., Ltd. (In re Mark Bell Furniture Warehouse, Inc.)*, 992 F.2d 7, 9 (1st Cir. 1993); *In re Abbotts Dairies of Pa.*, 788 F.2d 143, 147 (3d Cir. 1986); *Willemain v. Kivitz (In re Willemain)*, 764 F.2d 1019, 1023 (4th Cir. 1985); *Factory Mut. Ins. V. Panda Energy Int'l (In re Hereford Biofuels, LP)*, 466 B.R. 841, 860 (Bankr. N.D. Tex. 2012).  To the extent the Debtors seek Court approval of a Sale, the Debtors will adduce facts at the Sale Hearing demonstrating that any bidder who is deemed the Prevailing Purchaser for the Assets had negotiated at arm's length, with all parties represented by their own counsel.

65.     Accordingly, any sale order entered will include a provision that the Prevailing Purchaser for the Assets is a "good faith" purchaser within the meaning of section 363(m) of the

Bankruptcy Code. The Debtors believe that providing the Prevailing Purchaser with such protection will ensure that the Debtors will receive the maximum price for the Assets and that any Sale will close promptly.

I.    **The Debtors Have Exercised Sound Business Judgment and Will Provide Adequate Notice and an Opportunity to Object to the Assumption and Assignment of Executory Contracts and Unexpired Leases**

66.    In connection with the potential assumption and assignment of the Designated Contracts, establishing a process is necessary by which (a) the Debtors and the non-debtor counterparties can reconcile cure obligations, if any, in accordance with Bankruptcy Code section 365, and (b) such counterparties can object to the assumption and assignment of executory contracts and unexpired leases and any applicable Cure Costs.

67.    Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a). The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection. *See, e.g.*, *In re Senior Care Ctrs., LLC*, No. 18-33967, 2019 Bankr. LEXIS 3185, at *7 (Bankr. D. N.D. Tex. Oct. 4, 2019) (citing *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985)); *In re Republic Airways Holdings Inc.*, 2016 Bankr. LEXIS 1927, at *10-11 (Bankr. S.D.N.Y. May 3, 2016) (citing *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984) (stating that Section 365 is traditionally subject to the "business judgment" standard); *In re Gucci*, 193 B.R. 411 (S.D.N.Y. 1996). If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract. *See Mission Prod. Holdings v. Tempnology, LLC*, 139 S. Ct. 1652, 1658 (2019) ("The bankruptcy court will generally approve [the debtor's] choice, under the deferential 'business judgment' rule.")

(citing *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984)); *see also Group of Institutional Investors v. Chicago M. St. P. & P.R.R. Co.*, 318 U.S. 523 (1943); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39–40 (3d. Cir. 1989).  Under the business judgment test, a court should approve a debtor's proposed assumption if such assumption will benefit the estate. *In re Tayfur*, 599 Fed. App'x. 44, 46 (3rd Cir. 2015); *In re Republic Airways Holdings Inc.*, Case No. 16-10429, 2016 Bankr. LEXIS 1927, at *10-11 (Bankr. S.D.N.Y. May 3, 2016) ("Courts generally will not second-guess a debtor's business judgment concerning whether an assumption or rejection benefits the debtor's estate."); *In re Gunner Hotel Assoc.*, 96 B.R. 696, 698, (Bankr. W.D. Tex. 1988); *In re Food City, Inc.*, 94 B.R. 91, 93-94 (Bankr. W.D. Tex. 1988); *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.),* 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting *In re Stable Mews Assoc.,* 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984) ("The business judgment test "requires only that the trustee (or debtor-in-possession) demonstrate that rejection of the executory contract will benefit the estate."). Any more exacting scrutiny would slow the administration of a debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the Court's ability to control a case impartially. *See Richmond Leasing Co. v. Capital Bank, NA.*, 762 F.2d 1303, 1311 (5th Cir. 1985).  Moreover, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1).

68.     Section 365(f) of the Bankruptcy Code provides that once an executory contract is assumed, the debtor may elect to assign such contract if "adequate assurance of future performance is provided." 11 U.S.C. § 365(f)(2). *See also L.R.S.C. Co. v. Rickel Home Centers, Inc. (In re*

*Rickel Home Center, Inc.)*, 209 F.3d 291, 299 (3d Cir. 2000) ("The Code generally favors free assignability as a means to maximize the value of the debtor's estate."); *see also RPD Holdings, L.L.C. v. Tech Pharm. Servs. (In re Provider Meds, L.L.C.)*, 907 F.3d 845, 851 (5th Cir. 2018) ("Once a trustee assumes an executory contract, a trustee may generally also assign the contract even where legal or contractual provisions would otherwise prohibit assignment."); *Leonard v. General Motors Corp. (In re Headquarters Dodge, Inc.)*, 13 F.3d 674, 682 (3d Cir. 1994) (noting purpose of section 365(f) is to assist trustee in realizing the full value of the debtor's assets). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B. R. 524, 538 (Bankr. D.N.J. 1989). *See also Absinthe Bar, L.L.C. v. Bourbon Saloon, Inc. (In re Bourbon Saloon, Inc.)*, 647 Fed. App'x. 342, 346 (5th Cir. 2016) ("A bankruptcy court's determination of adequate assurance of future performance and the ability to cure under § 365 is a fact-specific question.") (citing *Tex. Health Enters. Inc. v. Lytle Nursing Home (In re Tex. Health Enters. Inc.)*, 72 F. App'x. 122, 126 (5th Cir. 2003)); *Winters Nursery LLC v. Color Spot Holdings, Inc. (In re Color Spot Holdings, Inc.)*, 2018 WL 3996938, at *2 (D. Del. 2018); *In re Texas Health Enterprises, Inc.*, 246 B.R. 832, 834 (Bankr. E.D. Tex Jan. 27, 2000); *In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (stating that adequate assurance of future performance does not mean absolute assurance that debtor will thrive). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *In re Bygaph, Inc.*, 56 B.R. 596, 605–06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when a prospective assignee of a lease from debtors has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of

succeeding); *In re Old South Coors, Inc.*, 27 B.R. 923, 926 (Bankr. N.D. Miss. 1983) (finding that successful business experience and financial strength of assignees met "all reasonable standards of adequate assurance . . . .").

69.     Here, adequate assurance of future performance with respect to the Prevailing Purchaser shall be presented at any Sale Hearing. Upon any closing, the Prevailing Purchaser will have financial resources sufficient to perform under any executory contracts or unexpired leases it seeks to have assumed by the Debtors. To the extent that any defaults exist under any executory contracts and unexpired leases that are to be Assigned in connection with the Transaction, the Prevailing Purchaser will cure any such default contemporaneously with or as soon as practicable after consummation of an assumption and assignment of such executory contract or unexpired lease. Moreover, if necessary, the Debtors will adduce facts at the Sale Hearing on any objection demonstrating the financial wherewithal of the Prevailing Purchaser and its willingness and ability to perform under the executory contracts and unexpired leases to be assigned to it. If the Debtors seek approval of a Sale, the Sale Hearing will provide the Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of the Prevailing Purchaser to provide adequate assurance of future performance under the executory contracts and unexpired leases that it seeks to assume.

70.     Additionally, the proposed Objection and Cure Procedures for the identification and payment of Cure Amounts are appropriately and reasonably tailored to provide non-debtor counterparties of the Designated Contracts with adequate notice of the  proposed assumption and assignment of their applicable contract, as well as the proposed Cure Amounts related thereto, if any. Such non-debtor parties to the Designated Contract are given an opportunity to object to the proposed assumption and assignment and, in the event an objection is not resolved and the Debtors,

nonetheless, seek to assume the contract of such objecting counterparty, the Court will adjudicate the dispute, including issues pertaining to adequate assurance of future performance.

71.     If the Debtors pursue a Sale, on the closing date of the Transaction, or as soon thereafter as practicable, the Prevailing Purchaser will (a) pay each of the counterparties to the Designated Contracts assumed and assigned as part of the Transaction for which there is not a dispute as to Cure Amounts, or such other party as is necessary to cure defaults, the Cure Amounts related to the Designated Contracts; and (b) with respect to the Designated Contracts for which the Cure Amounts are disputed, if any, pay such Cure Amount as determined by the Court at the Sale Hearing or otherwise. The payment of any Cure Amounts, as directed by the Court, will be in full and final satisfaction of all obligations to cure defaults and will compensate the respective counterparties to the Designated Contracts for any pecuniary losses under such contracts or leases pursuant to Bankruptcy Code section 365(b)(1).

72.     As set forth in the Objection and Cure Procedures, the Debtors are also requesting that any Counterparty that fails to object to the proposed assumption and assignment of any Designated Contract be deemed to consent to the assumption and assignment of the applicable Designated Contract pursuant to Bankruptcy Code section 365 and on the terms set forth in the Sale Order, notwithstanding any anti-alienation provision or other restriction on assignment contained in the applicable contract or lease. *See, e.g., In re Alta Mesa Resources, Inc*., Case No. 19-35133 (Bankr. S.D. Tex., Sept. 11, 2019) [Dkt. 317] (*citing Hargrave v. Township of Pemberton (In re Tabone, Inc.),* 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (finding that by not objecting to sale motion, creditor was deemed to consent)).

73.     The Debtors respectfully submit that the procedures proposed herein for executory contracts and unexpired leases being Assigned at any Closing are appropriate and reasonably

tailored to provide adequate notice to the counterparties of any such contract (the "<u>Contract Notice Parties</u>") in the form of the Assumption Notice of the proposed assumption and/or assignment of their applicable contract, as well as proposed Cure Amounts, if applicable. Thus, the Court should approve the Objection and Cure Procedures and authorize the Debtors to assume and assign executory contracts and unexpired leases as may be set forth in the Prevailing Purchaser's asset purchase agreement.

J.     **The Court Should Waive the Stay of Bankruptcy Rules 6004 and 6006**

74.     Because time is of the essence in regard to the Transaction, the Debtors request that the Court waive the 14-day stay (a) provided in Bankruptcy Rule 6004(h) in all orders requested to be entered herein and (b) provided in Bankruptcy Rule 6006(d) in the Sale Order.

## <u>RESERVATION OF RIGHTS</u>

75.     Nothing contained herein is intended to be or shall be deemed as (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' or any appropriate party in interest's rights to dispute the amount of, basis for, or validity of any claim; (c) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable nonbankruptcy law; (d) an admission as to whether any contract or lease is an executory contract or unexpired lease; (e) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code; or (f) a waiver of the rights of parties in interest to contest whether any of the interests described herein constitute property of the Debtors' estates. The Debtors expressly reserve all of their rights with respect to the foregoing matters. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any party in interest's rights to subsequently dispute and/or contest such claim.

## **NOTICE**

76.     Notice of the hearing on the relief requested in this Motion will be provided by the Debtors in accordance and compliance with Bankruptcy Rules and Local Rules.  The Debtors will provide notice of this motion to the following: (a) the U.S. Trustee for the Southern District of Texas, (b) the holders of the thirty largest unsecured claims against the Debtors (on a consolidated basis), (c) of the thirty largest unsecured claims against the Debtors (on a consolidated basis), (d) Oaktree Fund Administration, LLC and its counsel (Sullivan & Cromwell LLP, as primary counsel, and Bracewell LLP, as local counsel), (e) the United States Attorney's Office for the Southern District of Texas, (f) the Internal Revenue Service, (g) the United States Securities and Exchange Commission, (h) the state attorneys general  for states in which the Debtors conduct business, (i) governmental agencies having a regulatory or statutory interest in these cases, (j) any party that has requested notice pursuant to Bankruptcy Rule 2002 and Bankruptcy Local Rule 9013-1(d).  No other or further notice is needed in light of the nature of the relief requested.

*[Remainder of page intentionally left blank]*

## <u>CONCLUSION</u>

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto, granting the relief requested in this motion and granting such other relief and further relief as appropriate under the circumstances.

Dated: May 14, 2023

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Michael D. Warner*

Michael D. Warner (SBT 00792304)
Maxim B. Litvak (SBT 24002482)
Benjamin L. Wallen (SBT 24102623)
440 Louisiana Street, Suite 900
Houston, TX 77002
Telephone: (713) 691-9385
Facsimile:  (713) 691-9407
mwarner@pszjlaw.com
mlitvak@pszjlaw.com
bwallen@pszjlaw.com

-and-

Richard M. Pachulski (*pro hac vice* pending)
Debra I. Grassgreen (*pro hac vice* pending)
Shirley S. Cho (*pro hac vice* pending)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
rpachulski@pszjlaw.com
dgrassgreen@pszjlaw.com
scho@pszjlaw.com

*Proposed Counsel to the Debtors and Debtors in Possession*

**<u>Certificate of Service</u>**

I certify that on May 14, 2023, I caused a copy of the foregoing document to be served via the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Michael D. Warner*
Michael D. Warner