# EXHIBIT 2

(Dexmedetomidine HCI Contract)

DocuSign Envelope ID: 33AF526C-1D01-4E91-A5D1-4C3607A7C2F6

CONFIDENTIAL

## LICENSE, DISTRIBUTION AND SUPPLY AGREEMENT
### *(Dexmedetomidine HCl in 0.9% Sodium Chloride injectable solution (4 mcg/ml))*

THIS LICENSE, DISTRIBUTION AND SUPPLY AGREEMENT (including all Schedules hereto and as amended or supplemented from time to time, this "**Agreement**") is entered into as of November 16th, 2022 (the "**Effective Date**") by and between:

Athenex Pharmaceutical Division LLC, a Delaware limited liability company having a place of business at 10 Martingale Rd Suite 230, Schaumburg, IL 60173 ("**Athenex**"),

and

Alter Pharma NV, a public limited liability company (naamloze vennootschap / société anonyme) organized under the laws of Belgium, having its registered office at Marie Curie Square 50, 5th Building (4th Floor), 1070 Anderlecht, Belgium, and with enterprise number 0827.869.165 (Register of Legal Entities of Brussels) ("**ANV**"), for itself and on behalf of two of its Affiliates (defined below): Generic Pharma International Limited, an Irish company ("**GPI**"), and Milla Pharmaceuticals, Inc., a Delaware corporation ("**Milla**") (ANV, GPI and Milla collectively, "**Alter Pharma**").

Each of Athenex and ANV may be referred to herein as a "**Party**" and together as the "**Parties**".

### RECITALS

A.      ANV has developed the drug product Dexmedetomidine HCl in 0.9% Sodium Chloride injectable solution (4 mcg/ml), as more specifically described in the ANDA (defined below) (the "**Product**") and owns certain related intellectual property and data.

B.      Milla has filed with FDA (defined below) the ANDA No. 217308 for the Product (the "**ANDA**") seeking approval in the United States of America, its territories and possessions, such as Washington D.C., Puerto Rico and Guam (the "**Territory**"). The reference listed drug for the Product is NDA No. N021038, marketed under the brand name Precedex, owned by Hospira Inc. ("**RLD**").

C.      GPI has entered into a supply agreement with a contract manufacturer ("**CMO**") to have commercial quantities of Product manufactured, packaged and supplied for sale in the Territory.

D.      Athenex distributes and sells drug products and desires to obtain the right to import, distribute, promote, market, and sell (collectively, "**Commercialize**") the Product in the Territory.

E.      The Parties wish to collaborate on an exclusive basis with respect to the supply and Commercialization of the Product in the Territory, all on the terms and subject to the conditions set forth below.

NOW THEREFORE, in consideration of the foregoing and the promises below, the Parties agree as follows:

## 1.      DEFINITIONS.

1.1.      **Glossary**. For purposes of this Agreement, the following terms have the indicated meanings, with grammatical variations having corresponding meanings:

"**Affiliate**" means any Person that controls, is controlled by, or is under common control with a Party; where "control" means (a) the possession, directly or indirectly, of the power to direct the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and/or (b) the ownership,

DocuSign Envelope ID: 33AF526C-1D01-4E91-A5D1-4C3607A7C2F6

CONFIDENTIAL

directly or indirectly, of more than fifty percent (50%) of the voting securities or other ownership interest of a Person.

"**Authority**" means any governmental authority, department, body or agency or any court, tribunal, bureau, commission, or other similar body, whether international, supranational, national, federal, state, provincial, county, local or municipal.

"**Batch**" means, with respect to the Product, a separate and distinct quantity of Product processed under continuous and identical conditions and designated by a batch number.

"**cGMP**" means the current good manufacturing practices set forth in 21 C.F.R. Parts 210 and 211.

"**Commercially Reasonable Efforts**" means, with respect to a Person, efforts and resources normally used by such Person to, in the case of Alter Pharma, develop, register, manufacture, and/or supply, as applicable, or, in the case of Athenex, Commercialize a generic pharmaceutical product owned by it or to which it has exclusive rights, which product is of similar overall market potential at a similar stage in its product lifecycle as the Product, taking into account, *inter alia*, the competitiveness of the marketplace, the proprietary position of the product, the profitability of the product, and other relevant factors. The Parties acknowledge that the level of effort and resources may change at different times during the Product's life cycle.

"**Competing Product**" means any drug product, other than the Product supplied hereunder, (a) in an injectable or intravenous dosage form containing any form of dexmedetomidine HCl, in any strength or formulation, or (b) that is therapeutically equivalent to the RLD, or (c) that comprises the RLD itself or any "authorized generic" version thereof.

"**DSCSA**" means the U.S. Federal Drug Supply Chain Security Act and the rules and regulations promulgated thereunder, each as amended.

"**FD&C Act**" means the U.S. Federal Food, Drug, and Cosmetic Act and the rules and regulations promulgated thereunder, each as amended.

"**FDA**" means the U.S. Food and Drug Administration or any successor Authority.

"**GAAP**" means Generally Accepted Accounting Principles in the United States, consistently applied within and across measured periods.

"**GDUFA**" means the Generic Drug User Fee Act of 2012, as amended by the FDA Reauthorization Act of 2017, and as further amended from time to time.

"**Gross Sales**" means, for any measured period, all revenues (whether actual or accrued) of Athenex, its Affiliates and any Subs in connection with the sale of Product in the Territory, including (a) the gross amount invoiced to Purchasers (including hospital sales, mail orders, retail sales, and sales to governmental entities, wholesalers, and medical institutions), (b) any upfront fees, royalties, milestone fees, and similar non-per unit revenues related to the sale of or access to the Product, (c) any expense reimbursement or recovery as a result of commercial arrangements relating to the Product, such as refunds or reimbursements for defective Product or damages in transit, customer program accruals including overbills, administrative fees and reversals of chargebacks, and (d) amounts received in connection with litigation directly related to the Product, such as settlement payments, damages, attorneys' fees and sales of authorized generic product. For purposes of determining whether a given sale occurs during a measured period, Product will be considered sold as of the date of shipment by Athenex to the Purchaser. Gross Sales shall be calculated in accordance GAAP. In the event that Athenex sells Product as part of a bundle with other products not covered by this Agreement, or Athenex provides a discount, allowance or rebate to a Purchaser based on the gross amount of all products sold, such

2

DocuSign Envelope ID: 33AF526C-1D01-4E91-A5D1-4C3607A7C2F6

CONFIDENTIAL

discount will be allocated pro rata based on the selling prices of all such products. Athenex shall ensure that all appropriate reverse chargebacks are timely received from wholesalers.

"**Label**" or "**Labeling**" means any labels, inserts or other written or graphic material contained in or affixed to Product or its packaging, including transport packaging.

"**Launch**" means the first commercial sale (determined by issuance of invoice) of Product in the Territory by or on behalf of Athenex or any of its Subs to any Third Party.

"**Law**" means, with respect to a Person, all laws, statutes, ordinances, regulations, rules, judgments, decrees, and orders, as amended from time to time, of any Authority (a) in the United States and/or (b) in any other jurisdiction in which such Person operates or performs activities in respect of this Agreement.  The term Law includes cGMP, the DSCSA and the FD&C Act, as applicable.

"**Materials**" means, collectively, all active ingredients, raw materials, excipients, Labeling, packaging, packing and other items that are incorporated into or used to produce Product in accordance with the Specifications.

"**NDC**" means a unique, product-specific "National Drug Code" number, assigned in part by the FDA and in part by the vendor of a drug product, pursuant to Section 510 of the FD&C Act.

"**Net Profit**" means Net Sales for a measured period *less* (a) the Supply Price for Product included in such Net Sales, (b) the Sales & Marketing Fee (*provided*, that in any Quarter in which there are "negative Net Profits" or there would be "negative Net Profits" after deduction of the Sales & Marketing Fee, Athenex shall not be entitled to receive a Sales & Marketing Fee), and (c) subject to the caps specified in Sections 10.3 (Patent Litigation) and 10.4 (No-Fault Product Liability Litigation), any (i) Patent Litigation Costs and (ii) No-Fault Product Liability Litigation Costs permitted to be deducted hereunder in accordance with the terms of such provisions; all as calculated in accordance with GAAP.

"**Net Sales**" means, Gross Sales for a measured period *less* the sum of the following to the extent (i) not duplicated, (ii) actually incurred or accrued by Athenex, (iii) out-of-pocket, documented and reasonable, and (iv) solely with respect to Product units actually sold during such period: (a) normal and customary discounts, rebates and credits (such as cash discounts, volume discounts, chargebacks, promotional, shelf stock and other adjustments, including those granted on account of billing errors, rejected goods, expired goods, damaged goods, government mandated rebates and other and returns) actually allowed or given to Purchasers; (b) Medicaid fees; (c) redistribution center (RDC) fees and information service agreement (ISA) fees; (d) the Supply Price paid by Athenex to GPI for any Product that becomes expired, unsaleable or destroyed before reaching market, to the extent not caused by Athenex (including due to improper forecasting) or reimbursable or reimbursed by a Third Party; (e) actual bad debt write-off attributable to the sale of Product, so long as Athenex used reasonable efforts to verify the Purchaser's credit prior to selling it Product and to collect payment; (f) costs directly and specifically arising from Non-Conforming Product supplied by the CMO, such as destruction or disposal of Non-Conforming Product and Recall costs, to the extent the non-conformity and/or Recall was not caused by Athenex; and (g) failure to supply charges assessed by Purchasers to the extent caused by a failure of the CMO to timely supply Product, so long as Athenex was in compliance with its forecasting and ordering obligations under this Agreement. Net Sales shall be calculated in accordance with GAAP. No penalties or interest shall be deductible in the calculation of Net Sales to the extent such penalties or interest are caused by Athenex's failure to timely and properly fulfill its obligations. A specific item constituting a deduction from Net Sales for a measured period cannot be deducted more than once, regardless of whether that specific item may satisfy two or more discrete categories of deduction as part of the foregoing definition of Net Sales; and no item deducted from Net Sales or Net Profit for a measured period may also be deducted from Net Profit or Net Sales, respectively.  For the avoidance of doubt, in consideration of receiving the Sales & Marketing Fee, as between the Parties, Athenex shall be solely responsible for all logistics fees, storage and 3PL warehousing fees, wholesale distribution fees, insurance costs, in connection with the Commercialization of the Product, and no

3

DocuSign Envelope ID: 33AF526C-1D01-4E91-A5D1-4C3607A7C2F6

CONFIDENTIAL

such amounts may be deducted from Gross Sales in the calculation of Net Sales or otherwise charged through to GPI via the Profit Share or otherwise. All freight and shipping costs to its customers, duties, taxes, and other transportation charges shipping insurance, and customs costs from the CMO to Athenex's 3PL will be paid upfront by Athenex and shared between the parties according to their profit-share percentage. Athenex will deduct GPI's share from its profit-share payments.

"**Non-Conforming Product**" means Product that has been delivered by GPI hereunder that fails to meet the Product Warranty for any reason other than the fault of Athenex or any Person receiving, storing, delivering, distributing, or otherwise handling Product on behalf of or from Athenex.

"**Person**" means any natural person, corporation, limited liability company, general partnership, limited partnership, joint venture, proprietorship, trust, or other business organization, as well as any Authority.

"**Purchasers**" means all Third Parties purchasing or otherwise acquiring Product from Athenex or any of its Subs, including retailers, hospitals, pharmacies, wholesalers, and other distributors.

"**Quarter**" means each three (3) calendar month period during the Term beginning January, April, July, and October; *provided*, that (a) the first Quarter shall commence on the Launch date and end on the last day of the Quarter in which Launch occurred and (b) the last Quarter shall end on the last day of the Term.

"**Recall**" means any action (a) by a Party to recover title to or possession of, or to issue a field alert or field correction with respect to, quantities of Product sold or shipped to Third Parties for sale or use in the Territory, including any voluntary withdrawal of Product from the market in the Territory, or (b) by any Regulatory Authority in the Territory to recall, withdraw from the market, order any corrective action, or otherwise detain or destroy any Product.

"**Regulatory Approvals**" means all filings, permits, licenses, registrations, authorizations and approvals of any Regulatory Authority required for the commercial manufacture, export, import, Commercialization, and/or use of the Product in the Territory.

"**Regulatory Authority**" means any Authority regulating the manufacture, importation, distribution, sale, and/or use of the Product, including the FDA and state and local licensing boards.

"**Sales & Marketing Fee**" means an amount equal to 5.5% of Net Sales.

"**Specifications**" means the finished product specifications set forth in the ANDA.

"**Supply Price**" means the per-unit price payable by Athenex to GPI for supply of Product hereunder, which the Parties intend to reflect GPI's then-current fully burdened cost of goods, including all costs related to procurement, manufacturing, testing, release, packaging, packing, stability, vendor auditing, and regulatory activities for the Product (including GDUFA fees), The Supply Price is subject to adjustment in accordance with this Agreement.

"**Third Party**" means any Person that is not a Party or an Affiliate of a Party.

    1.2.    **Index**. For purposes of this Agreement, the following terms have the meanings set forth in the indicated section of this Agreement, with grammatical variations having corresponding meanings:

DocuSign Envelope ID: 33AF526C-1D01-4E91-A5D1-4C3607A7C2F6

CONFIDENTIAL

| Term | Section |
|------|---------|
| Agreement | Introductory paragraph |
| Alter Pharma | Introductory paragraph |
| ANDA | Recital B |
| ANV | Introductory paragraph |
| Athenex | Introductory paragraph |
| Athenex Marks | 3.4 (Labeling) |
| CDA | 12.1 (Confidentiality) |
| CMO | Recital C |
| Commercialize | Recital D |
| Effective Date | Introductory paragraph |
| Firm Commitment | 5.3 (Forecasts) |
| Firm Order | 5.4(b) (Firm Orders) |
| Forecast | 5.3 (Forecasts) |
| GPI | Introductory paragraph |
| Indemnified Party | 10.1 (Indemnification) |
| Indemnitor | 10.1 (Indemnification) |
| Milestone | 8.2(a) (Milestones) |
| Milla | Introductory paragraph |
| No-Fault Product Liability Litigation Costs | 10.4 (No-Fault Product Liability Litigation) |
| Party / Parties | Introductory paragraph |
| Patent Litigation Costs | 10.3 (Patent Litigation) |
| Product | Recital A |
| Product Warranty | 9.2 (Product Warranty) |
| Profit Share | 8.4(a) (Percentage Share) |
| PO | 5.4(a) (Purchase Orders) |
| PV Agreement | 7.2 (PV Agreement) |
| Quality Agreement | 7.3 (Quality Agreement) |
| RLD | Recital B |
| Steering Committee | 4 (Steering Committee (SteerCo)) |
| Sub | 2.1(a) (Sublicensees and Subcontractors) |
| Term | 11.1 (Term) |
| Territory | Recital B |
| Third Party Claims | 10.1 (Indemnification) |

2.      **RELATIONSHIP.**

2.1.     **Appointment**.  ANV, for itself, Milla, GPI and its other Affiliates, hereby appoints Athenex as its exclusive, authorized distributor of record for the Product in the Territory during the Term, with the exclusive right to Commercialize Product under the ANDA in the Territory during the Term; and Athenex hereby accepts such appointment. To this end:

(a)     Product Data License. ANV hereby grants to Athenex an exclusive, non-transferable (subject to Section 13.7 (Assignment; Beneficiaries)), sublicensable (subject to Section 2.1(b) (Sublicensees and Subcontractors)) right and license during the Term (subject to Section 11.3(c) (Wind-Down)) to use Product Data as necessary to Commercialize the Product in the Territory and perform Athenex's other obligations under this Agreement.

5

CONFIDENTIAL

(b)  <u>Sublicensees and Subcontractors</u>. Athenex shall not license, sublicense, subcontract, or delegate to any Person or otherwise authorize or empower the exercise by any Person, including any Athenex Affiliate (each a "**Sub**") in whole or in part its right to Commercialize the Product granted hereunder without ANV's prior written consent. If Athenex wishes to appoint a Sub, it shall so notify ANV in writing and provide ANV with a copy of the proposed Sub agreement for ANV's review and approval. If ANV grants its approval, Athenex shall not amend or supplement the Sub agreement in a manner detrimental to Alter Pharma without ANV's prior written consent. Athenex shall be responsible for all acts and omissions of its Subs as though such acts and omissions were Athenex's own.

(c)  <u>Athenex Non-Compete</u>. Athenex and its Affiliates and Subs shall not, directly or indirectly, develop, register, manufacture, supply, purchase, or Commercialize any Competing Product within or outside the Territory, or cause, assist, or cooperate with any Person in any of the foregoing. Further, Athenex and its Affiliates and Subs shall not, directly or indirectly (by assisting in or having knowledge of), export or Commercialize Product outside the Territory without ANV's express prior written consent. Athenex shall, and shall cause its Subs to, purchase exclusively from GPI one hundred percent (100%) of their respective requirements of Product for Commercialization in the Territory.

(d)  <u>Alter Pharma Non-Compete</u>. Alter Pharma shall not, directly or indirectly (subject to Section 2.1(a) (Sublicensees and Subcontractors)), enable any Person other than Athenex to Commercialize the Product in the Territory. Notwithstanding the foregoing, Alter Pharma may appoint a successor representative to Athenex and may introduce that successor to Purchasers and potential Purchasers so as to be able to commence business from the day after expiration or termination of this Agreement; *provided*, that Alter Pharma may not make such appointment or introductions more than three (3) months prior to the anticipated date of expiration or termination of this Agreement. For the avoidance of doubt, as between the Parties, ANV retains sole and exclusive global rights to the Product outside the Territory.

2.2.  **Limitation on Rights**. Neither Party is granting to the other Party, and such other Party shall not have, any express or implied right, title, or interest in, to, or under any intellectual property, data, license, permit, regulatory filing, Regulatory Approval, or other property, right, or asset that such Party (or any of its Affiliates) may own, control, license, or use, including the ANDA, except to the extent expressly set forth in this Agreement.

2.3.  **Governance Committee**. Each Party shall appoint two (2) of its employees to a governance committee, which shall coordinate the Parties' efforts under this Agreement. The initial committee members shall be appointed within three (3) business days after the Effective Date. A Party may change its committee members in its discretion. The committee shall meet at least once per month until Launch, and thereafter at least once per Quarter. The committee will be responsible for the following: (a) establishing and updating rolling, eighteen (18)-month-targets for monthly Product orders in the Territory addressing other supply chain matters; (b) establishing and updating existing and target Purchaser lists; (c); reviewing the status of Regulatory Approvals; (d) reviewing Commercialization strategy and activities; (e) attempting in good faith to resolve any disputes arising under this Agreement; and (f) handling such other matters as either Party may bring before the committee. Decisions will be taken based on a majority vote of all members; *provided*, that in the event of a tie vote, Alter Pharma's most senior representative shall have the casting vote. Meetings may be held telephonically, via video call or in person. The first committee meeting shall be held within ten (10) business days after the Effective Date. Any disputes arising from matters brought before the committee that cannot be resolved by its members shall be subject to the dispute resolution procedures described in Section 13.4 (Dispute Resolution).

DocuSign Envelope ID: 33AF526C-1D01-4E91-A5D1-4C3607A7C2F6

CONFIDENTIAL

3. **DEVELOPMENT & REGISTRATION.**

3.1. **Product Development**. The Parties acknowledge and agree that Product development work and data generation sufficient to file the ANDA with FDA has been performed by or for ANV prior to the Effective Date at ANV's cost. ANV will prosecute the ANDA through approval. If any Product-related development work or data generation is required after the Effective Date (e.g., completion of post-approval studies required by the FDA), ANV shall use its Commercially Reasonable Efforts to complete (or have completed) such activities within the timeframe required by the FDA and to the FDA's satisfaction. The cost of such activities shall be shared by the Parties according to their respective Profit Share percentage if mutually agreed to in advance (if Athenex does not agree to share such costs, ANV shall have the right to terminate the Agreement with immediate effect). As between the Parties, ANV exclusively shall own all Product-related data (whether pre-clinical, clinical, technical, chemical, safety, scientific or otherwise), formulations, manufacturing procedures and protocols, quality control procedures, information, know-how, documents (technical and non-technical), materials and other results of Product-related development work and/or data generation, whether developed, generated, created, or arising prior to or after the Effective Date, including any such items generated or developed by Athenex solely or jointly with Alter Pharma or others, but excluding any Athenex Marks and Athenex's NDCs (collectively, the "**Product Data**").

3.2. **Product Registration**. The Parties acknowledge and agree that the ANDA has been prepared and filed by Milla in its own name prior to the Effective Date at Milla's cost. Milla shall use its Commercially Reasonable Efforts to maintain the ANDA in good standing throughout the Term. To this end, as between the Parties, Milla exclusively shall be responsible for the following: (a) filing annual Product reports with the FDA; (b) submitting data from Product stability studies to the FDA; and (c) filing with the FDA the results of any post-approval studies required from time to time by the FDA; all in accordance with Law. If the FDA requires any amendments or supplements to the ANDA after the Effective Date, Milla will use its Commercially Reasonable Efforts to prepare and file (or have prepared and filed) such amendments or supplements within the timeframe required by the FDA and to the FDA's satisfaction. The cost of such activities shall be shared by the Parties according to their respective Profit Share percentage. As between the Parties, subject to Section 3.1 (Product Development), Milla shall exclusively own the ANDA, including all associated data, contents and correspondence (other than Product Data).

3.3. **Maintenance of Regulatory Approvals**. Subject to Section 3.2 (Product Registration), each Party shall use its Commercially Reasonable Efforts to obtain and maintain in good standing throughout the Term all Regulatory Approvals required for it (or its Affiliates or Subs) to perform their respective obligations under this Agreement, including, in the case of Athenex, such permits, licenses and approvals necessary to Commercialize the Product in the Territory. As between the Parties, subject to Sections 3.1 (Product Development) and 3.2 (Product Registration), each Party shall solely own all Regulatory Approvals obtained by it, including all associated data, contents, and correspondence.

3.4. **Labeling**. The Product shall be Labeled with, and Commercialized under, Athenex's name, logo, trademarks, and trade dress and an Athenex NDC and labeler code (collectively, "**Athenex Marks**"). Athenex shall provide to GPI, at such time in advance of Launch as reasonably requested by GPI, artwork and text for finished product Labeling as it relates to the Athenex Marks. If Athenex wishes or is required by Law to make any change in the Labeling as it relates to the Athenex Marks, Athenex shall be responsible for the updating of all artwork and text associated with such change and providing such changes to GPI. Subject to the requirements of Law, Athenex shall afford GPI a reasonable period of time in which to effect such changes. Athenex shall be responsible for, and shall reimburse GPI for, all costs and expenses incurred by GPI to make such changes, including artwork/component change fees, testing fees, FDA filing fees, and any resulting obsolete inventory of Materials and Product and destruction thereof. Athenex will ensure that all artwork and substantive content provided by Athenex compliant and consistent with Law throughout the Term. Artwork and text for Labeling (including changes) will be approved by both GPI and Athenex acting reasonably. Labeling

DocuSign Envelope ID: 33AF526C-1D01-4E91-A5D1-4C3607A7C2F6

CONFIDENTIAL

components will be purchased by GPI (directly or through the CMO) and are included in the Supply Price. Athenex hereby grants to GPI, each CMO and their respective Affiliates a non-exclusive, paid-up, royalty-free, non-transferable (subject to Section 13.7 (Assignment; Beneficiaries)), sublicensable (solely to CMOs) right and license during the Term to use the Athenex Marks as necessary to manufacture and supply Product hereunder and perform Alter Pharma's other obligations under this Agreement.

3.5.    **Changes to Specifications**. Milla may revise the Specifications, other than with respect to those portions of the Labeling for which Athenex is responsible under Section 3.4 (Labeling), from time to time in its sole discretion at its sole cost and expense. If any Regulatory Authority requires a change to the Specifications, the Parties shall cooperate in good faith to effect such change and shall share all costs and expenses incurred by GPI to make such change according to their respective Profit Share percentage.

3.6.    **Communications & Assistance**. Each Party shall keep the other Party reasonably informed regarding the status of matters within its scope of responsibility as set forth in this Section 3 (Development & Registration), including the status of Regulatory Approvals, interactions with Regulatory Authorities, and copies of all material Product-related FDA filings and correspondence. Each Party shall provide any non-financial assistance reasonably requested by the other Party in connection with the performance of the other Party's responsibilities under this Section 3 (Development & Registration).

4.    **Steering Committee "SteerCo"**

4.1.    **Formation of a Steering Committee**. The parties will form a joint Steering Committee with respect to this agreement. Athenex and Alter will each appoint an equal number of members to such committee with the initial members being designated as soon as reasonably practicable but within thirty (30) days of execution of this agreement. Each Party may change appointment of any or all such members of the Steering Committee at any time.

4.2.    **Purpose of the Steering Committee**. The Steering Committee will meet form time-to-time (but not less than quarterly) to discuss forecasts, status and progress of commercialization and supply efforts as well as any relevant topic impacting the business (complaints, market events, supply disturbances, etc.). In addition, the Steering Committee will operate by consensus, if consensus cannot be reached, the matter will be submitted to the Chief Executive Officer of each party for resolution.

5.    **MANUFACTURING & SUPPLY.**

5.1.    **Supply Chain Generally**. The Parties agree to cooperate in good faith to ensure a smooth supply chain for the Product while minimizing the capital requirements of such supply chain. Such cooperation shall include, for example: (a) communicating reliable sales and consumption forecasts; (b) optimizing Product manufacturing campaigns to reduce cost and avoid stock-outs while ensuring the proper handling of Product inventory to reduce expiration risk and minimize working capital requirements, and (c) resolving Non-Conforming Product matters.

5.2.    **Manufacture by CMO**. Athenex acknowledges that GPI will have Product manufactured, packaged, Labeled, and supplied hereunder through one or more CMOs. The Parties shall negotiate in good faith any amendments to this Agreement that may be required based on the operational needs of the CMOs, including timing and content of forecasts, orders, and invoices. The Parties will cooperate in good faith to ensure Athenex has reasonable opportunities, as per the timeline in the Quality Agreement, to verify cGMP compliance of each CMO then actively supplying Product hereunder pursuant to the following procedure: First, upon Athenex's request, GPI shall provide Athenex with a copy of GPI's most recent inspection report for the CMO, redacted to exclude information related to GPI's products other than the Product. If such report does not satisfy Athenex's reasonable needs, GPI shall use its Commercially Reasonable Efforts to schedule an on-site

DocuSign Envelope ID: 33AF526C-1D01-4E91-A5D1-4C3607A7C2F6

CONFIDENTIAL

inspection of the CMO's reports, records and facility areas in which Product and/or Materials, as applicable, are manufactured, packaged, Labeled, stored, handled and/or shipped in order to permit Athenex to verify that the CMO is in compliance with cGMP. Such inspections shall be subject to any restrictions set forth in the supply and/or quality agreements between GPI and the CMO. If the CMO denies Athenex access, the Parties will negotiate in good faith an alternative, such as having an independent Third Party perform an inspection. All costs and expenses of any inspection requested by Athenex, including those of Alter Pharma and the CMO (if any), shall be borne solely by Athenex.

5.3.    **Forecasts**. Athenex shall provide to GPI, on or before the first day of each calendar quarter during the Term, a written, rolling twelve (12) month forecast of Athenex's monthly requirements of Product (in full Batch quantities) for the succeeding twelve (12) month period (each, a "**Forecast**"). The first Forecast, which is attached as Schedule A, shall include Launch stock quantities. The first four (4) months of each Forecast (the "**Firm Commitment**") shall be binding on both Parties (i.e., "take or pay"). If short-dated Product or inventory write-off's or write-down's result from Athenex's failure to properly forecast, the reduction in Net Profit will be borne solely by Athenex.

5.4.    **Order Process**.

(a)    Purchase Orders. From time to time as provided in this Section 5.4 (Order Process), Athenex shall submit to GPI (or its designee) written, binding, non-cancellable purchase orders for Product (each, a "**PO**"). Each PO must include a purchase order number, specify the requested quantity, strength, and delivery date(s) of Product, and set forth any other elements necessary to ensure the timely production and shipment of such Product. Each PO must be in full-Batch increments. Concurrently with the submission of each Forecast, Athenex shall submit a PO for all portions of the Firm Commitment not already ordered. If Athenex fails to timely submit POs for Firm Commitment quantities, GPI shall be entitled to invoice Athenex for the value of the unordered Product. Athenex shall not be entitled to deduct any such invoiced "take or pay" amounts in the calculation of Net Profit or otherwise charge them through to GPI via the Profit Share or otherwise. Athenex shall submit any POs for quantities of Product in excess of the Firm Commitment at least one hundred twenty (120) days in advance of the delivery date requested in the PO. Athenex acknowledges and agrees that the CMO may limit submission of POs in excess of Forecast.

(b)    Firm Orders. GPI (or its designee) will confirm in writing each PO, including the expected delivery date, within ten (10) business days of receipt. If the CMO is unable to meet the delivery date requested by Athenex in its PO, GPI (or its designee) shall so notify Athenex in the PO confirmation and provide to Athenex an alternative delivery date. Only upon confirmation by GPI of Athenex-issued POs will such orders become firm, including PO's with alternative delivery dates approved by Athenex (each, a "**Firm Order**"). Athenex may not cancel or modify any Firm Order without GPI's (and the CMO's) prior written consent. GPI will use its Commercially Reasonable Efforts to cause the CMO to accommodate any Athenex request for cancellation or modification; *however*, Athenex acknowledges that the CMO's consent may be contingent on Athenex's payment of a penalty. Athenex shall not be entitled to deduct any such penalties in the calculation of Net Profit or otherwise charge them through to GPI via the Profit Share or otherwise.

(c)    Rejection; Excess Volume. GPI may reject any PO without penalty or liability if the requested Product quantities exceed the Firm Commitment or if the PO is not given in accordance with this Agreement. Notwithstanding the foregoing, GPI shall use Commercially Reasonable Efforts to cause the CMO supply Athenex with quantities of Product that exceeds the Firm Commitment up to one hundred twenty percent (120%) of Firm Commitment quantities.

(d)    Validation Batches. GPI shall have the right to fulfill Athenex's POs for Launch stocks of Product in whole or in part with validation Batches of Product.

DocuSign Envelope ID: 33AF526C-1D01-4E91-A5D1-4C3607A7C2F6

CONFIDENTIAL

(e)     Late Order Fulfillment. Any Firm Order that is delivered later than agreed upon delivery date therein that results in a failure to supply penalty from any of Athenex's contracted customers can be directly deducted from future invoice payments or profit shares by Athenex to GPI, so long as the delay or failure-to-supply penalty was not caused by Athenex, or any of its contracted parties, and to the extent the penalty could not have been mitigated or avoided by Athenex.

5.5.     **Shipping**. Product shall be delivered to Athenex (or its designee) EXW (Incoterms 2020) the CMO's facility. Athenex shall be responsible for selecting a common carrier, arranging shipping insurance, and taking delivery of Product from the CMO. Athenex solely will be responsible to pay upfront for all freight, insurance, and related costs for delivery from CMO to its 3PL (costs to be shared between the parties as per profit-share percentage and deducted from profit-share payment to GPI); GPI (or its designee) will assist in coordinating and scheduling delivery between Athenex and the CMO upon Athenex's request. Title to Product shall transfer to Athenex directly from the CMO concurrently with risk of loss pursuant to the foregoing Incoterm. Athenex shall not use expedited or non-economy shipping methods without GPI's prior written consent.

5.6.     **Shipment Intake**. Upon receipt of each shipment of Product under this Agreement, Athenex shall visually inspect such Product to confirm its identity, quantity, and condition (i.e., whether or not physically damaged) against the PO. Athenex shall notify the GPI (or its designee) of any mis-shipment, shortage, or physical damage within ten (10) Business Days of receipt. Such notice shall describe in detail the type and extent of the issue and include documents and/or other evidence (e.g., photos) necessary to confirm the detected issue. Any such issue shall be confirmed and resolved by the Parties acting in good faith in the ordinary course of business. For the avoidance of doubt, however, the delivering carrier, and not GPI or the CMO, is responsible for Product damage during shipment. Within twenty (20) days after receipt of each shipment of Product under this Agreement, Athenex shall perform any additional inspection and testing that the Quality Agreement requires Athenex to perform, in order to determine whether the Product conforms to the Product Warranty, whether the non-conformity is apparent or latent. If Product is Non-Conforming, Schedule B shall govern rejection and the Parties' respective related rights and remedies. Athenex shall not destroy any allegedly Non-Conforming Product without GPI's prior express written consent.

5.7.     **Storage & Handling**. Athenex shall store Product in suitable storage facilities in the Territory in accordance with the Specifications, cGMP, other Law, the Quality Agreement and other accepted industry standards. At all times while the Product is in Athenex's possession or control or in transit to Purchasers, Athenex shall follow all storage and handling instructions set forth in the Specifications, Labeling and/or certificate of analysis or otherwise provided by GPI.

5.8.     **Safety Stocks**. GPI shall use its Commercially Reasonable Efforts to cause the CMO to maintain at least three (3) months safety stock of Materials: (3) months for components and six (6) months for API, necessary to manufacture and supply Product to Athenex, except for pre-printed materials requiring dated information such as batch numbers and expiry dates; and Athenex shall maintain at least three (3) months' safety stock of finished Product. Safety stock quantities shall be based on Athenex's most recent Forecast. Safety stock will be retained, subject to rotation of shelf-life, and used to mitigate any Purchaser claims for failure to supply.

5.9.     **Track & Trace**. Each Party agrees to comply with all provisions of the DSCSA applicable to such Party. For purposes of the DSCSA and other Law related to drug pedigree, GPI and Athenex will act as Co-Licensed Partners (within the meaning of the FD&C Act) for the Product during the Term; *however*, each Party shall be solely responsible for its continuing obligations under the DSCSA and other Law. Upon any amendment of the DSCSA or the issuance or amendment of rules, regulation, or guidance thereunder, the Parties will reasonably cooperate with each other to amend this Agreement, as necessary, in order to permit each Party to comply with its obligations pursuant to the DSCSA. GPI will (or will use its Commercially Reasonable

DocuSign Envelope ID: 33AF526C-1D01-4E91-A5D1-4C3607A7C2F6

CONFIDENTIAL

Efforts to cause the CMO to) provide to Athenex, in such form and format as Athenex shall reasonably request from time to time, any information required by Athenex to complete and provide, in accordance with the DSCSA, Transaction Information and Transaction History for Product supplied hereunder (including lot-level information and, when required under DSCSA, Product Identifier information), as the foregoing terms are defined in the DSCSA. Athenex is responsible for handling all "saleable returns" (i.e., Product returned to Athenex from wholesalers that is eligible for sale to Third Parties) in accordance with and subject to the DSCSA.

6.      **COMMERCIALIZATION.**

6.1.      **Sales Activities**. Athenex shall be responsible for all Commercialization activities related to the Product in the Territory and for interfacing with Purchasers, including receiving and processing orders, distributing Product, receiving payments, pursuing collection, and processing refunds, rebates, chargebacks, federal and state rebates, and the like. The terms of sale agreed between Athenex and each Purchaser shall not be inconsistent with the terms of this Agreement without GPI's prior written consent. Athenex will notify GPI in writing of the Launch date of the Product within five (5) business days of its occurrence. Athenex shall aggressively market the product in the Territory with the goal of optimizing Net Profit for both Parties, subject to Law.

6.2.      **Market Pricing**. Athenex shall be entitled to determine the price of the Product to the market, using Commercially Reasonable Efforts to realize 30% gross margin. In the event gross margin is less than 15% for a particular customer, Athenex will provide prior notice to GPI.

6.3.      **Compliance Standards**. Athenex shall comply with all Laws relating to the Commercialization, handling, storage, shipment, and disposal of the Product. Without limiting the generality of the foregoing, Athenex agrees that, in the performance of this Agreement, it will not (a) make any illegal payments of any kind or give other consideration to any Authority or any government official at any time or under any circumstance, (ii) promote the Product in any manner that is inconsistent with the Product's Labeling, (iii) engage in any anticompetitive or antitrust conduct, including price fixing or (iv) make any false or misleading statements to Purchasers or other Third Parties regarding the Product. Athenex shall do nothing that will in any way damage the reputation of ANV, Milla, and GPI or the Product.

6.4.      **Duty to Inform and Mitigate**. Without limiting Section 8.3(d) (Market Tolerance) or any other obligation to notify set forth in this Agreement, (a) Athenex shall promptly notify GPI of any matter that could reasonably be expected to result in negative Net Profit, including due to rebates, chargebacks, Medicaid adjustments, etc., (b) GPI shall promptly inform Athenex of any anticipated delay in supply of Product from the CMO, and (c) each Party shall promptly notify the other Party of any matter in the Territory (excluding general or global economic conditions) that could reasonably be expected to materially affect the retail pricing, volume of sales, or market potential of the Product. To the extent of available information, each such notification shall include a reasonably detailed explanation and prognosis of the matter, including timing, genesis, duration, etc. If GPI informs Athenex of an anticipated delay in supply of Product from the CMO, Athenex shall use its Commercially Reasonable Efforts to manage Purchasers in a manner designed to mitigate the effects of such delay, including failure to supply penalties.

7.      **REGULATORY MATTERS.**

7.1.      **General Responsibilities**. Each of the Parties shall immediately notify the other Party of any inspections by or communications from the FDA or another Regulatory Authority related to the Product. Without derogating from any terms of this Agreement that are more specific, the Parties shall coordinate all interactions, communications and correspondence with the FDA and other Regulatory Authorities in connection

11

DocuSign Envelope ID: 33AF526C-1D01-4E91-A5D1-4C3607A7C2F6

CONFIDENTIAL

with the Product.  In general, subject to the Quality Agreement and PV Agreement, Athenex, as the NDC holder and exclusive distributor of Product under the ANDA, shall be primarily responsible for Product pharmacovigilance-related activities.  Athenex shall promptly provide to Milla (or its designee) copies of all FDA filings and correspondence. Milla shall have the right to review and approve all communications and filings with Regulatory Authorities prior to Athenex sending or making such communications and filings, including in connection with Recalls.

7.2.  **PV Agreement**.  As soon as reasonably practicable after the Effective Date, but in any event prior to Athenex placing its first PO, Athenex and GPI (and/or Milla) shall negotiate in good faith and enter into a pharmacovigilance agreement allocating responsibilities for managing pharmacovigilance and drug safety related to the Product as required by 21 C.F.R. § 314.80 and other Law (the "**PV Agreement**").  The Parties shall use their respective Commercially Reasonable Efforts to ensure that the PV Agreement reflects the terms of this Agreement.  If there is any inconsistency between the terms of the PV Agreement and this Agreement, the terms of the PV Agreement shall govern with respect to pharmacovigilance-related tasks, and the terms of this Agreement shall govern with respect to all other matters.

7.3.  **Quality Agreement**.  As soon as reasonably practicable after the Effective Date, but in any event prior to Athenex placing its first PO, Athenex and GPI shall negotiate in good faith and enter into a quality agreement allocating responsibilities for quality-related matters (the "**Quality Agreement**").  Athenex and GPI shall use their respective Commercially Reasonable Efforts to ensure that the Quality Agreement reflects the terms of this Agreement.  If there is an inconsistency between the terms of the Quality Agreement and this Agreement, the terms of the Quality Agreement shall govern with respect to quality-related tasks, and the terms of this Agreement shall govern with respect to all other matters.

7.4.  **GMP Inspections**.  Once every twenty-four (24) months during the Term (or, if for cause, more frequently as reasonably agreed by Athenex and GPI or within twelve (12) months after Term expiry), upon at least thirty (30) days' prior written notice, Athenex shall grant GPI access, during normal business hours, to areas of its facilities in which Product is handled, stored or shipped in order to verify that Athenex is performing its Product-related obligations in accordance with cGMP and other Law.  During any such inspection, Athenex shall also permit GPI to review records, samples, and reports relating to Product.  Such inspections shall be at the GPI's sole cost and expense.  Inspections shall be designed to minimize disruption of operations at the facility and shall be limited to two (2) inspecting representatives for up to two (2) consecutive days, unless there is good cause for additional time.  Athenex acknowledges that the granting of the foregoing inspection rights shall in no way relieve it of any of its obligations under this Agreement, nor shall such provisions require the GPI to conduct any such inspections.

8.  **FINANCIAL MATTERS.**

8.1.  **Cost Burden**. Except as otherwise expressly provided in this Agreement, each Party shall be solely responsible for, and bear, all costs and expenses incurred by it in performing its obligations and exercising its rights under this Agreement.  For the avoidance of doubt, Alter Pharma will bear all ANDA GDUFA filing fees and be responsible for using Commercially Reasonable Efforts to ensure payment by the CMO(s) of GDUFA facility registration fees.

8.2.  **Milestones**.

(a)  Amounts. In consideration of Alter Pharma's prior development and submission of the ANDA and the grant of the rights and licenses hereunder, Athenex shall pay GPI the following milestones (each, a "**Milestone**") totaling US$600,000, payable as follows:

DocuSign Envelope ID: 33AF526C-1D01-4E91-A5D1-4C3607A7C2F6

CONFIDENTIAL

    1) US$150,000 upon execution of this Agreement;

    2) US$150,000 upon ANDA acceptance (ANDA (already occurred, with invoice to be issued in December 2022);

    3) US$150,000 upon FDA approval of the ANDA; and

    4) US$150,000 upon Delivery of First Commercial Product.

       (b)    <u>Payment</u>. GPI shall be entitled to invoice Athenex for each Milestone upon occurrence of the relevant triggering event (whether or not notice of Launch is received from Athenex under Section 6.1 (Sales Activities)). Payment shall be due from Athenex within forty five (45) business days of the occurrence of the relevant triggering event, whether or not invoiced; provided that the first two milestone payments are to be paid within sixty (60) days of the triggering event. Milestone payments are non-creditable and non-refundable.

    8.3.    <u>**Supply Price**</u>.

       (a)    <u>Invoicing; Payment; Shipping</u>. Athenex shall pay GPI the Supply Price for all Product supplied hereunder. GPI shall invoice Athenex for the Supply Price upon receipt of invoice from the CMO for the applicable Product. Payment shall be due from Athenex within thirty (30) days of date of invoice (invoice is issued when goods are ready for pick-up). The Supply Price reflects shipping EXW (Incoterms 2020) the CMO's facility.

       (b)    <u>Initial Supply Price</u>. GPI's estimate of the initial Supply Price for each strength of the Product is set forth on <u>Schedule C</u>.

       (c)    <u>Post-Launch Supply Price Adjustments</u>. GPI shall be entitled to adjust the Supply Price twice per calendar year, effective each January 1 and July 1, to reflect verifiable changes in GPI's fully burdened cost of goods over the prior six (6) month period. GPI will submit no cost changes during the first year of the agreement unless it represents a cost reduction precipitated by market conditions. GPI will provide Athenex with at least sixty (60) days' prior written notice of any such adjustment to the Supply Price. If any such notice is delayed (i.e., given such that the applicable January 1 or July 1 will occur prior to the expiration of the notice period), such delay shall not preclude GPI from effecting the associated Supply Price adjustment, but the Supply Price adjustment will not be effective until expiration of such 60-day notice period. Firm orders accepted will not be subject to any increase in cost.

       (d)    <u>Market Tolerance</u>. Upon receipt of notice from GPI of any increase in the Supply Price permitted under this Section 8.3 (Supply Price), if Athenex believes in good faith that the adjusted Supply Price would result in "negative Net Profit" because the price that Athenex can charge to Purchasers, after gross to net deductions permitted under this Agreement in the calculation of Net Sales and other deductions permitted under this Agreement in the calculation of Net Profit, would be less than the Supply Price, Athenex shall promptly notify GPI. The Parties shall then meet and confer in good faith a course of action, which may (but is not required) to include (i) GPI agreeing to seek cost savings with the goal of achieving a lower Supply Price, (ii) Athenex agreeing to seek cost savings so as to reduce deductions in the calculation of Net Sales and/or Net Profit, (iii) selling Product for an agreed period of time even though negative Net Profit will be generated, and the Parties agreeing to a fair allocation of such negative Net Profit between them, and/or (iv) termination of this Agreement by mutual agreement.

    8.4.    <u>**Profit Sharing**</u>.

       (a)    <u>Percentage Share</u>. In consideration of Athenex's Commercialization of the Product, Athenex shall be entitled to retain fifty percent (50%) of Net Profit and shall remit the other fifty percent (50%) of Net Profit to GPI (such percentage, each Party's respective "**Profit Share**"). Example Profit Share Calculation is set forth on <u>Schedule E</u>.

DocuSign Envelope ID: 33AF526C-1D01-4E91-A5D1-4C3607A7C2F6

CONFIDENTIAL

(b)     Records. For the entire Term plus one (1) year thereafter, Athenex shall, and shall cause its Affiliates and Subs to, keep clear, accurate and detailed books and records regarding all aspects of Commercialization as necessary to accurately calculate Net Profit on a Product-specific basis. Athenex and its Affiliates and Subs shall not be entitled to include in any calculation related to the Parties' Profit Shares any general corporate overhead, general reserves, or other expense allocations that are not specifically identifiable to the Product. Product-related costs, such as freight costs, shipping costs, duties, taxes (other than income), Third Party logistics fees, quality checks, etc. shall be allocated to Product sold.

(c)     Quarterly Reports. Within thirty (30) days after the end of each quarter following Launch, Athenex shall provide GPI with a good faith, written estimate of sales data and Net Profit for such quarter. Monthly preliminary draft report indicating sales, units, and chargebacks shall be issued within fifteen (15) days at the end of each month.

(d)     Quarterly Reports & Payment. Within forty-five (45) days after the end of each Quarter, Athenex shall (i) provide GPI with a detailed written statement showing the calculation of the Parties' Profit Shares for such Quarter, including calculations of all components and sub-components thereof (i.e., Net Profit, Net Sales and Gross Sales, and all deductions therefrom), (ii) submit to GPI detailed supporting information and documentation for the foregoing calculations, including line-item deductions, (iii) submit to GPI a sales deduction reserve roll forward report containing the following information for each type of deduction from Net Sales and Net Profit: the beginning reserve balance, amounts accrued, credits actually processed, any other adjustments posted, and the ending reserve balance, and (iv) pay GPI its Profit Share. For clarity, delivery of the Quarterly Report and payment of GPI's Profit Share are separate undertakings, neither contingent on the other.

(e)     Semi-Annual True-Up. By its nature, the Net Sales calculation may involve deductions based upon estimates and/or accruals. As soon as possible, but in no event later than sixty (60) days after (i) the end of each calendar six months period during the Term following Launch, and (ii) inventory depletion by Athenex in accordance with Section 11.3(c) (Wind-Down), Athenex shall perform a "true up" reconciliation of the deductions from Net Sales by comparing the estimates for deductions versus actual cash paid or credits issued and any remaining estimates related to the reported sales in the relevant period. Athenex shall provide GPI with a detailed written report of such reconciliation. If the reconciliation shows either an underpayment or an overpayment to GPI, then, within thirty (30) days of the reconciliation, (x) Athenex shall pay any underpayment amount to GPI or (y) Athenex shall book as a credit in its records any overpayment amount to GPI. Notwithstanding the foregoing, if GPI disputes the reconciliation calculations, the Parties shall negotiate in good faith a resolution. No payment shall be issued, nor any credit booked, by Athenex during the pendency of any such dispute. If there is a True-up that causes a $100,000 deviation, the Steer Committee will meet to discuss, negotiate, and aim to resolve.

(f)     Negative Net Profit. In no event shall Athenex pass through to GPI any "negative Net Profit" (i.e., require GPI to pay Athenex any amounts should Net Profit be less than zero); *however*, Athenex may roll over any negative Net Profit amounts for deduction from the next Quarter's Profit Share calculations.

8.5.     **Payment Terms**. Payment of all amounts due hereunder shall be by wire transfer of immediately available funds to an account designated by GPI. Supply Price payments shall be made in Euros and Profit Share payments shall be made in US Dollars. For purposes of Net Sales and/or Net Profit calculations or otherwise whenever conversion of payments from U.S. Dollars to Euros (or vice versa) is required, such conversion shall be calculated at the average rate of exchange reported on www.xe.com over the applicable Quarter. Payments shall be without deduction of exchange, collection, offsets, or other charges. If any payment is not received by GPI by its due date, GPI shall have the right, in addition to any other remedies available at law or in equity, to take one or more of the following actions: (a) terminate for breach in accordance with Section 11.2(a) (Breach); (b) suspend performance without penalty until all Athenex accounts are brought

CONFIDENTIAL

current; (c) charge to Athenex interest on the outstanding sum from the due date (both before and after any judgment) at two percent (2%) per month (or, if less, the maximum amount permitted by Law) until paid in full, plus all reasonable costs of collection of late payments, including reasonable attorneys' fees and court costs, incurred through the date of actual payment; and/or (d) require Athenex to pay all or a portion of the Supply Price in advance of shipment of Product.

8.6.    **Taxes**. All taxes imposed on a Party as a result of income shall be the responsibility of such Party. All amounts payable by Athenex to GPI under this Agreement shall be paid free and clear of all deductions or withholdings whatsoever, except as may be required by Law. If any such deductions or withholdings are required by Law, the amount of any such deduction or withholding shall be as communicated in writing and Athenex shall provide GPI with a receipt for any such deductions or withholdings. The Parties shall reasonably cooperate with one another to minimize deduction and withholding tax liability to the extent legally permissible, and each Party shall provide the other Party with any documents reasonably requested by the other Party to secure application of the most favorable rate of deduction or withholding tax under Law, or exemption from such deduction or withholding tax payments, as applicable.

8.7.    **Audit**. Commencing with Launch and continuing for six (6) months following Completion by Athenex of the true-up contemplated by Section 8.4(e)(ii), once per calendar year or more frequently for cause, or within one (1) year after expiration or termination of this Agreement, on thirty (30) days' prior written notice, GPI shall have the right to audit Athenex's calculation of the Parties' Profit Shares and all components thereof (i.e., Net Profit, Net Sales and Gross Sales, and all deductions therefrom), using a Third Party independent accounting firm reasonably acceptable to Athenex. Should the audit reveal accounting discrepancies in favor of GPI, Athenex shall immediately correct the relevant calculations and pay the amount due to GPI. Should the audit reveal accounting discrepancies in favor of Athenex, Athenex shall immediately correct the relevant calculations and shall be entitled to deduct any amount due to Athenex, without interest, from GPI's Profit Share until fully recouped.

## 9.    **REPRESENTATIONS & WARRANTIES.**

9.1.    **Mutual Warranties**. Each Party represents, warrants and covenants to the other Party that: (a) it is a corporation or non-corporate entity duly organized and validly existing under the laws of the state or other jurisdiction of its incorporation or organization; (b) the execution, delivery and performance of this Agreement by it has been duly authorized by all requisite corporate action and does not require any shareholder (or equivalent) action or approval; (c) it has the corporate power and authority to enter into this Agreement and to perform its obligations hereunder; (d) it is not aware of any legal, contractual or other restriction, limitation or condition that could reasonably expected to affect adversely its ability to perform its obligations hereunder; and (e) it shall at all times comply with all Laws in connection with the performance of its obligations under this Agreement.

9.2.    **Product Warranty**. GPI hereby warrants to Athenex, solely as a pass through of the CMO's warranty, that, at the time of tender of delivery, all Product supplied to Athenex hereunder for sale in the Territory will (a) conform to the Specifications, (b) have been manufactured in accordance with cGMP and (c) not be adulterated or misbranded within the meaning of the FD&C Act (the "**Product Warranty**").

9.3.    **Athenex Warranties**. Athenex hereby represents, warrants and covenants to Alter Pharma as follows: (a) it has the skill, expertise, experience and personnel necessary to perform its obligations under this Agreement; (b) all Athenex Marks and any Product-related promotional materials or advertising used by Athenex or any of its Subs (i) may lawfully be used in connection with the Product and (ii) such use does not and will not infringe, violate, misappropriate or misuse any intellectual property rights held by Third Parties; (c) it shall comply with the Specifications relating to the handling, storage, transport and disposal of Product; (d) is not, and it does not and will not use in any capacity the services of any Person, debarred under the Generic Drug

15

DocuSign Envelope ID: 33AF526C-1D01-4E91-A5D1-4C3607A7C2F6

CONFIDENTIAL

Enforcement Act of 1992 or debarred, excluded, suspended, or otherwise ineligible to participate in a Federal or state health care program or in Federal procurement or non-procurement programs; (e) neither it, nor, to its knowledge, any of its employees or agents, has engaged in any activity that could reasonably be expected to lead to it becoming so debarred, excluded, suspended, or otherwise ineligible; and (f) it shall immediately notify GPI in writing if it becomes aware of any facts or circumstances that could reasonably be expected to result in a breach of this Section 9.3.  Breach of this Section 9.3, including any failure to notify, shall constitute a material breach of this Agreement.

9.4.   DISCLAIMER. THE REPRESENTATIONS AND WARRANTIES SET FORTH IN THIS SECTION 9 (REPRESENTATIONS & WARRANTIES) ARE IN LIEU OF AND EXCLUDE ALL OTHER REPRESENTATIONS AND WARRANTIES, EXPRESS OR IMPLIED, CONTRACTUAL OR ARISING BY OPERATION OF LAW OR OTHERWISE, INCLUDING WARRANTIES OF NON-INFRINGEMENT, MERCHANTABILITY AND/OR FITNESS FOR A PARTICULAR PURPOSE, ALL OF WHICH ARE EXPRESSLY DISCLAIMED AND EXCLUDED.

## 10.   **INDEMNIFICATION & INSURANCE.**

10.1.   **Indemnification**. Each of Athenex and ANV (in such context, the "**Indemnitor**") shall indemnify, defend and hold harmless the other (in such context, the "**Indemnified Party**"), its Affiliates, and its and their respective shareholders, directors, officers, employees and agents for, from, and against, any and all losses, damages, costs, expenses (including reasonable attorneys' fees and reasonable investigative costs), judgments and liabilities in connection with any suit, demand, claim or action by any Third Party ("**Third Party Claim**") arising out of or resulting from any actual or alleged (i) negligence (applying a comparative negligence standard with respect to any concurrent negligence between the Parties) of the Indemnitor or its Affiliates or Subs, as applicable, (ii) the gross negligence or willful misconduct of the Indemnitor or its Affiliates or Subs, as applicable, or (iii) the material breach of this Agreement by the Indemnitor (including any breach caused by a Person for whom Indemnitor is responsible hereunder, such as Subs)—with respect to each Indemnitor's responsibilities and obligations referenced in this Agreement, to the extent not caused by the Indemnified Party.

10.2.   **Indemnification Procedures**. The indemnification obligations in Section 10.1 (Indemnification) are conditioned upon the Indemnified Party: (a) promptly notifying the Indemnitor of any Third Party Claim of which the Indemnified Party becomes aware (including a copy of any related complaint, summons, notice or other instrument); *provided*, that failure to provide such notice within a reasonable period of time shall not relieve the Indemnitor of any of its indemnification obligations hereunder except to the extent the Indemnitor is prejudiced by such failure; (b) reasonably cooperating with the Indemnitor in the defense of any such Third Party Claim; and (c) not compromising or settling any Third Party Claim without the prior written consent of the Indemnitor. The Indemnitor shall have the sole and exclusive right to select counsel to defend any Third Party Claim and final decision-making authority regarding all aspects of the defense of such Third Party Claim. Notwithstanding the foregoing, (i) the Indemnified Party shall have the right to retain its own separate counsel in connection with any Third Party Claim at its own expense, (ii) no admission of liability and no settlement of any Third Party Claim in a manner adverse to the Indemnified Party (or any Person claiming indemnity through it) shall be made by the Indemnitor without the prior written approval of the Indemnified Party, acting reasonably, and (iii) no admission of liability and no settlement of any Third Party Claim shall be made by the Indemnified Party (or any Person claiming indemnity through it) without the prior written approval of the Indemnitor, acting reasonably.

10.3.   **Patent Litigation**. The Parties shall cooperate in good faith if any Third Party Claim is made against one or both of them or any of their respective Affiliates by the owner or rights-holder of either the RLD or a Competing Product alleging that the Product infringes patents held by such Person. To confirm, ANV makes no representations or warranties as to the patent non-infringement of the Product, whether related to the RLD or otherwise. ANV (and/or any of its Affiliates) shall have the first right and responsibility to defend any

16

DocuSign Envelope ID: 33AF526C-1D01-4E91-A5D1-4C3607A7C2F6

CONFIDENTIAL

such Third Party Claim. The Parties would enter into a joint defense agreement if necessary. ANV (and/or any of its Affiliates) shall bear the costs of such defense but shall be permitted to invoice Athenex for a portion, equal to Athenex's Profit Share percentage, of all out-of-pocket, documented, and reasonable costs incurred in connection with such defense ("**Patent Litigation Costs**") on a rolling basis as invoices for such Patent Litigation Costs are received.  Athenex shall not be entitled to deduct in the calculation of Net Profit or otherwise charge such costs through to GPI via the Profit Share or otherwise any Patent Litigation Costs so reimbursed to ANV.  If ANV (and/or any of its Affiliates) fails to timely commence or diligently pursue the defense any such Third Party Claim, Athenex shall have the right to step in and do so, at Athenex's expense, but Athenex shall be permitted to deduct its Patent Litigation Costs from Net Profit; *provided*, that no deduction of Patent Litigation Costs and/or No-Fault Product Litigation Costs collectively shall reduce Alter Pharma's Profit Share payment by more than fifty percent (50%) in any given Quarter. Each Party shall use all commercially reasonable efforts to control the costs of defense.

10.4.    **No-Fault Product Liability Litigation**.  The Parties shall cooperate in good faith if any Third Party Claim is made against one or both of them or any of their respective Affiliates alleging death or personal injury caused by the Product, which Third Party Claim is not covered by either Party's obligation under Section 10.1 (Indemnification).  Athenex shall have the first right and responsibility to defend any such Third Party Claim. The Parties would enter into a joint defense agreement if necessary. Athenex shall bear the costs of such defense but shall be permitted to deduct from Net Profit all out-of-pocket, documented, and reasonable costs incurred by it in connection with such defense ("**No-Fault Product Liability Litigation Costs**"); *provided*, that no deduction of Patent Litigation Costs and/or No-Fault Product Litigation Costs collectively shall reduce GPI's Profit Share payment by more than fifty percent (50%) in any given Quarter. If Athenex fails to timely commence or diligently pursue the defense any such Third Party Claim, ANV (and/or any of its Affiliates) shall have the right to step in and do so, at Athenex's expense. Each Party shall use all commercially reasonable efforts to control the costs of defense.  If the Third Party Claim is the result of Non-Conforming Product for which the CMO is liable, GPI shall pursue all commercially reasonable financial rights and remedies against the CMO.  Any recovery obtained from the CMO shall first be applied to reimburse GPI its legal costs incurred pursuing such remedy, and any remainder shall be shared by the Parties according to their respective Profit Share percentages.

10.5.    **Insurance**. Each of the Parties shall obtain and maintain in full force and effect, during the Term and for three (3) years thereafter, policies of general liability insurance and product liability coverage with aggregate limits which are commercially reasonable, but in no event less than five million dollars ($5,000,000) per occurrence, with the other Party named as additional insured. All insurance policies shall be obtained from an insurance carrier with an A.M. Best rating of at least A- VII. Each Party shall promptly provide the other Party upon written request certificates from its insurers indicating the amount of insurance coverage, the nature of such coverage, the other Party's additional insured status, and expiration date of each applicable policy.

10.6.    **Disclaimer of Liability**.  EXCEPT IN THE EVENT OF ITS GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR ANY PUNITIVE, SPECIAL, INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES OR FOR ANY LOSS OF PROFIT OR REVENUE, LOSS OF USE OF PRODUCT, OR COST OF ANY SUBSTITUTE PRODUCT, FACILITY OR SERVICE, WHETHER ARISING IN CONTRACT, TORT, NEGLIGENCE, STRICT LIABILITY OR ANY OTHER LEGAL THEORY, OR OTHERWISE ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREIN OR ANY BREACH HEREOF, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES;

CONFIDENTIAL

*PROVIDED*, THAT THE FOREGOING SHALL NOT LIMIT SUCH PARTY'S OBLIGATIONS UNDER SECTION 10 (INDEMNIFICATION).

## 11.   **TERM AND TERMINATION.**

11.1.   **Term**. The term of this Agreement shall commence on the Effective Date and, unless earlier terminated in accordance with Section 11.2 (Termination), continue for a period of four (4) years from the date of Launch. Such initial term shall automatically renew for successive periods of one (1) year each, unless either Party gives written notice of non-renewal to the other Party at least six (6) months prior to the expiration of the initial term or then-current renewal term, as applicable. The period of effectiveness of this Agreement is referred to as the **"Term"**.

11.2.   **Termination**. Without limiting either Party's rights or remedies:

(a)   Breach. Either Party may terminate this Agreement upon written notice to the other Party if the other Party has failed to remedy a material breach of this Agreement within sixty (60) days following receipt of a written notice that describes the breach in reasonable detail and expressly states that it is a notice under this Section 11.2(a) (Breach).

(b)   Bankruptcy. Either Party may terminate this Agreement immediately without further action if (i) the other Party is declared insolvent or bankrupt by a court of competent jurisdiction, and such declaration or order remains in effect for a period of sixty (60) days, (ii) a voluntary petition of bankruptcy is filed in any court of competent jurisdiction by such other Party, or (iii) this Agreement is assigned by such other Party for the benefit of creditors.

(c)   Commercialization Events. GPI may terminate this Agreement upon with ninety (90) days  written notice to Athenex if (i) Athenex fails to place its first PO within sixty (60) days after the Effective Date, (ii) Athenex fails to Launch within sixty (60) days after first receipt of Product, (iii) Net Profit are negative in either (A) three (3) consecutive Quarters or (B) in any three (3) Quarters in any rolling five (5) Quarter period; or (iv) Athenex makes payment more than forty five (45) days late at least twice in any calendar year. Athenex may terminate this Agreement immediately upon notice to GPI if delivery of Product is more than forty five (45) days late and not substantially complete at least twice in any calendar year.

(d)   Regulatory Considerations. Either Party may terminate this Agreement immediately upon written notice to the other Party if, not due to the breach of this Agreement by either Party, any Authority takes any action that (i) prevents GPI from manufacturing (or having manufactured), selling (or having sold), or exporting the Product or (ii) prevents Athenex from purchasing or Commercializing the Product; and the terminating Party has determined, in its reasonable judgment, that such action will continue in effect for more than six (6) months.

(e)   CMO Termination. If the supply agreement with the CMO(s) terminates for any reason, Athenex agrees that any interrupted or discontinued supply of Product shall not constitute a breach of this Agreement. ANV will use Commercially Reasonable Efforts to identify an alternative CMO as soon as reasonably practicable. If the supply interruption or discontinuation results in a failure-to-supply penalty with Athenex's customers (so long as Athenex itself did not cause or could not have mitigated the penalty), then the parties shall share the penalty according to their profit-share percentage.

(f)   Change of Control. ANV may terminate this Agreement immediately upon written notice to Athenex in the event of the transfer, directly or indirectly, of more than fifty percent (50%) of either the assets or the voting equity or other transfer of ownership of Athenex to any Third Party other than those Persons owning or holding such assets or equity on the Effective Date ("Successor Party") only upon the following circumstances where the Successor Party: (i) is less situated than Athenex with respect to sales and

18

CONFIDENTIAL

marketing capabilities so that it cannot similarly perform the obligations under this Agreement, including achieving Athenex's stated forecasts for the Product; (ii) fails to launch and market the Product upon FDA approval (or it is reasonably determined that Successor Party will not do so); and/or (iii) currently markets or has in its pipeline a Competing Product. ANV will make the determination herein in good faith and subject to reasonable commercial industry standards.

(g)     <u>Force Majeure</u>.  Either Party may terminate this Agreement as provided in Section 13.2 (Force Majeure).

11.3.   <u>**Effects of Termination**</u>.

(a)     <u>Accrued Rights</u>. The expiration or termination of this Agreement for any reason shall neither release Athenex from the obligation to pay any sum that may be owing hereunder, nor operate to discharge any liability that had been incurred by either Party prior to any such expiration or termination.

(b)     <u>No Penalties</u>. Except as expressly provided in this Section 11.3 (Effects of Termination), neither Party shall, solely by reason of the expiration or termination of this Agreement, be liable to the other Party for compensation, reimbursement, or damages for any reason.

(c)     <u>Wind-Down</u>. Upon expiration or termination of this Agreement:

(i)     The Parties shall work together in good faith to either, at ANV's election, (A) effect a smooth transition of the Commercialization of the Product in the Territory to a Third Party designated by ANV or (B) wind-down the Commercialization of the Product in the Territory.

(ii)    Athenex shall have the right to deplete its inventory of Product through sales to then-current Purchasers; *provided*, that GPI reserves the right to repurchase from Athenex all or any part of Athenex's inventory of Product for the lesser of (A) the prevailing price being charged by Athenex to Purchasers or (B) the then-current Supply Price; and *provided further*, that such inventory depletion activities shall cease, and in no event shall Athenex be entitled to sell Product after, the date that is three (3) months after expiration or termination of this Agreement unless otherwise agreed to in writing by ANV.

(iii)   Subject to clause (iii) above, Athenex and its Affiliates and Subs shall have no further rights in the Product or under the ANDA, and Athenex shall cease to represent itself as an authorized distributor of the Product in the Territory and otherwise desist from all conduct that might lead any Person to believe that Athenex is so authorized.

11.4.   **Survival**. Notwithstanding the expiration or termination of this Agreement for any reason, the Parties' rights and obligations under the following Sections shall survive and continue in effect in accordance with their respective terms: 1 (to the extent necessary to construe other surviving provisions), 2.1(b), 2.2, 3.1 (last sentence only), 3.2 (last sentence only), 3.3 (last sentence only), 5.5, 5.6 (including <u>Schedule B</u>), 5.7, 5.7, 5.9, **Error! Reference source not found.**, **Error! Reference source not found.**, 7.2 (last sentence only), 7.3 (last sentence only), 8.1 (first and last sentences only), 7.2 (last sentence only), 7.3 (last sentence only), 7.4, 9.4, 8.7, 10, 10, 12.3, 11.4, 13, and 13.

12.     **CONFIDENTIALITY.**

12.1.   **Confidentiality**. The provisions of the confidentiality agreement between Athenex and Milla dated as of May 6, 2022 (the "**CDA**") shall apply to all information exchanged between the Parties in connection with this Agreement, as well as the existence and terms of this Agreement. The scope and purpose of the CDA is hereby expanded as necessary to cover the activities contemplated by, and the Parties to, this Agreement; and each of the Parties expressly agrees that it is subject to and bound by the CDA. If the CDA

DocuSign Envelope ID: 33AF526C-1D01-4E91-A5D1-4C3607A7C2F6

CONFIDENTIAL

expires or terminates prior to this Agreement, the terms of the CDA shall continue to govern the Parties' obligations of confidentiality and non-use with respect to information hereunder throughout the Term and for ten (10) years thereafter.

12.2. **Publicity**. Neither Party will use the other Party's name in any public context or make any press release or other public disclosure regarding this Agreement or the transactions contemplated hereby, including identifying the other Party as a business partner or in connection with any scholarly or industry publications or presentations, without the other Party's express prior written consent, except as used in approved Labeling or except to the extent included required by Law, by any Authority, or by the rules of any public exchange on which the securities of such Party are listed, in which case such Party shall use commercially reasonable efforts to obtain the approval of the other Party as to the form, nature and extent of the press release or public disclosure prior to issuing or making the disclosure. This Section 12.2 (Publicity) is intended to supplement, and not to supersede, the Parties' obligations under the CDA.

13. **MISCELLANEOUS.**

13.1. **Further Assurances**. The Parties agree to execute, acknowledge, and deliver such further instruments and to take all such other incidental acts as may be reasonably necessary or appropriate to carry out the purpose and intent of this Agreement.

13.2. **Force Majeure**. Neither Party shall be liable for the failure to perform its obligations under this Agreement if such failure is occasioned by a cause or contingency beyond such Party's reasonable control, government mandated shutdown or restrictions due to pandemics or epidemics effecting elements of the supply chain, whether or not foreseeable, including strikes or other labor disturbances, lockouts, riots, wars, acts of terrorism, fires, floods, storms, interruption of or delay in transportation, lack of or inability to obtain fuel, power, or compliance with any order or regulation of any Authority acting within color of right. A Party claiming a right to excused performance under this Section 13.2 (Force Majeure) shall promptly notify the other Party in writing of the extent of its inability to perform and the nature of the force majeure event. Such excuse shall continue as long as the force majeure event continues; *provided*, that if the force majeure event continues for ninety (90) days or more, the Party not subject to the force majeure event shall have the right to terminate this Agreement upon written notice to the Party claiming a right to excused performance. Upon cessation of such force majeure event, the affected Party shall promptly resume performance under this Agreement as soon as it is commercially reasonable for the Party to do so. The affected Party shall use its commercially reasonable efforts to mitigate the effects of such failure or delay due to the force majeure event. Neither Party shall be entitled to rely on a force majeure event to relieve it from an obligation to pay money (including any interest for delayed payment) that would otherwise be due and payable under this Agreement.

13.3. **Notices**. Any notice permitted or required to be given hereunder shall be in writing and delivered by certified mail, return receipt requested, or by internationally recognized overnight express courier, addressed to Athenex or ANV, as applicable, at their respective addresses set forth in the signature block of this Agreement and to the attention of the signatories to this Agreement, or to such other address or recipient as either of them may designate by written notice delivered to the other.

13.4. **Dispute Resolution**. Any dispute, claim or controversy arising out of or relating to this Agreement that Athenex and ANV are unable to amicably settle themselves shall be resolved by binding alternative dispute resolution in accordance with the then-existing commercial arbitration rules of the American Arbitration Association held in New York City, New York, USA, before a single, disinterested arbitrator who is knowledgeable about the pharmaceutical industry and experienced in handling commercial disputes. The arbitrator shall be appointed jointly by Athenex and ANV within thirty (30) days following the institution of arbitration. If Athenex and ANV are unable to agree on the arbitrator within such period, the American Arbitration Association shall be instructed to select such arbitrator within fifteen (15) days thereafter. The

DocuSign Envelope ID: 33AF526C-1D01-4E91-A5D1-4C3607A7C2F6

CONFIDENTIAL

arbitrator's award will be final and binding and may be entered in any court having jurisdiction. The arbitrator will not have the power to award any damages excluded by, or in excess of, the damage limitations set forth in this Agreement, but may award the prevailing party reimbursement of its attorneys' and arbitration costs and fees. Issues of arbitrability will be determined in accordance solely with the U.S. federal substantive and procedural laws relating to arbitration; in all other respects, the arbitrator will be obligated to apply and follow the substantive law of the State of New York and the laws of the United States applicable therein, without regard to any conflicts of law principles. The U.N. Convention on Contracts for the International Sale of Goods shall not apply to this Agreement.

13.5.    **Entire Agreement; Amendments; Waivers**. This Agreement, together with the CDA, constitutes the entire agreement and understanding between the Parties with respect to the subject matter hereof and supersedes all previous undertakings, agreements, and representations between the Parties, written or oral, with respect to the subject matter hereof, including the Non-Binding Term Sheet dated as of May 13, 2022. No modification of, addition to, or waiver of any provisions of this Agreement shall be binding upon either Party unless the same shall be in writing and duly executed by a duly authorized representative of Athenex and ANV. No waiver by either Party of any of its rights hereunder shall be effective unless in writing and signed by the Party to be charged therewith.

13.6.    **Conflicts**. No terms, provisions or conditions of any purchase order, order acknowledgement, quote, proposal, invoice, or other business form or written authorization used by either Party will have any effect on the rights, duties or obligations of the Parties under, or otherwise modify, this Agreement, regardless of any failure of the other Party to object to such terms, provisions, or conditions, except to the extent such document specifically refers to this Agreement, sets forth an express intent to override it, and is signed by both Athenex and ANV.

13.7.    **Assignment; Beneficiaries**. This Agreement may not be assigned in whole or in part by Athenex to any Affiliate or Third Party, nor shall Athenex authorize others to represent themselves as a representative of ANV or any of its Affiliates. ANV shall be free to assign this Agreement in whole or in part to an Affiliate or Third Party subject to prompt written notice to Athenex. Any attempt to assign, or any actual assignment of, all or any part of this Agreement in contravention of the foregoing shall be deemed null and void. This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns, and the Persons entitled to indemnity hereunder. In no event shall Athenex have any direct rights or recourse against GPI, Milla or any other Affiliate of ANV.

13.8.    **Independent Contractors**. The Parties are independent contractors to one another, and this Agreement shall not be construed to create between the Parties any other relationship such as, by way of example only, that of employer-employee, principal-agent, joint-venturers, partners or any similar relationship, the existence of which is expressly denied by the Parties. Neither Party shall have the power or authority to bind the other Party or to assume or create any obligation, express or implied, on the other Party's behalf or in the other Party's name, and it will not represent to any Person that it has such power or authority.

13.9.    **Construction**.

(a)    Drafting Party. This Agreement constitutes the joint product of the Parties. Each provision has been subject to the mutual consultation and agreement of the Parties and shall not be construed for or against either of them by reason of authorship. The language in this Agreement is to be construed in all cases according to its fair meaning.

(b)    Severability. If any provision of this Agreement is determined by a court of competent jurisdiction to be invalid, illegal, or unenforceable in any respect, the remaining provisions of this Agreement shall remain in full force and effect, and such unenforceable provision shall be deemed modified so as to comply with law while maintaining, to the maximum extent possible, the original intent of the provision.

DocuSign Envelope ID: 33AF526C-1D01-4E91-A5D1-4C3607A7C2F6

CONFIDENTIAL

(c)      <u>Divisions</u>.  The division of this Agreement into Sections, subsections, clauses and Schedules and the insertion of headings are for convenience of reference only and shall not affect the interpretation of this Agreement.  Unless otherwise indicated, any reference in this Agreement to a Section, subsection, clause, or Schedule refers to the specified Section subsection, clause, or Schedule to this Agreement.  In this Agreement, the terms "this Agreement", "hereof", "herein", "hereunder" and similar expressions refer to this Agreement as a whole (including any Schedules hereto) and not to any particular Section, subsection, clause, Schedule or other provision hereof.

(d)      <u>Conventions</u>. Whenever used in this Agreement, unless otherwise specified:  (i) all monetary amounts are expressed in, and all references to "$" or "dollars" mean, the lawful currency of the United States; (ii) the word "including" (with its grammatical variations) means "including without limitation," "including but not limited to", or words of similar import; (iii) the words "agree" or "written agreement" will not impose any obligation on either Party to agree to any terms or to engage in discussions relating to such terms, except as such Party may elect in such Party's sole discretion; (iv) the word "days" means calendar days unless otherwise specified as business days; (v) the words "copy" and "copies" include, to the extent available, electronic copies, files or databases containing the information, files, items, documents or materials to which such words apply; and (vi) all references to the singular shall include the plural and vice versa.

13.10.  **Counterparts**.  This Agreement may be executed in counterparts, by original, electronic, or facsimile signature, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Agreement may be delivered electronically by email of a signed PDF copy.

<i>Signature page follows</i>

DocuSign Envelope ID: 33AF526C-1D01-4E91-A5D1-4C3607A7C2F6

CONFIDENTIAL

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective duly authorized representatives as of the Effective Date.

**ALTER PHARMA, NV**

By   Filip van de Vliet
Name:   Filip Van de Vliet
Title:   Themtis BV, having as permanent representative Filip Van de Vliet, Managing Director
        Nov 16, 2022
Address for Notice:
    Marie Curie Square 50, 5th Building (4th Floor),
    1070 Anderlecht, BELGIUM
    Attn: Managing Director
    Email: legal@alterpharma.be (only in cc, no notice by email alone)

**ATHENEX, INC.**

By   Jeffrey Yordon
Name:   Jeffrey Yordon
Title:   President & Chief Operating Officer
        Nov 16, 2022
Address for Notice:
    Athenex, Inc.
    Conventus Building, 1001 Main Street, Suite 600, Buffalo, NY 14203
    Attn: Legal Department
    Email: legal-agreements@athenex.com

**SCHEDULES**

| Schedule A | - | First Year Forecast |
| Schedule B | - | Non-Conforming Product Procedures |
| Schedule C | - | Estimated Initial Supply Price |
| Schedule D | - | Product Packaging Description |
| Schedule E | - | Profit Share Example Calculation |

DocuSign Envelope ID: 33AF526C-1D01-4E91-A5D1-4C3607A7C2F6

CONFIDENTIAL

## SCHEDULE A

**First Year Forecast**

| Presentation | 4mcg/ml 50ml | 4mcg/ml 100ml |
|---|---|---|
| **202_ Mkt $** | | |
| **202_ Units** | | |
| **Year 1 Mkt Share** | | |
| **Year 1 Forecast Units** | | |

DocuSign Envelope ID: 33AF526C-1D01-4E91-A5D1-4C3607A7C2F6

CONFIDENTIAL

## SCHEDULE B

### Non-Conforming Product Procedures

A. **Returns**. Athenex shall not have the right to return Product (to GPI, the CMO or otherwise), either during the Term or upon expiration or termination of this Agreement, unless (a) such Product is Non-Conforming Product and (b) Athenex notifies GPI in writing of such Non-Conformity within ten (10) days following receipt of such Product. The failure by Athenex to notify GPI within such twenty (20)-day period that any Product is Non-Conforming Product shall constitute irrevocable acceptance of such Product by Athenex. Returns of Non-Conforming Product require prior written authorization from GPI and shipping in accordance with instructions provided by GPI. When contacting GPI for return authorization, Athenex must provide the invoice number and date of shipment. Athenex agrees to implement a verified routing service (VRS) in accordance with the requirements of the DSCSA.

B. **Evaluation**. If the Parties and/or the CMO do not agree on whether the Product is Non-Conforming, or where in the supply chain the Non-Conformity arose, and fail to resolve such dispute within a reasonable period of time, GPI shall pursue evaluation and testing in accordance with its contract with the CMO. The Parties will cooperate to submit necessary samples of Product for testing. The determination of any independent laboratory or expert appointed under GPI's contract with the CMO will be binding on both Parties and the CMO. The cost of the independent laboratory shall be borne by the Person who is found to be in error. If the laboratory determines that the Product is conforms to the Product Warranty, Athenex shall accept and pay for the Product in accordance with the terms of this Agreement. If laboratory determines that the Product is Non-Conforming and was Non-Conforming at the time of tender of delivery hereunder, then Paragraph C (Remedy) below shall apply. If the Product is determined to be Non-Conforming, but that Athenex, its Affiliates, any carrier, Purchaser, or other Person involved in shipping, handling, distribution, or storage of Product following tender of delivery is the cause of Non-Conformity, then Athenex shall accept and pay for the Product in accordance with the terms of this Agreement and thereafter destroy such Product in accordance with Law. Where Athenex does not prevail under this Paragraph B (Evaluation), Athenex shall not be entitled to deduct in the calculation of Net Profit or otherwise charge such costs through to GPI via the Profit Share or otherwise the costs of the laboratory evaluation, the Supply Price, freight and insurance costs, Product destruction costs, and any other costs incurred by it in connection with the subject Product.

C. **Remedy**. In respect of any Product properly and timely rejected by Athenex under Paragraph A (Returns) and determined to be Non-Conforming Product, GPI will either, in agreement with Athenex, (a) credit Athenex for the Supply Price of the Non-Conforming Product or (b) use its Commercially Reasonable Efforts to cause the CMO to, at the CMO's expense, either (i) to the extent permitted by cGMP, rework or reprocess the Non-Conforming Product (and pay for the return shipping of the Non-Conforming Product to the CMO's manufacturing facility for such purpose) or (ii) replace the Non-Conforming Product with Product that conforms to the Product Warranty. **The remedies described in this Paragraph C (Remedy) shall be GPI's sole liability and Athenex's sole remedy for any Non-Conforming Product.**

CONFIDENTIAL

## SCHEDULE C

### Estimated Initial Supply Price

| Product | Strength (mcg/mL) | Unit size (mL) | Pack size (units) | Batch size (packs) | MOQ (packs) | Mfg Cost/pack (EUR) | API Cost/g (EUR) | API Cost/pack included (EUR) | Product Cost/pack (EUR) | Markup | Estimated Initial Supply Price (EUR) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Dexmedetomidine HCl in 0.9% Sodium Chloride injectable solution | 4 | 50 | 10 glass vials | 2.000 | 12.000* | 18,83 | 1.450 | 3,19 | 22,02 | 10% | 24,22 |
| Dexmedetomidine HCl in 0.9% Sodium Chloride injectable solution | 4 | 100 | 10 glass vials | 1.500 | 12.000* | 19,30 | 1.450 | 6,38 | 25,68 | 10% | 28.45 |

*The MOQ per campaign should be 120K vials (MOQ in each strength can be 1 batch but combined need to arrive to 120K vials)

**1,00 Euro =0,984 US Dollars 1 EUR to USD - Euros to US Dollars Exchange Rate (xe.com) Euro to US Dollar conversion — Last updated Oct 3, 2022, 23:23 UTC

CONFIDENTIAL

## SCHEDULE D

### Product Packaging Description

27

DocuSign Envelope ID: 33AF526C-1D01-4E91-A5D1-4C3607A7C2F6

DocuSign Envelope ID: 33AF526C-1D01-4E91-A5D1-4C3607A7C2F6

CONFIDENTIAL

## SCHEDULE E

### Profit Share Example Calculation

Athenex Pharmaceutical Division, LLC
Profit sharing detail    Q4 2022
Profit sharing for: XYZ Inc.

| | Product XYZ |
|---|---|
| NDC | 70860XXXXX |
| | |
| Units | 1000 | Note: all rates/figures are illustrative only, subject to change |
| | |
| Gross Sales | 100,000 | Sales at WAC (Wholesaler Acquisition Cost) |
| Chargebacks | -35000 | Difference between WAC and the various contract prices of end-customers |
| Discounts | -2330 | Prompt pay discounts.  Based on WAC price. |
| Credits | -1000 | Damaged / expired product (we retain title until customer receives product) |
| FFS & Admin | -8450 | Fees from wholesalers and GPOs (Group Purchasing Organizations).  Is a percentage of contract price. |
| Medicaid | -100 | Automatically enrolled in all state Medicaid programs |
| | |
| Net Sales | 53120 |
| | |
| Cost of Goods Sold: | |
| Direct Material at actual cost | 5000 |
| Inbound freight | 2500 |
| Outbound freight/Logistics | 710 |
| TOTAL COST OF GOODS SOLD | 8210 |
| | |
| GROSS MARGIN | 44910 |
| | |
| Overhead - 5.5% of Net Sales | 2656 |
| | |
| NET MARGIN | 42254 |
| | |
| Profit Share % 50 | 0.5 |
| | |
| Profit Share $ owed to Supplier | 21,127 |

28