**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| ATHENEX, INC., et al., | Case No. 23-90295 (DRJ) |
| Debtors.[1] | (Jointly Administered) |

**ORDER (I) AUTHORIZING (A) THE SALE OF ORASCOVERY ASSETS
FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES AND THE
ASSUMPTION AND ASSIGNMENT OF THE ASSUMED CONTRACTS AND (B) THE
DEBTORS TO ENTER INTO AND PERFORM UNDER THE PURCHASE
AGREEMENT AND (II) GRANTING RELATED RELIEF**

(Related Dkt. Nos. 17 & 198)

Upon the emergency motion (the "Motion")[2] of the above-captioned debtors and debtors

in possession (collectively, the "Debtors") for entry of an order (this "Order") (i) authorizing and

approving, among other things, (a) the sale of the Orascovery Business (as defined in the Purchase

Agreement (as defined below) and related assets, the "Purchased Assets") of Debtors Athenex

R&D LLC ("Seller") and Athenex, Inc. ("Athenex"), to C-MER Specialty Group Limited, or its

assignee Health Hope Pharma Limited, a limited liability company organized under the laws of

Hong Kong (the "Purchaser"), free and clear of liens, claims, and encumbrances (the

---

[1] A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors'
claims and noticing agent at https://dm.epiq11.com/athenex. The location of Athenex, Inc.'s principal place of
business and the Debtors' service address in these Chapter 11 Cases is 1001 Main Street, Suite 600, Buffalo, NY
14203.

[2] The Motion was filed on May 14, 2023 as *Debtors' Emergency Motion for (I) Entry of an Order Approving (A)
Bid Procedures; (B) the Form and Manner of Notice; (C) the Procedures for Determining Cure Amounts for
Executory Contracts and Unexpired Leases; and (II) Entry of an Order Approving (A) the Sale of Substantially
All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances and Interests; and (B) the
Assumption and Assignment of Certain Contracts and Unexpired Leases* [Dkt. 17]. Capitalized terms used but
not otherwise defined herein shall have the meaning ascribed to them in the Motion or the Purchase Agreement,
as applicable.

"Transaction"), (b) Seller and Athenex to enter into and perform under the Purchase Agreement, (c) the assumption and assignment of certain executory contracts and unexpired leases in connection with the Transaction, and (ii) granting related relief, all as more fully set forth in the Motion and herein; and upon the evidence offered in support of the Motion; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Amended Standing Order; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that it may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. § 1408; and this Court having designated the Purchaser as the Stalking Horse Bidder under the Bid Procedures Order following a hearing held, and pursuant to an order entered, on June 7, 2023 [Dkt. No. 198]; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion, and having heard the statements in support of the relief requested therein at any hearing before this Court, and upon the First Day Declaration and the declarations and other evidence submitted in support of the Motion; and this Court having conducted a hearing on the Motion (the "Sale Hearing"), at which time all interested parties were offered an opportunity to be heard with respect to the Motion; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, **THE COURT HEREBY FINDS THAT**:

## I.      Jurisdiction, Final Order, and Statutory Predicates.

A.      The statutory predicates for the relief requested in the Motion are sections 105(a), 363, and 365 of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004 and 6006 and Bankruptcy Local Rule 2002-1.

B.      This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Sale Order, waives any stay, and expressly directs entry of judgment as set forth herein.

## II.     Notice of the Purchase Agreement, Transaction, Sale Hearing and Bidding Procedures Order.

C.      As evidenced by the affidavits of service and publication previously filed with the Court, and based on the representations of counsel at the Sale Hearing, due, proper, timely, adequate and sufficient notice of the Motion, the Bid Procedures Order, the Auction, the Sale Hearing, the Purchase Agreement, this Sale Order and the Transaction has been provided in accordance with sections 102(1) and 363 of the Bankruptcy Code, Bankruptcy Rules 2002, 9007, 9008 and 9014, and the Local Bankruptcy Rule 2002-1.  The Debtors have complied with all obligations to provide notice of the Motion, the Bid Procedures Order, the Auction, the Sale Hearing, the Purchase Agreement, this Sale Order and the Transaction as required by the Bid Procedures Order.  The aforementioned notices are good, sufficient and appropriate under the circumstances, and no other or further notice of the Motion, the Bid Procedures Order, the Auction, the Sale Hearing, the Purchase Agreement, this Sale Order or the Transaction is, or shall be, required. The requirements of Bankruptcy Rule 6004(a) and the Local Bankruptcy Rules are satisfied by such notice.

4882-8668-9387v.2

D.     A reasonable opportunity to object and be heard with respect to the Transaction, the Motion and the relief requested therein and provided in this Sale Order has been afforded to all interested persons and entities, including the Objection Notice Parties (as defined in the Bidding Procedures Order).

E.     As demonstrated by the evidence proffered or adduced at the Sale Hearing and the representations of counsel at the Sale Hearing, the Debtors have complied in all material respects with the Bidding Procedures Order.  The Debtors and their professionals have adequately and appropriately marketed the Purchased Assets in compliance with the Bidding Procedures and the Bidding Procedures Order, and in accordance with the Debtors' fiduciary duties.  Based upon the record of these proceedings, creditors, other parties in interest and prospective purchasers were afforded a reasonable and fair opportunity to bid for the Purchased Assets.

F.     The Bid Procedures were substantively and procedurally fair to all parties and all potential bidders and afforded notice and a full, fair and reasonable opportunity for any person to make a higher or otherwise better offer to purchase the Purchased Assets.  The Debtors conducted the sale process without collusion and in accordance with the Bid Procedures.

G.     The Purchaser is the Successful Bidder, and the Purchase Agreement is the Successful Bid (as defined in the Bid Procedures), for the Purchased Assets in accordance with the Bid Procedures Order.  The Transaction and the Purchase Agreement comply with the Bidding Procedures Order and all other applicable orders of the Court.

III.    **Good Faith of the Purchaser and the Prepetition Term Loan Secured Parties.**

H.     The Purchase Agreement and the related agreements were negotiated, proposed, and entered into by the Debtors, the Purchaser and the Prepetition Term Loan Secured Parties[3]

---

[3]    As such term is defined in the *Interim Order (I) Authorizing the Debtors to Use Cash Collateral; (II) Granting Adequate Protection to Prepetition Term Loan Secured Parties; (III) Modifying Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* [Dkt. 60] (the "Cash Collateral Order").

without collusion, in good faith, and from arm's-length bargaining positions.  Neither the Debtors, the Prepetition Term Loan Secured Parties, nor the Purchaser have engaged in any conduct that would cause or permit the Purchase Agreement, any related agreements or the Transaction to be avoided, or for any costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.

I.      The Purchaser is consummating the Transaction in good faith and the Purchaser is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code, and has proceeded in good faith in all respects in connection with the Transaction.  The Purchaser is therefore entitled to all of the protections afforded under section 363(m) of the Bankruptcy Code. None of the Debtors nor the Purchaser have engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code.  The Debtors were free to deal with any other party interested in buying or selling some or all of the Purchased Assets on behalf of the Debtors' estates.  The protections afforded by section 363(m) of the Bankruptcy Code are integral to the Transaction and the Purchaser would not consummate the Transaction without such protections.

## IV.    Highest and Best Offer.

J.      The Debtors' marketing process with respect to the Purchased Assets, including the Debtors' prepetition marketing process with respect to the Purchased Assets, afforded a full, fair, and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the Purchased Assets.  The Purchase Agreement: (i) constitutes the highest and best offer for the Purchased Assets; (ii) is fair and reasonable; (iii) constitutes reasonably equivalent value and fair consideration for the Purchased Assets (as those terms are defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and Section 548 of the Bankruptcy Code) and fair consideration under the Bankruptcy Code and under applicable non-bankruptcy

law, and (iv) is in the best interests of the Debtors, their estates, their creditors and all other parties in interest.

K.      The Debtors' determination that the Purchase Agreement constitutes the highest and best offer for the Purchased Assets constitutes a valid and sound exercise of the Debtors' business judgment.

L.      Consistent with their fiduciary duties, the Debtors have demonstrated good, sufficient and sound business reasons and justifications for entering into the Transaction and the performance of their obligations under the Purchase Agreement, including, but not limited to, the fact that the Purchase Agreement will provide a greater recovery for the Debtors' estates and creditors than would be provided by any other available alternative, including a separate liquidation of the Debtors and the Purchased Assets.

**IT IS HEREBY ORDERED THAT**:

1.      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to these chapter 11 cases pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

2.      The Motion is granted as provided herein, and entry into and performance under, the Purchase Agreement and the consummation of the Transaction contemplated thereby is authorized and approved.

3.      All objections to the Motion or the relief requested therein that have not been withdrawn, waived or settled as announced to the Court at the Sale Hearing or by stipulation filed with the Court, and all reservations of rights included in such objections, are hereby denied and overruled on the merits with prejudice.  Those parties who did not object or withdrew their

objections to the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code to the relief granted herein.

4.      Notice of the Motion and Sale Hearing was adequate, appropriate, fair and equitable under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004 and 6006, and the Bid Procedures Order.

## APPROVAL OF THE PURCHASE AGREEMENT

5.      In accordance with section 363 of the Bankruptcy Code and Bankruptcy Rule 6004 and as described in the Motion, the Debtors are authorized to sell the Purchased Assets to the Purchaser in accordance with the terms and conditions set forth in the *Stalking Horse Asset Purchase Agreement* dated as of June 6, 2023, substantially in the form attached hereto as **Schedule 1** (the "Purchase Agreement").  The Purchase Agreement, together with all annexes, exhibits, and amendments thereto, is hereby approved.

6.      The Debtors are authorized and empowered to take any and all actions necessary or appropriate to: (a) consummate the sale of the Purchased Assets to the Purchaser pursuant to and in accordance with the terms and conditions of the Purchase Agreement; (b) close the sale of the Purchased Assets as contemplated in the Purchase Agreement and this Order (including any customary or immaterial modifications to the purchase price); and (c) execute and deliver, perform under, consummate, implement, and close fully the Purchase Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Purchase Agreement and the sale of the Purchased Assets, including any other ancillary document, or as may be reasonably necessary or appropriate to the performance of the obligations as contemplated by the Purchase Agreement and such other ancillary documents.

7.      The Purchase Agreement represents the highest and best offer to purchase the Purchased Assets under the facts and circumstances of these chapter 11 cases. Approval of the

7

Purchase Agreement and the consummation of the transaction contemplated hereby is in the best interests of the Debtors, their creditors, their estates, and all other parties in interest.  The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the sale of the Purchased Assets.

## TRANSFER OF THE PURCHASED ASSETS

8.      The Debtors are authorized to sell the Purchased Assets free and clear of any and all liens, claims, and encumbrances against the Debtors or their estates (other than those included in the Assumed Liabilities or Permitted Liens (each as defined in the Purchase Agreement)), because one or more of the standards set forth in section 363(f) of the Bankruptcy Code has been satisfied.

9.      Pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, the sale of the Purchased Assets under the terms and conditions set forth in the Purchase Agreement shall be free and clear of any and all liens, claims, encumbrances, and other interests of any kind or nature whatsoever (other than those included in the Assumed Liabilities or Permitted Liens (each as defined in the Purchase Agreement)); *provided* that any such liens, claims, encumbrances, and other interests shall attach to the proceeds of the sale with the same validity, in the amount, with the same priority as, and to the same extent that any such liens, claims, and encumbrances have with respect to the Purchased Assets, subject to any claims and defenses that the Debtors may possess with respect thereto.  Any such interests shall be transferred and attached to the proceeds of the sale with the same validity and priority, and subject to the same defenses that such liens had against the Purchased Assets immediately prior to the Closing (as defined below).

10.      The sale, transfer and assignment of the Purchased Assets pursuant to this Sale Order and the Purchase Agreement shall vest the Purchaser with valid and indefeasible title to the Purchased Assets and will be a legal, valid and effective transfer of the Purchased Assets free and

clear of any and all liens, claims and encumbrances (other than those included in the Assumed Liabilities or Permitted Liens (each as defined in the Purchase Agreement).

11.     All persons and entities holding liens or interests in the Purchased Assets arising under, out of, in connection with, or in any way relating to the Debtors, the Purchased Assets or the transfer of the Purchased Assets to the Purchaser (other than those included in the Assumed Liabilities or Permitted Liens (each as defined in the Purchase Agreement)), hereby are forever barred, estopped, and permanently enjoined from asserting against the Purchaser or their successors or assigns, their property, or the Purchased Assets such persons' or entities' liens or interests in and to the Purchased Assets.

12.     Notwithstanding any provision of the Purchase Agreement to the contrary, after the Closing of the sale of the Purchased Assets, the Debtors shall have no further liability with respect to the Purchased Assets, and any claims, whether administrative or otherwise, relating to or arising from the Purchased Assets after the Closing of the sale and transfer of the Purchased Assets that are asserted against the Debtors shall be deemed disallowed.

13.     A certified copy of this Order may be filed with the appropriate clerk and/or recorded with the recorder to act to cancel any of the liens and other encumbrances of record.

14.     If any person or entity which has filed statements or other documents or agreements evidencing liens on, or interests in, the Purchased Assets shall not have delivered to the Debtors prior to the Closing in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of liens or interests which the person or entity has or may assert with respect to the Purchased Assets, the Debtors are hereby authorized, and the

Purchaser is hereby authorized to execute and file such statements, instruments, releases, and other documents on behalf of such person or entity with respect to the Purchased Assets.

15.     This Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons and entities who may be required by operation of law, the duties of their office or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease, and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

16.     The Purchase Agreement and any related agreements, documents, or other instruments may be modified, amended or supplemented by the parties thereto with the consent of the Prepetition Term Loan Secured Parties and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment, or supplement does not have a material adverse effect on the Debtors' estates or the rights of any party holding a lien, claim or encumbrance on or against the Purchased Assets.

17.     No bulk sales law or similar law of any state or other jurisdiction shall apply in any way to the transactions with the Debtors that are approved by this Sale Order, including, without limitation, the Purchase Agreement and the Transaction.

18.     Notwithstanding anything in this Sale Order, subject to section 525(a) of the Bankruptcy Code, no governmental unit (as defined in Bankruptcy Code § 101(27)) or any representative thereof may deny, revoke, suspend, or refuse to renew, any right, permit, license,

10

copyright, patent, trademark or other permission relating to the use of the Purchased Assets sold, transferred, or conveyed to the Purchaser on account of the filing or pendency of these chapter 11 cases, the conduct of the Sale, or the consummation of the Transaction contemplated by the Purchase Agreement and the related agreements.

19.     The reversal or modification of the authorization provided herein to consummate the transactions contemplated herein shall not affect the validity of the sale, transfer and assignment of the Purchased Assets to the Purchaser.  The Purchaser has entered into the Purchase Agreement in good faith and is a purchaser in good faith of the Purchased Assets as that term is used in Section 363(m) of the Bankruptcy Code, and, upon the occurrence of the Closing of the purchase of the Purchased Assets, the Purchaser shall have all of the protections afforded by Section 363(m) of the Bankruptcy Code.

## PROHIBITION OF ACTIONS AGAINST THE PURCHASER

20.     The Purchaser is not an "insider" or "affiliate" of the Debtors, as those terms are defined in sections 101(31) and 101(2) of the Bankruptcy Code.

21.     By virtue of the Transaction, neither the Purchaser nor any of its affiliates shall be deemed to:  (i) be a legal successor, or otherwise deemed to be a successor, to any of the Debtors under any theory of law or equity; (ii) have, de facto or otherwise, merged with or into any or all Debtors or their estates; (iii) have a common identity or a continuity of enterprise with the Debtors; (iv) be an alter ego or a mere continuation or substantial continuation, or be holding itself out as a mere continuation, of the Debtors or any business, enterprise, or operation of the Debtors; or (v) be liable for any acts or omissions of the Debtors in the conduct of the business or arising under or related to the Purchased Assets, other than as set forth in the Purchase Agreement.  The Purchaser's acquisition of the Purchased Assets owned by the Debtors shall be free and clear of any "successor liability", vicarious liability and other types of transferee liability of any kind or

4882-8668-9387v.2

nature whatsoever, whether known or unknown as of the Closing, asserted or unasserted, fixed or contingent, liquidated or unliquidated (other than, to the extent applicable, any Assumed Liabilities), and the Purchased Assets shall not be subject to any Claims, Encumbrances and Interests arising under or in connection with any Retained Liability (as defined in the Purchase Agreement). The operations of the Purchaser and its affiliates shall not be deemed a continuation of the Debtors' business as a result of the acquisition of the Purchased Assets. The Purchaser would not have acquired the Purchased Assets but for the foregoing protections against potential claims based upon "successor liability" theories.

### ASSUMPTION AND ASSIGNMENT OF DESIRED 365 CONTRACTS

22.     Subject to, and at the date and time (the "Closing Date") of, the closing (the "Closing") of the Sale of the Purchased Assets contemplated by this Order, the Debtors may assume the Assumed Contracts (as identified pursuant to the Purchase Agreement) and assign each of them to the Purchaser pursuant to section 365 of the Bankruptcy Code free and clear of all Claims and Interests except as otherwise provided in the Agreement and subject to the Assumed Liabilities, and notwithstanding any anti-assignment clause as provided in section 365(f) of the Bankruptcy Code. The assumption and assignment of the Assumed Contracts pursuant to the terms of this Order is integral to the Purchase Agreement and is in the best interests of the Debtors and their estates, creditors and other parties in interest, and represents the reasonable exercise of sound and prudent business judgment by the Debtors.

23.     The Debtors have, to the extent necessary, satisfied the requirements of section 365 of the Bankruptcy Code, including sections 365(b)(1)(A), 365(b)(1)(B), 365(b)(3) (to the extent applicable) and 365(f) of the Bankruptcy Code, in connection with the sale and assumption and assignment of the Assumed Contracts to the extent provided under the Purchase Agreement and have:  (1) cured any default existing prior to the date hereof under any of the Assumed Contracts,

within the meaning of section 365(b)(1)(A) of the Bankruptcy Code, and (2) provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof under any of the Assumed Contracts, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code.

24.     As and to the extent requested or required, the Purchaser has provided adequate assurance of future performance of and under the Assumed Contracts, within the meaning of sections 365(b)(1), 365(b)(3) (to the extent applicable) and 365(f)(2) of the Bankruptcy Code.

25.     The Assumed Contracts are assignable notwithstanding any provisions contained therein to the contrary, and any provisions in any Assumed Contracts that prohibit or condition the assignment of such Assumed Contracts or allow the non-Debtor counterparty to such Assumed Contracts to terminate, recapture, impose any penalty, condition on renewal or extension or modify any term or condition upon the assignment of such Assumed Contracts constitute unenforceable anti-assignment provisions that are void and of no force and effect.  The Assumed Contracts shall be transferred to, and remain in full force and effect for the benefit of, the Purchaser in accordance with their respective terms, notwithstanding any provision in any such contract that prohibits, restricts, or conditions such assignment or transfer.

26.     The respective amounts set forth on the cure notices approved and served pursuant to the Bid Procedures Order [Dkt. Nos. 141, 162, 249 & 281] (the "Cure Notice(s)"), and served upon each counterparty to the Assumed Contracts (each a "Counterparty"), are the sole amounts necessary under sections 365(b)(1)(A) and (B) and 365(f)(2)(A) of the Bankruptcy Code to cure all defaults and pay all actual pecuniary losses thereunder (the "Cure Costs").  If any timely response or objection was or is filed to the Cure Notice, then the Cure Costs shall be either (i) as agreed upon by the Debtors and the Counterparty in writing and filed on an amended cure schedule (ii) or, if no agreement can be reached, then the amount set forth in a later Order of the Court

13

resolving the cure dispute.  The Purchaser shall pay the Cure Costs for each of the Assumed

Contracts subject to the right of the Purchaser to remove any such contract or lease from the

Schedule of Assumed Contracts or Schedule of Assumed Leases through and including the Closing

Date.  Upon payment of the Cure Costs, any monetary default existing, if any, under and related

to the Assumed Contracts as of the Closing will be deemed to be fully and finally cured.  Upon the

assignment of the Assumed Contracts and the payment of the Cure Costs, the Purchaser shall be

deemed to be in full compliance with all provisions of the Assumed Contracts.

## RELATED RELIEF

27.     Notwithstanding anything to the contrary in this Order or the Purchase Agreement,

the Purchased Assets shall not include the sale or release of any claims, causes of action, or

Proceedings (i) against the Debtors' current or former officers, directors, managers, insiders, or

their respective Representatives, or (ii) under Sections 544, 547, 548, 549 or 550 of the Bankruptcy

Code.

28.     All time periods set forth in this Order and the Purchase Agreement shall be

calculated in accordance with Bankruptcy Rule 9006(a).

29.     The stay provided for in Bankruptcy Rules 6004(h) and 6006(d) is hereby reduced

to the extent necessary to permit Closing of the sale of the Purchased Assets.  This Order shall

otherwise be effective immediately upon its entry.

30.     To the extent there is any inconsistency between the terms of the Purchase

Agreement, the Motion, and this Order, the terms of this Order shall govern.

31.     Notwithstanding the relief granted herein and any actions taken pursuant to such

relief, nothing contained in the Motion or this Order shall constitute, nor is it intended to constitute:

(a) an admission as to the validity, priority, or amount of any particular claim against a Debtor

entity; (b) a waiver of the Debtors' right to dispute any particular claim on any grounds; (c) a

14

promise or requirement to pay any particular claim or finding that any particular claim is an administrative expense claim or other priority claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Order or the Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates (g) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (h) a concession by the Debtors or any other party-in-interest that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Order are valid and the Debtors and all other parties-in-interest expressly reserve their rights to contest the extent, validity, or perfection, or to seek avoidance of all such liens.  Any payment made pursuant to this Order should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

32.     The consummation of the Transaction shall be conditioned on and subject to the terms of paragraph 28 of the Cash Collateral Order entered by the Court at Docket No. 60 (or such applicable final order with respect to the matters addressed therein), and the Debtors are authorized to use the proceeds of the Transaction received by the Debtors in accordance therewith.

33.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Bankruptcy Local Rules are satisfied by such notice.

34.     The Debtors are authorized, but not directed, to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion and the Purchase Agreement.

4882-8668-9387v.2

35.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

36.     This Order shall be binding upon the Purchaser and all successors and assigns of the Purchaser, the Debtors, their estates, all creditors of and holders of equity interests in the Debtors, and any holders of liens against or on all or any portion of the Purchased Assets.  This Order and the Purchase Agreement shall inure to the benefit of the Debtors, their estates, their creditors, the Purchaser, and its respective successors and assigns.

Dated:  _____, 2023

_____
DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE

## **Schedule 1**

**Purchase Agreement**

**EXECUTION VERSION**

**STALKING HORSE ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**ATHENEX R&D LLC,**

**ATHENEX, INC.,**
and

**C-MER SPECIALTY GROUP LIMITED**

**DATED AS OF JUNE 6, 2023**

# TABLE OF CONTENTS

**Article 1** DEFINITIONS ..................................................................................................... 2
  1.1    **Definitions** .................................................................................................... 2
**Article 2** PURCHASE AND SALE ....................................................................................... 9
  2.1    **Purchased Assets** ........................................................................................ 9
  2.2    **Athenex Orascovery Assets** ...................................................................... 10
  2.3    **Excluded Assets** ......................................................................................... 10
  2.4    **Non-assignable Assets** ............................................................................... 12
  2.5    **Liabilities** ................................................................................................... 13
  2.6    **Assumption and Rejection of Contracts** ................................................... 13
  2.7    **Purchase Price** ........................................................................................... 14
  2.8    **Withholding** ............................................................................................... 14
**Article 3** CLOSING; PAYMENT OF PURCHASE PRICE ................................................ 14
  3.1    **Closing** ........................................................................................................ 14
  3.2    **Closing Deliveries** ..................................................................................... 14
**Article 4** REPRESENTATIONS AND WARRANTIES OF SELLER AND ATHENEX ...... 16
  4.1    **Existence and Power** .................................................................................. 16
  4.2    **Authorization** ............................................................................................. 16
  4.3    **Enforceability** ............................................................................................ 17
  4.4    **Non-contravention** ..................................................................................... 17
  4.5    **Proceedings** ................................................................................................ 17
  4.6    **Compliance with Law; Permits** ................................................................ 17
  4.7    **Title to Purchased Assets** .......................................................................... 18
  4.8    **Intellectual Property** ................................................................................. 18
  4.9    **Affiliate Transactions** ............................................................................... 19
  4.10   **Required Notices** ....................................................................................... 19
  4.11   **Brokers** ...................................................................................................... 19
  4.12   **Leased or Owned Real Property** ............................................................... 19
  4.13   **Exclusivity of Representations and Warranties** ........................................ 19
**Article 5** REPRESENTATIONS AND WARRANTIES OF BUYER ................................. 19
  5.1    **Existence and Power** .................................................................................. 19
  5.2    **Authorization** ............................................................................................. 19
  5.3    **Enforceability** ............................................................................................ 20
  5.4    **Governmental and Third Party Authorizations** ........................................ 20

| 5.5 | **Non-contravention** | 20 |
|---|---|---|
| 5.6 | **Brokers** | 20 |
| 5.7 | **Proceedings** | 20 |
| 5.8 | **Financial Capability** | 20 |
| 5.9 | **Solvency** | 21 |
| 5.10 | **Independent Investigation** | 21 |
| 5.11 | **Exclusivity of Representations and Warranties** | 21 |
| Article 6 | PRE-CLOSING COVENANTS | 21 |
| 6.1 | **Conduct of Business** | 21 |
| 6.2 | **Pre-Closing Access to Information** | 22 |
| 6.3 | **Supplemental Disclosure** | 23 |
| 6.4 | **Efforts to Close** | 23 |
| 6.5 | **Contact with Customers, Suppliers and Other Business Relations** | 24 |
| 6.6 | **Bankruptcy Matters** | 24 |
| 6.7 | **Access to Books and Records** | 25 |
| 6.8 | **Employee Matters** | 26 |
| 6.9 | **Transfer of Subsidiary Excluded Assets** | 26 |
| 6.10 | **Satisfaction of Intercompany Balances** | 26 |
| 6.11 | **Athenex Orascovery Assets** | 26 |
| Article 7 | COVENANTS OF BUYER AND SELLER | 26 |
| 7.1 | **Public Announcements** | 26 |
| 7.2 | **Tax Matters** | 27 |
| Article 8 | CONDITIONS TO CLOSING | 28 |
| 8.1 | **Conditions to Obligation of Buyer** | 28 |
| 8.2 | **Conditions to Obligation of Seller and Athenex** | 28 |
| 8.3 | **Frustration of Closing Conditions** | 29 |
| 8.4 | **Waiver of Conditions** | 29 |
| Article 9 | TERMINATION | 29 |
| 9.1 | **Termination** | 29 |
| 9.2 | **Effect of Termination** | 31 |
| Article 10 | SURVIVAL AND RELEASE | 31 |
| 10.1 | **Survival** | 31 |
| Article 11 | MISCELLANEOUS | 31 |
| 11.1 | **Notices** | 31 |
| 11.2 | **Amendments and Waivers** | 33 |
| 11.3 | **Expenses** | 33 |

| 11.4 | **Successors and Assigns** | 33 |
| 11.5 | **Governing Law** | 33 |
| 11.6 | **Jurisdiction and Authority of the Bankruptcy Court; Dispute Resolution; Waiver of Jury Trial** | 33 |
| 11.7 | **Counterparts** | 34 |
| 11.8 | **No Third Party Beneficiaries** | 34 |
| 11.9 | **Entire Agreement** | 34 |
| 11.10 | **Disclosure Schedules** | 35 |
| 11.11 | **Captions** | 35 |
| 11.12 | **Remedies** | 35 |
| 11.13 | **Severability** | 35 |
| 11.14 | **Interpretation** | 35 |
| 11.15 | **Prevailing Party** | 36 |
| 11.16 | **Further Assurances** | 36 |

EXHIBITS

<u>Exhibit A</u>     Methodology for allocation of Purchase Price

## STALKING HORSE ASSET PURCHASE AGREEMENT

THIS STALKING HORSE ASSET PURCHASE AGREEMENT (the "Agreement"), dated as of June 6, 2023, is entered into by and among **Athenex R&D LLC**, a Delaware limited liability company ("Seller"), **Athenex, Inc**., a Delaware corporation ("Athenex"), and **C-MER Specialty Group Limited**, a limited liability company organized under the laws of Hong Kong ("Buyer").  Seller, Athenex and Buyer are referred to herein as the "Parties".  Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in Article 1.

### RECITALS

A.      Seller and Athenex are  chapter 11 debtors and debtors-in-possession in Case No. 23-90295 (DRJ) (Jointly Administered) (the "Bankruptcy Case") pending in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court").

B.      Seller is in the business of developing small molecule oral chemotherapy treatments for neoadjuvant breast cancer and solid tumors (the "Orascovery Business").

C.      That certain Order Approving (a) Bid Procedures; (b) the Form and Manner of Notice; (c) the Procedures for Determining Cure Amounts for Executory Contracts and Unexpired Leases; and (d) Granting Related Relief was entered in the Bankruptcy Case on May 22, 2023 (the "Procedures Order").

D.      Athenex owns 100% of the outstanding equity interests in Athenex HK Innovative Limited and Athenex Therapeutics Limited, both of which are limited liability companies formed under the laws of the Hong Kong Special Administrative Region of the People's Republic of China (each a "Subsidiary" and. collectively, the "Subsidiaries").

E.      Athenex owns, or has the right to use, certain assets used in the operation of the Orascovery Business.

F.      In connection with the filing of the Bankruptcy Case, Seller terminated the employment of the great bulk of its employees and is currently operating with only a skeleton staff in an effort to maintain and preserve the Purchased Assets (as defined below).

G.      Subject to the terms and conditions set forth herein, Seller desires to sell to Buyer, pursuant to Section 363(f) of the Bankruptcy Code (as defined in Section 1.1) and with the approval of the Bankruptcy Court, the Purchased Assets, and Buyer desires to purchase the Purchased Assets from Seller, all on the terms and conditions set forth in this Agreement.

H.      Subject to the terms and conditions set forth herein, Athenex desires to sell to Buyer, pursuant to Section 363(f) of the Bankruptcy Code (as defined in Section 1.1) and with the approval of the Bankruptcy Court, the Athenex Orascovery Assets (as defined in Section 2.2), and Buyer desires to purchase the Athenex Orascovery Assets from Athenex, all on the terms and conditions set forth in this Agreement.

1

## AGREEMENTS

NOW, THEREFORE, in consideration of the foregoing premises and the representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE 1
## DEFINITIONS

1.1 **Definitions**.  When used in this Agreement, the following terms shall have the meanings assigned to them in this Section 1.1.

"Affiliate" means, with respect to any specified Person, any other Person directly or indirectly controlling, controlled by or under common control with such specified Person.  For purposes of this definition, the terms "controlling," "controlled by," or "under common control with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise, or the power to elect more than fifty percent (50%) of the directors, managers, general partners, or persons exercising similar authority with respect to such Person.

"Agreed Statement" has the meaning set forth in Section 7.1.

"Agreement" has the meaning set forth in the Preamble hereto.

"Allocation" has the meaning set forth in Section 7.2(c).

"Ancillary Documents" means the Bill of Sale, Contract Assignments, Consents, and all other agreements, instruments and documents delivered at the Closing pursuant to this Agreement.

"Approval Order" has the meaning set forth in Section 6.6(b).

"Assumed Contracts" has the meaning set forth in Section 2.1(d).

"Assumed Liabilities" has the meaning set forth in Section 2.5(a).

"Athenex" has the meaning set forth in the Preamble hereto.

"Athenex Orascovery Assets" has the meaning set forth in Section 2.2.

"Athenex Orascovery IP" means any Intellectual Property included in the Athenex Orascovery Assets, as identified on Schedule 2.2.

"Bankruptcy Case" has the meaning set forth in Recital A.

2

"Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time.

"Bankruptcy Court" has the meaning set forth in Recital A.

"Benefit Plan" means: (a) any material Employee Plan and (b) any material employment, severance or similar contract or arrangement (whether or not written) or agreement, arrangement, plan or policy (whether or not written) providing any compensation or benefits to any Employee (including any agreement, arrangement, plan or policy making available bonuses, equity awards, or deferred compensation) other than an Employee Plan, to which Seller has Liability.

"Bid Procedures" means the Bid Procedures included in the Procedures Order.

"Bid Protections" has the meaning set forth in the Procedures Order approved by the Bankruptcy Court.

"Bill of Sale" has the meaning set forth in Section 3.2(b)(i).

"Books and Records" means all of the books and records, in all formats (both tangible and intangible), used or maintained by or on behalf of Seller in connection with or otherwise related to the Orascovery Business, including (a) executed copies of all of the written Assumed Contracts, (b) all equipment, product and other warranties pertaining to the Purchased Assets, (c) all technical information and any data, maps, computer files, diagrams, blueprints and schematics, (d) all filings made with or records required to be kept by any Governmental Authority (including all backup information on which such filings are based), (e) all research and development reports, (f) all equipment and operating logs, (g) all financial and accounting records, (i) all employment records with respect to Transferred Employees, and (h) all creative, promotional or advertising materials.

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks located in New York, New York are authorized or required by Law to close.

"Business Intellectual Property" means all Intellectual Property that is (i) owned by Seller and used exclusively in the Orascovery Business or (ii) owned by a Subsidiary.

"Business IP Agreements" means all licenses, sublicenses, consent to use agreements, settlements, coexistence agreements, covenants not to sue, waivers, releases, permissions and other Contracts, whether written or oral, relating to Business Intellectual Property to which Seller or a Subsidiary is a party, beneficiary or otherwise bound.

"Business IP Registrations" means all Business Intellectual Property that is subject to any issuance, registration or application by, to or with any Governmental Entity or authorized private registrar in any jurisdiction, including issued Patents, registered Trademarks, domain names and Copyrights, and pending applications for any of the foregoing.

"Buyer" has the meaning set forth in the Preamble hereto.

3

"Buyer Closing Certificate" has the meaning set forth in Section 8.2(c).

"Charges" has the meaning set forth in Section 7.2(a).

"Closing" has the meaning set forth in Section 3.1.

"Closing Date" has the meaning set forth in Section 3.1.

"Code" means the Internal Revenue Code of 1986, as amended, and regulations promulgated thereunder.

"Confidentiality Agreement" means that certain Confidentiality Agreement, effective as of May 10, 2023, by and between C-Mer Eye Care Holdings Limited, an Affiliate of Buyer, and Athenex.

"Consents" has the meaning set forth in Section 3.2(b)(vii).

"Contract" means any written and legally binding agreement, contract, commitment or arrangement.

"Contract Assignments" has the meaning set forth in Section 3.2(b)(iii).

"Cure" means, with respect to an Assumed Contract, to pay the amount equal to all unpaid monetary obligations required to be paid as a condition to the assumption of such Assumed Contract pursuant to the provisions of Section 365 of the Bankruptcy Code, or such other amount as may be agreed upon by the Parties to such Assumed Contract, to the extent such obligations are enforceable under the Bankruptcy Code and other applicable bankruptcy Law.

"Deposit" has the meaning set forth in Section 3.2(a)(i).

"Employee" means any employee of Seller (whether salaried or hourly, and full-time or part-time), whether or not actively employed on the date hereof, including employees on vacation and leave of absence, including maternity, family, sick, military or disability leave.

"Employee Plan" means any "employee benefit plan," as defined in Section 3(3) of ERISA, that: (a) is subject to Title I of ERISA; (b) is maintained, administered or contributed to by Seller, or Seller with regard to any employee of Seller; and (c) covers any Employee.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and regulations promulgated thereunder.

"Excluded Assets" has the meaning set forth in Section 2.3.

"Fraud" means any occurrence of an event with respect to which all of the following are true: (a) a representation made by a party was false or materially inaccurate when made, (b) the party had actual knowledge that the representation was false, (c) the representation was made with

4

the intent to deceive or induce the recipient to act or refrain from acting, (d) the recipient acted (or refrained from taking an action) in justifiable reliance on the representation and (e) the recipient suffered losses as a result of such reliance and action or refraining from acting.

"GAAP" means generally accepted accounting principles, consistently applied, as in effect when applied and when applicable to Seller or Athenex means United States GAAP and when applicable to Buyer means international GAAP.

"General Enforceability Exceptions" means general principles of equity and by bankruptcy, insolvency or similar Laws and general equitable principles affecting the rights of creditors generally.

"Governmental Entity" means (i) any nation, state, commonwealth, province, territory, county, municipality, district or other jurisdiction of any nature, foreign or domestic, (ii) any federal, state, local, municipal, or other government of the foregoing, (iii) any governmental or quasi governmental entity of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal) or (iv) anybody (including any international or multinational body) exercising, or entitled to exercise any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature, including any arbitral tribunal.

"Intellectual Property" means any and all rights in, arising out of, or associated with any of the following in any jurisdiction throughout the world: (a) issued patents and patent applications (whether provisional or non-provisional), including divisionals, continuations, continuations-in-part, substitutions, reissues, reexaminations, extensions, or restorations of any of the foregoing, and other Governmental Entity-issued indicia of invention ownership (including certificates of invention, petty patents, and patent utility models) ("Patents"); (b) trademarks, service marks, brands, certification marks, logos, trade dress, trade names, and other similar indicia of source or origin, together with the goodwill connected with the use of and symbolized by, and all registrations, applications for registration, and renewals of, any of the foregoing ("Trademarks"); (c) copyrights and works of authorship, whether or not copyrightable, and all registrations, applications for registration, and renewals of any of the foregoing ("Copyrights"); (d) internet domain names and social media account or user names (including "handles"), whether or not Trademarks, all associated web addresses, URLs, websites and web pages, social media sites and pages, and all content and data thereon or relating thereto, whether or not Copyrights; (e) mask works, and all registrations, applications for registration, and renewals thereof; (f) molecules and molecule combinations or pairings, all Patents, registrations, applications for registration, and renewals thereof; (g) trade secrets, know-how, inventions (whether or not patentable), discoveries, improvements, technology, business and technical information, databases, data compilations and collections, tools, methods, formulae, algorithms, processes, techniques, and other confidential and proprietary information and all rights therein; (h) computer programs, operating systems, applications, firmware, and other code, including all source code, object code, application programming interfaces, data files, databases, protocols, specifications, and other documentation thereof; (i) rights of publicity; and (j) all other intellectual or industrial property and proprietary rights.

"Law" means any statute, law, ordinance, code, rule or regulation of any Governmental Entity.

"Liability(ies)" means with respect to any Person, any direct or indirect liabilities, obligations, commitments, indebtedness, claim, loss, damage, deficiency, assessment, fine, penalty, or responsibility of such Person of any kind or nature, whether fixed or unfixed, choate or inchoate, liquidated or unliquidated, secured or unsecured, asserted or unasserted, due or to become due, accrued or unaccrued, vested or unvested, executory, determined, determinable, absolute, known or unknown, contingent or otherwise, regardless of whether or not the same is required to be accrued on any financial statements of such Person.

"Licensed Intellectual Property" means all Intellectual Property used in the Orascovery Business in which (a) Seller hold any rights or interests granted by other Persons, including Affiliates, pursuant to a Business IP Agreement or (b) Athenex holds any rights pursuant to any Contract included in the Athenex Orascovery Assets.

"Lien" means, with respect to any property or asset, any mortgage, lien, pledge, security interest, hypothecation, charge or any other similar encumbrance in respect of such property or asset.  For the avoidance of doubt, "Lien" shall exclude any restrictions on transfer under securities Laws, this Agreement, any Ancillary Documents and any terms and conditions of any Organizational Document of Seller.

"Material Adverse Effect" means any change, event, development, or effect that has a material adverse effect on the Orascovery Business, assets, liabilities, financial condition or results of operations of Seller, taken as a whole; provided that none of the following shall be taken into account (either alone or in combination) in determining whether there is or has been a Material Adverse Effect: any adverse change, event, circumstance, or development arising from or relating to: (a) any action required or permitted by this Agreement or any action taken (or omitted to be taken) with the written consent of or at the written request of the Buyer; (b) any matter of which Buyer is aware on the date hereof; (c) the announcement, pendency or completion of the transactions contemplated by this Agreement, including losses or threatened losses of employees, customers, suppliers, distributors or others having relationships with Seller; (d) any failure of Seller to meet any internal or published projections, forecasts or revenue or earnings predictions; (c) general economic or political conditions; (e) conditions generally affecting the industries in which Seller is conducted; (f) any changes in financial, banking or securities markets in general, including any disruption thereof and any decline in the price of any security or any market index or any change in prevailing interest rates; (g) acts of war (whether or not declared), armed hostilities or terrorism, or the escalation or worsening thereof; (h) any changes in applicable Laws or accounting rules (including GAAP) or the enforcement, implementation or interpretation thereof; (i) any natural or man-made disaster or acts of God; or (j) any epidemics, pandemics, disease outbreaks, or other public health emergencies whether or not declared by a Governmental Entity; provided, that in the cases of clauses (a) through (j) above, such change, event, development, or effect shall only be considered in determining whether a Material Adverse Effect has occurred if such change, event, development, or effect impacts Seller materially and disproportionately to the impact that such change, event, development, or effect generally has upon other Persons operating in the same or substantially similar industries or markets as Seller. For the

6

avoidance of doubt, neither the filing of the Bankruptcy Case or any actions taken in furtherance of the Bankruptcy Case or the transactions contemplated by this Agreement, nor the consequences or effects of or changes or developments arising from the filing or any such actions shall be deemed to be a Material Adverse Event for purposes of this Agreement.

"Net Sales" means worldwide gross sales less all discounts, marketing credits and sales commissions, calculated in accordance with international GAAP.

"Non-assignable Asset" has the meaning set forth in Section 2.4.

"Order" means any award, injunction, judgment, decree, order, ruling, subpoena or verdict or other decision issued, promulgated or entered by any Governmental Entity of competent jurisdiction.

"Ordinary Course of Business" means, with respect to Seller, the ordinary course of business consistent with its past custom and practice, subject to changes in operations resulting from Seller operating as a distressed business with very significant reductions in personnel, and subject to changes resulting from the filing and/or pendency of the Bankruptcy Case or the requirements of any debtor in possession financing in the Bankruptcy Case.

"Organizational Documents" means, with respect to any entity, as applicable, the certificate of incorporation, articles of incorporation, bylaws, articles of organization, partnership agreement, limited liability company agreement, formation agreement, joint venture agreement and other similar organizational documents of such entity (in each case, as amended through the date of this Agreement).

"Orascovery Business" has the meaning set forth in Recital B.

"Outside Date" has the meaning set forth in Section 9.1(d).

"Parties" has the meaning set forth in the Preamble hereto.

"Permit" means any authorization, approval, consent, certificate, governmental license, registration, variance, exemption, waiver, permit or franchise of or from any Governmental Entity.

"Permitted Liens" means: (a) Liens for Taxes that are not yet due and payable or that are being contested in good faith by appropriate proceedings; (b) statutory Liens (or contractual restatements thereof) of landlords and workers', carriers', materialmen's, suppliers' and mechanics' or other like Liens incurred in the Ordinary Course of Business; (c) Liens that will be released prior to or as of the Closing; and (d) purported Liens evidenced by the filing of UCC financing statements relating solely to operating leases or consignment or bailee arrangements entered into in the Ordinary Course of Business.

"Person" means an individual, a corporation, a partnership, a limited liability company, a trust, an unincorporated association, a Governmental Entity, or any other entity or body.

"Petition Date" means the date upon which the Bankruptcy Case was commenced.

"Proceeding" means any suit, litigation, arbitration or other dispute resolution proceeding before any Governmental Entity.

"Procedures Order" is defined in the Recitals above.

"PSZJ" means Pachulski Stang Ziehl & Jones LLP, counsel to Seller.

"Purchased Assets" has the meaning set forth in Section 2.1.

"Purchase Price" has the meaning set forth in Section 2.7.

"Representatives" of any Person shall mean the directors, managers, officers, employees, consultants, financial advisors, counsel, accountants and other representatives and agents of such Person.

"Retained Liabilities" has the meaning set forth in Section 2.5(b).

"Schedule Supplement" has the meaning set forth in Section 6.3.

"Seller" has the meaning set forth in the Preamble hereto.

"Seller Closing Certificate" has the meaning set forth in Section 8.1(c).

"Seller Closing Notice" has the meaning set forth in Section 9.1(f).

"Seller Disclosure Schedules" means the disclosure schedules delivered by Seller concurrently with the execution and delivery of this Agreement.

"Seller's Knowledge" or any similar phrase means the actual, current knowledge of Johnson Lau, Rudolf Kwan and Joe Annoni only.  For the avoidance of doubt, none of such individuals shall have any personal liability or obligations regarding such knowledge.

"Subsidiary Excluded Assets" has the meaning set forth in Section 6.9.

"Subsidiaries" has the meaning set forth in Recital D.

"Tangible Personal Property" has the meaning set forth in Section 2.1(b).

"Tax" or "Taxes" means all U.S. federal, state, provincial, local and foreign income, profits, franchise, license, gross receipts, occupation, premium, windfall profits, environmental, customs, duties, capital stock, severance, stamp, payroll, sales, employment, unemployment, disability, use, ad valorem, recapture, unclaimed property, escheat, personal and real property, withholding, excise, production, transfer, alternative minimum, registration, value added,

8

occupancy, estimated and other taxes, charges, fees, levies, or other like assessments, including any interest, penalty, or addition thereto, whether disputed or not.

"Tax Returns" any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Transfer Taxes" means sales, use, transfer, real property transfer, recording, documentary, stamp, registration and stock transfer Taxes and any similar Taxes.

"U.S." or "United States" means the United States of America.

## ARTICLE 2
## PURCHASE AND SALE

2.1     **Purchased Assets**.  Upon the terms and subject to the conditions of this Agreement, at the Closing, Seller shall sell, transfer, assign, convey and deliver to Buyer, and Buyer shall purchase from Seller, free and clear of all Liens (other than Permitted Liens) to the extent provided in Section 363(f)(3) of the Bankruptcy Code, all of Seller's right, title and interest in and to all of Seller's property and assets, real, personal or mixed, tangible and intangible, of every kind and description, held for use or used in the Orascovery Business, wherever located (collectively, the "Purchased Assets"), including all of the following (but excluding all of the Excluded Assets):

(a)     all accounts and notes receivable (whether current or non-current) and all causes of action specifically pertaining to the collection of the foregoing, in each case to the extent arising exclusively out of the operation of the Orascovery Business (but excluding any accounts or notes receivable due from any Affiliate of Seller), including, without limitation, but subject to updating by Seller not less than three (3) Business Days prior to the Closing Date to reflect activity during the period following mutual execution and delivery of this Agreement, the items set forth in Schedule 2.1(a);

(b)     all tangible personal property, including computer hardware, manufacturing equipment, office equipment, laboratory equipment and tools, accessories, machinery, furniture, and fixtures owned by Seller and used or held for use in the Orascovery Business as of the Closing and listed or set forth on Schedule 2.1(b) (collectively, the "Tangible Personal Property");

(c)     all supplies, goods, materials, work in process, inventory and stock in trade owned and held by Seller for use in connection with the operation of the Orascovery Business;

(d)     all of Seller's rights under the Contracts identified by Seller as "executory contracts" (within the meaning of Section 365 of the Bankruptcy Code) and which Buyer has designated to be included in the Purchased Assets in accordance with Section 2.6 and as set forth on Schedule 2.1(d) (collectively, together with any Contracts included in the Athenex Orascovery Assets and assumed by Buyer, the "Assumed Contracts"), subject to the provisions of Section 2.6;

(e)     all of Seller's rights relating to deposits and prepayments with respect to the Assumed Contracts, which deposits and prepayments are listed on <u>Schedule 2.1(e)</u>;

(f)     those Permits, if any, listed on <u>Schedule 2.1(f)</u>, to the extent transferrable or assignable;

(g)     all warranties (express and implied), guaranties and similar rights that continue in effect with respect to any Purchased Asset (including, without limitation, warranties and guaranties made by suppliers, manufacturers and contractors for or under any Assumed Contract), to the extent assignable;

(h)     all intangible personal property (including Business Intellectual Property) owned by Seller and used or held for use in the Orascovery Business as of the Closing Date, but in all cases only to the extent of Seller's interest and only to the extent transferable including, without limitation, the goodwill of the Orascovery Business, processes, Trademarks, trade names, service marks, domain names, catalogues, customer lists and other customer data bases, advertising materials, software programs, and telephone numbers identified with the Orascovery Business;

(i)     all Proceedings of Seller relating to any Purchased Asset or Assumed Liability (but not including any Proceeding described in <u>Section 2.3(p)</u>);

(j)     all rights of Seller under non-disclosure, confidentiality or similar agreements entered into with third parties in connection with the sale of the Orascovery Business or any Purchased Assets; and

(k)     all Books and Records, except as specifically provided in <u>Section 2.3(j)</u>.

2.2     **Athenex Orascovery Assets**.  Upon the terms and subject to the conditions of this Agreement, at the Closing, Athenex shall sell, transfer, assign, convey and deliver to Buyer, and Buyer shall purchase from Seller, free and clear of all Liens (other than Permitted Liens) to the extent provided in Section 363(f)(3) of the Bankruptcy Code, all of Seller's right, title and interest in and to only the following assets of Athenex (collectively, the "<u>Athenex Orascovery Assets</u>"): (a) all of the issued and outstanding equity interests of each Subsidiary and all Tax assets (including Tax refunds and prepayments) and Tax Returns of the Subsidiaries; (b) the License Agreement, dated December 16, 2011, by and between Hanmi Pharmaceutical Ltd. and Athenex (f/k/a Kinex Pharmaceuticals, LLC) for Orascovery Program, as amended; (c) the License Agreement, dated June 28, 2013, by and between Hanmi Pharmaceutical Co., Ltd. and Athenex Therapeutics Limited (formerly known as Kinex Therapeutics (HK) Limited) and Athenex (formerly known as Kinex Pharmaceuticals, Inc.), as guarantor, on Orascovery Program Mainland China Territory; and (d) the assets identified on <u>Schedule 2.2</u>. For the avoidance of doubt, Buyer is not acquiring pursuant to this Agreement any assets or rights of Athenex, other than the Athenex Orascovery Assets.

2.3     **Excluded Assets**.  Notwithstanding anything herein to the contrary, from and after the Closing, Seller shall retain all of its right, title and interest in and to, and there shall be excluded from the sale, conveyance, assignment or transfer to Buyer hereunder, and the Purchased Assets

shall not include the following assets and properties (such retained assets and properties being the "Excluded Assets"):

       (a)     all cash and cash equivalents (including bank account balances, certificates of deposit and other time deposits and petty cash) and marketable and other securities;

       (b)     all rights under this Agreement and any Ancillary Agreement;

       (c)     all cash deposits and prepaid items relating to or arising in connection with the operation of the Orascovery Business, other than those described in Section 2.1(e);

       (d)     all of the equity interests in Seller;

       (e)     all Benefit Plans (including all trusts, insurance policies and administration service Contracts related thereto), and all assets in respect of any Benefit Plan;

       (f)     any Contracts between Seller, on the one hand, and any of its Affiliates, on the other hand, except those set forth on Schedule 2.1(d), and any accounts or notes receivable due from any Affiliate of Seller;

       (g)     any Contract to which Seller is a party that (i) is not an Assumed Contract or (ii) is an Assumed Contract but is not assumable and assignable pursuant to the terms thereof or as a matter of applicable Law (including, without limitation, any Assumed Contract with respect to which any consent requirement in favor of the counter-party thereto is not satisfied and may not be overridden pursuant to Section 365 of the Bankruptcy Code) (collectively, "Excluded Contracts");

       (h)     the organizational documents, minute books, member ledger, books of account or other records having to do with the limited liability company organization of Seller, and all employee related files or records;

       (i)     all Tax assets (including Tax refunds and prepayments) and Tax Returns of Seller or any of its Affiliates (other than the Subsidiaries) for any period including, with respect to the Purchased Assets or the Orascovery Business, for taxable periods ending on or prior to the Closing Date;

       (j)     any Books and Records which Seller is required by applicable Law to retain; provided, however, that Seller shall provide Buyer with copies of all such Books and Records at or prior to the Closing, and any Books and Records relating solely to the Excluded Assets or Retained Liabilities;

       (k)     all insurance policies of Seller, and all benefits, rights and claims and proceeds thereunder relating to any Excluded Assets or Retained Liabilities;

       (l)     all refunds for prepaid insurance premiums or insurance prepayments;

       (m)     all claims and causes of action of Seller, except as provided in Section 2.1(i);

(n)      any Tangible Personal Property held by Seller pursuant to a Contract where Buyer does not assume the underlying Contract relating to such Tangible Personal Property at the Closing;

(o)      any software or other item of intangible property (including Intellectual Property) held by Seller pursuant to a license or other Contract where Buyer does not assume the underlying Contract relating to such intangible personal property at the Closing;

(p)      all preference or avoidance Proceedings of Seller, including, without limitation, any such Proceedings arising under Sections 544, 547, 548, 549, and 550 of the Bankruptcy Code; and

(q)      any assets specifically set forth or described on <u>Schedule 2.3(q)</u>.

2.4      **Non-assignable Assets**. Nothing in this Agreement, the Bill of Sale or the Contract Assignments or the consummation of the transactions contemplated hereby or thereby shall be construed as an attempt or agreement to assign or transfer any Purchased Asset or Athenex Orascovery Asset (including any Assumed Contract or Permit) to Buyer which by its terms or by Law is not assignable or transferable without a consent or is cancelable by a third party in the event of an assignment or transfer (a "<u>Non-assignable Asset</u>"), unless and until such consent shall have been obtained (including by virtue of the effect of the Approval Order rendering certain consents to be unnecessary) or any applicable Law satisfied. Seller, Athenex and Buyer shall use diligent and commercially reasonable efforts to obtain any consent that may be required and satisfy any Law necessary to the assignment or transfer of a Non-assignable Asset to Buyer, and Seller and Athenex shall take all such commercially reasonable actions as may be necessary to effect the assignment or transfer of the Non-assignable Asset. Unless and until any such consent that may be required is obtained or Law satisfied, Seller or Athenex, as applicable, shall establish an arrangement reasonably satisfactory to Buyer under which Buyer would obtain the claims, rights and benefits and assume the corresponding Liabilities and obligations under such Non-assignable Asset (including by means of any subcontracting, sublicensing or subleasing arrangement) or under which Seller or Athenex, as applicable, would enforce for the benefit of Buyer, with Buyer assuming and agreeing to pay Seller's or Athenex's obligations  and reasonable expenses, any and all claims, rights and benefits of Seller against a third party thereto; provided, that in no event shall Buyer be required to enter into any such arrangement with respect to any Non-assignable Asset for which a required consent is necessary.  Seller shall promptly pay over to Buyer all payments received by Seller or Athenex in respect of all Non-assignable Assets.  If and when the applicable consents or approvals, the absence of which caused the deferral of transfer of any Non-assignable Asset pursuant to this Section, are obtained, the transfer of the applicable Non-assignable Asset to Buyer shall automatically and without further action be effected in accordance with the terms of this Agreement.

2.5     **Liabilities**.

(a)     Subject to the terms and conditions of this Agreement, at the Closing, Buyer shall assume and agree to perform, pursuant to the Bill of Sale and the Contract Assignments, as applicable, the following Liabilities of Seller or Athenex, as applicable (collectively, the "Assumed Liabilities"):

(i)     all Liabilities of Seller (or, as applicable, Athenex) under the Assumed Contracts arising after the Closing Date;

(ii)     all Liabilities arising on or after the Closing Date with respect to the Purchased Assets or Buyer's operation of the Orascovery Business; and

(iii)     all Cure obligations required to be paid pursuant to the Approval Order as a condition to Buyer's assumption of the Assumed Contracts in accordance with Section 2.6(c).

(b)     Except for the Assumed Liabilities described in Section 2.5(a), Buyer shall not assume, nor be obligated to pay, perform, satisfy or discharge, any Liability of Seller, Athenex, or any Affiliate of Seller (collectively, the "Retained Liabilities"); provided, however, that Liabilities of the Subsidiaries shall not constitute Retained Liabilities.

2.6     **Assumption and Rejection of Contracts**.

(a)     Subject to the approval of the Bankruptcy Court by Final Order, the Assumed Contracts will be assumed by Seller (or, with respect to any Assumed Contract that is an Athenex Orascovery Asset, by Athenex) and assigned to Buyer on the Closing Date in accordance with Section 365 of the Bankruptcy Code. The final determination of which Contracts shall be Assumed Contracts shall be within the sole discretion of Buyer.

(b)     No later than the day that is five (5) Business Days after the date of this Agreement, Seller shall provide Buyer with a written schedule containing all of Seller's Contracts and all Contracts of Athenex that constitute Athenex Orascovery Assets. along with a reasonable good faith estimate of the Cure amount due and owing for each Contract.  On or prior to the day that is the earlier of (i) ten (10) Business Days after Seller's delivery of such estimate and (ii) three (3) Business Days prior to the Closing Date (the "Rejection Deadline"), Buyer may, by written notice to Seller, amend Schedule 2.1(d) and Schedule 2.2.  Only the Assumed Contracts listed on Schedule 2.1(d) and Schedule 2.2, as amended, as of the expiration of the Rejection Deadline, shall be assumed and assigned to Buyer at Closing; provided, however, that upon the prior written consent of the Parties which shall not be unreasonably withheld, Schedule 2.1(d) and Schedule 2.2 may be amended at any time prior to the Closing Date.

(c)     In the absence of a dispute regarding the acts necessary to Cure with respect to an Assumed Contract, Buyer shall pay the Cure amount due and owing on all Assumed Contracts on the Closing Date, or upon such other terms as Buyer and the non-debtor party to an Assumed Contract may otherwise agree.  In the event of a dispute regarding (i) the acts necessary to Cure, or (ii) the ability of Buyer or Seller or Athenex, as applicable, to provide "adequate

13

assurance of future performance" (within the meaning of Section 365 of the Bankruptcy Code) under any Assumed Contract, the assumption thereof shall be conditioned upon resolution of such dispute by the Bankruptcy Court.  Seller and Athenex, as applicable (with the consent of Buyer) or Buyer, as applicable, reserves the right either to reject or nullify the assumption of any Contract no later than the day that is one (1) Business Day after a Final Order determining the acts necessary to Cure or any request for adequate assurance of future performance.

(d)     Notwithstanding anything in this Agreement to the contrary, a Contract that is validly rejected or otherwise not assumed and assigned to Buyer pursuant to this <u>Section 2.6</u> shall constitute an Excluded Asset.

2.7     **Purchase Price**.  Subject to the provisions of this Agreement, the aggregate consideration to be paid by Buyer to Seller and Athenex for the Purchased Assets and the Athenex Orascovery Assets shall be US$2,500,000 (the "<u>Purchase Price</u>").  The Purchase Price shall be paid as and when and otherwise in accordance with the provisions of <u>Section 3.2(a)</u>.  In addition to the Purchase Price, Buyer will pay Seller a milestone payment of US$5,000,000 promptly after the point in time where Net Sales of Oraxol have reached US$10,000,000.

2.8     **Withholding**.  Notwithstanding any provision hereof to the contrary, each of Buyer, Seller, Athenex and any of their Affiliates shall be entitled to deduct and withhold from any consideration otherwise payable under the terms of this Agreement such amounts as it is required to deduct and withhold pursuant to any provision of Law, including those related to or regarding Taxes; provided, however, that no such withholding shall apply to any payments to Seller or Athenex hereunder unless Buyer has provided Seller and Athenex with at least three (3) calendar days advance written notice of Buyer's intent to withhold and Buyer reasonably cooperates with Seller to minimize or eliminate such withholding.  To the extent that amounts are so deducted and withheld, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made.

**ARTICLE 3**
**CLOSING; PAYMENT OF PURCHASE PRICE**

3.1     **Closing**.  Unless this Agreement shall have been terminated in accordance with <u>Section 9.1</u>, the Parties shall consummate the transactions contemplated by this Agreement (the "<u>Closing</u>"), as promptly as practicable but in no event later than three (3) Business Days after the date on which all conditions set forth in <u>Article 8</u> (except those conditions that are to be satisfied at Closing) have been satisfied (or waived by the Party entitled to the benefit of the same), with such Closing to occur at 11:00 a.m., Eastern standard time, or at such other place, date and time as the Parties shall mutually agree in writing (the date on which the Closing occurs, the "<u>Closing Date</u>").  The Closing shall take place via electronic exchange of executed documents and other closing deliveries via email on the Closing Date.

3.2     **Closing Deliveries**.

(a)     <u>Payment of Purchase Price</u>.

(i)     Prior to the execution and delivery of this Agreement, Buyer delivered to PSZJ, for deposit in its trust account for the benefit of Seller, an amount equal to US$250,000 (the "Deposit"), which PSZJ shall hold subject to the terms of this Agreement.  The Deposit shall be held by PSZJ and released as follows:  (1) at the Closing, the Deposit shall be credited and applied toward payment of the Purchase Price (and paid to Seller); (2) if Seller terminates this Agreement prior to Closing pursuant to Section 9.1(c) or Section 9.1(f) (each, a "Buyer Default Termination"), then the Deposit shall become nonrefundable and shall be paid to Seller for Seller's own account as liquidated damages; and (3) if this Agreement is terminated by Seller prior to Closing for any reason other than a Buyer Default Termination, then the Deposit shall be returned to Buyer. The Parties agree that the payment of the Deposit to Seller as a result of a Buyer Default Termination shall not be the sole and exclusive remedy with respect to a Buyer Default Termination, but shall serve as setoff for any claim of breach or payment due to Seller for breach by Buyer of this Agreement.

(ii)     At the Closing, Buyer shall direct PSZJ to deliver the Deposit to Athenex, as provided in Section 3.2(a)(i).

(iii)     At the Closing, Buyer shall pay and deliver to Seller, by wire transfer of immediately available good funds of the United States to one or more accounts designated by Seller, an amount equal to US$2,250,000 (which amount represents the Purchase Price minus the amount of the Deposit).

(b)     Deliveries by Seller and Athenex at the Closing.  At the Closing, Seller and Athenex, as applicable, shall deliver to Buyer the following:

(i)     a Bill of Sale, Assignment and Assumption Agreement or similar document, in a form acceptable to Buyer and Seller (the "Bill of Sale"), duly executed by Seller;

(ii)     a bill of sale or similar document, in a form acceptable to Buyer and Athenex, duly executed by Athenex;

(iii)     one or more Assignment and Assumption Agreements or similar documents, in a form acceptable to Buyer and Seller, with respect to the Assumed Contracts, including, without limitation, an assignment of any real property leases included among the Assumed Contracts (collectively, the "Contract Assignments"), duly executed by Seller or, as applicable, Athenex;

(iv)     an Assignment of Trademarks and Domain Names, in a form reasonably acceptable to Buyer, duly executed by the applicable Seller;

(v)     the Seller Closing Certificate;

(vi)     a copy of (A) the resolutions of Seller's governing body authorizing the execution and delivery of this Agreement and the Ancillary Documents and performance by Seller of the transactions contemplated hereby and thereby, and (B) the resolutions of Athenex's governing body authorizing the execution and delivery of this Agreement and the Ancillary Documents and performance by Athenex of the transactions contemplated hereby and thereby;

15

(vii)     evidence of the consents, authorizations, and approvals set forth on Schedule 3.2(b)(vii) (collectively, the "Consents");

(viii)    an assignment of the equity securities of each Subsidiary, in a form acceptable to Buyer, signed by Athenex; and

(ix)     a properly completed and duly executed IRS Form W-9 by each of Seller and Athenex.

(c)     Deliveries by Buyer at the Closing.  At the Closing, Buyer shall deliver to Seller the following:

(i)      each Bill of Sale, duly executed by Buyer;

(ii)     the Contract Assignments, each duly executed by Buyer;

(iii)    the Buyer Closing Certificate; and

(iv)    a copy of the resolutions of Buyer's governing body, certified by an appropriate authorized officer of Buyer as having been duly and validly adopted and being in full force and effect as of the Closing Date and authorizing the execution and delivery of this Agreement and the Ancillary Documents and performance by Buyer of the transactions contemplated hereby and thereby.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF SELLER AND ATHENEX

Except as set forth in the Seller Disclosure Schedules, which exceptions or disclosures set forth therein will be deemed to be a part of the representations and warranties made hereunder, Seller and Athenex, as applicable, hereby each represent and warrant to Buyer as follows:

4.1     **Existence and Power**.  Each of Seller and Athenex is a limited liability company that is duly organized, validly existing, and in good standing under the Laws of the state where it was formed.  Each of Seller and Athenex has all requisite entity power and authority required to own, lease, or, subject to the provisions of the Bankruptcy Code applicable to debtors in possession, operate the properties and assets now owned, leased or operated by it and to carry on its business as presently conducted.  Seller is duly qualified to transact business and is in good standing (or the equivalent thereof, if applicable) authorized to transact business in each jurisdiction in which the nature of the business conducted by it requires such qualification.

4.2     **Authorization**.  Subject to entry of the Approval Order, each of Seller and Athenex has all requisite power and authority to execute and deliver, and to perform its obligations under, this Agreement and each Ancillary Document to which Seller or Athenex, as applicable, is a party. The execution, delivery and performance by each of Seller and Athenex of this Agreement and such Ancillary Documents and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all necessary company action on the part of Seller or Athenex.

4.3     **Enforceability**.  This Agreement has been duly executed and delivered by each of Seller and Athenex. Upon entry of the Approval Order, this Agreement shall constitute (and each Ancillary Document to which Seller or Athenex is or will be a party will constitute at or prior to the Closing) a valid and legally binding obligation of Seller or Athenex, as applicable, enforceable against Seller and Athenex, as applicable, in accordance with its terms, assuming that this Agreement and such Ancillary Documents, where applicable, have been duly executed by the other parties thereto, except as enforcement may be limited by General Enforceability Exceptions.

4.4     **Non-contravention**.  Subject to entry of the Approval Order, except as set forth on Schedule 4.4, the execution, delivery and performance by Seller and Athenex of this Agreement or any Ancillary Documents, and the consummation of the transactions contemplated hereby will not (a) violate or conflict with the Organizational Documents of Seller or Athenex, (b) violate any Law or any Order, in each case applicable to Seller or Athenex, (c) constitute a default under, or give rise to termination, cancellation or acceleration of any right or obligation of Seller or Athenex under, or to a loss of any benefit to which Seller or Athenex is entitled under any Assumed Contract binding upon Seller or Athenex, or (d) result in the creation or imposition of any Lien (other than Permitted Liens) on any Purchased Asset or Athenex Orascovery Asset.  Subject to entry of the Approval Order, except as set forth on Schedule 4.4, no permit, consent, approval or authorization of, notice or declaration to, or filing or registration with any Governmental Entity is required to be made or obtained by Seller or Athenex in connection with the consummation of the transactions contemplated by this Agreement or any Ancillary Document.

4.5     **Proceedings**.  There are no Proceedings (other than the Bankruptcy Case) pending or, to Seller's Knowledge, threatened in writing by or against Seller or Athenex that relate to the Orascovery Business or the Purchased Assets or that seek or otherwise are reasonably expected to (x) materially adversely affect the ability of Seller or Athenex to consummate the transactions contemplated by this Agreement and the Ancillary Documents, (y) prevent, enjoin or otherwise delay the transactions contemplated by this Agreement, or (z) materially impact Buyer's right to use the Purchased Assets.

4.6     **Compliance with Law; Permits**.

(a)     Except (A) as set forth on Schedule 4.6(a), (B) as otherwise specifically directed by the Bankruptcy Court, or (C) where such violation or non-compliance would not, individually or in the aggregate have a Material Adverse Effect: (i) Seller is not in violation of any Law or Order to which it is subject with respect to the Orascovery Business; and (ii) within the prior three years, Seller has not received (A) any written notice or other communication from a Governmental Body that alleges that the Orascovery Business is not in compliance with any Law or Order applicable thereto; or (B) any written notice or other written communication regarding material deficiencies in the compliance practices, procedures, methodologies or methods of the Orascovery Business, including any complaint, allegation, assertion or claim that the Orascovery Business has engaged in illegal practices.

(b)     Schedule 4.6(b) sets forth a list of all Permits currently held by Seller with respect to the Orascovery Business. Seller has not received any written notice that it is in violation of any Permit set forth on Schedule 4.6(b).

4.7    **Title to Purchased Assets**.  Seller owns (or has the right to use) the Purchased Assets, free and clear of all Liens (other than Permitted Liens).  Athenex owns (or has the right to use) the Athenex Orascovery Assets, free and clear of all Liens (other than Permitted Liens).

4.8    **Intellectual Property**.

(a)    Schedule 4.8(a) contains a correct, current, and complete list, as of the date hereof, of: (i) all Business IP Registrations, specifying as to each, as applicable: the title, mark, or design; the record owner and inventor(s), if any; the jurisdiction by or in which it has been issued, registered, or filed; the patent, registration, or application serial number; the issue, registration, or filing date; and the current status; (ii) all unregistered Trademarks included in the Business Intellectual Property; and (iii) all other material Business Intellectual Property used or held for use by Seller in the Orascovery Business.

(b)    Schedule 4.8(b) contains a contains a correct, current and complete list, as of the date hereof, of all Business IP Agreements including the date, title and parties thereto:  (i) under which Seller or any Subsidiary is a licensee (excluding generally commercially available, off the shelf software programs licensed pursuant to shrink-wrap or "click to accept" agreements) or otherwise obtains Intellectual Property rights, or (ii) pursuant to which Seller or any Subsidiary has licensed or otherwise granted Intellectual Property rights to any Person (excluding (x) non-exclusive licenses granted in the Ordinary Course of Business and (y) licenses for off-the-shelf software for the internal use of Seller or a Subsidiary).

(c)    To Seller's Knowledge, there are no Proceedings (including any opposition, cancellation, revocation, review or other proceeding), whether settled or pending:  (i) alleging any infringement, misappropriation or other violation by Seller or the Subsidiaries (or, with respect to any of the Athenex Orascovery Assets, Athenex) of the Intellectual Property of any Person; (ii) challenging the validity, enforceability, registrability, patentability or ownership of any Business Intellectual Property, Athenex Orascovery IP, or any Licensed Intellectual Property or Seller's or Athenex's right, title, or interest in or to any Business Intellectual Property, Athenex Orascovery IP, or any Licensed Intellectual Property; or (iii) by Seller, Athenex or by the owner of any Licensed Intellectual Property alleging any infringement, misappropriation, or other violation by any Person of the Business Intellectual Property, Athenex Orascovery IP or such Licensed Intellectual Property.

(d)    Seller, Athenex and each Subsidiary has taken commercially reasonable steps to maintain and enforce its ownership and rights with respect to the Business Intellectual Property, Athenex Orascovery IP, and Licensed Intellectual Property and to preserve the confidentiality of all Trade Secrets included in the Business Intellectual Property and Licensed Intellectual Property.

(e)    Except as set forth in any Business IP Agreement, as of the date of this Agreement, Athenex and Seller have not committed to out-license, assign or sell any Business Intellectual Property or Athenex Orascovery IP to any Person other than Buyer.

4.9 **Affiliate Transactions**.  Schedule 4.9 sets forth all Contracts between either Seller or any Subsidiary, on the one hand, and any Affiliates of Seller, on the other hand, necessary to operate the Orascovery Business as it is currently conducted.

4.10 **Required Notices**.  Athenex and Seller have each complied with all notice provisions of the Bankruptcy Laws.  Without limiting the generality of the foregoing, each of Athenex and Seller has delivered adequate notice of the sale of the Purchased Assets and Athenex Orascovery Assets free and clear of  all Liens (other  than Permitted Liens) and Excluded Liabilities to (a) each Person who is the beneficiary of or a holder of any Lien in and to any of the Purchased Assets, and (b) each counterparty to each of the Assumed Contracts.

4.11 **Brokers**.  Except for any investment banker identified on Schedule 4.11 (whose fees shall be paid by Seller or Athenex pursuant to a separate agreement), no broker, finder, financial advisor or other intermediary is or will be entitled to any fee or commission from Seller or Athenex  in connection with the transactions contemplated by this Agreement.

4.12 **Leased or Owned Real Property**.  Neither Seller nor any Subsidiary leases or owns any real property.

4.13 **Exclusivity of Representations and Warranties**.  Except as set forth in this Article 4, none of Seller, Athenex or any other Person is making any representation or warranty of any kind or nature whatsoever, oral or written, express or implied, relating to Seller, Athenex, the Purchased Assets, the Athenex Orascovery Assets, or the Orascovery Business (including any relating to financial condition, results of operations, assets or liabilities of Seller, Athenex, or the Subsidiaries), and Seller and Athenex hereby disclaim any such other representations or warranties.  Without limiting the generality of the foregoing, none of Seller, Athenex or any other Person on behalf of Seller or Athenex has made or makes, and Seller and Athenex hereby disclaim, any representation or warranty, whether express or implied, with respect to any projections, forecasts, estimates or budgets made available to Buyer, its Affiliates or any of their respective Representatives (including the reasonableness of the assumptions underlying any of the foregoing).

# ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller as follows:

5.1 **Existence and Power**.  Buyer is a limited liability company duly organized, validly existing, and in good standing under the Laws of  Hong Kong.

5.2 **Authorization**.  Buyer has all requisite power and authority to execute and deliver, and to perform its obligations under, this Agreement and each Ancillary Document to which Buyer is a party or subject.  The execution, delivery, and performance by Buyer of this Agreement and such Ancillary Documents and the consummation of the transactions contemplated hereby and thereby (a) are within Buyer's limited liability company powers and (b) have been duly authorized by all necessary limited liability company action on the part of Buyer.

5.3     **Enforceability**.  This Agreement has been duly executed and delivered by Buyer. This Agreement constitutes (and each Ancillary Document to which Buyer is or will be a party will constitute at or prior to the Closing) a valid and legally binding obligation of Buyer, enforceable against Buyer in accordance with its terms, assuming that this Agreement and such Ancillary Documents, where applicable, have been duly executed by the other parties thereto, except as enforcement may be limited by General Enforceability Exceptions.

5.4     **Governmental and Third Party Authorizations**.  No consent, approval or authorization of, declaration to or filing or registration with, any Governmental Entity or any other Person is required to be made or obtained in connection with the execution, delivery and performance by Buyer of this Agreement or any Ancillary Document or the consummation by Buyer of the transactions contemplated by this Agreement or any Ancillary Document.

5.5     **Non-contravention**.  The execution, delivery and performance by Buyer of this Agreement or any Ancillary Documents, and the consummation of the transactions contemplated hereby and thereby, will not (a) violate the Organizational Documents of Buyer, (b) violate any Law or Order, in each case applicable to Buyer, or (c) constitute a default under, or give rise to termination, cancellation or acceleration of any right or obligation of Buyer or to a loss of any benefit to which Buyer is entitled, under any contract, agreement, instrument, commitment or arrangement binding upon Buyer.

5.6     **Brokers**.  No investment banker, broker, finder or other intermediary is or will be entitled to any fee or commission from Buyer or any of its Affiliates in connection with the transactions contemplated by this Agreement or any of the Ancillary Documents.

5.7     **Proceedings**.  There are no Proceedings pending or, to the knowledge of Buyer, threatened against Buyer or any of its Affiliates that seek or otherwise are reasonably expected to (x) materially adversely affect the ability of Buyer to consummate the transactions contemplated by this Agreement and the Ancillary Documents or (y) prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.

5.8     **Financial Capability**.

(a)     Sufficient Funds.  Buyer has, and will have on the Closing Date, unrestricted funds available sufficient to (i) consummate the transactions contemplated by this Agreement, including to make all payments at the Closing contemplated by Section 3.2(a), including payment of the Purchase Price; and (ii) pay all costs and expenses and other amounts required to be paid by Buyer in connection with the Closing or otherwise.  Buyer has, and at the Closing will have, the resources and capabilities (financial or otherwise) to perform all of its obligations hereunder, and Buyer has not incurred any Liability or restriction of any kind that would impair or adversely affect such resources and capabilities.

(b)     Obligations Not Conditioned on Financings.  In no event shall the receipt or availability of any funds by Buyer or any Affiliate or any other financing be a condition to any of Buyer's obligations under this Agreement.  Buyer understands and acknowledges and agrees that under the terms of this Agreement, Buyer's obligation to consummate the transactions

contemplated by this Agreement is not in any way contingent upon or otherwise subject to Buyer's consummation of any financing arrangements, Buyer's obtaining any financing, or the availability, grant, provision or extension of any financing to Buyer.

5.9    **Solvency**.  Buyer is solvent (a) as of the date of this Agreement and (b) at and immediately after the Closing, after giving effect to the transactions contemplated hereby (including the payment of the Purchase Price and all other amounts required to be paid, borrowed or refinanced in connection with the consummation of the transactions contemplated by this Agreement and all related fees and expenses).

5.10    **Independent Investigation**.    Buyer has conducted its own independent investigation, review and analysis of Seller and the Subsidiaries, the Orascovery Business, the Purchased Assets, the Athenex Orascovery Assets, and the Assumed Liabilities, and acknowledges that it has been provided adequate access to the personnel, properties, premises, and other documents and data of Seller for such purpose. Buyer acknowledges and agrees that: (a) in making its decision to enter into this Agreement and consummate the transactions contemplated by this Agreement, Buyer has relied solely upon its own investigation and the express representations and warranties of Seller set forth in Article 4 of this Agreement (including related portions of the Seller Disclosure Schedules); and (b) none of Seller, Athenex or any other Person has made any representation or warranty as to Seller, any Subsidiary, Athenex, the Orascovery Business, the Purchased Assets, the Athenex Orascovery Assets,  or the Assumed Liabilities, except as expressly set forth in Article 4 of this Agreement.  Buyer will accept the Purchased Assets and Athenex Orascovery Assets at the Closing "AS IS, "WHERE IS," and "WITH ALL FAULTS." In connection with Buyer's investigation of Seller and the Subsidiaries, Buyer and its Affiliates may have received from or on behalf of Seller certain estimates, projections, forecasts and plans, including projected statements of operating revenues and income from operations of Seller and certain business plan information of Seller.  Buyer acknowledges that there are uncertainties inherent in attempting to make any such estimates, projections and other forecasts and plans, that Buyer is familiar with such uncertainties, that Buyer is taking full responsibility for making its own evaluation of the adequacy and accuracy of all estimates, projections and other forecasts and plans so furnished to it (including the reasonableness of the assumptions underlying such estimates, projections and forecasts), and that Buyer shall have no claim against Seller or any of its Affiliates or any Representatives of any of the foregoing with respect thereto.

5.11    **Exclusivity of Representations and Warranties**.  Except as set forth in this Article 5, neither Buyer nor any other Person is making any representation or warranty of any kind or nature whatsoever, oral or written, express or implied, relating to Buyer or its Affiliates, and Buyer hereby disclaim any such other representations or warranties.

**ARTICLE 6**
**PRE-CLOSING COVENANTS**

6.1    **Conduct of Business**.  Except as set forth on Schedule 6.1, as contemplated by this Agreement, as required by Law, as prohibited or restricted by the Bankruptcy Code, to the extent Seller does not have adequate funding therefor in the Bankruptcy Case, as prohibited by any debtor-in-possession financing in the Bankruptcy Case, or as Buyer may otherwise consent to in writing (which consent (x) shall not be unreasonably withheld, conditioned or delayed and (y) shall

be deemed to have been granted if not affirmatively withheld in writing within seventy-two (72) hours of Seller's written request therefor), from the date hereof through the Closing, Seller shall:

(a)     Seller shall use commercially reasonable efforts:

(i)     to maintain the material items of Tangible Personal Property in the same condition as they were on the date of this Agreement, subject to reasonable wear and tear and disposal consistent with the Ordinary Course of Business;

(ii)     to perform all of its obligations under all Assumed Contracts (but, specifically excluding the obligation to pay any Cure amounts owing to the counterparties thereto);

(iii)     to maintain its Books and Records in accordance with past practice;

(iv)     to comply in all material respects with all applicable Laws; and

(b)     Seller shall not:

(i)     (sell, lease, transfer, or assign any of the Purchased Assets, other than in the Ordinary Course of Business;

(ii)     make any material increase to the base compensation of any of its directors, managers, Employees, or officers, except in the Ordinary Course of Business, except as may be required by any Law or Contract;

(iii)     enter into any employment Contract or collective bargaining agreement;

(iv)     terminate any Assumed Contract (other than upon any expiration of the term of any Assumed Contract), materially amend any Assumed Contract or enter into any Contract that would be an Assumed Contract if such Contract was in effect on the date hereof, in each case, other than in the Ordinary Course of Business; or

(v)     agree to do any of the foregoing.

(c)     The provisions of this Section 6.1 are not intended to be, nor will they be construed as, an endeavor on the part of Seller or Buyer to implement the transactions contemplated hereunder prior to the Closing (and satisfaction of the conditions in Article 8), and the Parties agree that Buyer will not prior to the Closing be entitled to exercise any control over the business or affairs of Seller.

6.2     **Pre-Closing Access to Information**.

(a)     From and after the date hereof until the earlier of the Closing Date or the termination of this Agreement in accordance with its terms, upon reasonable notice, and subject to restrictions contained in any confidentiality agreements to which Seller and Athenex are subject, Seller shall provide to Buyer and its authorized Representatives during regular business hours reasonable access to all books and records of and documents and other information regarding

Seller, the Subsidiaries and, solely with respect to the Athenex Orascovery Assets, Athenex  (in a manner so as to not unreasonably interfere with the normal business operations of Seller, the Subsidiaries, or Athenex).  Notwithstanding anything to the contrary set forth in this Agreement, during the period from the date hereof until the Closing, neither Seller nor any of its Affiliates shall be required to disclose to Buyer or any of its Representatives (i) any information (A) if doing so would violate any Contract, fiduciary duty or Law to which Seller or any of its Affiliates is a party or is subject, (B) if Seller reasonably determined upon the advice of legal counsel that doing so could result in the loss of the ability to successfully assert attorney-client and work product privileges, (C) if Seller or any of its Affiliates, on the one hand, and Buyer or any of its Affiliates, on the other hand, are adverse parties in a litigation and such information is reasonably pertinent thereto, or (D) if Seller reasonably determines that such information should not be disclosed due to its competitively sensitive nature or (ii) any information relating to Taxes or Tax Returns other than information relating to Seller. For the avoidance of all doubt, nothing in this <u>Section 6.2(a)</u> shall be deemed to give rise to a contingency, condition or similar right regarding Buyer's satisfaction with any information of any kind to which Buyer is given access prior to the Closing Date.

(b)     All information disclosed pursuant to <u>Section 6.2(a)</u>, together with the terms of this Agreement and the information disclosed on Seller Disclosure Schedules, shall be treated as "Confidential Information" pursuant to the terms of the Confidentiality Agreement, the provisions of which are by this reference hereby incorporated herein.

6.3     **<u>Supplemental Disclosure</u>**.  From time to time prior to the Closing, Seller and Athenex shall each have the right (but not the obligation) to supplement or amend the Seller Disclosure Schedules with respect to any matter arising after the date hereof or, with respect to representations and warranties qualified by Seller's Knowledge, of which Seller or Athenex becomes aware after the date hereof (each a "<u>Schedule Supplement</u>"), and each such Schedule Supplement shall automatically be deemed to be incorporated into and to supplement and amend the Seller Disclosure Schedules. Any disclosure in any such Schedule Supplement shall not be deemed to have cured any inaccuracy in or breach of any representation or warranty contained in this Agreement, including for purposes of termination rights contained in this Agreement or of determining whether or not the conditions in <u>Article 8</u> have been met; provided, however, that if as a result of matters disclosed in such Schedule Supplement, Buyer has the right to (pursuant to <u>Section 9.1</u>), but does not elect to, terminate this Agreement within three (3) Business Days of its receipt of such Schedule Supplement, then Buyer shall conclusively be deemed to have waived all conditions to its obligations hereunder or rights to terminate this Agreement with respect to the matters disclosed therein under <u>Section 8.1</u> and <u>Section 9.1</u> or otherwise.

6.4     **<u>Efforts to Close</u>**.

(a)     Subject to the terms of this Agreement, each of the Parties shall use its commercially reasonable efforts to cause the conditions to Closing to be satisfied and for the Closing to occur as promptly as reasonably practicable.

(b)     In the event any Proceeding by any Governmental Entity or other Person is commenced which challenges the validity or legality of the transactions contemplated hereby or seeks damages in connection therewith, the Parties agree to cooperate and use reasonable efforts

to defend against such Proceeding and, if an injunction or other order is issued in any such action, suit or other proceeding, the Parties agree to take reasonable actions to have such injunction or other order lifted, in order to expeditiously consummate the transactions contemplated by this Agreement prior to the Outside Date; provided, however, nothing in this Section 6.4(b) shall be deemed to extend or otherwise affect the Outside Date or the Parties' rights in connection therewith.

(c)     The Parties acknowledge that certain consents to and notices in respect of the transactions contemplated by this Agreement may be required from or to parties to contracts, leases, licenses or other agreements to which Seller or Athenex is a party (including the Contracts set forth on Schedule 4.4).  During the period between the date hereof and the Closing Date, Seller and Athenex will each use its commercially reasonable efforts (but without any obligation to pay any fee or charge or the like in connection with such efforts), and Buyer will reasonably cooperate with Seller and Athenex, to obtain such consents.

(d)     Buyer expressly acknowledges and agrees that (i) Seller, Athenex and their Affiliates have no responsibility for any financing that Buyer may seek to raise in connection with the consummation of the transactions contemplated by this Agreement, (ii) it is not a contingency or condition to Closing under this Agreement (nor to the consummation of the transactions contemplated by this Agreement and the Ancillary Documents), for Buyer to obtain any equity, debt or other type of financing whatsoever for such transactions, and (iii) Buyer does not have the right to terminate this Agreement or to otherwise refuse to consummate such transactions by reason of Buyer's failure to obtain financing for its acquisition.

6.5     **Contact with Customers, Suppliers and Other Business Relations**.  During the period from the date of this Agreement until the earlier of the Closing or the termination of this Agreement in accordance with its terms, Buyer hereby agrees that it is not authorized to and shall not (and shall not permit any of its Representatives or Affiliates to) contact any employee, customer, supplier, distributor or other material business relation regarding Seller, the Subsidiaries, the Orascovery Business, or the transactions contemplated by this Agreement without the prior written (including by e-mail) consent of Athenex or Seller, as applicable, which consent will not be unreasonably withheld, conditioned or delayed.

6.6     **Bankruptcy Matters**.

(a)     Stalking Horse Bid.  This Agreement is intended to qualify as a Stalking Horse Agreement with respect to the Purchased Assets and the Athenex Orascovery Assets  and Buyer is to be declared a Stalking Horse Bidder all as set forth in Section 2 of the Bid Procedures approved by the Bankruptcy Court on May 22, 2023, as they may be amended.

(b)     Approval Order.  Pursuant to the Bid Procedures, Seller and Athenex shall move for an order (the "Approval Order") from the Bankruptcy Court, which, among other things, (i) approves the sale of the Purchased Assets to Buyer on the terms and conditions set forth in this Agreement and authorizes Seller to proceed with this transaction, (ii) includes a specific finding that Buyer is a good faith buyer of the Purchased Assets pursuant to Section 363(m) of the Bankruptcy Code, (iii) orders Buyer to pay, concurrently with the Closing and as a condition to Seller's assumption and assignment thereof, all Cure amounts owing to the counterparties to the

Assumed Contracts, and (iv) states that the sale of the Purchased Assets to Buyer shall be free and clear of all Liens (other than Permitted Liens) to the extent provided in section 363(f)(3) of the Bankruptcy Code. The form of the Approval Order shall be in form and substance reasonably satisfactory to Buyer. If requested by Seller or the Bankruptcy Court, Buyer shall provide adequate assurance of future performance (satisfactory to the Bankruptcy Court) to the counterparties to the Assumed Contracts. As provided in <u>Section 8.1(f)</u> and <u>Section 8.2(f)</u>, obligations of Buyer, Seller and Athenex to consummate the transactions contemplated in this Agreement are conditioned upon the Bankruptcy Court's entry of the Approval Order.

(c)     <u>Procedures Order</u>. The transaction contemplated by this Agreement shall be conducted in all respects in accordance with the process and procedures established in and the provisions of the Procedures Order and Buyer agrees to be bound by the Procedures Order and the Bid Procedures obligations in connection with, among other things, bidding, overbidding, the sale auction, refraining from collusion, return of deposits, and standing as a backup bidder for the Purchased Assets shall be as established and determined in accordance with the Procedures Order.

(d)     <u>Competing Bids</u>. This Agreement and the transactions contemplated hereby are subject to Seller's right and ability to consider the higher or better competing bids with respect to the Orascovery Business and the Purchased Assets in accordance with the Bid Procedures and the Procedures Order. In furtherance thereof, Seller and Athenex shall have the right to, and may cause its Representatives and Affiliates to, (a) initiate contact with, solicit or encourage submission of any inquiries, proposals, offers or bids by, and negotiate with, any Person (in addition to Buyer and its Affiliates) in connection with any sale or other disposition of the Purchased Assets and (b) respond to any request for information or due diligence inquiry, or make management available for such purposes, to any such Person, in each case, in accordance with the Bid Procedures.

(e)     <u>Communications with Customers and Suppliers</u>. Prior to the Closing, Buyer shall not, and shall cause its Affiliates and Representatives not to, contact, or engage in any discussions or otherwise communicate with, Seller's customers, suppliers, licensors, licensees and other Persons with which Seller has commercial dealings without obtaining the prior written consent of Seller.

(f)     <u>Winding Up; Dissolution; Liquidation</u>. Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall prohibit Seller or Athenex from ceasing its operations or winding up its affairs at any time after the Closing Date, it being acknowledged and agreed by Buyer that Seller and Athenex intend to wind up their affairs and liquidate and dissolve its existence as soon as reasonably practicable following the Closing Date or the consummation of a liquidating plan under Chapter 11 of the Bankruptcy Code.

6.7     **Access to Books and Records**. After the Closing, Buyer, Athenex and Seller shall use reasonable efforts to maintain until the first anniversary of the Closing Date all Books and Records relating to Seller, the Subsidiaries or any of the Purchased Assets or Assumed Liabilities prior to the Closing in the manner such Books and Records are maintained immediately prior to the Closing Date in all material respects. For a period of one (1) year following the Closing, (a) Seller and Athenex or any of their Representatives, upon reasonable notice, shall have access during normal business hours to examine, inspect and copy such Books and Records, and (b) Buyer shall provide Seller and Athenex and their Representatives with, or cause to be provided to Seller

and Athenex and their Representatives, such Books and Records as Seller or Athenex or their Representatives shall reasonably request in connection with any Proceeding to which Seller or Athenex is a party (including, without limitation, in connection with Seller's or Athenex's (or either of its successor's) administration of the Bankruptcy Case) or in connection with the requirements of any Laws applicable to Seller or Athenex. Seller, Athenex and their Representatives shall have the right to make copies of such Books and Records at Seller's and Athenex's sole cost. Buyer shall not be obligated to provide the other party with access to any Books and Records pursuant to this <u>Section 6.7</u> where such access would violate any Law or any attorney-client privilege. Buyer may require Seller or Athenex and their Representatives to execute a non-disclosure agreement prior to providing access to Books and Records.

6.8 **Employee Matters**. Buyer will not offer employment to any of Seller's or Athenex's employees at Closing or assume any Liabilities with respect to any of Seller's or Athenex's employees, past or present, or any Benefit Plan.

6.9 **Transfer of Subsidiary Excluded Assets**. Prior to the Closing, Seller shall cause the applicable Subsidiary to assign and transfer to another Person (which may include an Affiliate of Athenex) (a) Athenex HK Innovative Limited's interests in Atis Science and Technology Company Limited and Axis Therapeutics Limited, and (b) any other assets or rights of a Subsidiary that the Parties determine are not used or held for use with respect to the Orascovery Business (collectively, the "Subsidiary Excluded Assets"), so that, as of the Closing Date, the Subsidiaries will no longer own any of the Subsidiary Excluded Assets.

6.10 **Satisfaction of Intercompany Balances**. Prior to the Closing, Seller and Athenex shall cause all loans, accounts receivable, and other amounts due (a) from either Subsidiary to Athenex, Seller, or any of their respective Affiliates, or (b) to either Subsidiary from Athenex, Seller, or any of their respective Affiliates, to be cancelled, discharged, or otherwise satisfied in full; provided, however, that no payment shall be due to or from either Subsidiary in connection therewith.

6.11 **Athenex Orascovery Assets**. If, prior to the Closing, the Parties determine that Athenex owns (or has a right to use) any assets that are used solely with respect to the Orascovery Business, they will amend <u>Schedule 2.2</u> to add such assets to the Athenex Orascovery Assets (without any change in the Purchase Price).

## ARTICLE 7
## COVENANTS OF BUYER AND SELLER

7.1 **Public Announcements**. Neither Buyer nor Seller or Athenex shall, nor shall any of their respective controlled Affiliates, without the prior written approval of Buyer, Athenex and Seller, issue any press release or otherwise make any public statement with respect to this Agreement or the transactions contemplated by this Agreement (any such press release or public statement so approved by the Parties, an "Agreed Statement"), provided that such restrictions on press releases and public statements shall not apply to (i) any disclosure as may be required by applicable Law or by obligations pursuant to any listing agreement with any national securities exchange or stock market, in which case the Party required to make the release or announcement

shall allow the other Party reasonable time to comment on such release or announcement in advance of such issuance, (ii) any disclosure made in connection with the enforcement of any right or remedy relating to this Agreement or the Ancillary Documents or the transactions contemplated hereby or thereby, (iii) any disclosure that is consistent with (and does not reveal any information beyond what is already included in) a prior Agreed Statement, or (iv) any disclosure or statement made in the Bankruptcy Case that is required in connection with the filing of the Bankruptcy Case or appropriate in the furtherance of such filing,  the administration of the Bankruptcy Case, or of the transactions contemplated herein (including, without limitation, the Sale Motion).

7.2    **Tax Matters**

(a)    Prorations. Personal property, ad valorem, use and intangible taxes and assessments, common area maintenance charges, utility charges and rental payments with respect to the Purchased Assets and the Leased Real Property (collectively, "Charges") shall be prorated on a per diem basis and apportioned on a calendar year basis between Seller or Athenex, as applicable, on the one hand, and Buyer, on the other hand, as of the date of the Closing.  Seller or Athenex, as applicable shall be liable for that portion of such Charges relating to, or arising in respect of, periods on or prior to the Closing Date, and Buyer shall be liable for that portion of such Charges relating to, or arising in respect of, any period after the Closing Date.

(b)    Transfer Taxes. Buyer shall pay all Transfer Taxes arising out of or in connection with the transactions contemplated by this Agreement. Buyer shall file all necessary Tax Returns and other documentation with respect to all such Transfer Taxes and if required by applicable Law, Seller shall join in the execution of any such Tax Returns and other documentation.

(c)    Allocation of Purchase Price.  The Purchase Price and other items required to be included under Section 1060 of the Code shall be allocated among the Purchased Assets and the Athenex Orascovery Assets in accordance with the allocation principles set forth on Exhibit A (the "Allocation").  No later than sixty (60) days following the Closing, Buyer shall prepare and provide to Seller a proposed Allocation prepared pursuant to this Section 7.2(c) for Seller's review. Seller and Athenex shall have thirty (30) days to review the Allocation. If Seller does not notify Buyer in writing of any objections within such 30-day period or if Seller and Buyer resolve all such objections, none of the Parties, nor any of their respective Affiliates, shall take any position (whether in financial statements, audits, tax returns or otherwise) which is inconsistent with the Allocation, unless required to do so by applicable Law.  If prior to the end of such 30-day period, Buyer and Seller are unable to so agree on the Allocation then such Allocation shall not be binding on the Parties. Seller shall timely and properly prepare, execute, file and deliver all documents, forms and other information as Buyer may reasonably request to prepare the Allocation.  In the event that the Allocation is binding on the Parties, (i) in case of any adjustment to the Purchase Price, requiring an amendment to the Allocation, Buyer shall prepare and deliver such amended Allocation to Seller, which shall be prepared in a manner consistent with the Allocation, and (ii) if the Allocation is disputed by any Governmental Entity, the Party receiving notice of such dispute shall promptly notify the other Party.

## ARTICLE 8
## CONDITIONS TO CLOSING

8.1 **Conditions to Obligation of Buyer**. The obligation of Buyer to consummate the transactions contemplated by this Agreement is subject to the satisfaction (or waiver by Buyer in writing and in Buyer's sole discretion) of the following conditions:

(a) The representations and warranties of Seller and Athenex contained in Article 4 of this Agreement shall be true and correct in all respects as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects), except where the failure of such representations and warranties to be true and correct would not have a Material Adverse Effect.

(b) Seller and Athenex shall have performed or complied in all material respects with all obligations and covenants required by this Agreement to be performed or complied with by Seller or Athenex, on or prior to the Closing Date.

(c) Buyer shall have received a certificate of Athenex and Seller, each dated as of the Closing Date and signed by an authorized officer of each such entity, to the effect that the conditions set forth in Sections 8.1(a) and 8.1(b) have been satisfied (the "Seller Closing Certificate").

(d) All Consents shall have been obtained (including, in the case of consents to assignment of Assumed Contracts, by virtue of the effect of the Approval Order rendering certain consents to be unnecessary) or made, as applicable.

(e) No temporary restraining order, preliminary or permanent injunction or other Order preventing the consummation of the transactions contemplated by this Agreement shall be in effect, and there shall be no proceeding brought by any Governmental Entity pending before any court of competent jurisdiction seeking such an Order.

(f) The Bankruptcy Court shall have entered the Approval Order in accordance with Section 6.6(b), and the Approval Order shall be unstayed and in full force and effect as of the Closing Date.

(g) Seller and Athenex have made or are prepared to immediately make all of the deliveries required by Section 3.2(b).

8.2 **Conditions to Obligation of Seller and Athenex**. The obligation of Seller and Athenex to consummate the transactions contemplated by this Agreement is subject to the satisfaction (or waiver by Seller or Athenex, as applicable, in writing and in Seller's or Athenex's sole discretion) of the following conditions:

(a) The representations and warranties of Buyer set forth in Article 5 of this Agreement shall be true and correct in all respects as of the Closing Date (except those representations and warranties that address matters only as of a specified date, the accuracy of

28

which shall be determined as of that specified date in all respects), except where the failure of such representations and warranties to be true and correct would not have a not have a material adverse effect on Buyer's ability to consummate the transactions contemplated hereby.

(b)     Buyer shall have performed or complied in all material respects with all obligations and covenants required by this Agreement to be performed or complied with by Buyer on or prior to the Closing Date.

(c)     Seller shall have received a certificate dated as of the Closing Date by an authorized officer of Buyer to the effect that the conditions set forth in Sections 8.2(a) and 8.2(b) have been satisfied (the "Buyer Closing Certificate").

(d)     All Consents shall have been obtained (including, in the case of consents to assignment of Assumed Contracts, by virtue of the effect of the Approval Order rendering certain consents to be unnecessary) or made, as applicable.

(e)     No temporary restraining order, preliminary or permanent injunction or other Order preventing the consummation of the transactions contemplated by this Agreement shall be in effect, and there shall be no proceeding brought by any Governmental Entity pending before any court of competent jurisdiction seeking such an Order.

(f)     The Bankruptcy Court shall have entered the Approval Order in accordance with Section 6.6(b), and the Approval Order shall  be unstayed and in full force and effect as of the Closing Date.

(g)     Buyer has made or is prepared to immediately make all of the deliveries required by Sections 3.2(a) and 3.2(c).

8.3     **Frustration of Closing Conditions**.  No Party may rely on or assert the failure of any condition set forth in this Article 8, as the case may be, if such failure results from or was caused primarily by such Party's failure to comply with any provision of this Agreement.

8.4     **Waiver of Conditions**.  All conditions set forth in this Article 8 will be deemed to have been satisfied or waived from and after the Closing.

## ARTICLE 9
## TERMINATION

9.1     **Termination**.  This Agreement may be terminated, and the transactions contemplated herein may be abandoned, prior to the Closing solely as follows; provided that any Party desiring to terminate this Agreement pursuant to this Section 9.1 shall give written notice of such termination to the other Parties to this Agreement:

(a)     by the mutual written consent of Athenex, Seller and Buyer;

(b)     by Buyer, if any of the representations or warranties of Seller or Athenex set forth in Article 4 shall not be true and correct such that the condition to Closing set forth in

Section 8.1(a) would not be satisfied and the breach or breaches causing such representations or warranties not to be true and correct is not cured within five (5) days after written notice thereof is delivered from Buyer to Seller or Athenex, as applicable; provided, that Buyer shall not have the right to terminate this Agreement pursuant to this Section 9.1(b) if Buyer is then in material violation or breach of any of its covenants, obligations, representations or warranties set forth in this Agreement and such violation or breach would give rise to the failure of a condition set forth in Section 8.2(a) or Section 8.2(b);

(c)  by Seller and Athenex, if any of the representations or warranties of Buyer set forth in Article 5 shall not be true and correct such that the condition to Closing set forth in Section 8.2(a) would not be satisfied and the breach or breaches causing such representations or warranties not to be true and correct is not cured within five (5) days after written notice thereof is delivered from Seller and Athenex to Buyer; provided, that neither Seller nor Athenex shall have the right to terminate this Agreement pursuant to this Section 9.1(c) if Seller or Athenex is then in material violation or breach of any of their covenants, obligations, representations or warranties set forth in this Agreement and such violation or breach would give rise to the failure of a condition set forth in Section 8.1(a) or Section 8.1(b);

(d)  by either Buyer or by Seller and Athenex if the Closing shall not have occurred on or before July 7, 2023 (the "Outside Date"); provided, however, that a Party shall not have the right to terminate this Agreement pursuant to this Section 9.1(d) if the failure of the Closing to occur by the Outside Date results from or was caused by the failure of the Party seeking to terminate this Agreement to comply with any provisions of this Agreement;

(e)  by either Buyer or by Seller and Athenex, if any Governmental Entity shall have issued an Order or taken any other action permanently enjoining, restraining or otherwise prohibiting the Closing and such Order or other action shall have become final and non-appealable; provided, that the Party seeking to terminate this Agreement pursuant to this Section 9.1(e) shall have used reasonable efforts to remove such Order, injunction, restraint or prohibition, and such Order, injunction, restraint or prohibition shall not have been principally caused by the breach by such Party of its covenants or agreements under this Agreement;

(f)  by Seller and Athenex, if all of the conditions set forth in Section 8.2 (not including conditions which are to be satisfied by actions taken at the Closing; provided that such conditions shall have been capable of being satisfied as of the date of termination of this Agreement) have been satisfied or validly waived by Buyer, Seller and Athenex have given notice to Buyer in writing that Seller is prepared to consummate the transactions contemplated by this Agreement (a "Seller Closing Notice"), and Buyer fails to consummate the transactions contemplated by this Agreement on the date the Closing should have occurred pursuant to Section 3.1, or, if later, on the third (3rd) Business Day immediately following the date of delivery of such Seller Closing Notice;

(g)  by Buyer, if all of the conditions set forth in Section 8.1 (not including conditions which are to be satisfied by actions taken at the Closing; provided that such conditions shall have been capable of being satisfied as of the date of termination of this Agreement) have been satisfied or validly waived by Seller, Buyer has given notice to Seller in writing that Buyer is prepared to consummate the transactions contemplated by this Agreement (a "Buyer Closing

Notice"), and Seller or Athenex fails to consummate the transactions contemplated by this Agreement on the date the Closing should have occurred pursuant to <u>Section 3.1</u>, or, if later, on the third (3rd) Business Day following the date of delivery of such Buyer Closing Notice; or

        (h)    by either Buyer or by Seller and Athenex, subject to and in accordance with the terms of <u>Section 6.6(b)</u>, if the Bankruptcy Court does not issue the Approval Order in accordance with <u>Section 6.6(b)</u>.

      9.2    **Effect of Termination**.  In the event of the termination of this Agreement pursuant to <u>Section 9.1</u>, this entire Agreement shall forthwith become void (and there shall be no liability or obligation on the part of Buyer, Seller, Athenex or their respective officers, directors or equity holders) with the exception of (i) the provisions of <u>Section 3.2(a)(i)</u>, <u>Section 6.2(b)</u>, <u>Section 9.1</u>, this <u>Section 9.2</u> and <u>Article 11</u>, together with all applicable defined terms set forth in <u>Article 1</u>, each of which provisions shall survive such termination and remain valid and binding obligations of the Parties and (ii) any liability of any Party for any willful breach of this Agreement prior to such termination.  For the avoidance of doubt, the Confidentiality Agreement shall survive any termination of this Agreement in accordance with its terms and shall automatically be extended until such date that is two (2) years following the date of termination of this Agreement, and nothing in this <u>Article 9</u> shall be construed to discharge or relieve any party to the Confidentiality Agreement of its obligations thereunder.

**ARTICLE 10**
**SURVIVAL AND RELEASE**

      10.1    **Survival**.  The representations and warranties of the Parties and, except as provided in the last sentence of this <u>Section 10.1</u>, the covenants and agreements of the Parties, contained in this Agreement and in any certificate delivered pursuant to this Agreement shall terminate upon the Closing. No Party shall have any liability after the Closing for any inaccuracy in or breach of its representations and warranties set forth in this Agreement, and none of the Parties or any of their respective Affiliates or their respective Representatives shall have recourse against another Party under this Agreement following the Closing for any breach of or inaccuracy in any such representation or warranty or any breach or nonfulfillment of covenant, condition or agreement required to be performed or fulfilled prior to the Closing. Only the covenants and agreements in this Agreement that by their terms survive the Closing (or that contemplate action or impose obligations after the Closing) shall so survive the Closing in accordance with their respective terms.

**ARTICLE 11**
**MISCELLANEOUS**

      11.1    **Notices**.  Any notice, request, demand, waiver, consent, approval or other communication which is required or permitted hereunder shall be in writing and shall be deemed given:  (a) on the date established by the sender as having been delivered personally, (b) on the date delivered by a private courier as established by the sender by evidence obtained from the courier, (c) on the date delivered by email (if sent prior to 5:00 p.m.  New York City time, or if

31

sent later, then on the next Business Day), or (d) on the fifth Business Day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid.  Such communications, to be valid, must be addressed as follows:

If to Buyer, to:

> C-MER Specialty Group Limited
> Suite 1535, Central Building
> 1-3 Pedder Street, Hong Kong
> Attn:  Chapman Chan
> Email:  chapmanchan@hkcmer.com

With a required copy (which shall not constitute notice) to:

> Munsch Hardt Kopf & Harr, P.C.
> 500 N. Akard Street, Suite 3800
> Dallas, Texas 75201
> Attn: Deborah Perry
> Email:  dperry@munsch.com

If to Seller or Athenex, to:

> Athenex, Inc.
> Conventus Building
> 1001 Main Street, Suite 600
> Buffalo, NY 14203
> Attn: Legal Department
> Email: legal-agreements@athenex.com

With a required copy (which shall not constitute notice) to:

> Harter Secrest & Emery LLP
> 1600 Bausch & Lomb Place
> Rochester, New York 14604-2711
> Attn: Alexander R. McClean
> Facsimile No.: (585) 232-2152
> E-mail: amcclean@hselaw.com

And

> Pachulski Stang Ziehl & Jones LLP
> 10100 Santa Monica Blvd, Suite 1300
> Los Angeles, CA 90067
> Attn: Shirley Cho
> E-mail: scho@pszjlaw.com

or to such other address or to the attention of such Person or Persons as the recipient Party has specified by prior written notice to the other Parties hereto.

11.2    **Amendments and Waivers**.  Any provision of this Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and is duly executed, in the case of an amendment, by each Party to this Agreement, or in the case of a waiver, by the Party against whom the waiver is to be effective.  No failure or delay by any Party in exercising any right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  Any waiver of any term or condition shall not be construed as a waiver of any subsequent breach or a subsequent waiver of the same term or condition, or a waiver of any other term or condition of this Agreement.

11.3    **Expenses**.  Except as otherwise provided in this Agreement, each Party shall bear its own costs and expenses in connection with the negotiation, documentation and consummation of the transactions contemplated by this Agreement, including all legal, accounting, financial advisory, consulting and all other fees and expenses of third parties, whether or not the transactions contemplated by this Agreement are consummated.

11.4    **Successors and Assigns**.  This Agreement may not be assigned by any Party (whether by operation of law or otherwise) without the prior written consent of the other Parties and the prior approval of the Bankruptcy Court; provided that, prior to the Closing, Buyer may assign this Agreement and its rights and interests hereunder to Health Hope Pharma Limited, a limited liability company to be formed in Hong Kong that will be an Affiliate of Buyer, upon written notice to, but without the prior written consent of, Seller and Athenex, and upon such assignment, Buyer shall be relieved of its obligations and responsibilities hereunder, and the applicable assignee of Buyer shall assume and agree to perform and discharge such obligations and responsibilities of Buyer hereunder.   Subject to the foregoing, all of the terms and provisions of this Agreement shall inure to the benefit of and be binding upon the Parties and their respective permitted successors and assigns.  Any attempted or purported assignment that is not in accordance with the terms of this <u>Section 11.4</u> shall be void <u>ab initio</u>
.

11.5    **Governing Law**.  This Agreement and the exhibits and schedules hereto shall be governed by and interpreted and enforced in accordance with the Laws of the State of Delaware, without giving effect to any choice of Law or conflict of Laws rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware.

11.6    **Jurisdiction and Authority of the Bankruptcy Court; Dispute Resolution; Waiver of Jury Trial**.

(a)    Any suit, action or other proceeding arising out of or relating to this Agreement or any transaction contemplated hereby shall be brought exclusively in the Bankruptcy Court.  Each of the Parties hereby irrevocably submits to the exclusive jurisdiction of such court for the purpose of any such suit, action or other proceeding.  A final judgment in any such suit, action or other proceeding may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.  Each Party irrevocably and unconditionally waives any objection

to the laying of venue of any action, suit or proceeding arising out of this Agreement or the transactions contemplated hereby in such court, and hereby irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.  Nothing in this <u>Section 11.6</u>, however, shall affect the right of any Party to serve legal process in any other manner permitted by Law.

(b)        EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREBY OR THE ACTIONS OF SUCH PARTY IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE AND ENFORCEMENT HEREOF.

11.7    <u>**Counterparts**</u>.

(a)        This Agreement may be executed in counterparts, each of which when executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute but one and the same instrument.  This Agreement shall become effective when each Party shall have received a counterpart hereof signed by the other Party.  The Parties agree that the delivery of this Agreement, the Ancillary Documents and any other agreements and documents at the Closing may be effected by means of an exchange of facsimile signatures or other electronic delivery.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile or scanned pages shall be effective as delivery of a manually executed counterpart to this Agreement.

(b)        No Party shall raise the use of a facsimile machine or electronic transmission to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or electronic transmission as a defense to the formation or enforceability of this Agreement and each Party forever waives any such defense.  The words "execution," "executed", "signed," "signature," and words of like import in this Agreement shall include images of manually executed signatures transmitted by facsimile or other electronic format (including, without limitation, "pdf," "tif" or "jpg") and other electronic signatures (including, without limitation, SignNow and DocuSign).

11.8    <u>**No Third Party Beneficiaries**</u>.  No provision of this Agreement is intended to or shall confer upon any Person other than the Parties any rights or remedies of any nature whatsoever under or by reason of this Agreement.

11.9    <u>**Entire Agreement**</u>.  This Agreement, the Ancillary Documents, schedules, including the Seller Disclosure Schedules and the other documents, instruments and agreements specifically referred to herein or therein or delivered pursuant hereto or thereto, together with the Confidentiality Agreement, set forth the entire understanding of the Parties with respect to the subject matter hereof and the transactions contemplated hereby.  All schedules, including any Seller Disclosure Schedule, referred to herein are intended to be and hereby are specifically made a part of this Agreement and incorporated by reference herein.  Any and all previous agreements and understandings between or among the Parties regarding the subject matter hereof, whether

written or oral, are superseded by this Agreement, except for the Confidentiality Agreement which shall continue in full force and effect in accordance with its terms.

11.10 **Disclosure Schedules**. Except as otherwise provided in the Seller Disclosure Schedules, all capitalized terms therein shall have the meanings assigned to them in this Agreement. Matters reflected in the Seller Disclosure Schedules are not necessarily limited to matters required by this Agreement to be disclosed. No disclosure made in the Seller Disclosure Schedules shall constitute an admission or determination that any fact or matter so disclosed is material, has had or could reasonably be expected to have a Material Adverse Effect, meets a dollar or other threshold set forth in this Agreement or would otherwise be required to be disclosed, and no Person shall use the fact of the setting of a threshold or the inclusion of such facts or matters in any dispute or controversy as to whether any obligation, amount, fact or matter is or is not material for purposes of this Agreement. Information disclosed in any Seller Disclosure Schedule delivered will qualify any representation and warranty in this Agreement to the extent that a reasonable buyer would infer, based solely on the face of the applicable disclosure, the relevance or applicability of the information disclosed to any such representation or warranty, notwithstanding the absence of a reference or cross-reference to such representation or warranty on any such Seller Disclosure Schedule or Seller Disclosure Schedule or the absence of a reference or cross reference to such Seller Disclosure Schedule in such representation or warranty. No disclosure in the Seller Disclosure Schedules relating to any possible breach or violation of any agreement or Law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred.

11.11 **Captions**. All captions and section headings contained in this Agreement are for convenience of reference only, do not form a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement.

11.12 **Remedies**. Seller shall be entitled to pursue specific performance of the terms hereof, including an injunction or injunctions to prevent breaches of this Agreement by Buyer and to enforce specifically the terms and provisions of this Agreement, this being in addition to any other remedy to which Seller is entitled at law or in equity.

11.13 **Severability**. Any provision of this Agreement which is invalid or unenforceable in any jurisdiction shall be ineffective to the extent of such invalidity or unenforceability without invalidating or rendering unenforceable the remaining provisions hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. Upon such determination that any term or other provision of this Agreement is invalid, illegal or unenforceable under applicable Law, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

11.14 **Interpretation**. The Parties have participated jointly in the negotiation and drafting of this Agreement, and any rule of construction or interpretation otherwise requiring this Agreement to be construed or interpreted against any Party by virtue of the authorship of this Agreement shall not apply to the construction and interpretation hereof. The Parties agree that any

drafts of this Agreement or any Ancillary Document prior to the final fully executed drafts shall not be used for purposes of interpreting any provision thereof, and each of the Parties agrees that no Party or any Affiliate thereof shall make any claim, assert any defense or otherwise take any position inconsistent with the foregoing in connection with any Proceeding among any of the foregoing.  For the purposes of this Agreement, except as otherwise expressly provided herein or unless the context otherwise requires:  (a) the meaning assigned to each term defined herein shall be equally applicable to both the singular and the plural forms of such term and vice versa, and words denoting either gender shall include both genders as the context requires; (b) where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning; (c) the terms "hereof," "herein," "hereunder," "hereby" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement (including any exhibit or schedule hereto) as a whole and not to any particular provision of this Agreement; (d) when a reference is made in this Agreement to an Article, Section, paragraph, Exhibit or Schedule, such reference is to an Article, Section, paragraph, Exhibit or Schedule to this Agreement (provided that references to "Schedules" herein shall be deemed to refer to the applicable schedule of Seller Disclosure Schedule or the Seller Disclosure Schedule), unless otherwise specified; (e) the word "include," "includes," and "including" when used in this Agreement shall be deemed to be followed by the words "but not limited to," unless otherwise specified; (f) the word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other thing extends, and such phrase shall not mean simply "if" and (g) all accounting terms used and not defined herein have the respective meanings given to them under GAAP.  All dollar or "$" amounts set forth in this Agreement shall refer to U.S. dollars unless explicitly indicated otherwise.  Time is of the essence for each and every provision of this Agreement.  In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" mean "to but excluding" and the word "through" means "to and including".  Whenever the last day for the exercise of any privilege or the discharge of any duty hereunder shall fall upon a day that is not a Business Day, the Party having such privilege or duty may exercise such privilege or discharge such duty on the next succeeding day that is a Business Day.  Any reference in this Agreement to "made available" means a document or other information that was provided or made available to Buyer and its Representatives in Seller's electronic or virtual data rooms, management presentations or in any other form.

11.15  **Prevailing Party**.  In the event of any Proceeding in connection with this Agreement or any Ancillary Document, the prevailing Party in any such Proceeding shall be entitled to recover from the other Party its costs and expenses, including, without limitation, reasonable legal fees and expenses.

11.16  **Further Assurances**.  Following the Closing, each of the Parties shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances, and take such further actions (at no material cost or expense to the Party to whom the request is directed) as may be reasonably required to carry out the provisions hereof and give effect to the Closing transactions contemplated by this Agreement; provided, however, neither Party shall be required by this Section 11.16 to initiate or join in any Proceeding.  After the Closing, Seller shall promptly transfer or deliver to Buyer cash, checks (which shall be properly endorsed) or other property that Seller may receive in respect of any item that constitutes

part of the Purchased Assets or relates to the Assumed Liabilities.  After the Closing, Buyer shall promptly transfer or deliver to Seller cash, checks (which shall be properly endorsed) or other property that Buyer may receive in respect of any item that is an Excluded Asset or relates to the Retained Liabilities.

*   *   *   *

[Signature page follows]

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be duly executed on its behalf as of the date first above written.

ATHENEX:                                              SELLER:

ATHENEX, INC.                                        ATHENEX R&D LLC

By: _____        By: _____
    Name: Nicholas K. Campbell                      Name: Nicholas K. Campbell
    Title: Chief Restructuring Officer                Title: Chief Restructuring Officer

BUYER:

HEALTH HOPE PHARMA LIMITED


By: _____
    Name:
    Title:

[Signature Page to Stalking Horse Asset Purchase Agreement]

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be duly executed on its behalf as of the date first above written.

ATHENEX:                                          SELLER:

ATHENEX, INC.                                     ATHENEX R&D LLC


By: _____                  By: _____
    Name:                                             Name:
    Title:                                            Title


BUYER:

C-MER SPECIALTY GROUP LIMITED


By: _____
    Name:  Dennis Lam Shun Chiu
    Title:  Director


[Signature Page to Stalking Horse Asset Purchase Agreement]

Exhibit A
Allocation of Purchase Price

The Purchase Price (as increased by the amounts treated as assumed liabilities for federal income Tax purposes and other amounts treated as taxable sales consideration for federal income Tax purposes) shall be allocated to the assets of Seller for all Tax purposes in accordance with their respective fair market values pursuant to the principles of Section 1060 of the Code and the regulations adopted thereunder and the principles of this Exhibit A.  Any subsequent adjustments to the Purchase Price shall be reflected in the Allocation hereunder in a manner consistent with Treasury Regulations Section 1.1060-1 and the principles expressed in this Exhibit A.

The Allocation shall be made under the following principles:

| **Asset Class** | **Allocation** |
|---|---|
| Class I Assets (i.e. cash and cash equivalents): | Not applicable |
| Class II Assets (i.e. marketable stock/securities and actively traded personal property): | Not applicable |
| Class III Assets (i.e. accounts receivable and similar rights to payment): | An amount equal to the fair market value of such assets. |
| Class IV Assets (i.e. inventory/stock in trade/property held for sale in ordinary course of business): | An amount equal to the fair market value of such assets |
| Class V Assets (i.e. assets not classified in classes I through VII, such as equipment and depreciable property used in Orascovery Business, including buildings): | An amount equal to the fair market value of such assets |
| Class VI & VII Assets (i.e. § 197 intangibles, goodwill and going concern value): | Any residual amount |

# DISCLOSURE SCHEDULES

## to the

## ASSET PURCHASE AGREEMENT

## by and among

## ATHENEX R&D LLC, LLC

## and

## C-MER SPECIALTY GROUP LIMITED

These Schedules ("Disclosure Schedules") are made and given pursuant to the Asset Purchase Agreement (the "Agreement"), dated as of June 6, 2023, by and among Athenex R&D LLC, LLC, a Delaware limited liability company ("Seller"), Athenex, Inc, a Delaware corporation ("Athenex"), and C-MER Specialty Group Limited, a limited liability company organized under the laws of Hong Kong ("Buyer"). Except as otherwise provided herein, all capitalized terms used herein shall have the meanings assigned to them in the Agreement.

Matters reflected in these Disclosure Schedules are not necessarily limited to matters required by the Agreement to be disclosed. Matters reflected in these Disclosure Schedules are not necessarily limited to matters required by the Agreement to be disclosed.  No disclosure made in these Disclosure Schedules shall constitute an admission or determination that any fact or matter so disclosed is material, has had or could reasonably be expected to have a Material Adverse Effect, meets a dollar or other threshold set forth in the Agreement or would otherwise be required to be disclosed, and no Person shall use the fact of the setting of a threshold or the inclusion of such facts or matters in any dispute or controversy as to whether any obligation, amount, fact or matter is or is not material for purposes of the Agreement.  Information disclosed in any Disclosure Schedule delivered will qualify any representation and warranty in the Agreement to the extent that a reasonable buyer would infer, based solely on the face of the applicable disclosure, the relevance or applicability of the information disclosed to any such representation or warranty, notwithstanding the absence of a reference or cross-reference to such representation or warranty on any such Disclosure Schedule or the absence of a reference or cross reference to such Disclosure Schedule in such representation or warranty.  No disclosure in these Disclosure Schedules relating to any possible breach or violation of any agreement or Law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred.

**Schedule 2.1(a)**
**Accounts Receivable**

None, other than those accounts receivable obtained by Buyer through the purchase of all equity interests of Athenex HK Innovative Limited and Athenex Therapeutics Limited.

**Schedule 2.1(b)**
**<u>Tangible Personal Property</u>**

None, other than the tangible personal property owned by Athenex HK Innovative Limited and Athenex Therapeutics Limited that Buyer will acquire through its acquisition of all of the issued and outstanding equity interests of each such entity.

**Schedule 2.1(d)**
**<u>Assumed Contracts</u>**

- All Contracts of Athenex R&D LLC, as Seller, assumed by Buyer pursuant to the Agreement, including those Contracts listed on <u>Schedules 4.8 (a) and 4.8(b)</u>.
- All Contracts included in the Athenex Orascovery Assets and assumed by Buyer pursuant to the Agreement, including those Contracts listed on <u>Schedule 2.2</u>.

**Schedule 2.1(e)**
**Rights to Deposits**

None, other than deposits of Athenex HK Innovative Limited and Athenex Therapeutics Limited that Buyer will acquire through its acquisition of all of the issued and outstanding equity interests of each such entity.

**Schedule 2.1(f)**
**<u>Permits Transferrable</u>**


None, other than Permits held by Athenex HK Innovative Limited and Athenex Therapeutics Limited that Buyer will acquire through its acquisition of all of the issued and outstanding equity interests of each such entity.

## Schedule 2.2
## Athenex Orascovery Assets

Contracts:

- License Agreement by and between Athenex, Inc. and Guangzhou Xianxgxue Pharmaceutical Co., Ltd. effective December 12, 2019 as amended by Supplemental Agreement dated March 31, 2020, Second Supplemental Agreement dated June 2020, and Third Supplemental Agreement dated November 8, 2021

- License Agreement, dated June 28, 2013, by and between Hanmi Pharmaceutical Co., Ltd. and Athenex Therapeutics Limited (f/k/a Kinex Therapeutics (HK) Limited) and Athenex, Inc. (f/k/a Kinex Pharmaceuticals, Inc.), as guarantor, on Orascovery Program Mainland China Territory

- License Agreement by and between Athenex, Inc. (f/k/a Kinex Pharmaceuticals, Inc.) and Pharmaessentia Corp. effective December 16, 2013 as amended by First Amendment dated December 23, 2016 and Second Amendment November 27, 2018

- License Agreement by and between Athenex, Inc. (f/k/a Kinex Pharmaceutcials, Inc.) and ZenRx Limited effective Aprile 25, 2013

- License Agreement by and between Athenex, Inc. (f/k/a Kinex Pharmaceuticals, LLC) and Hanmi Pharmaceutical Ltd. effective December 16, 2011 as amended by First Amendment dated November 9, 2012, Second Amendment dated October 21, 2013, Third Amendment dated March 3, 2015, Fourth Amendment dated March 7, 2017, and Fifth Amendment dated September 4, 2018

- Clinical Trial Agreement by and among Athenex, Inc., Greater Glasgow Health Board and _____ dated _____ related to KX-ORAX-012 Study

- Agreement by and between Athenex, Inc. and Professor Andrew M. Wardley dated _____

- Clinical Trial Agreement by and among Athenex, Inc., Newcastle Upon Tyne Hospitals NHS Foundation Trust, and Aptus Clinical Ltd effective June 19, 2019 as amended by Addendum dated November 4, 2019

- Master Manufacturing Services Agreement by and between Athenex, Inc. and Patheon Pharmaceuticals Inc. effective August 15, 2020

- Product Agreement for HM30181AK Encequidar Tablets by and between Athenex, Inc. and Patheon Pharmaceuticals Inc. dated August 15, 2020

- WKO-ANX-1628 Regulatory and Medical Writing Support Work Order by and between Athenex, Inc. and PharmaDirections, Inc. dated January 24, 2023

- Master Services Agreement (#181) by and between Athenex, Inc. and ProductLife Limited dated June 18, 2018 as amended by Work Order Addendum (ATHE-6122-UK, #2) dated December 16, 2021

- Master Services Agreement by and between Athenex, Inc. and SciLucent, Inc. effective January 10, 2023

- Master Services Agreement to Provide Pharmaceutical Support Servies by and between Athenex, Inc. and Sentry BioPharma Services, Inc. dated February 15, 2017
- Clinical Trial Agreement by and among Athenex, Inc., The Christie NHS Foundation Trust, and Aptus Clinical Ltd effective February 28, 2019 as amended by Amendment Agreement N. 1 dated April 28, 2020

- Clinical Trial Agreement, dated as of January 20, 2020, between The Royal Marsden NHS Foundation Trust and Athenex, Inc., as amended by Amendment No. 1 dated effective as of May 6, 2021

- Master Services Agreement by and between Athenex, Inc. and Hovione Limited dated effective as of October 14, 2018

- Commercial Manufacturing Services and Supply Agreement by and between Athenex, Inc. and MW Encap Ltd dated effective August 7, 2020

- Agreement between Athenex, Inc. and Intertek Pharmaceutical Services Manchester dated effective _____ related to Nitrosamine method validation

Patents:

| Title | Applicant | Application Number | Territory |
|---|---|---|---|
| Therapeutic combinations of orally administered Paclitaxel, a p-gp inhibitor and a checkpoint inhibitor for the treatment of solid tumors | Athenex, Inc. | 111134378 | Taiwan |
| Therapeutic combinations of orally administered Paclitaxel, a p-gp inhibitor and a checkpoint inhibitor for the treatment of solid tumors | Athenex, Inc. | PCT/US2022/076269 | PCT |

**Schedule 2.3(q)**
**Excluded Assets**

Seller owns 100% of the equity interests in Athenex Pharmaceuticals Co. Ltd., an entity formed under the laws of Taiwan.  Such equity interests are Excluded Assets.

**Schedule 3.2(b)(vii)**
**Material Consents**

The consent of Hanmi Pharmaceutical Co., Ltd., to the extent required under the following Contracts:

- License Agreement, dated June 28, 2013, by and between Hanmi Pharmaceutical Co., Ltd. and Athenex Therapeutics Limited (f/k/a Kinex Therapeutics (HK) Limited) and Athenex, Inc. (f/k/a Kinex Pharmaceuticals, Inc.), as guarantor, on Orascovery Program Mainland China Territory.

- License Agreement by and between Athenex, Inc. (f/k/a Kinex Pharmaceuticals, LLC) and Hanmi Pharmaceutical Ltd. effective December 16, 2011 as amended by First Amendment dated November 9, 2012, Second Amendment dated October 21, 2013, Third Amendment dated March 3, 2015, Fourth Amendment dated March 7, 2017, and Fifth Amendment dated September 4, 2018.

**Schedule 4.4**
**Non-contravention**

U.S. Food and Drug Administration (FDA) has issued a complete response letter (CRL) for Athenex's New Drug Application (NDA) for Oral Paclitaxel plus Encequidar for the treatment of metastatic breast cancer.  The FDA issues a CRL to indicate that the review cycle for an application is complete and that the application is not ready for approval in its present form.

The United Kingdom Medicines and Healthcare Products Regulatory Agency (MHRA) rejected the marketing authorization application for metastatic breast cancer based on chemistry, manufacturing, and controls issues. Athenex is pursuing re-examination of an opinion by an independent board.

Certain Assumed Contracts require notice to, or the consent of, the counterparties to the assignment of such Assumed Contracts.

Approval of the Bankruptcy Court is required for the transactions contemplated by the Agreement.

**Schedule 4.6(b)**
**<u>Permits Held</u>**

None.

**Schedule 4.8(a)**
**Business IP Registrations**

Patents:

| Title | Applicant | Application Number | Territory |
|---|---|---|---|
| Oral Taxane Compositions And Methods | Athenex HK Innovative Limited | 2016333292 | Australia |
| Oral Taxane Compositions and Methods | Athenex HK Innovative Limited | 2022200919 | Australia |
| Oral Taxane Compositions And Methods | Athenex HK Innovative Limited | 11 2018 006510-2 | Brazil |
| Oral Taxane Compositions And Methods | Athenex HK Innovative Limited | 2999201 | Canada |
| Oral Taxane Compositions And Methods | Athenex HK Innovative Limited | 201680063516.8 | China |
| Oral Taxane Compositions And Methods | Athenex HK Innovative Limited | 202111009477.2 | China |
| Oral Taxane Compositions And Methods | Athenex HK Innovative Limited | 16850378.7 | EPO |
| Oral Taxane Compositions And Methods | Athenex HK Innovative Limited | 181158400 | Hong Kong |
| Oral Taxane Compositions And Methods | Athenex HK Innovative Limited | 201817010669 | India |
| Oral Taxane Compositions And Methods | Athenex HK Innovative Limited | 202318017576 | India |
| Oral Taxane Compositions And Methods | Athenex HK Innovative Limited | 1985045365 | Japan |
| Oral Taxane Compositions and Methods | Athenex HK Innovative Limited | 2021-191523 | Japan |
| Oral Taxane Compositions And Methods | Athenex HK Innovative Limited | 10-2018-7011838 | Korea |
| Oral Taxane Compositions And Methods | Athenex HK Innovative Limited | 2018003452 | Mexico |
| Oral Taxane Compositions And Methods | Athenex HK Innovative Limited | 740759 | New Zealand |
| Oral Taxane Compositions And Methods | Athenex HK Innovative Limited | 11201802123T | Singapore |
| Oral Taxane Compositions And Methods | Athenex HK Innovative Limited | 105131091 | Taiwan |
| Oral Taxane Compositions And Methods | Athenex HK Innovative Limited | 109143285 | Taiwan |
| Oral Taxane Compositions And Methods | Athenex HK Innovative Limited | 111106208 | Taiwan |
| Oral Taxane Compositions And Methods | Athenex HK Innovative Limited | 15/277890 | United States |
| Oral Taxane Compositions And Methods | Athenex HK Innovative Limited | 17/069557 | United States |
| High-Strength Oral Taxane Compositions And Methods | Athenex HK Innovative Limited | 2018346616 | Australia |
| High-Strength Oral Taxane Compositions And Methods | Athenex HK Innovative Limited | PCT/US2018/054552 | Brazil |
| High-Strength Oral Taxane Compositions And Methods | Athenex HK Innovative Limited | 3078615 | Canada |
| High-Strength Oral Taxane Compositions And Methods | Athenex HK Innovative Limited | 201880076637.5 | China |
| High-Strength Oral Taxane Compositions And Methods | Athenex HK Innovative Limited | 18864459.5 | EPO |
| High-Strength Oral Taxane Compositions And Methods | Athenex HK Innovative Limited | A2020-50 | Guatemala |
| High-Strength Oral Taxane Compositions And Methods | Athenex HK Innovative Limited | 62020021225.1 | Hong Kong |
| High-Strength Oral Taxane Compositions And Methods | Athenex HK Innovative Limited | 273754 | Israel |
| High-Strength Oral Taxane Compositions And Methods | Athenex HK Innovative Limited | 202047018370 | India |
| High-Strength Oral Taxane Compositions And Methods | Athenex HK Innovative Limited | 2020-519763 | Japan |
| High-Strength Oral Taxane Compositions And Methods | Athenex HK Innovative Limited | 10-2020-7012871 | Korea |

| | | | |
|---|---|---|---|
| High-Strength Oral Taxane Compositions And Methods | Athenex HK Innovative Limited | 2020005575 | Mexico |
| High-Strength Oral Taxane Compositions And Methods | Athenex HK Innovative Limited | 763143 | New Zealand |
| High-Strength Oral Taxane Compositions And Methods | Athenex HK Innovative Limited | 11202003003T | Singapore |
| High-Strength Oral Taxane Compositions And Methods | Athenex HK Innovative Limited | 107135098 | Taiwan |
| High-Strength Oral Taxane Compositions And Methods | Athenex HK Innovative Limited | 16/153280 | United States |
| Compositions and Methods for Treating Hyperproliferative Skin Disorders | Athenex HK Innovative Limited | 2019231706 | Australia |
| Compositions and Methods for Treating Hyperproliferative Skin Disorders | Athenex HK Innovative Limited | 3092939 | Canada |
| Compositions and Methods for Treating Hyperproliferative Skin Disorders | Athenex HK Innovative Limited | 2019800293395 | China |
| Compositions and Methods for Treating Hyperproliferative Skin Disorders | Athenex HK Innovative Limited | 19763753.1 | EPO |
| Compositions and Methods for Treating Hyperproliferative Skin Disorders | Athenex HK Innovative Limited | 62021035102.4 | Hong Kong |
| Compositions and Methods for Treating Hyperproliferative Skin Disorders | Athenex HK Innovative Limited | PCT/US2019/21037 | PCT |
| Compositions and Methods for Treating Hyperproliferative Skin Disorders | Athenex HK Innovative Limited | 108107592 | Taiwan |
| Compositions and Methods for Treating Hyperproliferative Skin Disorders | Athenex HK Innovative Limited | 16/978037 | United States |
| THERAPEUTIC COMBINATIONS OF ORALLY ADMINISTERED PACLITAXEL AND A P-gp INHIBITOR FOR THE TREATMENT OF ANGIOSARCOMA | Athenex HK Innovative Limited | 108113027 | Taiwan |
| THERAPEUTIC COMBINATIONS OF ORALLY ADMINISTERED PACLITAXEL AND A P-gp INHIBITOR FOR THE TREATMENT OF ANGIOSARCOMA | Athenex HK Innovative Limited | 17/963,504 | United States |
| THERAPEUTIC COMBINATIONS OF ORALLY ADMINISTERED PACLITAXEL AND A P-gp INHIBITOR FOR THE TREATMENT OF ANGIOSARCOMA | Athenex HK Innovative Limited | 201980039460.6 | China |
| THERAPEUTIC COMBINATIONS OF ORALLY ADMINISTERED PACLITAXEL AND A P-gp INHIBITOR FOR THE TREATMENT OF ANGIOSARCOMA | Athenex HK Innovative Limited | 19786248 | EPO |
| THERAPEUTIC COMBINATIONS OF ORALLY ADMINISTERED PACLITAXEL AND A P-gp INHIBITOR FOR THE TREATMENT OF ANGIOSARCOMA | Athenex HK Innovative Limited | 62021035597.5 | Hong Kong |
| THERAPEUTIC COMBINATIONS OF ORALLY ADMINISTERED DOCETAXEL AND A P-GP INHIBITOR FOR THE TREATMENT OF CANCER | Athenex HK Innovative Limited | 108146058 | Taiwan |
| THERAPEUTIC COMBINATIONS OF ORALLY ADMINISTERED DOCETAXEL AND A P-GP | Athenex HK Innovative Limited | 16/715,735 | United States |

| | | | |
|---|---|---|---|
| INHIBITOR FOR THE TREATMENT OF CANCER | | | |
| THERAPEUTIC COMBINATIONS OF ORALLY ADMINISTERED DOCETAXEL AND A P-GP INHIBITOR FOR THE TREATMENT OF CANCER | Athenex HK Innovative Limited | 17/083,543 | United States |
| THERAPEUTIC COMBINATIONS OF ORALLY ADMINISTERED DOCETAXEL AND A P-GP INHIBITOR FOR THE TREATMENT OF CANCER | Athenex HK Innovative Limited | 17/838,430 | United States |
| THERAPEUTIC COMBINATIONS OF ORALLY ADMINISTERED DOCETAXEL AND A P-GP INHIBITOR FOR THE TREATMENT OF CANCER | Athenex HK Innovative Limited | 2019397560 | Australia |
| THERAPEUTIC COMBINATIONS OF ORALLY ADMINISTERED DOCETAXEL AND A P-GP INHIBITOR FOR THE TREATMENT OF CANCER | Athenex HK Innovative Limited | 3122766 | Canada |
| THERAPEUTIC COMBINATIONS OF ORALLY ADMINISTERED DOCETAXEL AND A P-GP INHIBITOR FOR THE TREATMENT OF CANCER | Athenex HK Innovative Limited | 201980091687.5 | China |
| THERAPEUTIC COMBINATIONS OF ORALLY ADMINISTERED DOCETAXEL AND A P-GP INHIBITOR FOR THE TREATMENT OF CANCER | Athenex HK Innovative Limited | 19836420.0 | EPO |
| THERAPEUTIC COMBINATIONS OF ORALLY ADMINISTERED IRINOTECAN AND A P-GP INHIBITOR FOR THE TREATMENT OF CANCER | Athenex HK Innovative Limited | 108146059 | Taiwan |
| THERAPEUTIC COMBINATIONS OF ORALLY ADMINISTERED IRINOTECAN AND A P-GP INHIBITOR FOR THE TREATMENT OF CANCER | Athenex HK Innovative Limited | 16/715,753 | United States |
| THERAPEUTIC COMBINATIONS OF ORALLY ADMINISTERED IRINOTECAN AND A P-GP INHIBITOR FOR THE TREATMENT OF CANCER | Athenex HK Innovative Limited | 2019395284 | Australia |
| THERAPEUTIC COMBINATIONS OF ORALLY ADMINISTERED IRINOTECAN AND A P-GP INHIBITOR FOR THE TREATMENT OF CANCER | Athenex HK Innovative Limited | 3122699 | Canada |
| THERAPEUTIC COMBINATIONS OF ORALLY ADMINISTERED IRINOTECAN AND A P-GP INHIBITOR FOR THE TREATMENT OF CANCER | Athenex HK Innovative Limited | 201980091622.0 | China |
| THERAPEUTIC COMBINATIONS OF ORALLY ADMINISTERED IRINOTECAN AND A P-GP INHIBITOR FOR THE TREATMENT OF CANCER | Athenex HK Innovative Limited | 19836886 | EPO |
| THERAPEUTIC COMBINATIONS OF ORALLY ADMINISTERED PACLITAXEL AND A P-gp | Athenex Therapeutics Limited | 105123085 | Taiwan |

| | | | |
|---|---|---|---|
| INHIBITOR FOR THE TREATMENT OF CANCER | | | |
| THERAPEUTIC COMBINATIONS OF ORALLY ADMINISTERED PACLITAXEL AND A P-gp INHIBITOR FOR THE TREATMENT OF CANCER | Athenex Therapeutics Limited | 17/959,470 | United States |
| THERAPEUTIC COMBINATIONS OF ORALLY ADMINISTERED PACLITAXEL AND A P-gp INHIBITOR FOR THE TREATMENT OF CANCER | Athenex Therapeutics Limited | 2021209160 | Australia |
| THERAPEUTIC COMBINATIONS OF ORALLY ADMINISTERED PACLITAXEL AND A P-gp INHIBITOR FOR THE TREATMENT OF CANCER | Athenex Therapeutics Limited | 202211612201.8 | China |
| THERAPEUTIC COMBINATIONS OF ORALLY ADMINISTERED PACLITAXEL AND A P-gp INHIBITOR FOR THE TREATMENT OF CANCER | Athenex Therapeutics Limited | MX/A/2022/000394 | Mexico |
| THERAPEUTIC COMBINATIONS OF ORALLY ADMINISTERED PACLITAXEL AND A P-gp INHIBITOR FOR THE TREATMENT OF CANCER | Athenex Therapeutics Limited | 778241 | New Zealand |
| THERAPEUTIC COMBINATIONS OF ORALLY ADMINISTERED PACLITAXEL AND A P-gp INHIBITOR FOR THE TREATMENT OF CANCER | Athenex Therapeutics Limited | 2016295357 | Australia |
| THERAPEUTIC COMBINATIONS OF ORALLY ADMINISTERED PACLITAXEL AND A P-gp INHIBITOR FOR THE TREATMENT OF CANCER | Athenex Therapeutics Limited | 2993127 | Canada |
| THERAPEUTIC COMBINATIONS OF ORALLY ADMINISTERED PACLITAXEL AND A P-GP INHIBITOR FOR THE TREATMENT OF CANCER | Athenex Therapeutics Limited | 16827318 | EPO |
| THERAPEUTIC COMBINATIONS OF ORALLY ADMINISTERED PACLITAXEL AND A P-gp INHIBITOR FOR THE TREATMENT OF CANCER | Athenex Therapeutics Limited | 18115067.6 | Hong Kong |
| THERAPEUTIC COMBINATIONS OF ORALLY ADMINISTERED PACLITAXEL AND A P-gp INHIBITOR FOR THE TREATMENT OF CANCER | Athenex Therapeutics Limited | MX/A/2018/000872 | Mexico |
| THERAPEUTIC COMBINATIONS OF ORALLY ADMINISTERED PACLITAXEL AND A P-gp INHIBITOR FOR THE TREATMENT OF CANCER | Athenex Therapeutics Limited | 739270 | New Zealand |
| THERAPEUTIC COMBINATIONS OF ORALLY ADMINISTERED PACLITAXEL AND A P-gp INHIBITOR FOR THE TREATMENT OF CANCER | Athenex Therapeutics Limited | 15/745490 | United States |
| THERAPEUTIC COMBINATIONS OF ORALLY ADMINISTERED PACLITAXEL AND A P-gp | Athenex Therapeutics Limited | 2016295357 | Australia |

| | | | |
|---|---|---|---|
| INHIBITOR FOR THE TREATMENT OF CANCER | | | |
| THERAPEUTIC COMBINATIONS OF ORALLY ADMINISTERED PACLITAXEL AND A P-gp INHIBITOR FOR THE TREATMENT OF CANCER | Athenex Therapeutics Limited | 2993127 | Canada |
| THERAPEUTIC COMBINATIONS OF ORALLY ADMINISTERED PACLITAXEL AND A P-gp INHIBITOR FOR THE TREATMENT OF CANCER | Athenex Therapeutics Limited | MX/E/2018/004478 | Mexico |
| Polymorphisms of HM30181 Mesylate | Athenex R&D LLC | PCT/US21/57046 | PCT |
| Polymorphisms of HM30181 Mesylate | Athenex R&D LLC | 17/513448 | United States |
| Polymorphisms of HM30181 Mesylate | Athenex R&D LLC | 18/136765 | United States |

Trademarks:

See attached list.

| COUNTRY | REFERENCE # | OWNER | APPLICATION # | REGISTRATION # | STATUS CLASSES |
|---|---|---|---|---|---|

Athenex, Inc.

**Trademark Report By Title**

Printed On: 16 May 2023   9:29:49AM

## CHEMOLUTION

| COUNTRY | REFERENCE # | OWNER | APPLICATION # | REGISTRATION # | STATUS CLASSES |
|---|---|---|---|---|---|
| CHINA | 102596.000104 | Athenex, Inc. | 13 Jan 2021 1579892 | 13 Jan 2021 1579892 | REGISTERED 05 |
| EUROPEAN UNION (EUTM) | 102596.000105 | Athenex, Inc. | 13 Jan 2021 1579892 | 03 Aug 2021 1579892 | REGISTERED 05 |
| JAPAN | 102596.000107 | Athenex, Inc. | 13 Jan 2021 1,579,892 | | PENDING 05 |
| UNITED KINGDOM | 102596.000106 | Athenex, Inc. | 13 Jan 2021 1579892 | 14 Jul 2021 1579892 | REGISTERED 05 |
| United States | 102596.000085 | Athenex, Inc. | 14 Jul 2020 90/051,274 | | ALLOWED 05 |

CURRENT DUE | ACTION
8/2/2023 | FILE ITU EXTENSION
8/2/2023 | STATEMENT OF USE

| COUNTRY | REFERENCE # | OWNER | APPLICATION # | REGISTRATION # | STATUS CLASSES |
|---|---|---|---|---|---|
| WIPO | 102596.000099 | Athenex, Inc. | 13 Jan 2021 1579892 | 13 Jan 2021 1579892 | REGISTERED 05 |

CURRENT DUE | ACTION
1/13/2031 | RENEWAL

## ORASCOVERY

| COUNTRY | REFERENCE # | OWNER | APPLICATION # | REGISTRATION # | STATUS CLASSES |
|---|---|---|---|---|---|
| CHINA | 102596.000100 | Athenex, Inc. | 13 Jan 2021 1,588,526 | 13 Aug 2021 1,588,526 | REGISTERED 05, 42 |
| EUROPEAN UNION (EUTM) | 102596.000101 | Athenex, Inc. | 13 Jan 2021 1,588,526 | 13 Jan 2021 1,588,526 | REGISTERED 05, 42 |
| JAPAN | 102596.000103 | Athenex, Inc. | 13 Jan 2021 1,588,526 | | PENDING 05, 42 |
| UNITED KINGDOM | 102596.000102 | Athenex, Inc. | 13 Jan 2021 1,588,526 | 08 Sep 2021 1,588,526 | REGISTERED 05, 42 |
| United States | 102596.000086 | Athenex, Inc. | 15 Jul 2020 90/053,396 | 07 Mar 2023 6,994,088 | REGISTERED 42 |

CURRENT DUE | ACTION
3/7/2029 | AFFIDAVIT OF USE
3/7/2033 | AFFIDAVIT W/RENEWAL

| COUNTRY | REFERENCE # | OWNER | APPLICATION # | REGISTRATION # | STATUS CLASSES |
|---|---|---|---|---|---|
| WIPO | 102596.000098 | Athenex, Inc. | 13 Jan 2021 1,588,526 | 13 Jan 2021 1,588,526 | REGISTERED 05, 42 |

CURRENT DUE | ACTION
1/13/2031 | RENEWAL

## PAXORLEA

| COUNTRY | REFERENCE # | OWNER | APPLICATION # | REGISTRATION # | STATUS CLASSES |
|---|---|---|---|---|---|
| CHINA | 102596.000040 | Athenex, Inc. | 01 Nov 2019 1506761 | 01 Nov 2019 1506761 | REGISTERED 05 |

12556544_1

| COUNTRY | REFERENCE # | OWNER | FILED APPLICATION # | REGISTERED REGISTRATION # | STATUS CLASSES |
|---|---|---|---|---|---|
| EUROPEAN UNION (EUTM) | 102596.000039 | Athenex, Inc. | 01 Nov 2019 1506761 | 01 Nov 2019 1506761 | REGISTERED 05 |
| JAPAN | 102596.000041 | Athenex, Inc. | 01 Nov 2019 1506761 | 01 Nov 2019 1506761 | REGISTERED 05 |
| UNITED KINGDOM | 102596.000094 | Athenex, Inc. | 01 Nov 2019 UK00801506761 | 19 Jun 2020 UK00801506761 | REGISTERED 05 |
| CURRENT DUE 11/1/2029 | ACTION RENEWAL | | | | |
| United States | 102596.000128 | Athenex, Inc. | 20 Dec 2022 97/725,615 | | PENDING 05 |
| CURRENT DUE 6/20/2023 | ACTION FOREIGN FILING DUE | | | | |
| WIPO | 102596.000063 | Athenex, Inc. | 01 Nov 2019 1506761 | 01 Nov 2019 1506761 | REGISTERED 05 |
| CURRENT DUE 11/1/2029 | ACTION RENEWAL | | | | |

## PAXORLEA CARECONNECT

| COUNTRY | REFERENCE # | OWNER | FILED APPLICATION # | REGISTERED REGISTRATION # | STATUS CLASSES |
|---|---|---|---|---|---|
| CHINA | 102596.000119 | Athenex, Inc. | 11 Jun 2021 1608926 | | PENDING 41, 44 |
| EUROPEAN UNION (EUTM) | 102596.000113 | Athenex, Inc. | 11 Jun 2021 1608926 | 11 Jun 2021 1608926 | REGISTERED 41, 44 |
| UNITED KINGDOM | 102596.000115 | Athenex, Inc. | 11 Jun 2021 1608926 | 11 Jun 2021 WO0000001608926 | REGISTERED 41, 44 |
| WIPO | 102596.000111 | Athenex, Inc. | 11 Jun 2021 1608926 | 11 Jun 2021 1608926 | REGISTERED 41, 44 |
| CURRENT DUE 6/11/2031 | ACTION RENEWAL | | | | |

END OF REPORT

12556544_1

**Schedule 4.8(b)**
**Business IP Agreements**

- License Agreement by and between Athenex Therapeutics Limited and Avalon Polytom (HK) Limited Pegtomarginase dated as of June 29, 2018.

- License and Supply Agreement by and between Athenex Therapeutics Limited and Avalon Hepapoc Limited Galactose Meter and Strip dated as of June 29, 2018

- Exclusive License Agreement by and among Polyu Technology and Consultancy Company Limited, The Royal Institution for the Advancement of Learning/McGill University and Athenex HK Innovative Limited (f/k/a Kinex Pharmaceuticals (HK) Limited) dated February 26, 2015

- Supply Agreement dated as of May 17, 2019 by and among Athenex HK Innovative Limited, Shanghai Tofflon Medical Technology Industry Development Co., Ltd. and Wingson Science and Technology Company Limited, as amended by Amendment to Supply Agreement dated May 22, 2019 to change the name of Wingson Science and Technology Company Limited to ATIS Science and Technology Company Limited

- Clinical Trial Agreement dated March 14, 2018 by and between Athenex HK Innovative Limited and The Chinese University of Hong Kong and Agreement for Services related to KX-ORAX0010 dated June 13, 2018, as amended by the First Amendment to Agreement for Services dated December 1, 2019

- License Agreement, dated June 28, 2013, by and between Hanmi Pharmaceutical Co., Ltd. and Athenex Therapeutics Limited (f/k/a Kinex Therapeutics (HK) Limited) and Athenex, Inc. (f/k/a Kinex Pharmaceuticals, Inc.), as guarantor, on Orascovery Program Mainland China Territory.

- All other Contracts set forth on Schedule 2.2 that constitute Business IP Agreements

**Schedule 4.9**
**Affiliate Transactions**

- License Agreement dated July 2, 2020 by and among Athenex, Inc., Athenex HK Innovative Limited and Nuwagen Limited.

**Schedule 4.11**
**<u>Brokers</u>**

Cassel Salpeter & Co., LLC

**Schedule 6.1**
**Conduct of Business Exceptions**

None.