**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| ATHENEX, INC., et al., | Case No. 23-90295 (DRJ) |
| Debtors. [1] | (Jointly Administered) |

**ORDER (I) AUTHORIZING (A) THE SALE OF CERTAIN ASSETS OF DEBTOR
ATHENEX PHARMACEUTICAL DIVISION, LLC TO OAKTREE STRATEGIC
CREDIT ASSET HOLDINGS, LLC FREE AND CLEAR OF LIENS, CLAIMS, AND
ENCUMBRANCES AND (B) THE DEBTORS TO ENTER INTO AND PERFORM
UNDER THE PURCHASE AGREEMENT AND (II) GRANTING RELATED RELIEF**

(Related Docket Nos. 17, 113, 239)

Upon the emergency motion (the "Motion")[2] of the above-captioned debtors and debtors

in possession (collectively, the "Debtors") for entry of an order (this "Order") (i) authorizing and

approving, among other things, (a) the sale of the Purchased Assets as defined in the Purchase

Agreement to the Purchaser free and clear of liens, claims, and encumbrances (the "Transaction")

and (b) Athenex Pharmaceutical Division, LLC ("APD") to enter into and perform under the

Purchase Agreement, and (ii) granting related relief, all as more fully set forth in the Motion; and

upon the evidence offered in support of the Motion; and this Court having jurisdiction over this

matter pursuant to 28 U.S.C. § 1334 and the Amended Standing Order; and this Court having

---

[1]  A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors'
claims and noticing agent at https://dm.epiq11.com/athenex. The location of Athenex, Inc.'s principal place of
business and the Debtors' service address in these Chapter 11 Cases is 1001 Main Street, Suite 600, Buffalo, NY
14203.

[2]  The Motion was filed on May 14, 2023 as *Debtors' Emergency Motion for (I) Entry of an Order Approving
(A) Bid Procedures; (B) The Form and Manner of Notice; (C) the Procedures for Determining Cure Amounts for
Executory Contracts and Unexpired Leases; and (II) Entry of an Order Approving (A) the Sale of Substantially
All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances and Interests; and (B) the
Assumption and Assignment of Certain Contracts and Unexpired Leases* [Docket No. 17]. Capitalized terms used
but not otherwise defined herein shall have the meaning ascribed to them in the Motion or the Purchase
Agreement.

found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found

that it may enter a final order consistent with Article III of the United States Constitution; and this

Court having found that venue of this proceeding and the Motion in this district is proper pursuant

to 28 U.S.C. § 1408; and this Court having found that the relief requested in the Motion is in the

best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court

having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion

were appropriate under the circumstances and no other notice need be provided; and this Court

having reviewed the Motion, and having heard the statements in support of the relief requested

therein at any hearing before this Court, and upon the First Day Declaration and the declarations

filed in support of the Motion; and this Court having conducted a hearing on the Motion (the "Sale

Hearing"), at which time all interested parties were offered an opportunity to be heard with respect

to the Motion; and this Court having determined that the legal and factual bases set forth in the

Motion establish just cause for the relief granted herein; and upon all of the proceedings had before

this Court; and after due deliberation and sufficient cause appearing therefor, **THE COURT**

**HEREBY FINDS THAT**:

## I.      **Jurisdiction, Final Order, and Statutory Predicates.**

A.      The Court has jurisdiction to hear and determine the Motion pursuant to 28 U.S.C.

§§ 157 and 1334. Venue is proper in this District and in the Court pursuant to 28 U.S.C. §§ 1408

and 1409.

B.      The Debtors' rights, title and interest in the Purchased Assets constitute property of

APD's bankruptcy estate and title thereto is vested in APD's bankruptcy estate within the meaning

of section 541(a) of the Bankruptcy Code.

C.      The statutory predicates for the relief requested in the Motion are sections 105(a),

363, and 365 of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004 and 6006 and Bankruptcy

2

Local Rule 2002-1.

D.      This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order, waives any stay, and expressly directs entry of judgment as set forth herein.

## II.   Notice of the Purchase Agreement, Transaction, Sale Hearing and Bidding Procedures Order.

E.      As evidenced by the affidavits of service and publication previously filed with the Court, and based on the representations of counsel at the Sale Hearing, due, proper, timely, adequate and sufficient notice of the Motion, the Bid Procedures Order, the Auction, the Sale Hearing, the Purchase Agreement, this Order and the Transaction has been provided in accordance with sections 102(1) and 363 of the Bankruptcy Code, Bankruptcy Rules 2002, 9007, 9008 and 9014, and the Local Bankruptcy Rule 2002-1.  The Debtors have complied with all obligations to provide notice of the Motion, the Bid Procedures Order, the Auction, the Sale Hearing, the Purchase Agreement, this Order and the Transaction as required by the Bid Procedures Order.  The aforementioned notices are good, sufficient and appropriate under the circumstances, and no other or further notice of the Motion, the Bid Procedures Order, the Auction, the Sale Hearing, the Purchase Agreement, this Order or the Transaction is, or shall be, required. The requirements of Bankruptcy Rule 6004(a) and the Local Bankruptcy Rules are satisfied by such notice.

F.      A reasonable opportunity to object and be heard with respect to the Transaction, the Motion and the relief requested therein and provided in this Order has been afforded to all interested persons and entities, including the Objection Notice Parties (as defined in the Bidding Procedures Order).

3

G.      As demonstrated by the evidence proffered or adduced at the Sale Hearing and the representations of counsel at the Sale Hearing, the Debtors have complied in all material respects with the Bidding Procedures Order.  The Debtors and their professionals have adequately and appropriately marketed the Purchased Assets in compliance with the Bidding Procedures and the Bidding Procedures Order, and in accordance with the Debtors' fiduciary duties.  Based upon the record of these proceedings, creditors, other parties in interest and prospective purchasers were afforded a reasonable and fair opportunity to bid for the Purchased Assets.

H.      The revised bid procedures, filed as of June 12, 2023 [Docket No. 239] (the "Bid Procedures"), were substantively and procedurally fair to all parties and all potential bidders and afforded notice and a full, fair and reasonable opportunity for any person to make a higher or otherwise better offer to purchase the Purchased Assets.  The Debtors conducted the sale process without collusion and in accordance with the Bid Procedures.

I.      Oaktree Strategic Credit Asset Holdings, LLC (the "Buyer") and Oaktree Fund Administration, LLC (the "Agent") as administrative agent on behalf of the Prepetition Term Loan Secured Parties[3] and solely for the purposes of and as described in section 11.4 thereof, are collectively referred to as the "Purchaser" in this Order.  Purchaser is the Successful Bidder, and the Purchase Agreement is the Successful Bid (as defined in the Bid Procedures), for the Purchased Assets in accordance with the Bid Procedures Order.  The Transaction and the Purchase Agreement comply with the Bidding Procedures Order and all other applicable orders of the Court.

III.   **Good Faith of the Purchaser and the Prepetition Term Loan Secured Parties.**

J.      The Purchase Agreement and the related agreements were negotiated, proposed, and entered into by the Debtors, the Purchaser and the Prepetition Term Loan Secured Parties

---

[3]   As such term is defined in the *Final Order (I) Authorizing the Debtors to Use Cash Collateral; (II) Granting Adequate Protection to Prepetition Term Loan Secured Parties; (III) Modifying Automatic Stay; and (IV) Granting Related Relief* [Docket No. 275].

4

without collusion, in good faith, and from arm's-length bargaining positions.  Neither the Debtors, the Prepetition Term Loan Secured Parties, nor the Purchaser have engaged in any conduct that would cause or permit the Purchase Agreement, any related agreements or the Transaction to be avoided, or for any costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.

K.      The Purchaser is consummating the Transaction in good faith and the Purchaser is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code, and has proceeded in good faith in all respects in connection with the Transaction.  The Purchaser is therefore entitled to all of the protections afforded under section 363(m) of the Bankruptcy Code. None of the Debtors nor the Purchaser have engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code.  The Debtors were free to deal with any other party interested in buying or selling some or all of the Purchased Assets on behalf of the Debtors' estates.  The protections afforded by section 363(m) of the Bankruptcy Code are integral to the Transaction and the Purchaser would not consummate the Transaction without such protections.

## IV.    Highest and Best Offer.

L.      The Debtors' marketing process with respect to the Purchased Assets, including the Debtors' prepetition marketing process with respect to the Purchased Assets, afforded a full, fair, and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the Purchased Assets.  The Purchase Agreement: (i) constitutes the highest and best offer for the Purchased Assets; (ii) is fair and reasonable; (iii) constitutes reasonably equivalent value and fair consideration for the Purchased Assets (as those terms are defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and Section 548 of the Bankruptcy Code) and fair consideration under the Bankruptcy Code and under applicable non-bankruptcy

law, and (iv) is in the best interests of the Debtors, their estates, their creditors and all other parties in interest.

M.      The Debtors' determination that the Purchase Agreement constitutes the highest and best offer for the Purchased Assets constitutes a valid and sound exercise of the Debtors' business judgment.

N.      Consistent with their fiduciary duties, the Debtors have demonstrated good, sufficient and sound business reasons and justifications for entering into the Transaction and the performance of their obligations under the Purchase Agreement, including, but not limited to, the fact that the Purchase Agreement will provide a greater recovery for the Debtors' estates and creditors than would be provided by any other available alternative, including a separate liquidation of the Debtors and the Purchased Assets.

O.      Pursuant to the Bid Procedures Order, the Bid Procedures and applicable law, including Bankruptcy Code section 363(k), and in accordance with the Purchase Agreement, the Purchaser was authorized to credit bid all or a portion of the Prepetition Term Loan Secured Indebtedness.  Pursuant to the Purchase Agreement, the Purchaser credit bid an amount equal to twenty million dollars ($20,000,000.00) subject to downward adjustment as set forth in the Purchase Agreement as the purchase price for the Purchased Assets (the "Credit Bid").  The Credit Bid is a valid and proper offer pursuant to Bankruptcy Code section 363(b) and 363(k).

       **IT IS HEREBY ORDERED THAT**:

1.      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to these chapter 11 cases pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

2.      The Motion is granted as provided herein, and entry into and performance under, the Purchase Agreement and the consummation of the Transaction contemplated thereby is authorized and approved.

3.      All objections to the Motion or the relief requested therein that have not been withdrawn, waived or settled as announced to the Court at the Sale Hearing or by stipulation filed with the Court, and all reservations of rights included in such objections, are hereby denied and overruled on the merits with prejudice.  Those parties who did not object or withdrew their objections to the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code to the relief granted herein.

4.      This Sale Order will be binding in all respects upon the Debtors, their bankruptcy estates, all creditors, all holders of equity interests in the Debtors, all holders of any Interests or Claims (whether known or unknown) against the Debtors, any and all alleged holders of Interests or Claims against or on all or any portion of the Purchased Assets, all counterparties to any executory contract or unexpired lease of the Debtors, the Purchaser and all agents, representatives, affiliates, and permitted successors and assigns of the Purchaser, and any trustees, examiners, or other fiduciary under any section of the Bankruptcy Code, if any, subsequently appointed in the Debtors' Chapter 11 Cases or upon a conversion to chapter 7 under the Bankruptcy Code of any or all of the Debtors' cases.  The terms and provisions of the Purchase Agreement and this Order will inure to the benefit of the Debtors, their bankruptcy estates, their creditors, the Purchaser and all agents, representatives, affiliates, and permitted successors and assigns of the Purchaser, and any other affected third parties, including all persons asserting any Interests or Claims in the Purchased Assets to be sold to the Purchaser pursuant to the Purchase Agreement, notwithstanding any subsequent appointment of any trustee(s), party, entity, or other fiduciary under any section of

7

any chapter of the Bankruptcy Code, as to which trustee(s), party, entity, or other fiduciary such terms and provisions likewise will be binding.

5.     Notice of the Motion and Sale Hearing was adequate, appropriate, fair and equitable under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004 and 6006, and the Bid Procedures Order.

## APPROVAL OF THE PURCHASE AGREEMENT

6.     In accordance with section 363 of the Bankruptcy Code and Bankruptcy Rule 6004 and as described in the Motion, the Debtors are authorized, but not directed, to sell the Purchased Assets to the Purchaser in accordance with the terms and conditions set forth in the *Asset Purchase Agreement by and Among Athenex Pharmaceutical Division, LLC* and *Oaktree Strategic Credit Asset Holdings, LLC, and Oaktree Fund Administration, LLC as administrative agent and solely for purposes of section 11.4 thereof dated as of June 20, 2023*, attached hereto as **Schedule 1** (the "Purchase Agreement").   The Purchase Agreement, together with all annexes, exhibits, and amendments thereto, is hereby approved.

7.     The Debtors are authorized and empowered, but not directed, to take any and all actions necessary or appropriate to: (a) consummate the sale of the Purchased Assets to the Purchaser pursuant to and in accordance with the terms and conditions of the Purchase Agreement; (b) close the sale of the Purchased Assets as contemplated in the Purchase Agreement and this Order (including any customary or immaterial modifications to the purchase price); and (c) execute and deliver, perform under, consummate, implement, and close fully the Purchase Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Purchase Agreement and the sale of the Purchased Assets, including any other ancillary document, or as may be reasonably necessary or appropriate to the performance of the obligations as contemplated by the Purchase Agreement and such other ancillary documents.

8

8.      The Purchase Agreement represents the highest and best offer to purchase the Purchased Assets under the facts and circumstances of these chapter 11 cases.  Approval of the Purchase Agreement and the consummation of the transaction contemplated hereby is in the best interests of the Debtors, their creditors, their estates, and all other parties in interest.  The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the sale of the Purchased Assets.

**TRANSFER OF THE PURCHASED ASSETS**

9.      The Debtors are authorized, but not directed, to sell the Purchased Assets free and clear of and all liens, claims, and encumbrances against the Debtors or their estates (other than those included in the Assumed Liabilities or Permitted Liens (each as defined in the Purchase Agreement)), because one or more of the standards set forth in section 363(f) of the Bankruptcy Code has been satisfied.

10.      Pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, the sale of the Purchased Assets under the terms and conditions set forth in the Purchase Agreement shall be free and clear of any and all liens, claims, encumbrances, and other interests of any kind or nature whatsoever (other than those included in the Assumed Liabilities or Permitted Liens (each as defined in the Purchase Agreement)); *provided* that any such liens, claims, encumbrances, and other interests shall attach to the proceeds of the sale with the same validity, in the amount, with the same priority as, and to the same extent that any such liens, claims, and encumbrances have with respect to the Purchased Assets, subject to any claims and defenses that the Debtors may possess with respect thereto.  Any such interests shall be transferred and attached to the proceeds of the sale with the same validity and priority, and subject to the same defenses that such liens had against the Purchased Assets immediately prior to the Closing (as defined below).

9

11.     The sale, transfer and assignment of the Purchased Assets pursuant to this Order and the Purchase Agreement shall vest the Purchaser with valid and indefeasible title to the Purchased Assets and will be a legal, valid and effective transfer of the Purchased Assets free and clear of any and all liens, claims and encumbrances (other than those included in the Assumed Liabilities or Permitted Liens (each as defined in the Purchase Agreement).

12.     All persons and entities holding liens or interests in the Purchased Assets arising under, out of, in connection with, or in any way relating to the Debtors, the Purchased Assets or the transfer of the Purchased Assets to the Purchaser (other than those included in the Assumed Liabilities or Permitted Liens (each as defined in the Purchase Agreement)), hereby are forever barred, estopped, and permanently enjoined from asserting against the Purchaser or their successors or assigns, their property, or the Purchased Assets such persons' or entities' liens or interests in and to the Purchased Assets.

13.     Notwithstanding any provision of the Purchase Agreement to the contrary, after the Closing of the sale of the Purchased Assets, the Debtors shall have no further liability with respect to the Purchased Assets, and any claims, whether administrative or otherwise, relating to or arising from the Purchased Assets after the Closing of the sale and transfer of the Purchased Assets that are asserted against the Debtors shall be deemed disallowed.

14.     A certified copy of this Order may be filed with the appropriate clerk and/or recorded with the recorder to act to cancel any of the liens and other encumbrances of record.

15.     If any person or entity which has filed statements or other documents or agreements evidencing liens on, or interests in, the Purchased Assets shall not have delivered to the Debtors prior to the Closing in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of liens or interests which the person or entity

has or may assert with respect to the Purchased Assets, the Debtors are hereby authorized, and the Purchaser is hereby authorized to execute and file such statements, instruments, releases, and other documents on behalf of such person or entity with respect to the Purchased Assets.

16.     This Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons and entities who may be required by operation of law, the duties of their office or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease, and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

17.     The Purchase Agreement and any related agreements, documents, or other instruments may be modified, amended or supplemented by the parties thereto with the consent of the Prepetition Term Loan Secured Parties and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment, or supplement does not have a material adverse effect on the Debtors' estates or the rights of any party holding a lien, claim or encumbrance on or against the Purchased Assets.

18.     No bulk sales law or similar law of any state or other jurisdiction shall apply in any way to the transactions with the Debtors that are approved by this Order, including, without limitation, the Purchase Agreement and the Transaction.

19.     Notwithstanding anything in this Order, subject to section 525(a) of the Bankruptcy Code, no governmental unit (as defined in Bankruptcy Code § 101(27)) or any representative

11

thereof may deny, revoke, suspend, or refuse to renew, any right, permit, license, copyright, patent, trademark or other permission relating to the use of the Purchased Assets sold, transferred, or conveyed to the Purchaser on account of the filing or pendency of these chapter 11 cases, the conduct of the Sale, or the consummation of the Transaction contemplated by the Purchase Agreement and the related agreements.

20.     The reversal or modification of the authorization provided herein to consummate the transactions contemplated herein shall not affect the validity of the sale, transfer and assignment of the Purchased Assets to the Purchaser.  The Purchaser has entered into the Purchase Agreement in good faith and is a purchaser in good faith of the Purchased Assets as that term is used in Section 363(m) of the Bankruptcy Code, and, upon the occurrence of the Closing of the purchase of the Purchased Assets, the Purchaser shall have all of the protections afforded by Section 363(m) of the Bankruptcy Code.

## PROHIBITION OF ACTIONS AGAINST THE PURCHASER

21.     The Purchaser is not an "insider" or "affiliate" of the Debtors, as those terms are defined in sections 101(31) and 101(2) of the Bankruptcy Code.

22.     By virtue of the Transaction, neither the Purchaser nor any of its affiliates shall be deemed to:  (i) be a legal successor, or otherwise deemed to be a successor, to any of the Debtors under any theory of law or equity; (ii) have, de facto or otherwise, merged with or into any or all Debtors or their estates; (iii) have a common identity or a continuity of enterprise with the Debtors; (iv) be an alter ego or a mere continuation or substantial continuation, or be holding itself out as a mere continuation, of the Debtors or any business, enterprise, or operation of the Debtors; or (v) be liable for any acts or omissions of the Debtors in the conduct of the business or arising under or related to the Purchased Assets, other than as set forth in the Purchase Agreement.  The Purchaser's acquisition of the Purchased Assets owned by the Debtors shall be free and clear of

12

any "successor liability", vicarious liability and other types of transferee liability of any kind or nature whatsoever, whether known or unknown as of the Closing, asserted or unasserted, fixed or contingent, liquidated or unliquidated (other than, to the extent applicable, any Assumed Liabilities), and the Purchased Assets shall not be subject to any Claims, Encumbrances and Interests arising under or in connection with any Retained Liability (as defined in the Purchase Agreement). The operations of the Purchaser and its affiliates shall not be deemed a continuation of the Debtors' business as a result of the acquisition of the Purchased Assets. The Purchaser would not have acquired the Purchased Assets but for the foregoing protections against potential claims based upon "successor liability" theories.

## RELATED RELIEF

23.     All time periods set forth in this Order and the Purchase Agreement shall be calculated in accordance with Bankruptcy Rule 9006(a).

24.     The stay provided for in Bankruptcy Rules 6004(h) and 6006(h) is hereby reduced to the extent necessary to permit Closing of the sale of the Purchased Assets. This Order shall otherwise be effective immediately upon its entry.

25.     To the extent there is any inconsistency between the terms of the Purchase Agreement, the Motion, and this Order, the terms of this Order shall govern.

26.     At any time prior to the Closing, the Purchaser may assign the Purchase Agreement or its rights thereunder to one or more of its affiliates or designees, which shall be entitled to assume and accede to the Purchase Agreement and to purchase and acquire any or some of the Purchased Assets in lieu of such Purchaser, and such affiliate(s) or designee(s) shall be deemed to be a Purchaser for all purposes under this Order.

27.     All persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtors to sell and transfer

13

the Purchased Assets to the Purchaser in accordance with the terms of the Purchase Agreement and this Order.

28.     Following the Closing, no holder of a lien, claim, or encumbrance in the Purchased Assets shall interfere with the Purchaser's title to or use and enjoyment of the Purchased Assets based on or related to such lien, or any actions that the Debtors may take in this chapter 11 case or any successor case.

29.     Except as otherwise expressly provided in the Purchase Agreement, the Purchaser shall have no liability to pay wages, bonuses, severance pay, benefits (including, without limitation, contributions or payments on account of any under-funding with respect to any and all pension plans) or any other payment with respect to employees or former employees of the Debtors. Except as otherwise expressly provided in the Purchase Agreement, the Purchaser shall have no liability with respect to any collective bargaining agreement, employee pension plan, employee welfare or retention, benefit and/or incentive plan to which the Debtors are a party and relating to the Purchased Assets (including, without limitation, arising from or related to the rejection or other termination of any such agreement), and the Purchaser shall in no way be deemed a party to or assignee of any such agreement, and no employee of the Purchaser shall be deemed in any way covered by or a party to any such agreement, and except as otherwise expressly provided in the Purchase Agreement, all parties to any such agreement are hereby enjoined from asserting against the Purchaser any and all claims arising from or relating to such agreement.

30.     Notwithstanding anything contrary in this Order or the Purchase Agreement, (a) the Order Authorizing Debtors to Honor Certain Prepetition Obligations to Customers and to Continue Customer Programs [Docket No. 133] shall remain in full force and effect in all respects; (b) the transfer of accounts receivable to the Purchaser shall not be free and clear of, and shall not affect, diminish, or impede in any respect, any claims or defenses based on setoff, deduction, recoupment

14

or netting, or other affirmative defenses, pursuant to the terms of the agreements giving rise to such accounts receivable and applicable law, with respect to the mutual claims of indebtedness between AmerisourceBergen Drug Corporation and its affiliates and/or subsidiaries (collectively, "ABDC") and McKesson Corporation and its affiliates and/or subsidiaries (collectively, "McKesson") and Cardinal Health, Inc. and its affiliates and/or subsidiaries ("collectively, "Cardinal Health", and together with ABDC and McKesson, the "Distributors"), on the one hand, and the Debtors or the Purchaser on the other; and (c) the rights of the Distributors to exercise setoffs, deduction, and netting are expressly permitted and preserved, pursuant to section 553(a) of the Bankruptcy Code; and (d) causes of action, claims, or receivables asserted by the Debtors against the Distributors shall not be sold to the Purchaser free and clear of the Distributors' rights and defenses, including, without limitation, all return, product exchange, refund, rebate, chargeback, and credit rights under such agreements; provided that the Purchaser shall have the full benefit of all of the Debtors' rights, claims, and defenses, all of which shall be fully preserved and conveyed to the Purchaser, to the foregoing rights of setoff, deduction, recoupment or netting, or other affirmative defenses of the Distributors, including, without limitation, all return, product exchange, refund, rebate, chargeback, and credit rights of the Distributors under applicable agreements, set forth in clauses (b), (c), and (d) above.

31.     Notwithstanding the relief granted herein and any actions taken pursuant to such relief, nothing contained in the Motion or this Order shall constitute, nor is it intended to constitute: (a) an admission as to the validity, priority, or amount of any particular claim against a Debtor entity; (b) a waiver of the Debtors' right to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim or finding that any particular claim is an administrative expense claim or other priority claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Order or the Motion; (e) a request or

15

authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates (g) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (h) a concession by the Debtors or any other party-in-interest that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Order are valid and the Debtors and all other parties-in-interest expressly reserve their rights to contest the extent, validity, or perfection, or to seek avoidance of all such liens.  Any payment made pursuant to this Order should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

32.     The consummation of the Transaction shall be conditioned on and subject to the terms of paragraph 28 of the order entered by the Court at Docket No. 275 and the Debtors are authorized and directed to use the proceeds of the Transaction received by the Debtors in accordance therewith.

33.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Bankruptcy Local Rules are satisfied by such notice.

34.     The Debtors are authorized, but not directed, to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion and the Purchase Agreement.

35.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

36.     This Order shall be binding upon the Purchaser and all successors and assigns of the Purchaser, the Debtors, their estates, all creditors of and holders of equity interests in the

16

Debtors, and any holders of liens against or on all or any portion of the Purchased Assets.  This Order and the Purchase Agreement shall inure to the benefit of the Debtors, their estates, their creditors, the Purchaser, and its respective successors and assigns.

Dated: _____, 2023

_____
DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE

**<u>Schedule 1</u>**

**Purchase Agreement**

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

*ATHENEX PHARMACEUTICAL DIVISION, LLC*,

*OAKTREE STRATEGIC CREDIT ASSET HOLDINGS, LLC*,

**and**

*OAKTREE FUND ADMINISTRATION, LLC,*
*as administrative agent and solely for purposes of Section 11.4 of this Agreement*

**DATED AS OF JUNE 20, 2023**

ARTICLE I DEFINITIONS ........................................................................................... 2
    1.1    **Definitions** .................................................................................... 2

ARTICLE II PURCHASE AND SALE ........................................................................... 7
    2.1    **Purchased Assets** ......................................................................... 7
    2.2    **Nonassignable Assets** ................................................................. 8
    2.3    **Liabilities.** ................................................................................... 8
    2.4    **Purchase Price** ............................................................................ 8
    2.5    **Accounts Receivable Statement.** ................................................ 8
    2.6    **Withholding** ................................................................................. 9

ARTICLE III CLOSING; PAYMENT OF PURCHASE PRICE ................................... 9
    3.1    **Closing** ........................................................................................ 9
    3.2    **Closing Deliveries** ..................................................................... 10

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF SELLER ................ 10
    4.1    **Existence and Power** ................................................................. 10
    4.2    **Authorization** ............................................................................ 10
    4.3    **Enforceability** ........................................................................... 11
    4.4    **Noncontravention** ...................................................................... 11
    4.5    **Proceedings; Compliance with Laws** ...................................... 11
    4.6    **Title to Purchased Assets; Accounts Receivable** .................... 11
    4.7    **Brokers** ...................................................................................... 12
    4.8    **Exclusivity of Representations and Warranties.** ...................... 12

ARTICLE V REPRESENTATIONS AND WARRANTIES OF BUYER .................. 12
    5.1    **Existence and Power** ................................................................. 12
    5.2    **Authorization** ............................................................................ 12
    5.3    **Enforceability** ........................................................................... 12
    5.4    **Governmental and Third Party Authorizations** ...................... 12
    5.5    **Noncontravention** ...................................................................... 13
    5.6    **Brokers** ...................................................................................... 13
    5.7    **Proceedings** ............................................................................... 13
    5.8    **Financial Capability** ................................................................. 13
    5.9    **Independent Investigation** ......................................................... 13
    5.10   **Exclusivity of Representations and Warranties** ...................... 14

ARTICLE VI PRE-CLOSING COVENANTS ............................................................ 14
    6.1    **Conduct of Business** ................................................................. 14
    6.2    **Pre-Closing Access to Information** .......................................... 15
    6.3    **Supplemental Disclosure** ......................................................... 15
    6.4    **Efforts to Close** ......................................................................... 15
    6.5    **Bankruptcy Matters** .................................................................. 16
    6.6    **Access to Books and Records** ................................................... 16

ARTICLE VII COVENANTS OF BUYER AND SELLER ........................................ 17
    7.1    **Public Announcements** .............................................................. 17

ARTICLE VIII CONDITIONS TO CLOSING ........................................................... 17

| 8.1 | **Conditions to Obligation of Buyer** | 17 |
|-----|--------------------------------------|----|
| 8.2 | **Conditions to Obligation of Seller** | 18 |
| 8.3 | **Frustration of Closing Conditions** | 19 |
| 8.4 | **Waiver of Conditions** | 19 |

ARTICLE IX TERMINATION ........................................................................... 19
| 9.1 | **Termination** | 19 |
|-----|----------------|----|
| 9.2 | **Effect of Termination** | 20 |

ARTICLE X SURVIVAL AND RELEASE ....................................................... 21
| 10.1 | **Survival** | 21 |
|------|-------------|----|

ARTICLE XI MISCELLANEOUS ..................................................................... 21
| 11.1 | **Notices** | 21 |
|-------|-------------|----|
| 11.2 | **Amendments and Waivers** | 22 |
| 11.3 | **Expenses** | 22 |
| 11.4 | **Successors and Assigns** | 23 |
| 11.5 | **Governing Law** | 23 |
| 11.6 | **Consent to Jurisdiction; Service of Process; Waiver of Jury Trial** | 23 |
| 11.7 | **Counterparts** | 24 |
| 11.8 | **No Third Party Beneficiaries** | 24 |
| 11.9 | **Entire Agreement** | 24 |
| 11.10 | **Disclosure Schedules** | 24 |
| 11.11 | **Captions** | 25 |
| 11.12 | **Remedies** | 25 |
| 11.13 | **Severability** | 25 |
| 11.14 | **Interpretation** | 25 |
| 11.15 | **Further Assurances** | 26 |

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (the "Agreement"), dated as of June 20, 2023, is entered into by and among ATHENEX PHARMACEUTICAL DIVISION, LLC, a Delaware limited liability company ("Seller"), OAKTREE STRATEGIC CREDIT ASSET HOLDINGS, LLC a Delaware limited liability company ("Buyer") and OAKTREE FUND ADMINISTRATION, LLC, a Delaware limited liability company (the "Agent"), as administrative agent on behalf of the Lenders party to the Credit Agreement and solely for purposes of and as described in Section 11.4 of this Agreement. Seller and Buyer are referred to herein as the "Parties". Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in Article I of this Agreement.

## RECITALS

A.      Seller is in the business of developing, sourcing, and selling multisource injectable pharmaceutical products in the United States (the "Business").  Seller is a chapter 11 debtor and debtor-in-possession in Case No. 23-90295 (DRJ) (Jointly Administered) (the "Bankruptcy Case") pending in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court").

B.      On May 22, 2023, the Bankruptcy Court entered that certain *Order Approving (a) Bid Procedures; (b) the Form and Manner of Notice; (c) the Procedures for Determining Cure Amounts for Executory Contracts and Unexpired Leases; and (d) Granting Related Relief* was entered in the Bankruptcy Case [Docket No. 113], as modified by Docket No. 239 (the "Procedures Order").

C. The Agent and Seller are party to (a) the Credit Agreement and Guaranty, dated as of June 19, 2020 (as amended, restated and supplemented from time to time, the "Credit Agreement") and (b) the Security Agreement dated as of June 19, 2020 (the "Security Agreement") granting Liens on certain Collateral (as defined in the Security Agreement), which includes, subject to certain exceptions, all of Seller's personal property (the "Encumbered Assets").

D. Agent shall be party to this Agreement solely for purposes of confirming its designation of its Credit Bid Right (as defined in the Procedures Order) to Buyer as provided in Paragraph 14 of the Procedures Order and on behalf of the Lenders party to the Credit Agreement (the "Lenders"). Buyer shall take title to all of the Purchased Assets and assume all of the Assumed Liabilities pursuant to this Agreement.

E. In consideration of the Encumbered Assets and in satisfaction of the Liens thereon, Buyer desires to credit bid, pursuant to Section 363(k) of the Bankruptcy Code, an aggregate amount equal to the "Credit Bid Amount" as specified herein with respect to certain of the assets that are Encumbered Assets specified herein as the Purchased Assets, which Credit Bid Amount shall be allocated on a dollar-for-dollar credit against Obligations (as defined in the Credit Agreement) under the Credit Agreement as of the Closing Date.

F. Buyer desires to purchase, acquire and accept, and the Seller desires to sell, convey, assign, transfer and deliver to Buyer, all of the Purchased Assets, and Buyer is willing to assume,

and the Seller desires to assign and delegate to Buyer, all of the Assumed Liabilities, all in the manner and subject to the terms and conditions set forth herein and in accordance with Sections 105, 363 and 365 of the Bankruptcy Code;

**AGREEMENTS**

NOW, THEREFORE, in consideration of the foregoing premises and the representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

**ARTICLE I**
<u>**DEFINITIONS**</u>

1.1   <u>**Definitions**</u>.  When used in this Agreement, the following terms shall have the meanings assigned to them in this <u>Section 1.1</u>.

"<u>Action</u>" means any action, suit, claim, complaint, litigation, investigation, audit, proceeding, arbitration or other similar dispute.

"<u>Affiliate</u>" means, with respect to any specified Person, any other Person directly or indirectly controlling, controlled by or under common control with such specified Person.  For purposes of this definition, the terms "controlling," "controlled by," or "under common control with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise, or the power to elect more than fifty percent (50%) of the directors, managers, general partners, or persons exercising similar authority with respect to such Person. For the avoidance of doubt, Buyer and Seller shall not be deemed Affiliates of each other.

"<u>Agent</u>" has the meaning set forth in the Preamble.

"<u>Agreed Statement</u>" has the meaning set forth in <u>Section 7.1</u>.

"<u>Agreement</u>" has the meaning set forth in the Preamble.

"<u>Ancillary Documents</u>" all agreements, instruments and documents delivered at the Closing pursuant to this Agreement.

"<u>Assumed Liabilities</u>" has the meaning set forth in <u>Section 2.3(a)</u>.

"<u>Auction</u>" has the meaning set forth in the Bid Procedures.

"<u>Bankruptcy Case</u>" has the meaning set forth in the Recitals.

"<u>Bankruptcy Code</u>" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time.

"<u>Bankruptcy Court</u>" has the meaning set forth in the Recitals.

-2-

"Bid Procedures" has the meaning set forth in Section 6.6(b).

"Books and Records" means all of the books and records, in all formats (both tangible and intangible), used or maintained by or on behalf of Seller in connection with or otherwise related to the Purchased Assets or Assumed Liabilities.

"Business" has the meaning set forth in the Recitals.

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks located in New York, New York are authorized or required by Law to close.

"Buyer" has the meaning set forth in the Preamble.

"Buyer Closing Certificate" has the meaning set forth in Section 8.2(c).

"Closing" has the meaning set forth in Section 3.1.

"Closing Date" has the meaning set forth in Section 3.1.

"Closing Accounts Receivable" means the aggregate amount of accounts receivable of the Business as of the close of business on the Closing Date.

"Closing Statement" has the meaning set forth in Section 2.5(a).

"Code" means the Internal Revenue Code of 1986, as amended, and regulations promulgated thereunder.

"Confidentiality Obligations" means the obligations of the Parties contained in Section 14.16 of the Credit Agreement or any other applicable confidentiality obligations to which any Party may be subject.

"Contract" means any written and legally binding agreement, contract, commitment or arrangement.

"Credit Agreement" has the meaning set forth in the Recitals.

"Credit Bid Amount" means, the lesser of (i) $20,000,000.00 and (ii) the product of (y) $20,000,000.00 and (z) the Closing Accounts Receivable *divided by* $78,743,378.20.

"Credit Bid Right" has the meaning set forth in the Procedures Order.

"Encumbered Assets" has the meaning set forth in the Recitals.

"Final Closing Statement" has the meaning set forth in Section 2.5(b).

"Fundamental Representations" means the representations and warranties of Seller set forth in Section 4.1 (*Existence and Power*), Section 4.2 (*Authorization*), Section 4.3 (*Enforceability*), Section 4.6(a) (*Title to Purchased Assets*) and Section 4.7 (*Brokers*).

"GAAP" means United States generally accepted accounting principles, consistently applied, as in effect when applied by Seller.

"General Enforceability Exceptions" means general principles of equity and by bankruptcy, insolvency or similar Laws and general equitable principles affecting the rights of creditors generally.

"Governmental Entity" means (i) any nation, state, commonwealth, province, territory, county, municipality, district or other jurisdiction of any nature, foreign or domestic, (ii) any federal, state, local, municipal, or other government of the foregoing, (iii) any governmental or quasi-governmental entity of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal) or (iv) anybody (including any international or multinational body) exercising, or entitled to exercise any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature, including any arbitral tribunal.

"Initial Closing Statement" has the meaning set forth in Section 2.5(a).

"IRS" means the United States Internal Revenue Service.

"Law" means any statute, law, ordinance, code, rule or regulation of any Governmental Entity.

"Lenders" has the meaning given to such term in the Credit Agreement.

"Liability(ies)" means with respect to any Person, any direct or indirect liabilities, obligations, commitments, indebtedness, claim, loss, damage, deficiency, assessment, fine, penalty, or responsibility of such Person of any kind or nature, whether fixed or unfixed, choate or inchoate, liquidated or unliquidated, secured or unsecured, asserted or unasserted, due or to become due, accrued or unaccrued, vested or unvested, executory, determined, determinable, absolute, known or unknown, contingent or otherwise, regardless of whether or not the same is required to be accrued on any financial statements of such Person.

"Lien" means, with respect to any property or asset, any mortgage, lien, pledge, security interest, hypothecation, charge or any other similar encumbrance in respect of such property or asset.  For the avoidance of doubt, "Lien" shall exclude any restrictions on transfer under securities Laws, this Agreement, any Ancillary Documents and any terms and conditions of any Organizational Document of Seller.

"Material Adverse Effect" means any change, event, development, or effect that has, or would reasonably be expected to have, individually or in the aggregate, (a) a material adverse effect on the Purchased Assets, (b) the ability of Seller to consummate the transactions contemplated by this Agreement or perform its obligations under this Agreement or (c) the effect of preventing or materially delaying the consummation of the transactions contemplated hereby; provided that for the purposes of clause (a) none of the following shall be taken into account (either alone or in combination) in determining whether there is or has been a Material Adverse Effect: any adverse change, event, circumstance, or development arising from or relating to: (a) any action required or permitted by this Agreement or any action taken (or omitted to be taken) with the

-4-

written consent of or at the written request of Buyer; (b) the announcement, pendency or completion of the transactions contemplated by this Agreement, including losses or threatened losses of employees, customers, suppliers, distributors or others having relationships with Seller; (c) general economic or political conditions; (d) conditions generally affecting the industries in which Seller is conducted; (e) any changes in financial, banking or securities markets in general, including any disruption thereof and any decline in the price of any security or any market index or any change in prevailing interest rates; (f) acts of war (whether or not declared), armed hostilities or terrorism, or the escalation or worsening thereof; (g) any changes in applicable Laws or accounting rules (including GAAP) or the enforcement, implementation or interpretation thereof; (h) any natural or man-made disaster or acts of God; or (i) any epidemics, pandemics, disease outbreaks, or other public health emergencies; provided, that in the cases of clauses (a) through (i) above, such change, event, development, or effect shall only be considered in determining whether a Material Adverse Effect has occurred if such change, event, development, or effect impacts Seller materially and disproportionately to the impact that such change, event, development, or effect generally has upon other Persons operating in the same or substantially similar industries or markets as Seller. For the avoidance of doubt, neither the filing of the Bankruptcy Case or any actions taken in furtherance of the Bankruptcy Case or the transactions contemplated by this Agreement, nor the consequences or effects of or changes or developments arising from the filing or any such actions shall be deemed to be a Material Adverse Effect for purposes of this Agreement.

"Nonassignable Asset" has the meaning set forth in Section 2.2.

"Order" means any award, injunction, judgment, decree, order, ruling, subpoena or verdict or other decision issued, promulgated or entered by any Governmental Entity of competent jurisdiction.

"Ordinary Course of Business" means, with respect to Seller, the ordinary course of business consistent with its past custom and practice, subject to changes in operations resulting from Seller operating as a distressed business with very significant reductions in personnel, and subject to changes resulting from the filing and/or pendency of the Bankruptcy Case or the requirements of any debtor in possession financing in the Bankruptcy Case.

"Organizational Documents" means, with respect to any entity, as applicable, the certificate of incorporation, articles of incorporation, bylaws, articles of organization, partnership agreement, limited liability company agreement, formation agreement, joint venture agreement and other similar organizational documents of such entity (in each case, as amended through the date of this Agreement).

"Outside Date" has the meaning set forth in Section 9.1(d).

"Parties" has the meaning set forth in the Preamble.

"Permitted Liens" means: (a) Liens for taxes that are not yet due and payable or that are being contested in good faith by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are being maintained on Seller's financial statements in accordance with GAAP; (b) statutory Liens (or contractual restatements thereof) of landlords and workers',

carriers', materialmen's, suppliers' and mechanics' or other like Liens incurred in the Ordinary Course of Business; (c) Liens that will be released prior to or as of the Closing;  (d) purported Liens evidenced by the filing of UCC financing statements relating solely to operating leases or consignment or bailee arrangements entered into in the Ordinary Course of Business; (e) any right, interest, Lien or title of a licensor, sublicensor, licensee, sublicensee, lessor or sublessor under any license, sublicense, lease, sublease or other similar agreement or in the property being leased or licensed; (f) with regard to any real property, (i) any zoning, building codes and other land use Laws regulating the use or occupancy of real property or the activities conducted thereon, (ii) any zoning restrictions, easements and other reservations, covenants, conditions, oil and gas leases, mineral severances and Liens, (iii) any easements, rights-of-way, building or use restrictions, prescriptive rights, encroachments, protrusions, rights and party walls, and (iv) any matters that would be disclosed by an accurate survey or inspection of the real property used by Seller, in each case, only to the extent that such Liens do not materially and adversely affect Seller and (g) Liens set forth on Schedule 1.1(b).

"Person" means an individual, a corporation, a partnership, a limited liability company, a trust, an unincorporated association, a Governmental Entity, or any other entity or body.

"Prevailing Purchaser" has the meaning set forth in the Bid Procedures.

"Proceeding" means any suit, litigation, arbitration or other dispute resolution proceeding before any Governmental Entity.

"Protest Notice" has the meaning set forth in Section 2.5(d).

"Procedures Order" has the meaning set forth in the Recitals.

"Purchased Assets" has the meaning set forth in Section 2.1.

"Purchase Price" has the meaning set forth in Section 2.4.

"Representatives" of any Person shall mean the directors, managers, officers, employees, consultants, financial advisors, counsel, accountants and other representatives and agents of such Person.

"Sale Order" means an Order of the Bankruptcy Court, which Order shall be in form and substance acceptable to Buyer and Seller with such changes as Buyer and Seller accept in their respective sole discretion, and shall, among other things, (a) approve, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by Seller of this Agreement, (ii) the sale of the Purchased Assets to Buyer on the terms set forth herein and free and clear of all Liens and interests (other than included in the Assumed Liabilities and Permitted Liens), and (iii) the performance by Seller of its obligations under this Agreement, (b) find that Buyer is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code and grant Buyer the protections of Section 363(m) of the Bankruptcy Code, (c) find that Buyer is not a successor of Seller, (d) enjoin all Persons holding Liens, claims, and other interests, including rights or claims based on any successor or transferee liability from asserting them against Buyer, (e) find that this Agreement was negotiated, proposed and entered into without collusion, in good faith and from arm's length bargaining positions, (f) find that Seller and Buyer have not engaged

in any conduct that would cause or permit this Agreement to be avoided under Section 363(n) of the Bankruptcy Code, (g) find that this Agreement and the transactions contemplated hereby, are binding upon, and are not subject to rejection or avoidance by, any chapter 7 or chapter 11 trustee of Seller, (h) find that fair and reasonably equivalent value was received in connection with this Agreement, (i) authorize each of Seller and Buyer to execute and file termination statements, instruments of satisfaction, releases and similar documents with respect to all Liens that any Person has with respect to the assets transferred pursuant to this Agreement and (j) order that Buyer is receiving good and marketable title to all Purchased Assets

"<u>Schedule Supplement</u>" has the meaning set forth in <u>Section 6.3</u>.

"<u>Security Agreement</u>" has the meaning set forth in the Recitals.

"<u>Seller</u>" has the meaning set forth in the Preamble hereto.

"<u>Seller Closing Certificate</u>" has the meaning set forth in <u>Section 8.1(c)</u>.

"<u>Seller Closing Notice</u>" has the meaning set forth in <u>Section 9.1(f)</u>.

"<u>Seller Disclosure Schedules</u>" means the disclosure schedules delivered by Seller concurrently with the execution and delivery of this Agreement.

"<u>Seller's Knowledge</u>" or any similar phrase means the actual, current knowledge of Jeffrey Yordon, Joseph Annoni, John Romano, and Nick Campbell only.  For the avoidance of doubt, none of such individuals shall have any personal liability or obligations regarding such knowledge.

"<u>U.S.</u>" or "<u>United States</u>" means the United States of America.

## ARTICLE II
## PURCHASE AND SALE

2.1     **Purchased Assets**.  Upon the terms and subject to the conditions of this Agreement, at the Closing, Seller shall sell, transfer, assign, convey and deliver to Buyer, and Buyer, as designee of the Agent and Lenders, in accordance with the Procedures Order and in satisfaction of the Credit Bid Right, shall purchase from Seller, free and clear of all Liens (other than Permitted Liens), all of Seller's right, title and interest in and to the following assets (the "<u>Purchased Assets</u>"), and no others:

(a)     all of the Seller's accounts and notes receivable (whether current or non-current) and all causes of action specifically pertaining to the collection of the foregoing, in each case to the extent arising exclusively out of the operation of the Business (but excluding any accounts or notes receivable due from any Affiliate of Seller) held as of the Closing Date;

(b)     all credits, claims for refunds, deposits for the benefit of third parties and prepaid expenses relating to or arising in connection with the Purchased Assets or rights of setoff, rights of recoupment, rights of reimbursement, rights of or to indemnity or contribution and other similar rights (known and unknown, matured and unmatured, accrued or contingent, regardless of whether such rights are currently exercisable) against any Person, including (i) any Action

available to or being pursued by any Seller to the extent related to any Purchased Assets, Assumed Liabilities or the ownership, use, function or value of any Purchased Asset, whether arising by way of counterclaim or otherwise; and

(c)    all Books and Records, except as Seller may be required to retain under applicable Law.

2.2    **Nonassignable Assets**.  Nothing in this Agreement or the consummation of the transactions contemplated hereby or thereby shall be construed as an attempt or agreement to assign or transfer any Purchased Asset  to Buyer which by its terms or by Law is not assignable or transferable without a consent or is cancelable by a third party in the event of an assignment or transfer (a "Nonassignable Asset"), unless and until such consent shall have been obtained (including by virtue of the effect of the Sale Order rendering certain consents to be unnecessary) or Law satisfied.  Seller and Buyer shall use diligent and commercially reasonable efforts to obtain any consent that may be required and satisfy any Law necessary to the assignment or transfer of a Nonassignable Asset to Buyer, and Seller shall take all such commercially reasonable actions as may be necessary to effect the assignment or transfer of the Nonassignable Asset.  Unless and until any such consent that may be required is obtained or Law satisfied, Seller shall establish an arrangement reasonably satisfactory to Buyer under which Buyer would obtain the claims, rights and benefits and assume the corresponding liabilities and obligations under such Nonassignable Asset (including by means of any subcontracting, sublicensing or subleasing arrangement) or under which Seller would enforce for the benefit of Buyer any and all claims, rights and benefits of Seller against a third party thereto; provided, that in no event shall Buyer be required to enter into any such arrangement with respect to any Nonassignable Asset for which a required consent is necessary.  Seller shall promptly pay over to Buyer all payments received by such Seller in respect of all Nonassignable Assets.  If and when the applicable consents or approvals, the absence of which caused the deferral of transfer of any Nonassignable Asset pursuant to this Section 2.2, are obtained, the transfer of the applicable Nonassignable Asset to Buyer shall automatically and without further action be effected in accordance with the terms of this Agreement.

2.3    **Liabilities.** Subject to the terms and conditions of this Agreement, at the Closing, Buyer shall assume all obligations for refunds, chargebacks, rebates, discounts and the like and existing as of the Closing Date for which the counterparty has right of setoff or recoupment related exclusively to the Purchased Assets (the "Assumed Liabilities").

(b)    Except for the Assumed Liabilities described in Section 2.3(a), Buyer shall not assume, nor be obligated to pay, perform, satisfy or discharge, any Liability of Seller or any Affiliate of Seller.

2.4    **Purchase Price**.  The consideration for the sale and transfer of the Purchased Assets from the Seller to Buyer shall be the Credit Bid Amount (the "Purchase Price") as may be adjusted pursuant to Section 2.5(b) below.

2.5    **Accounts Receivable Statement**.

(a)    Preliminary Closing Statement. At least three (3) Business Days prior to the Closing Date, Seller shall prepare in good faith and deliver to Buyer a statement (the "Preliminary

-8-

Closing Statement") setting forth Seller's calculation the Closing Accounts Receivable together with reasonably detailed calculations of the components thereof.

(b)    <u>Final Closing Statement</u>. Within two (2) Business Days of the Closing Date, Seller shall provide a definitive Closing Statement setting forth Seller's calculation the Closing Accounts Receivable together with reasonably detailed calculations of the components thereof as of the Closing Date (the "<u>Final Closing Statement</u>"). For all purposes of this Agreement the Closing Accounts Receivable and Credit Bid Amount shall be adjusted as may be required based on the amounts set forth in the Final Closing Statement.

(c)    <u>Review of Closing Statement; Reasonable Access</u>. Prior to the Closing, Buyer may review the Closing Statement and the calculation of Closing Accounts Receivable set forth therein. For the purpose of verifying the Closing Statement, Buyer and its accountants, attorneys and other Representatives shall be granted upon Buyer's prior written request: (i) reasonable access to and copies of the Books and Records of the Business, (ii) reasonable access to the books and records, trial balances, and working papers of Seller's accountants prepared in connection with the preparation of the Closing Statement (if any), and (iii) reasonable access to Seller's and the Business's personnel and accountants.

(d)    <u>Protest Notice</u>. Within two (2) Business Days following delivery of any Closing Statement (but in any event prior to the Closing), Buyer may deliver written notice (the "<u>Protest Notice</u>") to Seller of any disagreement that Buyer may have as to any Closing Statement setting forth in reasonable detail the amount(s) in dispute. If Buyer fails to deliver a Protest Notice on or before the date which is two (2) Business Days following delivery of any Closing Statement, such Closing Statement shall be final, binding and non-appealable by the Parties.

(e)    <u>Resolution of Protest</u>. If a Protest Notice is timely delivered in accordance with <u>Section 2.5(d)</u>, Seller and Buyer shall promptly endeavor in good faith to resolve any disagreement as to the values or calculations set forth in any Closing Statement. If Seller and Buyer are unable to resolve such disagreement, they will submit the disagreement to the Bankruptcy Court for resolution, and the Bankruptcy Court's decision shall be final and binding upon the Parties.

2.6    **Withholding**.  The Parties and any of their respective agents shall be entitled to deduct and withhold from any amount otherwise payable pursuant to this Agreement such amounts as are required to be deducted or withheld with respect to the making of such payment under any provision of applicable Law; provided, the parties shall use their respective commercially reasonable efforts in seeking to reduce or eliminate any such withholding or deduction. Amounts so withheld or deducted shall be treated for all purposes of this Agreement as having been paid to the Person with respect to which such deduction or withholding was imposed.

### ARTICLE III
### CLOSING; PAYMENT OF PURCHASE PRICE

3.1    **Closing**.  Unless this Agreement shall have been terminated in accordance with <u>Section 9.1</u>, the Parties shall consummate the transactions contemplated by this Agreement (the "<u>Closing</u>") on the first Business Day on which all conditions set forth in <u>Article VIII</u> of this

Agreement (except those conditions that are to be satisfied at Closing) have been satisfied (or waived by the Party entitled to the benefit of the same), with such Closing to occur at 5:00 p.m., Eastern standard time, or at such other place, date and time as the Parties shall mutually agree in writing (the date on which the Closing occurs, the "Closing Date"). The Closing shall take place via electronic exchange of executed documents and other closing deliveries via email on the Closing Date.

3.2 **Closing Deliveries**.

(a) Deliveries by Seller at the Closing. At the Closing, Seller shall deliver to Buyer the following:

(i) the Seller Closing Certificate;

(ii) a copy of (A) the resolutions of Seller's governing body authorizing the execution and delivery of this Agreement and the Ancillary Documents and performance by Seller of the transactions contemplated hereby and thereby and (B) the Organizational Documents of Seller, certified by an appropriate authorized officer of Seller as having been duly and validly adopted and being in full force and effect as of the Closing Date

(iii) evidence of the approval of the Sale Order by the Bankruptcy Court; and

(iv) a properly completed and duly executed IRS Form W-9 by Seller.

(b) Deliveries by Buyer at the Closing. At the Closing, Buyer shall deliver to Seller the Buyer Closing Certificate, which shall confirm the reduction of the outstanding Obligations of Seller under the Credit Agreement in an amount equal to the Purchase Price.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the Seller Disclosure Schedules, which exceptions or disclosures set forth therein will be deemed to be a part of the representations and warranties made hereunder, Seller hereby represents and warrants to Buyer as follows:

4.1 **Existence and Power**. Seller is a limited liability company that is duly organized, validly existing, and in good standing under the Laws of the State of Delaware. Seller has all limited liability company power and authority required to own, lease, or, subject to the provisions of the Bankruptcy Code applicable to debtors in possession, operate the properties and assets now owned, leased or operated by it and to carry on its business as presently conducted. Seller is duly qualified to transact business as a limited liability company and is in good standing as a limited liability company authorized to transact business in each jurisdiction in which the nature of the business conducted by it requires such qualification.

4.2 **Authorization**. Subject to entry of the Sale Order, Seller has all requisite power and authority to execute and deliver, and to perform its obligations under, this Agreement and each Ancillary Document to which Seller is a party. The execution, delivery and performance by Seller

-10-

of this Agreement and such Ancillary Documents and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all necessary limited liability company action on the part of Seller and no other proceedings on the part of Seller are necessary to authorize the consummation of, and to consummate, the transactions contemplated hereby and thereby.

4.3     **Enforceability**.  This Agreement has been duly executed and delivered by Seller. Upon entry of the Sale Order, this Agreement shall constitute (and each Ancillary Document to which Seller is or will be a party will constitute at or prior to the Closing) a valid and legally binding obligation of Seller, enforceable against Seller in accordance with its terms, assuming that this Agreement and such Ancillary Documents, where applicable, have been duly executed by the other parties thereto, except as enforcement may be limited by General Enforceability Exceptions.

4.4     **Noncontravention**.  Subject to entry of the Sale Order, the execution, delivery and performance by Seller of this Agreement or any Ancillary Documents, and the consummation of the transactions contemplated hereby will not (a) violate or conflict with the Organizational Documents of Seller, (b) violate any Law or any Order, in each case applicable to Seller, (c) with or without notice or lapse of time or both, conflict with or result in any breach or violation of or constitute a default or change of control under, or give rise to a right of, or result in, termination, modification, cancellation, first offer, first refusal or acceleration of any obligation or to the loss of a benefit under any Contract to which Seller is party or bound and that relates to the Purchased Assets, or (d) result in the creation or imposition of any Lien (other than Permitted Liens) on any Purchased Asset.   Except for the approval of the Bankruptcy Court for the transactions contemplated by the Agreement, no permit, consent, approval or authorization of, notice or declaration to, or filing or registration with any Governmental Entity is required to be made or obtained by Seller in connection with the consummation of the transactions contemplated by this Agreement or any Ancillary Document.

4.5     **Proceedings; Compliance with Laws**.  There are no Proceedings (other than the Bankruptcy Case) pending or, to Seller's Knowledge, threatened in writing by or against Seller that seek or otherwise are reasonably expected to (x) materially adversely affect the ability of Seller to consummate the transactions contemplated by this Agreement and the Ancillary Documents or (y) prevent, enjoin or otherwise delay the transactions contemplated by this Agreement. Seller is in compliance in all material respects with all Laws applicable to the Purchased Assets and Assumed Liabilities.

4.6     **Title to Purchased Assets; Accounts Receivable**.

(a)     Seller has good and valid title to all of the Purchased Assets and, subject to entry of the Sale Order, may convey the Purchased Assets free and clear of all Liens (other than Permitted Liens) to the fullest extent permissible under Law, including Section 363(f) of the Bankruptcy Code.  To the knowledge of Seller as of the date of this Agreement there are no, and as of the Closing Date there will be no, Permitted Liens with respect to the Purchased Assets except those that are Assumed Liabilities set forth hereunder.

(b)      Schedule 4.6 sets forth all accounts receivable (including detail with respect to applicable rebates, refunds or chargebacks) as of the latest date available prior to the date of this Agreement.

4.7      **Brokers**. Except for any financial advisor identified on Schedule 4.7 (whose fees shall be paid by Seller pursuant to a separate agreement), no investment banker, broker, finder, financial advisor or other intermediary is or will be entitled to any fee or commission from Seller in connection with the transactions contemplated by this Agreement.

4.8      **Exclusivity of Representations and Warranties**. Except as set forth in this Article IV, neither Seller nor any other Person is making any representation or warranty of any kind or nature whatsoever, oral or written, express or implied, relating to Seller, the Purchased Assets or the Business (including any relating to financial condition, results of operations, assets or liabilities of Seller), and Seller hereby disclaims any such other representations or warranties.  Without limiting the generality of the foregoing, neither Seller nor any other Person on behalf of Seller has made or makes, and Seller hereby disclaims, any representation or warranty, whether express or implied, with respect to any projections, forecasts, estimates or budgets made available to Buyer, its Affiliates or any of their respective Representatives (including the reasonableness of the assumptions underlying any of the foregoing).

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller as follows:

5.1      **Existence and Power**.  Buyer is a limited liability company duly organized, validly existing, and in good standing under the Laws of Delaware.

5.2      **Authorization**.  Buyer has all requisite power and authority to execute and deliver, and to perform its obligations under, this Agreement and each Ancillary Document to which Buyer is a party or subject.  The execution, delivery, and performance by Buyer of this Agreement and such Ancillary Documents to which Buyer is a party and the consummation of the transactions contemplated hereby and thereby (a) are within Buyer's limited liability company] powers and (b) have been duly authorized by all necessary limited liability company action on the part of Buyer.

5.3      **Enforceability**.  This Agreement has been duly executed and delivered by Buyer. This Agreement constitutes (and each Ancillary Document to which Buyer is or will be a party will constitute at or prior to the Closing) a valid and legally binding obligation of Buyer, enforceable against Buyer in accordance with its terms, assuming that this Agreement and such Ancillary Documents, where applicable, have been duly executed by the other parties thereto, except as enforcement may be limited by General Enforceability Exceptions.

5.4      **Governmental and Third Party Authorizations**. No consent, approval or authorization of, declaration to or filing or registration with, any Governmental Entity or any other Person is required to be made or obtained in connection with the execution, delivery and performance by Buyer of this Agreement or any Ancillary Document or the consummation by Buyer of the transactions contemplated by this Agreement or any Ancillary Document.

5.5     **Noncontravention**.  The execution, delivery and performance by Buyer of this Agreement and any Ancillary Document to which Buyer is or will be a party, and the consummation of the transactions contemplated hereby and thereby, will not (a) violate the Organizational Documents of Buyer, (b) violate any Law or Order, in each case applicable to Buyer, or (c) with or without notice or lapse of time or both, conflict with or result in any breach or violation of or constitute a default or change of control under, or give rise to a right of, or result in, termination, modification, cancellation, first offer, first refusal or acceleration of any obligation or to the loss of a benefit under any Contract to which Buyer is party or bound.

5.6     **Brokers**.  No investment banker, broker, finder or other intermediary is or will be entitled to any fee or commission from Buyer or Buyer's Affiliates in connection with the transactions contemplated by this Agreement or any of the Ancillary Documents.

5.7     **Proceedings**.  There are no Proceedings pending or, to the knowledge of Buyer, threatened in writing against Buyer that seek or otherwise are reasonably expected to (x) materially adversely affect the ability of Buyer to consummate the transactions contemplated by this Agreement and the Ancillary Documents or (y) prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.

5.8     **Financial Capability**.

(a)     <u>Sufficient Funds</u>. Buyer has, and will have on the Closing Date, unrestricted funds available sufficient to (i) consummate the transactions contemplated by this Agreement, including to make all applicable payments at the Closing, including all costs and expenses and other amounts required to be paid by Buyer in connection with the Closing or otherwise. Buyer has, and at the Closing will have, the resources and capabilities (financial or otherwise) to perform its obligations hereunder, and Buyer has not incurred any Liability or restriction of any kind that would impair or adversely affect such resources and capabilities.

(b)     <u>Obligations Not Conditioned on Financings</u>. In no event shall the receipt or availability of any funds by Buyer or any of Buyer's Affiliates or any other financing be a condition to Buyer's obligations under this Agreement. Buyer understands, acknowledges and agrees that under the terms of this Agreement, Buyer's obligation to consummate the transactions contemplated by this Agreement is not in any way contingent upon or otherwise subject to Buyer's consummation of any financing arrangements, Buyer's obtaining any financing, or the availability, grant, provision or extension of any financing to Buyer.

5.9     **Independent Investigation**.   Buyer has conducted its own independent investigation, review and analysis of Seller, the Business, the Purchased Assets and the Assumed Liabilities, and acknowledges that it has been provided adequate access to the personnel, properties, premises, and other documents and data of Seller for such purpose. Buyer acknowledges and agrees that: (a) in making its decision to enter into this Agreement and consummate the transactions contemplated by this Agreement, Buyer has relied solely upon its own investigation and the express representations and warranties of Seller set forth in <u>Article IV</u> of this Agreement (including related portions of the Seller Disclosure Schedules); and (b) neither Seller nor any other Person has made any representation or warranty as to Seller, the Business, the Purchased Assets or the Assumed Liabilities, except as expressly set forth in <u>Article IV</u> of this

Agreement.  Buyer will accept the Purchased Assets at the Closing "AS IS, "WHERE IS," and "WITH ALL FAULTS." In connection with Buyer's investigation of Seller, Buyer and its Affiliates may have received from or on behalf of Seller certain estimates, projections, forecasts and plans, including projected statements of operating revenues and income from operations of Seller and certain business plan information of Seller.  Buyer acknowledges that there are uncertainties inherent in attempting to make any such estimates, projections and other forecasts and plans, that Buyer is familiar with such uncertainties, that Buyer is taking full responsibility for making its own evaluation of the adequacy and accuracy of all estimates, projections and other forecasts and plans so furnished to it (including the reasonableness of the assumptions underlying such estimates, projections and forecasts), and that Buyer shall have no claim against Seller or any of its Affiliates or any Representatives of any of the foregoing with respect thereto.

5.10    **Exclusivity of Representations and Warranties** Except as set forth in this Article V, neither Buyer nor any other Person is making any representation or warranty of any kind or nature whatsoever, oral or written, express or implied, relating to Buyer or its Affiliates, and Buyer hereby disclaims any such other representations or warranties.

## ARTICLE VI
## PRE-CLOSING COVENANTS

6.1    **Conduct of Business**.  Except as set forth on <u>Schedule 6.1</u>, as contemplated by this Agreement, as required by Law, as prohibited or restricted by the Bankruptcy Code, to the extent Seller does not have adequate funding therefor in the Bankruptcy Case, as prohibited by any debtor-in-possession financing in the Bankruptcy Case, or as Buyer may otherwise consent to in writing (which consent (x) shall not be unreasonably withheld, conditioned or delayed and (y) shall be deemed to have been granted if not affirmatively withheld in writing within seventy-two (72) hours of Seller's written request therefor), from the date hereof through the Closing:

(a)    Seller shall use commercially reasonable efforts:

(i)    to maintain its Books and Records in accordance with past practice;

(ii)    to comply in all material respects with all applicable Laws; and

(b)    Seller shall not:

(i)    sell, lease, transfer, or assign any Purchased Assets, other than in the Ordinary Course of Business;

(ii)    subject any of the Purchased Assets to any Liens, except for Permitted Liens;

(iii)    commence, settle or propose to settle any Proceedings (other than the Bankruptcy Case) that could reasonably be expected to materially diminish the value of the Purchased Assets or impair title thereto; or

(iv)    agree to do any of the foregoing.

(c)     The provisions of this Section 6.1 are not intended to be, nor will they be construed as, an endeavor on the part of Seller or Buyer to implement the transactions contemplated hereunder prior to the Closing (and satisfaction of the conditions in Article VIII of this Agreement), and the Parties agree that Buyer will not prior to the Closing be entitled to exercise any control over the business or affairs of Seller.

6.2     **Pre-Closing Access to Information**.

(a)     Subject to the Bid Procedures and applicable Law, Seller shall afford Buyer and its authorized Representatives reasonable access, during normal business hours and upon reasonable advance notice, to Seller's Books and Records and, during such period, Seller shall furnish as promptly as practicable to Buyer all information (financial or otherwise) Buyer may reasonably request concerning the Purchased Assets or Assumed Liabilities, provided, that no investigation pursuant to this Section 6.2(a) shall affect or be deemed to modify any representation or warranty made by the Seller herein.  Notwithstanding the foregoing, Seller shall not be required by this Section 6.2(a) to provide Buyer or its Representatives with access to or to disclose information (i) the disclosure of which would violate applicable Law or (ii) disclose any privileged information of Seller.

(b)     Seller and Buyer agree that information disclosed pursuant to Section 6.2(a), together with the terms of this Agreement and the information disclosed on Seller Disclosure Schedules, shall be treated as confidential pursuant to the terms of the Confidentiality Obligations set forth in the Credit Agreement as though Buyer were a Lender thereunder.

6.3     **Supplemental Disclosure**.  From time to time prior to the Closing, Seller shall have the right (but not the obligation) to supplement or amend Seller Disclosure Schedules with respect to any matter arising after the date hereof or, with respect to representations and warranties qualified by Seller's Knowledge, of which Seller becomes aware after the date hereof (each a "Schedule Supplement"), and each such Schedule Supplement shall automatically be deemed to be incorporated into and to supplement and amend Seller Disclosure Schedules. Any disclosure in any such Schedule Supplement shall not be deemed to have cured any inaccuracy in or breach of any representation or warranty contained in this Agreement, including for purposes of termination rights contained in this Agreement or of determining whether or not the conditions in Article VIII have been met.

6.4     **Efforts to Close**.

(a)     Subject to the terms of this Agreement, each of Buyer and Seller shall use their respective commercially reasonable efforts to cause the conditions to Closing to be satisfied and for the Closing to occur as promptly as practicable.

(b)     In the event any Proceeding by any Governmental Entity or other Person is commenced which challenges the validity or legality of the transactions contemplated hereby or seeks damages in connection therewith, the Parties agree to cooperate and use reasonable best efforts to defend against such Proceeding and, if an injunction or other order is issued in any such action, suit or other proceeding, the Parties agree to take reasonable actions to have such injunction or other order lifted, in order to expeditiously consummate the consummation of the transactions

contemplated by this Agreement prior to the Outside Date; provided, however, nothing in this Section 6.4(b) shall be deemed to extend or otherwise affect the Outside Date or the Parties' rights in connection therewith.

(c)     The Parties acknowledge that certain consents to and notices in respect of the transactions contemplated by this Agreement may be required from or to parties to contracts, leases, licenses or other agreements to which Seller is a party.  During the period between the date hereof and the Closing Date, Seller will use its commercially reasonable efforts (but without any obligation to pay any fee or charge or the like in connection with such efforts), and Buyer will reasonably cooperate with Seller, to obtain such consents.

6.5     **Bankruptcy Matters**.

(a)     Sale Order. Pursuant to the Bid Procedures, Seller shall move for the Sale Order from the Bankruptcy Court. As provided in Section 8.1(f) and Section 8.2(e), both Buyer's and Seller's obligations to consummate the transactions contemplated in this Agreement are conditioned upon the Bankruptcy Court's entry of the Sale Order, with any modifications to be agreed by Buyer and Seller.

(b)     Procedures Order. The transaction contemplated by this Agreement shall be conducted in all respects in accordance with the process and procedures established in and the provisions of the Procedures Order (the "Bid Procedures") and the Buyer agrees to be bound by the Procedures Order and the Bid Procedures obligations in connection with, among other things, bidding, overbidding, the Auction, refraining from collusion, return of deposits, and standing as a backup bidder for the Purchased Assets shall be as established and determined in accordance with the Procedures Order.

(c)     Competing Bids. This Agreement and the transactions contemplated hereby are subject to Seller's right and ability to consider the higher or better competing bids with respect to the Purchased Assets in accordance with the Bid Procedures and the Procedures Order.  In furtherance thereof, Seller shall have the right to, and may cause its Representatives and Affiliates to, (a) initiate contact with, solicit or encourage submission of any inquiries, proposals, offers or bids by, and negotiate with, any Person (in addition to Buyer and its Affiliates) in connection with any sale or other disposition of the Purchased Assets and (b) respond to any request for information or due diligence inquiry, or make management available for such purposes, to any such Person, in each case, solely in accordance with the Bid Procedures.

(d)     Winding Up; Dissolution; Liquidation.  Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall prohibit Seller from ceasing its operations or winding up its affairs at any time after the Closing Date, it being acknowledged and agreed by Buyer that Seller intends to wind up its affairs and liquidate and dissolve its existence as soon as reasonably practicable following the Closing Date or the consummation of a liquidating plan under Chapter 11 of the Bankruptcy Code.

6.6     **Access to Books and Records**.  After the Closing, Buyer and Seller shall use reasonable efforts to maintain, until the fifth anniversary of the Closing Date, all Books and Records relating to the Purchased Assets or the Assumed Liabilities prior to the Closing in the

manner such Books and Records are maintained immediately prior to the Closing Date in all material respects.  For a period of five (5) years following the Closing, (a) Seller or any of its Representatives, upon reasonable notice, shall have access during normal business hours to examine, inspect and copy such Books and Records, and (b) Buyer shall provide Seller and its Representatives with, or cause to be provided to Seller and its Representatives, such Books and Records as Seller or its Representatives shall reasonably request in connection with any Proceeding to which Seller is a party (including, without limitation, in connection with Seller's (or its successor's) administration of the Bankruptcy Case) or in connection with the requirements of any Laws applicable to Seller.  Seller and its Representatives shall have the right to make copies of such Books and Records at Seller's sole cost.  Buyer shall not be obligated to provide Seller or its Representatives with access to any books or records (including personnel files) pursuant to this Section 6.6 where such access would violate any Law or any attorney-client privilege. Buyer may require Seller and its Representatives to execute a non-disclosure agreement prior to providing access to Books and Records.

## ARTICLE VII
## COVENANTS OF BUYER AND SELLER

7.1     **Public Announcements**.  Neither Buyer nor Seller shall, nor shall any of their respective controlled Affiliates (including, with respect to Seller prior to the Closing, and Buyer after Closing, Seller), without the prior written approval of both Buyer and Seller, issue any press release or otherwise make any public statement with respect to this Agreement or the transactions contemplated by this Agreement (any such press release or public statement so approved by the Parties, an "Agreed Statement"), provided that such restrictions on press releases and public statements shall not apply to (i) any disclosure as may be required by applicable Law or by obligations pursuant to any listing agreement with any national securities exchange or stock market, in which case the Party required to make the release or announcement shall allow the other Party reasonable time to comment on such release or announcement in advance of such issuance, (ii) any disclosure made in connection with the enforcement of any right or remedy relating to this Agreement or the Ancillary Documents or the transactions contemplated hereby or thereby, (iii) any disclosure that is consistent with (and does not reveal any information beyond what is already included in) a prior Agreed Statement, or (iv) any disclosure or statement made in the Bankruptcy Case that is required in connection with the filing of the Bankruptcy Case or appropriate in the furtherance of such filing,  the administration of the Bankruptcy Case, or of the transactions contemplated herein (including, without limitation, the Sale Order).

## ARTICLE VIII
## CONDITIONS TO CLOSING

8.1     **Conditions to Obligation of Buyer**.  The obligation of Buyer to consummate the transactions contemplated by this Agreement is subject to the satisfaction (or waiver by Buyer in writing and in Buyer's sole discretion) of the following conditions:

(a)     (i) The Fundamental Representations shall be true and correct in all material respects on and as of the Closing Date, except to the extent expressly made as of an earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date and (ii) all other representations of Seller contained in this Agreement

-17-

(without giving effect to any materiality limitations, such as "material," "in all material respects" and "Material Adverse Effect" set forth therein) shall be true and correct on and as of the Closing Date, except to the extent expressly made as of an earlier date, in which case such representations and warranties shall be true and correct as of such earlier date, except for any failure of any such representation and warranty to be so true and correct that has not had and would not, individually or in the aggregate, reasonably be likely to have a Material Adverse Effect.

(b)     Seller shall have performed or complied in all material respects with all obligations and covenants required by this Agreement to be performed or complied with by Seller, on or prior to the Closing Date.

(c)     Buyer shall have received a certificate, dated as of the Closing Date and signed by an authorized officer of Seller, to the effect that the conditions set forth in Sections 8.1(a) and 8.1(b) have been satisfied (the "Seller Closing Certificate").

(d)     No temporary restraining order, preliminary or permanent injunction or other Order preventing the consummation of the transactions contemplated by this Agreement shall be in effect, and there shall be no proceeding brought by any Governmental Entity pending before any court of competent jurisdiction seeking such an Order.

(e)     The Bankruptcy Court shall have approved and authorized Buyer's ability, pursuant to Section 363(k) of the Bankruptcy Code, to credit bid the Credit Bid Amount in satisfaction of the Credit Bid Amount portion of the Purchase Price set forth in Section 2.4, and the order granting such approval shall not have been appealed, stayed, stayed pending appeal, modified, amended, reversed or vacated as of the Closing Date.

(f)     The Bankruptcy Court shall have entered the Sale Order in accordance with Section 6.5(a), and the Sale Order shall be unstayed and in full force and effect as of the Closing Date.

(g)     Seller has made or is prepared to immediately make all of the deliveries required by Section 3.2(a).

8.2     **Conditions to Obligation of Seller**.  The obligation of Seller to consummate the transactions contemplated by this Agreement is subject to the satisfaction (or waiver by Seller, in writing and in Seller's sole discretion) of the following conditions:

(a)     The representations and warranties of Buyer set forth in Article V of this Agreement shall be true and correct in all respects as of the Closing Date (to the extent expressly made as of an earlier date in which case such representations and warranties shall be true and correct in all respects as of such earlier date), except where the failure of such representations and warranties to be true and correct would not have a not have a material adverse effect on Buyer's ability to consummate the transactions contemplated hereby.

(b)     Buyer shall have performed or complied in all material respects with all obligations and covenants required by this Agreement to be performed or complied with by Buyer on or prior to the Closing Date.

(c)     Seller shall have received a certificate dated as of the Closing Date by an authorized officer of Buyer to the effect that the conditions set forth in Sections 8.2(a) and 8.2(b) have been satisfied (the "Buyer Closing Certificate").

(d)     No temporary restraining order, preliminary or permanent injunction or other Order preventing the consummation of the transactions contemplated by this Agreement shall be in effect, and there shall be no proceeding brought by any Governmental Entity pending before any court of competent jurisdiction seeking such an Order.

(e)     The Bankruptcy Court shall have entered the Sale Order in accordance with Section 6.5(a), and the Sale Order shall be unstayed and in full force and effect as of the Closing Date.

(f)     Buyer shall have made or be prepared to immediately make all of the deliveries required by Section 3.2(b).

8.3     **Frustration of Closing Conditions**.  No Party may rely on or assert the failure of any condition set forth in this Article VIII, as the case may be, if such failure results from or was caused primarily by such Party's failure to comply with any provision of this Agreement.

8.4     **Waiver of Conditions**.  All conditions set forth in this Article VIII will be deemed to have been satisfied or waived from and after the Closing.

## ARTICLE IX
## TERMINATION

9.1     **Termination**.   This Agreement may be terminated, and the transactions contemplated herein may be abandoned, prior to the Closing solely as follows; provided that any Party desiring to terminate this Agreement pursuant to this Section 9.1 shall give written notice of such termination to the other Parties to this Agreement:

(a)     by the mutual written consent of Seller and Buyer;

(b)     by Buyer, if any of the representations or warranties of Seller set forth in Article IV of this Agreement shall not be true and correct such that the condition to Closing set forth in Section 8.1(a) would not be satisfied and the breach or breaches causing such representations or warranties not to be true and correct is not cured within five (5) days after written notice thereof is delivered from Buyer to Seller; provided, that Buyer shall not have the right to terminate this Agreement pursuant to this Section 9.1(b) if Buyer is then in material violation or breach of any of its covenants, obligations, representations or warranties set forth in this Agreement and such violation or breach would give rise to the failure of a condition set forth in Section 8.2(a) or Section 8.2(b);

(c)     by Seller, if any of the representations or warranties of Buyer set forth in Article V of this Agreement shall not be true and correct such that the condition to Closing set forth in Section 8.2(a) would not be satisfied and the breach or breaches causing such representations or warranties not to be true and correct is not cured within five (5) days after written notice thereof is delivered from Seller to Buyer; provided, that Seller shall not have the right to

-19-

terminate this Agreement pursuant to this <u>Section 9.1(c)</u> if Seller is then in material violation or breach of any of its covenants, obligations, representations or warranties set forth in this Agreement and such violation or breach would give rise to the failure of a condition set forth in <u>Section 8.1(a)</u> or <u>Section 8.1(b)</u>;

(d)     by Buyer or Seller if the Closing shall not have occurred on or before June 30, 2023 (the "<u>Outside Date</u>"); provided, <u>however</u>, that a Party shall not have the right to terminate this Agreement pursuant to this <u>Section 9.1(d)</u> if the failure of the Closing to occur by the Outside Date results from or was caused by the failure of the Party seeking to terminate this Agreement to comply with any provisions of this Agreement;

(e)     by either Buyer or by Seller, if any Governmental Entity shall have issued an Order or taken any other action permanently enjoining, restraining or otherwise prohibiting the Closing and such Order or other action shall have become final and nonappealable; <u>provided</u>, that the Party seeking to terminate this Agreement pursuant to this <u>Section 9.1(e)</u> shall have used reasonable efforts to remove such Order, injunction, restraint or prohibition, and such Order, injunction, restraint or prohibition shall not have been principally caused by the breach by such Party of its covenants or agreements under this Agreement;

(f)     by Seller, if all of the conditions set forth in <u>Section 8.2</u> (not including conditions which are to be satisfied by actions taken at the Closing; <u>provided</u> that such conditions shall have been capable of being satisfied as of the date of termination of this Agreement) have been satisfied or validly waived by Buyer, Seller has given notice to Buyer in writing that Seller is prepared to consummate the transactions contemplated by this Agreement (a "<u>Seller Closing Notice</u>"), and Buyer fails to consummate the transactions contemplated by this Agreement on the date the Closing should have occurred pursuant to <u>Section 3.1</u>, or, if later, on the third (3rd) Business Day immediately following the date of delivery of such Seller Closing Notice;

(g)     by Buyer, if by Order of the Bankruptcy Court Buyer is legally prohibited for any reason to credit bid up to the full Credit Bid Amount in satisfaction of all of the Purchase Price as set forth in <u>Section 2.4</u>;

(h)     by Buyer, if all of the conditions set forth in <u>Section 8.1</u> (not including conditions which are to be satisfied by actions taken at the Closing; provided that such conditions shall have been capable of being satisfied as of the date of termination of this Agreement) have been satisfied or validly waived by Seller, Buyer has given notice to Seller in writing that Buyer is prepared to consummate the transactions contemplated by this Agreement (a "<u>Buyer Closing Notice</u>"), and Seller fails to consummate the transactions contemplated by this Agreement on the date the Closing should have occurred pursuant to <u>Section 3.1</u>, or, if later, on the third (3rd) Business Day following the date of delivery of such Buyer Closing Notice; or

(i)     by Seller or Buyer, subject to and in accordance with the terms of <u>Section 6.5(a)</u>, if the Bankruptcy Court does not issue the Sale Order in accordance with <u>Section 6.5(a)</u>.

9.2     **Effect of Termination**.  In the event of the termination of this Agreement pursuant to <u>Section 9.1</u>, this entire Agreement shall forthwith become void (and there shall be no liability or obligation on the part of Buyer, Seller or its officers, directors or equity holders) with the

exception of (i) the provisions of <u>Section 6.2(b)</u>, <u>Section 9.1</u>, this <u>Section 9.2</u> and <u>Article XI</u> of this Agreement, together with all applicable defined terms set forth in <u>Article I</u> of this Agreement, each of which provisions shall survive such termination and remain valid and binding obligations of the Parties and (ii) any liability of any Party for any willful breach of this Agreement prior to such termination.

# ARTICLE X
## SURVIVAL AND RELEASE

10.1   **Survival**.  Only the covenants and agreements in this Agreement that by their terms survive the Closing (or that contemplate action or impose obligations after the Closing) shall so survive the Closing in accordance with their respective terms. The representations and warranties of the parties and all other covenants and agreements shall terminate at the Closing.

# ARTICLE XI
## MISCELLANEOUS

11.1   **Notices**.   Any notice, request, demand, waiver, consent, approval or other communication which is required or permitted hereunder shall be in writing and shall be deemed given:  (a) on the date established by the sender as having been delivered personally, (b) on the date delivered by a private courier as established by the sender by evidence obtained from the courier, (c) on the date delivered by email (if sent prior to 5:00 p.m. Eastern standard time, or if sent later, then on the next Business Day), or (d) on the fifth (5th) Business Day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid.   Such communications, to be valid, must be addressed as follows:

> If to Buyer, to:

> > Oaktree Fund Administration, LLC
> > 333 S. Grand Avenue, 28th Fl.
> > Los Angeles, CA 90071
> > Attn:   Oaktree Agency
> > Email: Oaktreeagency@alterdomus.com

> > With a copy to:
> > Oaktree Capital Management, L.P.
> > 333 S. Grand Avenue, 28th Fl.
> > Los Angeles, CA 90071
> > Attn: Aman Kumar and Rahul Anand
> > Email: AmKumar@oaktreecapital.com; RAnand@oaktreecapital.com

> With a required copy (which shall not constitute notice) to:

> > Sullivan & Cromwell LLP
> > 125 Broad St.
> > New York, NY 10004
> > Attention: Rita-Anne O'Neill; Ari B. Blaut; Benjamin S. Beller

Email: oneillr@sullcrom.com; blauta@sullcrom.com;
bellerb@sullcrom.com

If to Seller, to:

Athenex, Inc.
Conventus Building
1001 Main Street, Suite 600
Buffalo, NY 14203
Attn: Legal Department
Email: legal-agreements@athenex.com

With a required copy (which shall not constitute notice) to:

Harter Secrest & Emery LLP
1600 Bausch & Lomb Place
Rochester, New York 14604-2711
Attn: Alexander R. McClean
Facsimile No.: (585) 232-2152
E-mail: amcclean@hselaw.com

and

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd, Suite 1300
Los Angeles, CA 90067
Attn: Shirley Cho
E-mail: scho@pszjlaw.com

or to such other address or to the attention of such Person or Persons as the recipient Party has specified by prior written notice to the other Parties hereto.

11.2   **Amendments and Waivers**.  Any provision of this Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and is duly executed, in the case of an amendment, by each Party to this Agreement, or in the case of a waiver, by the Party against whom the waiver is to be effective.  No failure or delay by any Party in exercising any right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. Any waiver of any term or condition shall not be construed as a waiver of any subsequent breach or a subsequent waiver of the same term or condition, or a waiver of any other term or condition of this Agreement.

11.3   **Expenses**.  Subject to any other agreement or Order of the Bankruptcy Court and except as otherwise provided in this Agreement, each Party shall bear its own costs and expenses in connection with the negotiation, documentation and consummation of the transactions contemplated by this Agreement, including all legal, accounting, financial advisory, consulting

and all other fees and expenses of third parties, whether or not the transactions contemplated by this Agreement are consummated.

11.4     **Successors and Assigns**.  This Agreement may not be assigned by any Party (whether by operation of law or otherwise) without the prior written consent of the other Parties *provided*, *however*, that (a) Buyer may assign some or all of its rights or delegate some or all of its obligations hereunder to one or more Affiliates (provided, however, that following such assignment, if after Closing, Buyer shall remain jointly and severally liable, together with the assignee, for all of Buyer's obligations hereunder, or, if prior to Closing, Buyer and the assignee shall be jointly but not severally liable for the respective obligations in accordance with their applicable ownership interests) and  (b) Buyer may assign some or all of its rights to receive assignment of any Purchased Assets hereunder to any third party.  Subject to the foregoing, all of the terms and provisions of this Agreement shall inure to the benefit of and be binding upon the Parties and their respective permitted successors and assigns.  Any attempted or purported assignment that is not in accordance with the terms of this <u>Section 11.4</u> shall be void <u>ab initio</u>. Further, the parties acknowledge and agree that Agent shall be party to this Agreement solely for purposes of confirming its designation of its Credit Bid Right to Buyer as provided in Paragraph 14 of the Procedures Order and on behalf of the Lenders party to the Credit Agreement. Buyer shall take title to all of the Purchased Assets and assume all of the Assumed Liabilities pursuant to this Agreement and Agent shall have no further rights or obligations with respect to the foregoing.

11.5     **Governing Law**.  This Agreement and the exhibits and schedules hereto shall be governed by and interpreted and enforced in accordance with the Laws of the State of Delaware, without giving effect to any choice of Law or conflict of Laws rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware.

11.6     **Consent to Jurisdiction; Service of Process; Waiver of Jury Trial**.  Any suit, action or other proceeding arising out of or relating to this Agreement or any transaction contemplated hereby shall be brought exclusively in the shall be brought exclusively in the Bankruptcy Court.  Each of the Parties hereby irrevocably submits to the exclusive jurisdiction of such court for the purpose of any such suit, action or other proceeding.  A final judgment in any such suit, action or other proceeding may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.  Each Party irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement or the transactions contemplated hereby in such court, and hereby irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.  To the extent the Bankruptcy Court declines, or is otherwise unable to, exercise jurisdiction, then the Parties agree that the state or federal courts in the County of New Castle, State of Delaware, shall have jurisdiction. Each Party further agrees that service of any process, summons, notice or document by U.S. registered mail to such Party's respective address set forth herein shall be effective service of process for any such action, suit or proceeding.  Nothing in this <u>Section 11.6</u>, however, shall affect the right of any Party to serve legal process in any other manner permitted by Law.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE)  ARISING  OUT  OF  OR  RELATING  TO  THIS  AGREEMENT,  THE

TRANSACTIONS CONTEMPLATED HEREBY OR THE ACTIONS OF SUCH PARTY IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE AND ENFORCEMENT HEREOF.

11.7    **Counterparts**.

(a)    This Agreement may be executed in counterparts, each of which when executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute but one and the same instrument.  This Agreement shall become effective when each Party shall have received a counterpart hereof signed by the other Party.  The Parties agree that the delivery of this Agreement, the Ancillary Documents and any other agreements and documents at the Closing may be effected by means of an exchange of facsimile signatures or other electronic delivery.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile or scanned pages shall be effective as delivery of a manually executed counterpart to this Agreement.

(b)    No Party shall raise the use of a facsimile machine or electronic transmission to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or electronic transmission as a defense to the formation or enforceability of this Agreement and each Party forever waives any such defense.  The words "execution," "executed", "signed," "signature," and words of like import in this Agreement shall include images of manually executed signatures transmitted by facsimile or other electronic format (including, without limitation, "pdf," "tif" or "jpg") and other electronic signatures (including, without limitation, SignNow and DocuSign).

11.8    **No Third Party Beneficiaries**.  No provision of this Agreement is intended to or shall confer upon any Person other than the Parties any rights or remedies of any nature whatsoever under or by reason of this Agreement.

11.9    **Entire Agreement**.  This Agreement, the Ancillary Documents, schedules, including the Seller Disclosure Schedules and the other documents, instruments and agreements specifically referred to herein or therein or delivered pursuant hereto or thereto set forth the entire understanding of the Parties with respect to the subject matter hereof and the transactions contemplated hereby.  All schedules, including any Seller Disclosure Schedule, referred to herein are intended to be and hereby are specifically made a part of this Agreement and incorporated by reference herein.  Any and all previous agreements and understandings between or among the Parties regarding the subject matter hereof, whether written or oral, are superseded by this Agreement.

11.10    **Disclosure Schedules**.  Except as otherwise provided in the Seller Disclosure Schedules, all capitalized terms therein shall have the meanings assigned to them in this Agreement.  Matters reflected in the Seller Disclosure Schedules are not necessarily limited to matters required by this Agreement to be disclosed.  No disclosure made in the Seller Disclosure Schedules shall constitute an admission or determination that any fact or matter so disclosed is material, has had or could reasonably be expected to have a Material Adverse Effect, meets a dollar or other threshold set forth in this Agreement or would otherwise be required to be disclosed, and no Person shall use the fact of the setting of a threshold or the inclusion of such facts or matters in

any dispute or controversy as to whether any obligation, amount, fact or matter is or is not material for purposes of this Agreement.  Information disclosed in any Seller Disclosure Schedule delivered will qualify any representation and warranty in this Agreement to the extent that a reasonable buyer would infer, based solely on the face of the applicable disclosure, the relevance or applicability of the information disclosed to any such representation or warranty, notwithstanding the absence of a reference or cross-reference to such representation or warranty on any such Seller Disclosure Schedule or Seller Disclosure Schedule or the absence of a reference or cross reference to such Seller Disclosure Schedule in such representation or warranty.  No disclosure in the Seller Disclosure Schedules relating to any possible breach or violation of any agreement or Law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred.

11.11  **Captions**.  All captions and section headings contained in this Agreement are for convenience of reference only, do not form a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement.

11.12  **Remedies**  Each Party acknowledges that irreparable damage would occur in the event that any covenant herein were not to be performed in accordance with its terms.  Each Party shall therefore be entitled, in addition to any other remedies that may be available, to seek one or more injunctions to prevent any breach of covenant and to obtain specific performance of the terms of this Agreement, without posting bond or other undertaking.  If any Action is brought by a Party to enforce this Agreement, the Party against whom such Action is brought shall waive the defense that there is an adequate remedy at Law.

11.13  **Severability**.  Any provision of this Agreement which is invalid or unenforceable in any jurisdiction shall be ineffective to the extent of such invalidity or unenforceability without invalidating or rendering unenforceable the remaining provisions hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  Upon such determination that any term or other provision of this Agreement is invalid, illegal or unenforceable under applicable Law, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

11.14  **Interpretation**.  The Parties have participated jointly in the negotiation and drafting of this Agreement, and any rule of construction or interpretation otherwise requiring this Agreement to be construed or interpreted against any Party by virtue of the authorship of this Agreement shall not apply to the construction and interpretation hereof.  The Parties agree that any drafts of this Agreement or any Ancillary Document prior to the final fully executed drafts shall not be used for purposes of interpreting any provision thereof, and each of the Parties agrees that no Party or any Affiliate thereof shall make any claim, assert any defense or otherwise take any position inconsistent with the foregoing in connection with any Proceeding among any of the foregoing.  For the purposes of this Agreement, except as otherwise expressly provided herein or unless the context otherwise requires:  (a) the meaning assigned to each term defined herein shall be equally applicable to both the singular and the plural forms of such term and vice versa, and words denoting either gender shall include both genders as the context requires; (b) where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding

meaning; (c) the terms "hereof," "herein," "hereunder," "hereby" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement (including any exhibit or schedule hereto) as a whole and not to any particular provision of this Agreement; (d) when a reference is made in this Agreement to an Article, Section, paragraph, Exhibit or Schedule, such reference is to an Article, Section, paragraph, Exhibit or Schedule to this Agreement (provided that references to "Schedules" herein shall be deemed to refer to the applicable schedule of Seller Disclosure Schedule or the Seller Disclosure Schedule), unless otherwise specified; (e) the word "include," "includes," and "including" when used in this Agreement shall be deemed to be followed by the words "but not limited to," unless otherwise specified; (f) the word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other thing extends, and such phrase shall not mean simply "if" and (g) all accounting terms used and not defined herein have the respective meanings given to them under GAAP.  All dollar or "$" amounts set forth in this Agreement shall refer to U.S. dollars unless explicitly indicated otherwise.  Time is of the essence for each and every provision of this Agreement.  In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" mean "to but excluding" and the word "through" means "to and including".  Whenever the last day for the exercise of any privilege or the discharge of any duty hereunder shall fall upon a day that is not a Business Day, the Party having such privilege or duty may exercise such privilege or discharge such duty on the next succeeding day that is a Business Day.  Any reference in this Agreement to "made available" means a document or other information that was provided or made available to Buyer and its Representatives in Seller's electronic or virtual data rooms, management presentations or in any other form.

11.15  **Further Assurances**.  Subject to the other provisions of this Agreement, each of Buyer and Seller will use its commercially reasonable efforts to (a) take all actions necessary or appropriate to consummate the transactions contemplated by this Agreement, (b) provide the other Party with reasonable cooperation and take such actions as such other Party may reasonably request in connection with the consummation of the transactions contemplated by this Agreement, (c) following the Closing, execute and deliver such additional documents, instruments, assignments, conveyances and assurances, and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement or for the perfection and recordation of such conveyance and transfer in any applicable jurisdiction in and (d) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the transactions contemplated by this Agreement. If, following the Closing, Seller receives or becomes aware that it holds any asset, property or right which constitutes a Purchased Asset, then the Seller shall transfer such asset, property or right to Buyer and/or, as applicable, one or more designees of Buyer as promptly as practicable for no additional consideration.

*   *   *   *

[Signature page follows]

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be duly executed on its behalf as of the date first above written.

SELLER:

ATHENEX PHARMACEUTICAL DIVISION, LLC

By: _____
    Name:    Nicholas K. Campbell
    Title:     Chief Restructuring Officer


OAKTREE STRATEGIC CREDIT ASSET HOLDINGS, LLC

By:    Oaktree Fund GP IIA, LLC
Its:    Manager

By:    Oaktree Fund GP II, L.P.
Its:    Managing Member

By: _____
Name: Matthew Stewart
Title:  Authorized Signatory

By: _____
Name: Mary Gallegly
Title:  Authorized Signatory

[Signature Page to Asset Purchase Agreement]

AGENT:

**OAKTREE FUND ADMINISTRATION, LLC**

By:      Oaktree Capital Management, L.P.
Its:     Managing Member

*SOLELY FOR PURPOSES OF SECTION 11.4 HEREOF*

By: _____
      Name: Matthew Stewart
      Title:   Managing Director

By: _____
      Name: Mary Gallegly
      Title:   Managing Director

[Signature Page to Asset Purchase Agreement]