## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re:<br><br>ATHENEX, INC., et al.,<br><br>Debtors. [1] | Chapter 11<br><br>Case No. 23-90295 (DRJ)<br><br>(Jointly Administered) |

### ORDER (I) AUTHORIZING (A) THE SALE OF CERTAIN ASSETS OF DEBTOR ATHENEX PHARMACEUTICAL DIVISION, LLC TO SAGENT PHARMACEUTICALS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND (B) THE DEBTORS TO ENTER INTO AND PERFORM UNDER THE PURCHASE AGREEMENT AND (II) GRANTING RELATED RELIEF

(Related Docket Nos. 17, 113, 239)

Upon the emergency motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order") (i) authorizing and approving, among other things, (a) the sale of the Purchased Assets (as defined in the Purchase Agreement (as defined below)) of Athenex Pharmaceutical Division, LLC ("APD") to Sagent Pharmaceuticals (the "Purchaser") free and clear of liens, claims, and encumbrances (the "Transaction"), (b) APD to enter into and perform under the Purchase Agreement (as defined herein), (c) the assumption and assignment of certain executory contracts and unexpired leases in connection with the Transaction, and (ii) granting related relief, all as more fully set forth in the Motion; and upon the evidence offered in support of the Motion; and this Court having jurisdiction

---

[1]   A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/athenex. The location of Athenex, Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 1001 Main Street, Suite 600, Buffalo, NY 14203.

[2]   The Motion was filed on May 14, 2023 as *Debtors' Emergency Motion for (I) Entry of an Order Approving (A) Bid Procedures; (B) The Form and Manner of Notice; (C) the Procedures for Determining Cure Amounts for Executory Contracts and Unexpired Leases; and (II) Entry of an Order Approving (A) the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances and Interests; and (B) the Assumption and Assignment of Certain Contracts and Unexpired Leases* [Dkt. 17]. Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to it in the Motion.

over this matter pursuant to 28 U.S.C. § 1334 and the Amended Standing Order; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that it may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. § 1408; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion, and having heard the statements in support of the relief requested therein at any hearing before this Court, and upon the First Day Declaration and the declarations filed in support of the Motion; and this Court having conducted a hearing on the Motion (the "Sale Hearing"), at which time all interested parties were offered an opportunity to be heard with respect to the Motion; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, **THE COURT HEREBY FINDS THAT**:

I.    **Jurisdiction, Final Order, and Statutory Predicates.**

A.    The Court has jurisdiction to hear and determine the Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this District and in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.    The Debtors' rights, title and interest in the Purchased Assets constitute property of APD's bankruptcy estate and title thereto is vested in APD's bankruptcy estate within the meaning of section 541(a) of the Bankruptcy Code.

2

C.      The statutory predicates for the relief requested in the Motion are sections 105(a), 363, and 365 of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004 and 6006 and Bankruptcy Local Rule 2002-1.

D.      This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Sale Order, waives any stay, and expressly directs entry of judgment as set forth herein.

## II.    Notice of the Purchase Agreement, Transaction, Sale Hearing and Bidding Procedures Order.

E.      As evidenced by the affidavits of service and publication previously filed with the Court, and based on the representations of counsel at the Sale Hearing, due, proper, timely, adequate and sufficient notice of the Motion, the Bid Procedures Order, the Auction, the Sale Hearing, the Purchase Agreement, this Sale Order and the Transaction has been provided in accordance with sections 102(1) and 363 of the Bankruptcy Code, Bankruptcy Rules 2002, 9007, 9008 and 9014, and the Local Bankruptcy Rule 2002-1.  The Debtors have complied with all obligations to provide notice of the Motion, the Bid Procedures Order, the Auction, the Sale Hearing, the Purchase Agreement, this Sale Order and the Transaction as required by the Bid Procedures Order.  The aforementioned notices are good, sufficient and appropriate under the circumstances, and no other or further notice of the Motion, the Bid Procedures Order, the Auction, the Sale Hearing, the Purchase Agreement, this Sale Order or the Transaction is, or shall be, required. The requirements of Bankruptcy Rule 6004(a) and the Local Bankruptcy Rules are satisfied by such notice.

F.      A reasonable opportunity to object and be heard with respect to the Transaction, the Motion and the relief requested therein and provided in this Sale Order has been afforded to all interested persons and entities, including the Objection Notice Parties (as defined in the Bidding Procedures Order).

G.      As demonstrated by the evidence proffered or adduced at the Sale Hearing and the representations of counsel at the Sale Hearing, the Debtors have complied in all material respects with the Bidding Procedures Order.  The Debtors and their professionals have adequately and appropriately marketed the Purchased Assets in compliance with the Bidding Procedures[3] and the Bidding Procedures Order, and in accordance with the Debtors' fiduciary duties.  Based upon the record of these proceedings, creditors, other parties in interest and prospective purchasers were afforded a reasonable and fair opportunity to bid for the Purchased Assets.

H.      The Bid Procedures were substantively and procedurally fair to all parties and all potential bidders and afforded notice and a full, fair and reasonable opportunity for any person to make a higher or otherwise better offer to purchase the Purchased Assets.  The Debtors conducted the sale process without collusion and in accordance with the Bid Procedures.

I.      The Purchaser is the Successful Bidder, and the Purchase Agreement is the Successful Bid (as defined in the Bid Procedures), for the Purchased Assets in accordance with the Bid Procedures Order.  The Transaction and the Purchase Agreement comply with the Bidding Procedures Order and all other applicable orders of the Court.

---

[3]      The term "Bidding Procedures" as used in this Order shall refer to those certain Amended Bid Procedures found at Dkt. No. 239.

**III.    Good Faith of the Purchaser and the Prepetition Term Loan Secured Parties.**

J.    The Purchase Agreement and the related agreements were negotiated, proposed, and entered into by APD, the Purchaser and the Prepetition Term Loan Secured Parties[4] without collusion, in good faith, and from arm's-length bargaining positions.  Neither APD, the Prepetition Term Loan Secured Parties, nor the Purchaser have engaged in any conduct that would cause or permit the Purchase Agreement, any related agreements or the Transaction to be avoided, or for any costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.

K.    The Purchaser is consummating the Transaction in good faith. The Purchaser is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code and has proceeded in good faith in all respects in connection with the Transaction.  The Purchaser is therefore entitled to all of the protections afforded under section 363(m) of the Bankruptcy Code.  Neither APD nor the Purchaser have engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code.  The Debtors were free to deal with any other party interested in buying or selling some or all of the Purchased Assets on behalf of the Debtors' estates.  The Purchaser (i) agreed to subject its bid to the competitive Bidding Procedures set forth in the Bidding Procedures Order, including the Auction; (ii) disclosed all payments and other consideration to be made or otherwise provided by the Purchaser and other agreements or arrangements entered into by the Purchaser in connection with the Sale; (iii) the Purchaser has not violated section 363(n) of the Bankruptcy Code by any action or inaction; and (iv) the negotiation and execution of the Purchase Agreement, including the Sale contemplated thereby, were at arms'-length and in good faith.  The

---

[4]    As such term is defined in the *Final Order (I) Authorizing the Debtors to Use Cash Collateral; (II) Granting Adequate Protection to Prepetition Term Loan Secured Parties; (III) Modifying Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* [Dkt. 275].

protections afforded by section 363(m) of the Bankruptcy Code are integral to the Transaction and the Purchaser would not consummate the Transaction without such protections.

L.      The consideration provided by the Purchaser pursuant to the Purchase Agreement: (i) is fair and adequate and constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession thereof, or the District of Columbia (including the Uniform Fraudulent Transfer Act); (ii) is fair consideration under the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, the Bankruptcy Code, and any other applicable laws; and (iii) will provide a greater recovery for the Debtors' estates and their creditors than would be provided by any other reasonably practicable available alternative.  The Purchase Agreement was not entered into, and the Sale is not being consummated, for the purpose of hindering, delaying, or defrauding creditors of the Debtors under the Bankruptcy Code or under any other applicable law.  Neither the Debtors nor the Purchaser have entered into the Purchase Agreement or are consummating the Sale with any fraudulent intent or otherwise improper purpose prohibited by law.

## IV.   Highest and Best Offer.

M.      The Debtors' marketing process with respect to the Purchased Assets, including the Debtors' prepetition marketing process with respect to the Purchased Assets, afforded a full, fair, and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the Purchased Assets.  The Purchase Agreement: (i) constitutes the highest and best offer for the Purchased Assets; (ii) is fair and reasonable; and (iii) is in the best interests of the Debtors, their estates, their creditors and all other parties in interest.

N.      The Debtors' determination that the Purchase Agreement constitutes the highest and best offer for the Purchased Assets constitutes a valid and sound exercise of the Debtors' business judgment.

DOCS_LA:349730.5 14039/002
4868-1239-8188.1

O.      Consistent with their fiduciary duties, the Debtors have demonstrated good, sufficient and sound business reasons and justifications for entering into the Transaction and the performance of their obligations under the Purchase Agreement, including, but not limited to, the fact that the Purchase Agreement will provide a greater recovery for the Debtors' estates and creditors than would be provided by any other available alternative, including a separate liquidation of the Debtors and the Purchased Assets.

**IT IS HEREBY ORDERED THAT**:

1.      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to these chapter 11 cases pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

2.      The Motion is granted as provided herein, and entry into and performance under, the Purchase Agreement and the consummation of the Transaction contemplated thereby is authorized and approved.

3.      All objections to the Motion or the relief requested therein that have not been withdrawn, waived or settled as announced to the Court at the Sale Hearing or by stipulation filed with the Court, and all reservations of rights included in such objections, are hereby denied and overruled on the merits with prejudice.  Those parties who did not object or withdrew their objections to the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code to the relief granted herein.

4.      This Sale Order will be binding in all respects upon the Debtors, their bankruptcy estates, all creditors, all holders of equity interests in the Debtors, all holders of any Interests or Claims (whether known or unknown) against the Debtors, any and all alleged holders of Interests

7

or Claims against or on all or any portion of the Purchased Assets, all counterparties to any executory contract or unexpired lease of the Debtors, the Purchaser and all agents, representatives, affiliates, and permitted successors and assigns of the Purchaser, and any trustees, examiners, or other fiduciary under any section of the Bankruptcy Code, if any, subsequently appointed in the Debtors' Chapter 11 Cases or upon a conversion to chapter 7 under the Bankruptcy Code of any or all of the Debtors' cases.  The terms and provisions of the Purchase Agreement and this Order will inure to the benefit of the Debtors, their bankruptcy estates, their creditors, the Purchaser and all agents, representatives, affiliates, and permitted successors and assigns of the Purchaser, and any other affected third parties, including all persons asserting any Interests or Claims in the Purchased Assets to be sold to the Purchaser pursuant to the Purchase Agreement, notwithstanding any subsequent appointment of any trustee(s), party, entity, or other fiduciary under any section of any chapter of the Bankruptcy Code, as to which trustee(s), party, entity, or other fiduciary such terms and provisions likewise will be binding.

5.      Notice of the Motion and Sale Hearing was adequate, appropriate, fair and equitable under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004 and 6006, and the Bid Procedures Order.

<strong><u>APPROVAL OF THE PURCHASE AGREEMENT</u></strong>

6.      In accordance with section 363 of the Bankruptcy Code and Bankruptcy Rule 6004 and as described in the Motion, the Debtors are authorized, but not directed, to sell the Purchased Assets to the Purchaser in accordance with the terms and conditions set forth in the *Asset Purchase Agreement by and among Athenex Pharmaceutical Division, LLC and Sagent Pharmaceuticals*, attached hereto as **<u>Schedule 1</u>** (the "<u>Purchase Agreement</u>").  The Purchase Agreement, together with all annexes, exhibits, and amendments thereto, is hereby approved.

8

7.      The Debtors are authorized and empowered, but not directed, to take any and all actions necessary or appropriate to: (a) consummate the sale of the Purchased Assets to the Purchaser pursuant to and in accordance with the terms and conditions of the Purchase Agreement; (b) close the sale of the Purchased Assets as contemplated in the Purchase Agreement and this Order (including any customary or immaterial modifications to the purchase price); and (c) execute and deliver, perform under, consummate, implement, and close fully the Purchase Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Purchase Agreement and the sale of the Purchased Assets, including any other ancillary document, or as may be reasonably necessary or appropriate to the performance of the obligations as contemplated by the Purchase Agreement and such other ancillary documents.

8.      The Purchase Agreement represents the highest and best offer to purchase the Purchased Assets under the facts and circumstances of these chapter 11 cases. Approval of the Purchase Agreement and the consummation of the transaction contemplated hereby is in the best interests of the Debtors, their creditors, their estates, and all other parties in interest.  The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the sale of the Purchased Assets.

## TRANSFER OF THE PURCHASED ASSETS

9.      The Debtors are authorized, but not directed, to sell the Purchased Assets free and clear of liens, claims, and encumbrances against the Debtors or their estates (other than included in the Assumed Liabilities or Permitted Liens (each as defined in the Purchase Agreement)), because one or more of the standards set forth in section 363(f) of the Bankruptcy Code has been satisfied.

10.     Pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, the sale of the Purchased Assets under the terms and conditions set forth in the Purchase Agreement shall be free

9

and clear of any and all liens, claims, encumbrances, and other interests of any kind or nature whatsoever (other than included in the Assumed Liabilities or Permitted Liens (each as defined in the Purchase Agreement)); *provided* that any such liens, claims, encumbrances, and other interests shall attach to the proceeds of the sale with the same validity, in the amount, with the same priority as, and to the same extent that any such liens, claims, and encumbrances have with respect to the Purchased Assets, subject to any claims, defenses, or challenges that the Debtors or party-in-interest may possess with respect thereto. Any such interests shall be transferred and attach to the proceeds of the sale with the same validity and priority, and subject to the same claims, defenses and challenges that such liens had against the Purchased Assets immediately prior to the Closing (as defined below).

11.     All persons and entities holding or otherwise asserting liens, claims, encumbrances, or other interests of any kind or nature in the Purchased Assets arising under, out of, in connection with, or in any way relating to the Debtors, the Purchased Assets or the transfer of the Purchased Assets to the Purchaser (other than included in the Assumed Liabilities or Permitted Liens (each as defined in the Purchase Agreement)), hereby are forever barred, estopped, and permanently enjoined from asserting such persons' or entities' liens, claims, encumbrances or other interests of any kind or nature in and to the Purchased Assets against the Purchaser or its successors or assigns, their property, or the Purchased Assets. For the avoidance of doubt, no holder's lien, claim, encumbrance or other interest of any kind or nature in the Purchased Assets as of the Closing shall impact Purchaser's future rights to sell, transfer or dispose of the Purchased Assets in the ordinary course of its business.  Notwithstanding any provision of the Purchase Agreement to the contrary, after the Closing of the sale of the Purchased Assets, the Debtors shall have no further liability with respect to the Purchased Assets, and any claims, whether administrative or otherwise, relating

10

to or arising from the Purchased Assets after the Closing of the sale and transfer of the Purchased Assets that are asserted against the Debtors shall be deemed disallowed.

12.    A certified copy of this Order may be filed with the appropriate clerk and/or recorded with the recorder to act to cancel any of the liens and other encumbrances of record.

13.    If any person or entity which has filed statements or other documents or agreements evidencing liens on, or interests in, the Purchased Assets shall not have delivered to the Debtors prior to the Closing in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of liens or interests which the person or entity has or may assert with respect to the Purchased Assets, the Debtors are hereby authorized, and the Purchaser is hereby authorized to execute and file such statements, instruments, releases, and other documents on behalf of such person or entity with respect to the Purchased Assets.

14.    This Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons and entities who may be required by operation of law, the duties of their office or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease, and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

15.    The Purchase Agreement and any related agreements, documents, or other instruments may be modified, amended or supplemented by the parties thereto with the consent of

the Prepetition Term Loan Secured Parties and in consultation with the Committee, in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment, or supplement does not have a material adverse effect on the Debtors' estates or the rights of any party holding a lien, claim or encumbrance on or against the Purchased Assets.

16.     No bulk sales law or similar law of any state or other jurisdiction shall apply in any way to the transactions with the Debtors that are approved by this Sale Order, including, without limitation, the Purchase Agreement and the Transaction.

17.     Notwithstanding anything in this Sale Order, subject to section 525(a) of the Bankruptcy Code, no governmental unit (as defined in Bankruptcy Code § 101(27)) or any representative thereof may deny, revoke, suspend, or refuse to renew, any right, permit, license, copyright, patent, trademark or other permission relating to the use of the Purchased Assets sold, transferred, or conveyed to the Purchaser on account of the filing or pendency of these chapter 11 cases, the conduct of the Sale, or the consummation of the Transaction contemplated by the Purchase Agreement and the related agreements.

18.     Notwithstanding anything to the contrary in the Purchase Agreement, the Purchased Assets shall not include the following three abbreviated new drug applications owned by Praxgen: (i) ANDA212058 (Dicyclomine Hydrochloride); (ii) A206677 (Pentobarbital Sodium); and (iii) A212770 (Lincomycin Hydrochloride).

## PROHIBITION OF ACTIONS AGAINST THE PURCHASER

19.     The Purchaser is not an "insider" of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code.

20.     By virtue of the Transaction, neither the Purchaser nor any of its affiliates shall be deemed to:  (i) be a legal successor, or otherwise deemed to be a successor, to any of the Debtors under any theory of law or equity; (ii) have, de facto or otherwise, merged with or into any or all

12

Debtors or their estates; (iii) have a common identity or a continuity of enterprise with the Debtors; (iv) be an alter ego or a mere continuation or substantial continuation, or be holding itself out as a mere continuation, of the Debtors or any business, enterprise, or operation of the Debtors; or (v) be liable for any acts or omissions of the Debtors in the conduct of the business or arising under or related to the Purchased Assets, other than as set forth in the Purchase Agreement.  The Purchaser's acquisition of the Purchased Assets owned by the Debtors shall be free and clear of any "successor liability", vicarious liability and other types of transferee liability of any kind or nature whatsoever, whether known or unknown as of the Closing, asserted or unasserted, fixed or contingent, liquidated or unliquidated (other than, to the extent applicable, any Assumed Liabilities), and the Purchased Assets shall not be subject to any Claims, Encumbrances and Interests arising under or in connection with any Retained Liability (as defined in the Purchase Agreement).  The operations of the Purchaser and its affiliates shall not be deemed a continuation of the Debtors' business as a result of the acquisition of the Purchased Assets.  The Purchaser would not have acquired the Purchased Assets but for the foregoing protections against potential claims based upon "successor liability" theories.

## ASSUMPTION AND ASSIGNMENT OF DESIRED 365 CONTRACTS

21.     Subject to, and at the date and time (the "Closing Date") of, the closing (the "Closing") of the Sale of the Purchased Assets contemplated by this Order, the Debtors may assume the Desired 365 Contracts (as identified in the Purchase Agreement) and assign each of them to the Purchaser pursuant to section 365 of the Bankruptcy Code free and clear of all Claims and Interests except as otherwise provided in the Purchase Agreement and subject to the Assumed Liabilities, and notwithstanding any anti-assignment clause as provided in section 365(f) of the Bankruptcy Code.  The assumption and assignment of the Desired 365 Contracts pursuant to the terms of this Order is integral to the Agreement and is in the best interests of the Debtors and their

13

estates, creditors and other parties in interest, and represents the reasonable exercise of sound and prudent business judgment by the Debtors.

22.     Upon the Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Purchaser will be fully and irrevocably vested in all right, title, and interest of each Desired 365 Contract.

23.     The Debtors and the Purchaser have, to the extent necessary, satisfied the requirements of section 365 of the Bankruptcy Code, including sections 365(b)(1)(A), 365(b)(1)(B), 365(b)(3) (to the extent applicable) and 365(f) of the Bankruptcy Code, in connection with the sale and assumption and assignment of the Desired 365 Contracts to the extent provided under the Agreement and have:  (1) cured any default existing prior to the date hereof under any of the Desired 365 Contracts, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code, and (2) provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof under any of the Desired 365 Contracts, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code.

24.     As and to the extent requested or required, Purchaser has provided adequate assurance of future performance of and under the Desired 365 Contracts, within the meaning of sections 365(b)(1), 365(b)(3) (to the extent applicable) and 365(f)(2) of the Bankruptcy Code.

25.     The Desired 365 Contracts are assignable notwithstanding any provisions contained therein to the contrary, and any provisions in any Desired 365 Contracts that prohibit or condition the assignment of such Desired 365 Contracts or allow the non-Debtor counterparty to such Desired 365 Contracts to terminate, recapture, impose any penalty, condition on renewal or extension or modify any term or condition upon the assignment of such Desired 365 Contracts constitute unenforceable anti-assignment provisions that are void and of no force and effect.

14

26. Except as otherwise agreed in writing between the Debtors, the Purchaser and the Counterparty to each Desired 365 Contract, stated on the record at the Sale Hearing, or determined by Court order resolving a timely-filed objection that is pending a final determination of actual Cure Cost, the respective amounts set forth on the cure notices approved and served pursuant to the Bid Procedures Order [Docket Nos. 141, 162, 249, 281] (collectively, the "Cure Notice"), and served upon each counterparty to the Desired 365 Contracts (each a "Counterparty"), are the sole amounts necessary under sections 365(b)(1)(A) and (B) and 365(f)(2)(A) of the Bankruptcy Code to cure all defaults and pay all actual pecuniary losses thereunder (the "Cure Costs"). The Counterparties to each Desired 365 Contract are forever bound by such Cure Costs and, upon payment of such Cure Costs, if any, are hereby enjoined from taking any action against the Debtors and their bankruptcy estates, Purchaser and all agents, representatives, affiliates, and permitted successors and assigns of the Purchaser, or the Purchased Assets with respect to any claim for cure under any Desired 365 Contract.

27. For all Desired 365 Contracts for which a Cure Notice was served, Purchaser is authorized and directed to pay all Cure Costs required to be paid by such parties in accordance with the Purchase Agreement upon the later of (a) Closing or (b) for any Desired 365 Contract for which an objection has been filed to the assumption and assignment of such agreement or the Cure Costs relating thereto and such objection remains pending as of the date of this Order, the resolution of such objection by settlement or order of this Court. If no out-of-court resolution can be reached, either party may request a hearing on no less than 14 days' notice to the other party.

28. Each Counterparty to a Desired 365 Contract is hereby forever barred, estopped, and permanently enjoined from asserting against the Debtors, the Purchaser, or any of their affiliates (including any designees), or the property of any of them, any default, breach, claims of pecuniary losses existing as of the Closing or by reason of Closing, action, liability, or other

15

cause of action existing as of the date of the Sale Hearing whether asserted or not, or, against the Purchaser or any of its affiliates (including any designees), any counterclaim, defense, setoff, or any other claim asserted or assertable against the Debtors. Each Counterparty to a Desired 365 Contract is hereby forever barred, estopped, and permanently enjoined from asserting any objection to the assumption and assignment of such Counterparty's Desired 365 Contract including, without limitation, that its consent is necessary for such assumption and assignment.

## **RELATED RELIEF**

29.     All time periods set forth in this Order and the Purchase Agreement shall be calculated in accordance with Bankruptcy Rule 9006(a).

30.     The stay provided for in Bankruptcy Rules 6004(h) is hereby reduced to the extent necessary to permit Closing of the sale of the Purchased Assets.  This Order shall otherwise be effective immediately upon its entry.

31.     To the extent there is any inconsistency between the terms of the Purchase Agreement, the Motion, and this Order, the terms of this Order shall govern.

32.     Notwithstanding the relief granted herein and any actions taken pursuant to such relief, nothing contained in the Motion or this Order shall constitute, nor is it intended to constitute: (a) an admission as to the validity, priority, or amount of any particular claim against a Debtor entity; (b) a waiver or impairment of the Debtors' right to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim or finding that any particular claim is an administrative expense claim or other priority claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Order or the Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates (g) a waiver

16

or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (h) a concession by the Debtors or any other party-in-interest that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Order are valid and the Debtors and all other parties-in-interest expressly reserve their rights to contest the extent, validity, or perfection, or to seek avoidance of all such liens.  Any payment made pursuant to this Order should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver or impairment of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

33.     The consummation of the Transaction shall be conditioned on and subject to the terms of paragraph 28 of the order entered by the Court at Docket No. 275 and the Debtors are authorized and directed to use the proceeds of the Transaction received by the Debtors in accordance therewith.

34.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Bankruptcy Local Rules are satisfied by such notice.

35.     The Debtors are authorized, but not directed, to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion and the Purchase Agreement.

36.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

DOCS_LA:349730.5 14039/002
4868-1239-8188.1

37.     This Order shall be binding upon the Purchaser and all successors and assigns of the Purchaser, the Debtors, their estates, all creditors of and holders of equity interests in the Debtors, and any holders of liens against or on all or any portion of the Purchased Assets.  This Order and the Purchase Agreement shall inure to the benefit of the Debtors, their estates, their creditors, the Purchaser, and its respective successors and assigns.

Dated: _____, 2023

_____
DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE

18

## Schedule 1

**Purchase Agreement**

DocuSign Envelope ID: F57AEEC8-F9DF-483D-A358-8FCFDD3F0D02

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**ATHENEX PHARMACEUTICAL DIVISION, LLC,**

**and**

**SAGENT PHARMACEUTICALS**

**DATED AS OF JUNE 23, 2023**

4891-8457-9180.2

DocuSign Envelope ID: F57AEEC8-F9DF-483D-A358-8FCFDD3F0D02

ARTICLE I DEFINITIONS ................................................................ 1
    1.1      **Definitions** ................................................................ 1

ARTICLE II PURCHASE AND SALE .................................................. 8
    2.1      **Purchased Assets** ...................................................... 8
    2.2      **Excluded Assets** ....................................................... 9
    2.3      **Nonassignable Assets; Assigned Contracts Schedule; Additional Excluded Assets** .................................................. 10
    2.4      **Liabilities** ............................................................. 11
    2.5      **Purchase Price** ....................................................... 12
    2.6      **Withholding** .......................................................... 12

ARTICLE III CLOSING ................................................................ 12
    3.1      **Closing** ................................................................. 12
    3.2      **Closing Deliveries** ................................................... 13

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF SELLER ........... 14
    4.1      **Existence and Power** ................................................ 14
    4.2      **Authorization** ........................................................ 14
    4.3      **Enforceability** ....................................................... 14
    4.4      **Noncontravention** ................................................... 14
    4.5      **Proceedings** .......................................................... 15
    4.6      **Compliance with Laws; Title to Purchased Assets** ............. 15
    4.7      **Intellectual Property** ............................................... 15
    4.8      **Brokers** ............................................................... 15
    4.9      **Exclusivity of Representations and Warranties** ............... 15

ARTICLE V REPRESENTATIONS AND WARRANTIES OF BUYER ............ 15
    5.1      **Existence and Power** ................................................ 15
    5.2      **Authorization** ........................................................ 16
    5.3      **Enforceability** ....................................................... 16
    5.4      **Governmental and Third Party Authorizations** ............... 16
    5.5      **Noncontravention** ................................................... 16
    5.6      **Brokers** ............................................................... 16
    5.7      **Proceedings** .......................................................... 16
    5.8      **Financial Capability** ................................................ 16
    5.9      **Solvency** .............................................................. 17
    5.10    **Independent Investigation** ......................................... 17
    5.11    **Exclusivity of Representations and Warranties** ............... 17

ARTICLE VI PRE-CLOSING COVENANTS ........................................ 17
    6.1      **Conduct of Business** ................................................ 17
    6.2      **Pre-Closing Access to Information** ............................... 18
    6.3      **Supplemental Disclosure** .......................................... 19
    6.4      **Efforts to Close** ...................................................... 19
    6.5      **Contact with Customers, Suppliers and Other Business Relations** ........ 20
    6.6      **Bankruptcy Matters** ................................................ 20

ARTICLE VII ACCESS TO BOOKS AND RECORDS POST-CLOSING ........... 20

DocuSign Envelope ID: F57AEEC8-F9DF-483D-A358-8FCFDD3F0D02

ARTICLE VIII COVENANTS OF BUYER AND SELLERS ................................................. 20
    8.1      **Public Announcements** ................................................................ 20
    8.2      **Tax Matters** ..................................................................................... 21
    8.3      **Assigned Contracts; Adequate Assurance and Performance** ................. 21
    8.4      **Cure Costs; Accrued Liabilities** ................................................ 22
    8.5      **Wrong-Pocket** ................................................................................. 22
    8.6      **Intellectual Property License** ................................................... 22

ARTICLE IX CONDITIONS TO CLOSING .................................................................... 23
    9.1      **Conditions to Obligation of Buyer** ........................................ 23
    9.2      **Conditions to Obligation of Seller** ......................................... 24
    9.3      **Frustration of Closing Conditions** .......................................... 24
    9.4      **Waiver of Conditions** ................................................................. 24

ARTICLE X TERMINATION ......................................................................................... 24
    10.1    **Termination** .................................................................................... 24
    10.2    **Effect of Termination** ................................................................. 26

ARTICLE XI SURVIVAL AND RELEASE ...................................................................... 26
    11.1    **Survival** ............................................................................................ 26

ARTICLE XII MISCELLANEOUS .................................................................................. 27
    12.1    **Notices** .............................................................................................. 27
    12.2    **Waivers** ............................................................................................ 28
    12.3    **Expenses** .......................................................................................... 28
    12.4    **Successors and Assigns** ................................................................ 28
    12.5    **Governing Law** ............................................................................... 28
    12.6    **Consent to Jurisdiction; Service of Process; Waiver of Jury Trial** ......... 28
    12.7    **Counterparts** ................................................................................... 29
    12.8    **No Third Party Beneficiaries** ..................................................... 29
    12.9    **Entire Agreement; Amendment** ................................................ 29
    12.10   **Disclosure Schedules** ................................................................... 29
    12.11   **Captions** ........................................................................................... 30
    12.12   **Remedies** ......................................................................................... 30
    12.13   **Severability** ..................................................................................... 30
    12.14   **Interpretation** ................................................................................ 31
    12.15   **Prevailing Party** ............................................................................ 31
    12.16   **Further Assurances** ...................................................................... 31

<u>EXHIBITS</u>

<u>Exhibit A</u>      Allocation of Purchase Price

4891-8457-9180.2

DocuSign Envelope ID: F57AEEC8-F9DF-483D-A358-8FCFDD3F0D02

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (the "Agreement"), dated as of June 23, 2023, is entered into by and among **Athenex Pharmaceutical Division, LLC** ("Seller"), and **Sagent Pharmaceuticals** ("Buyer"). Seller and Buyer are referred to herein as the "Parties". Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in Article I.

## RECITALS

A.     Seller is in the business of developing, sourcing, and selling multisource injectable pharmaceutical products in the United States (the "Business"). On May 14, 2023, Seller filed a voluntary petition in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court").

B.     That certain Order Approving (a) Bid Procedures; (b) the Form and Manner of Notice; (c) the Procedures for Determining Cure Amounts for Executory Contracts and Unexpired Leases; and (d) Granting Related Relief was entered in the Bankruptcy Case on May 22, 2023, and such Order was subsequently amended.

C.     Seller desires to sell to Buyer, pursuant to Section 363(f) of the Bankruptcy Code (as defined in Section 1.1) and with the approval of the Bankruptcy Court, certain assets of Seller used in connection with or arising out of the operation of the Business, and Buyer desires to purchase such assets from Seller, on the terms and conditions set forth in this Agreement.

## AGREEMENTS

NOW, THEREFORE, in consideration of the foregoing premises and the representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

## ARTICLE I
## DEFINITIONS

1.1     **Definitions**. When used in this Agreement, the following terms shall have the meanings assigned to them in this Section 1.1.

"365 Contracts" means all of the Seller's respective executory Contracts and unexpired leases, in each case, within the meaning of Section 365 of the Bankruptcy Code pertaining to the Purchased Assets or Assumed Liabilities.

"503(b)(9) Claims" means the claims against Seller held by the following parties in the following amounts, which are entitled to administrative priority pursuant to Section 503(b)(9) of the Bankruptcy Code: (i) Istituto Biochimico Italiano Giovanni Lorenzini S.p.A. in the amount of $1,274,846, and (ii) Maiva Pharma Private Limited, Global Pharmatech Private Limited and/or Global Pharmatech in the amount of $265,860.

"Affiliate" means, with respect to any specified Person, any other Person directly or indirectly controlling, controlled by or under common control with such specified Person. For purposes of this definition, the terms "controlling," "controlled by," or "under common control with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies

1

DocuSign Envelope ID: F57AEEC8-F9DF-483D-A358-8FCFDD3F0D02

of a Person, whether through the ownership of voting securities, by contract or otherwise, or the power to elect more than fifty percent (50%) of the directors, managers, general partners, or persons exercising similar authority with respect to such Person.

"Agreed Statement" has the meaning set forth in Section 8.1.

"Agreement" has the meaning set forth in the Preamble hereto.

"Allocation" has the meaning set forth in Section 8.2(c).

"Ancillary Documents" means all agreements, instruments and documents delivered at the Closing pursuant to this Agreement.

"ANDA" means an abbreviated new drug application, as defined in 21 CFR 314.3 of the FDCA.

"Assigned Contracts" has the meaning set forth in Section 2.1(d).

"Assumed Liabilities" has the meaning set forth in Section 2.4(a).

"Athenex" means Athenex, Inc., a Delaware corporation and the sole member of Seller.

"Athenex Trademark" has the meaning set forth in Section 8.6(b).

"Bankruptcy Case" means the chapter 11 proceeding filed by Seller in the Bankruptcy Court.

"Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Bidding Procedures" means the procedures employed with respect to the proposed sale of the Purchased Assets and the assumption of the Assumed Liabilities, as amended and incorporated in the Bidding Procedures Order.

"Bidding Procedures Order" means the Order of the Bankruptcy Court approving the Bidding Procedures entered May 22, 2023 [Docket No. 113, as modified by Docket No. 239].

"Bill of Sale" has the meaning set forth in Section 3.2(b)(i).

"Books and Records" means all of the books and records, in all formats (both tangible and intangible), used or maintained by or on behalf of Seller in connection with or otherwise related to the Business, including (a) executed copies of all of the written Assigned Contracts, if any, (b) all equipment, product and other warranties pertaining to the Purchased Assets, (c) all technical information and any data, maps, computer files, diagrams, blueprints and schematics, (d) all filings made with or records required to be kept by any Governmental Entity (including all backup information on which such filings are based), (e) all research and development reports, (f) all equipment and operating logs, (g) all financial and accounting records, (h) all employment records with respect to any transferring employees, and (i) all creative, promotional or advertising materials.

"Business" has the meaning set forth in the Recitals.

DocuSign Envelope ID: F57AEEC8-F9DF-483D-A358-8FCFDD3F0D02

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks located in New York, New York are authorized or required by Law to close.

"Business Trademarks" has the meaning set forth in Section 8.6(a).

"Buyer" has the meaning set forth in the Preamble hereto.

"Buyer Closing Certificate" has the meaning set forth in Section 9.2(c).

"Buyer Closing Notice" has the meaning set forth in Section 10.1(b)(iii).

"Buyer Default Termination" has the meaning set forth in Section 3.2(a)(i).

"Cash Purchase Price" has the meaning set forth in Section 2.5(a).

"Charges" has the meaning set forth in Section 8.2(a).

"Closing" has the meaning set forth in Section 3.1.

"Closing Date" has the meaning set forth in Section 3.1.

"Closing Inventory Value" has the meaning set forth in Section 2.5(a).

"Code" means the Internal Revenue Code of 1986, as amended, and regulations promulgated thereunder.

"Confidentiality Agreement" means that certain Confidentiality Agreement, dated as of May 15, 2023, by and between Athenex and Buyer.

"Contract" means any written and legally binding agreement, contract, commitment or arrangement, including all amendments and addenda thereto.

"Contract Assignments" has the meaning set forth in Section 3.2(b)(ii).

"COVID-19" means SARS-CoV-2 or COVID-19, and any evolutions or variants thereof or related or associate epidemics, pandemics or diseases existing prior to the Closing Date.

"Cure Costs" means all monetary Liabilities, including pre-petition monetary Liabilities, of Seller that must be paid or otherwise satisfied to cure all of Seller's monetary and other defaults under the Assigned Contracts, if any, pursuant to Section 365 of the Bankruptcy Code as provided hereunder as such amounts are determined by the Bankruptcy Court or approved pursuant to the assignment and assumption procedures provided for in the Bidding Procedures Order. For the avoidance of doubt, Seller shall pay a minimum of $7,000,000 in Cure Costs, inclusive of the 503(b)(9) Claims.

"Deposit" has the meaning set forth in Section 3.2(a).

"Environmental Laws" means any Law relating to the environment or to pollutants, contaminants, wastes or chemicals or any toxic, radioactive, ignitable, corrosive, reactive or otherwise hazardous substances, wastes or materials.

"Excluded Assets" has the meaning set forth in Section 2.2.

3

DocuSign Envelope ID: F57AEEC8-F9DF-483D-A358-8FCFDD3F0D02

"Excluded Contracts" has the meaning set forth in Section 2.2(g).

"FDCA" means the Federal Food, Drug and Cosmetic Act, as amended.

"GAAP" means United States generally accepted accounting principles, consistently applied, as in effect when applied by Seller.

"General Enforceability Exceptions" means general principles of equity and by bankruptcy, insolvency or similar Laws and general equitable principles affecting the rights of creditors generally.

"Governmental Entity" means (i) any nation, state, commonwealth, province, territory, county, municipality, district or other jurisdiction of any nature, foreign or domestic, (ii) any federal, state, local, municipal, or other government of the foregoing, (iii) any governmental or quasi-governmental entity of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal) or (iv) any body (including any international or multinational body) exercising, or entitled to exercise any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature, including any arbitral tribunal.

"Intellectual Property" means: (a) patents, pending applications for patents and statutory invention registrations, including continuations, continuations-in-part, divisions, provisional and non-provisional applications, reexaminations, reissues and extensions; (b) trademarks, service marks, trade names, corporate names, and other indicia of source of origin, including all common law rights thereto and all goodwill associated therewith and registrations and pending applications for registration thereof; (c) works of authorship, copyrights, and all applications and registrations thereof; (d) domain name registrations; (e) trade secrets, know-how, confidential or proprietary technical, business and other information, including processes, techniques, methods, formulae, designs, product specifications, algorithms, supplier information, prospect lists, customer lists, projections, analyses, market studies and similar proprietary items that are in Seller's possession, and all rights therein and thereto; (f) inventions (whether patentable or unpatentable, and whether or not reduced to practice), invention disclosures, mask works, circuit designs and other designs, industrial design rights, discoveries, ideas, developments, data, and software; (g) all other proprietary and intangible rights; and (h) all copies and tangible embodiments thereof (in whatever form or medium).

"Inventory" has the meaning set forth in Section 2.1(c).

"Inventory Sale Purposes" has the meaning set forth in Section 8.6(b).

"Law" means any statute, law, ordinance, code, rule or regulation of any Governmental Entity.

"Liability(ies)" means with respect to any Person, any direct or indirect liabilities, obligations, commitments, indebtedness, claim, loss, damage, deficiency, assessment, fine, penalty, or responsibility of such Person of any kind or nature, whether fixed or unfixed, choate or inchoate, liquidated or unliquidated, secured or unsecured, asserted or unasserted, due or to become due, accrued or unaccrued, vested or unvested, executory, determined, determinable, absolute, known or unknown, contingent or otherwise, regardless of whether or not the same is required to be accrued on any financial statements of such Person.

"Lien" means, with respect to any property or asset, any mortgage, lien, pledge, security interest, hypothecation, charge or any other similar encumbrance in respect of such property or asset. For the avoidance of doubt, "Lien" shall exclude any restrictions on transfer under securities Laws, this Agreement, any Ancillary Documents and any terms and conditions of any Organizational Document of Seller.

4

DocuSign Envelope ID: F57AEEC8-F9DF-483D-A358-8FCFDD3F0D02

"Material Adverse Effect" means any change, event, development, or effect that has a material adverse effect on the Business, assets, liabilities, financial condition or results of operations of Seller, taken as a whole; provided that none of the following shall be taken into account (either alone or in combination) in determining whether there is or has been a Material Adverse Effect: any adverse change, event, circumstance, or development arising from or relating to: (a) any action required or permitted by this Agreement or any action taken (or omitted to be taken) with the written consent of or at the written request of the Buyer; (b) the announcement, pendency or completion of the transactions contemplated by this Agreement, including losses or threatened losses of employees, customers, suppliers, distributors or others having relationships with Seller; (c) any failure of Seller to meet any internal or published projections, forecasts or revenue or earnings predictions; (d) general economic or political conditions; (e) conditions generally affecting the industries in which Seller is conducted; (f) any changes in financial, banking or securities markets in general, including any disruption thereof and any decline in the price of any security or any market index or any change in prevailing interest rates; (g) acts of war (whether or not declared), armed hostilities or terrorism, or the escalation or worsening thereof; (h) any changes in applicable Laws or accounting rules (including GAAP) or the enforcement, implementation or interpretation thereof; (i) any natural or man-made disaster or acts of God; or (j) any epidemics, pandemics, disease outbreaks, or other public health emergencies including, without limitation, the SARS-COV-2 virus or the related COVID-19 pandemic; provided, that in the cases of clauses (a) through (j) above, such change, event, development, or effect shall only be considered in determining whether a Material Adverse Effect has occurred if such change, event, development, or effect impacts Seller materially and disproportionately to the impact that such change, event, development, or effect generally has upon other Persons operating in the same or substantially similar industries or markets as Seller. For the avoidance of all doubt, neither the filing of the Bankruptcy Case nor any actions taken in furtherance of the Bankruptcy Case or the transactions contemplated by this Agreement (or the consequences of such actions) shall be deemed to constitute a Material Adverse Effect for purposes of this Agreement.

"Material Consents" has the meaning set forth in Section 3.2(b)(v).

"Nonassignable Asset" has the meaning set forth in Section 2.3.

"Order" means any award, injunction, judgment, decree, order, ruling, subpoena or verdict or other decision issued, promulgated or entered by any Governmental Entity of competent jurisdiction.

"Ordinary Course of Business" means, with respect to Seller, the ordinary course of business consistent with its past custom and practice, except for consequences relating to the filing and pendency of the Bankruptcy Case or the operations of the Business during the Bankruptcy Case.

"Organizational Documents" means, with respect to any entity, as applicable, the certificate of incorporation, articles of incorporation, bylaws, articles of organization, partnership agreement, limited liability company agreement, formation agreement, joint venture agreement and other similar organizational documents of such entity (in each case, as amended through the date of this Agreement).

"Outside Date" has the meaning set forth in Section 10.1(b).

"Parties" has the meaning set forth in the Preamble hereto.

"Permit" means any authorization, approval, consent, certificate, governmental license, registration, variance, exemption, waiver, permit or franchise of or from any Governmental Entity.

"Permitted Liens" means: (a) Liens for Taxes that are not yet due and payable or that are being contested in good faith by appropriate proceedings, in each case, solely to the extent set forth on Seller's

4891-8457-9180.2

DocuSign Envelope ID: F57AEEC8-F9DF-483D-A358-8FCFDD3F0D02

financial statements in accordance with GAAP; (b) statutory Liens (or contractual restatements thereof) of landlords and workers', carriers', materialmen's, suppliers' and mechanics' or other like Liens incurred in the Ordinary Course of Business; (c) Liens that will be released prior to or as of the Closing or attach to the proceeds of sale pursuant to the Sale Order; (d) purported Liens evidenced by the filing of UCC financing statements relating solely to operating leases or consignment or bailee arrangements entered into in the Ordinary Course of Business; (e) any right, interest, Lien or title of a licensor, sublicensor, licensee, sublicensee, lessor or sublessor under any license, sublicense, lease, sublease or other similar agreement or in the property being leased or licensed; (f) with regard to any real property, (i) any zoning, building codes and other land use Laws regulating the use or occupancy of real property or the activities conducted thereon, (ii) any zoning restrictions, easements and other reservations, covenants, conditions, oil and gas leases, mineral severances and Liens, (iii) any easements, rights-of-way, building or use restrictions, prescriptive rights, encroachments, protrusions, rights and party walls, and (iv) any matters that would be disclosed by an accurate survey or inspection of the real property used by Seller, in each case, only to the extent that such Liens do not materially and adversely affect Seller; (g) any and all Liens encumbering the underlying fee interest of any real property leased by the Company only to the extent that such Liens do not materially and adversely affect Seller, and (h) Liens set forth on Schedule 1.1(b).

"Person" means an individual, a corporation, a partnership, a limited liability company, a trust, an unincorporated association, a Governmental Entity, or any other entity or body.

"Proceeding" means any suit, litigation, arbitration or other dispute resolution proceeding before any Governmental Entity.

"Purchase Price" has the meaning set forth in Section 2.5(a).

"Purchased Assets" has the meaning set forth in Section 2.1.

"Representatives" of any Person shall mean the directors, managers, officers, employees, consultants, financial advisors, counsel, accountants and other representatives and agents of such Person.

"Retained Liabilities" has the meaning set forth in Section 2.4(b).

"Sale Hearing" means the hearing conducted by the Bankruptcy Court to approve the transactions contemplated by this Agreement or a transaction or series of transactions involving a sale, transfer or other disposition of all or any material portion of the Purchased Assets to another purchaser or purchasers other than the Buyer.

"Sale Motion" has the meaning set forth in Section 6.6.

"Sale Order" means an Order of the Bankruptcy Court, which form is acceptable to Buyer and Seller, and shall, among other things, (a) approve, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by Seller of this Agreement, (ii) the sale of the Purchased Assets to Buyer on the terms set forth herein and free and clear of all Liens and interests (other than included in the Assumed Liabilities and Permitted Liens), and (iii) the performance by Seller of its obligations under this Agreement, (b) authorize and empower Seller to assume and assign to Buyer the Assigned Contracts, if any, (c) find that Buyer is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code and grant Buyer the protections of Section 363(m) of the Bankruptcy Code, (d) find that Buyer is not a successor of Seller, (e) enjoin all Persons holding Liens, claims, and other interests, including rights or claims based on any successor or transferee liability from asserting them against Buyer, (f) find that this Agreement was negotiated, proposed and entered into without collusion, in good faith and from arm's length bargaining positions, (g) find that Seller and Buyer have not engaged in any conduct that would

4891-8457-9180.2

DocuSign Envelope ID: F57AEEC8-F9DF-483D-A358-8FCFDD3F0D02

cause or permit this Agreement to be avoided under Section 363(n) of the Bankruptcy Code, (h) find that this Agreement and the transactions contemplated hereby, are binding upon, and are not subject to rejection or avoidance by, any chapter 7 or chapter 11 trustee of Seller, (i) find that fair and reasonably equivalent value was received in connection with this Agreement, (j) authorize each of Seller and Buyer to execute and file termination statements, instruments of satisfaction, releases and similar documents with respect to all Liens that any Person has with respect to the assets transferred pursuant to this Agreement, (k) order that Buyer is receiving good and marketable title to all Purchased Assets and (l) find that notice was properly given to all holders of any Lien or interest, and to all counterparties to Assigned Contracts, if any.

"Schedule Supplement" has the meaning set forth in Section 6.3.

"Seller" has the meaning set forth in the Preamble hereto.

"Seller Closing Certificate" has the meaning set forth in Section 9.1(c).

"Seller Closing Notice" has the meaning set forth in Section 10.1(c).

"Seller Disclosure Schedules" means the disclosure schedules delivered by Seller concurrently with the execution and delivery of this Agreement.

"Seller's Knowledge" or any similar phrase means the actual, current knowledge of Jeffrey Yordon, Joseph Annoni, John Romano and Nick Campbell after reasonable inquiry of direct reports. For the avoidance of doubt, none of such individuals shall have any personal liability or obligations regarding such knowledge.

"Subsidiary" means any entity with respect to which a specified Person (or a Subsidiary thereof) (a) has the power, through the ownership of securities or otherwise, to elect a majority of the directors or similar managing body or (b) holds a majority of the equity interest.

"Successful Bid" means the highest or otherwise best bid as determined in accordance with the Bidding Procedures, which the Bidding Procedures refers to as the bid of the "Prevailing Purchaser".

"Tax" or "Taxes" means all U.S. federal, state, provincial, local and foreign income, profits, franchise, license, gross receipts, occupation, premium, windfall profits, environmental, customs, duties, capital stock, severance, stamp, payroll, sales, employment, unemployment, disability, use, ad valorem, recapture, unclaimed property, escheat, personal and real property, withholding, excise, production, transfer, alternative minimum, registration, value added, occupancy, estimated and other taxes, charges, fees, levies, or other like assessments, including any interest, penalty, or addition thereto, whether disputed or not.

"Tax Returns" any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Transfer Taxes" means sales, use, transfer, real property transfer, recording, documentary, stamp, registration and stock transfer Taxes and any similar Taxes.

"U.S." or "United States" means the United States of America.

4891-8457-9180.2

DocuSign Envelope ID: F57AEEC8-F9DF-483D-A358-8FCFDD3F0D02

# ARTICLE II
## PURCHASE AND SALE

2.1    **Purchased Assets**. Upon the terms and subject to the conditions of this Agreement, at the Closing, Seller shall sell, transfer, assign, convey and deliver to Buyer, and Buyer shall purchase from Seller, free and clear of all Liens other than Permitted Liens, all of Seller's right, title and interest in and to all of Seller's property and assets, real, personal or mixed, tangible and intangible, of every kind and description, held for use or used in the Business, wherever located (collectively, the "Purchased Assets"), including all of the following (but excluding all of the Excluded Assets):

(a)    [reserved];

(b)    any tangible personal property held by Seller pursuant to a Contract where Buyer assumes the underlying Contract relating to such tangible personal property at the Closing;

(c)    all inventory on hand owned by Seller in connection with the Business (the "Inventory"), and all rights of Seller in any raw materials;

(d)    all Contracts that are listed on Schedule 2.1(d) ("Assigned Contracts"), if any, subject to the provisions of Section 2.3; provided, however, by written notice to the Seller, Buyer may, in its sole and absolute discretion, amend or revise Schedule 2.1(d) (i) at any time within one (1) Business Day prior to the Closing Date, in order to add any Contract to such Schedule 2.1(d) and it shall be automatically included as an Assigned Contract for purposes of this Agreement, or remove any Contract from such Schedule 2.1(d) and it shall automatically be deemed an Excluded Contract for purposes of this Agreement, provided, that Buyer and Seller shall file a notice of revised Schedule 2.1(d) on or prior to the Closing Date, and (ii) at any time after the Closing Date to remove any Contract from such Schedule 2.1(d) in the event that after Closing, (A) the Bankruptcy Court determines (or the parties otherwise agree) that, for any particular Assigned Contract, the actual Cure Costs exceed the estimated Cure Costs set forth in the Seller's Cure Notices entered in the Bankruptcy Case as Docket Nos. 141, 162, 249, and 281, or as it may be subsequently amended (the "Cure Notices") or (B) a timely filed objection to a Cure Cost or to Buyer's assumption and assignment of a Contract is not resolved in a manner that is acceptable to Buyer in its sole discretion, and such removed Contract shall be automatically deemed an Excluded Contract for purposes of this Agreement; provided, that Buyer has notified Seller in writing of the removal of any such Contract no later than five (5) days following the final determination of the actual Cure Cost of such Contract; provided, further that in no event will Buyer pay less than $7,000,000 in Cure Costs, inclusive of the 503(b)(9) Claims. Furthermore, if it is discovered that a Contract should have been listed on the Cure Notices but was omitted therefrom (an "Omitted Contract"), Seller shall, promptly following discovery thereof (but in no event later than three (3) Business Days after such discovery), (A) notify Buyer in writing of such Omitted Contract and the corresponding related Cure Costs thereof (if any) and (B) if requested by Buyer in writing, file a motion with the Bankruptcy Court on notice to the counterparties to such Omitted Contract seeking entry of an order fixing the Cure Costs and approving the assumption and assignment of such Omitted Contract in accordance with this Section 2.1(d) (provided, that no Omitted Contract shall be assumed by and assigned to Buyer unless such Omitted Contract shall be expressly accepted at such time in writing by Buyer as an Assigned Contract);

(e)    all of Seller's rights relating to deposits and prepayments with respect to purchase orders or other Contracts included in the Assigned Contracts, if any;

(f)    the Permits set forth on Schedule 2.1(f), to the extent transferrable and assignable, including all ANDAs used in or in connection with the Business;

8

DocuSign Envelope ID: F57AEEC8-F9DF-483D-A358-8FCFDD3F0D02

(g)     all warranties (express and implied) that continue in effect with respect to any Purchased Asset (including, without limitation, warranties provided for under any Assigned Contract, if any), to the extent assignable;

(h)     all intangible personal property (including Intellectual Property) owned or held by Seller to the extent used exclusively in connection with the Business, including with respect to all existing products and all products in development, but in all cases only to the extent of Seller's interest and only to the extent transferable including, without limitation, the goodwill of the Business, processes, trademarks, trade names, service marks, domain names, catalogues, customer lists and other customer data bases, advertising materials, software programs, and telephone numbers identified with the Business;

(i)     to the extent transferable, all insurance benefits, right and proceeds arising from or relating to the Purchased Assets or the Assumed Liabilities; and

(j)     all Books and Records (including all non-income Tax Returns with respect to the Purchased Assets or the Business, for taxable periods ending on or prior to the Closing Date), except as specifically provided in Section 2.2(k).

2.2     **Excluded Assets**. Notwithstanding anything herein to the contrary, from and after the Closing, Seller shall retain all of its right, title and interest in and to, and there shall be excluded from the sale, conveyance, assignment or transfer to Buyer hereunder, and the Purchased Assets shall not include, the following assets and properties (such retained assets and properties being the "Excluded Assets"):

(a)     all accounts, cash and cash equivalents (including bank account balances, certificates of deposit and other time deposits and petty cash) and marketable and other securities;

(b)     all accounts and notes receivable (whether current or non-current) and all causes of action specifically pertaining to the collection of the foregoing, in each case to the extent arising exclusively out of the operation of the Business;

(c)     all rights under this Agreement and any Ancillary Document;

(d)     all cash deposits and prepaid items relating to or arising in connection with the operation of the Business, other than those described in Section 2.1(e);

(e)     all of the equity interests in Seller;

(f)     all employee benefit plans or benefit arrangements of Seller (including all trusts, insurance policies and administration service Contracts related thereto), and all assets in respect of any such employee benefit plan or benefit arrangement;

(g)     any Contracts between Seller, on the one hand, and any of its Affiliates, on the other hand, except any that are specifically identified as Assigned Contracts, and any accounts or notes receivable due from any Affiliate of Seller to the extent such receivable has been excluded in reports previously provided to Buyer;

(h)     any Contract to which Seller is a party that (i) is not an Assigned Contract or (ii) is an Assigned Contract but is not assumable and assignable pursuant to the terms thereof or as a matter of applicable Law (including, without limitation, any Assigned Contract with respect to which any consent requirement in favor of the counter-party thereto is not satisfied and may not be overridden pursuant to Section 365 of the Bankruptcy Code) (collectively, "Excluded Contracts");

9

DocuSign Envelope ID: F57AEEC8-F9DF-483D-A358-8FCFDD3F0D02

(i)     the organizational documents, minute books, member ledger, books of account or other records having to do with the limited liability company organization of Seller, and all employee related files or records, other than records related to transferred employees, if any;

(j)     all Tax assets (including Tax refunds and prepayments) and income Tax Returns of Seller or any of its Affiliates for any period including, with respect to the Purchased Assets or the Business, for taxable periods ending on or prior to the Closing Date;

(k)     any Books and Records which Seller is required by applicable Law to retain; provided, however, that Seller shall provide Buyer with copies of all such Books and Records at or prior to the Closing, and any Books and Records relating solely to the Excluded Assets or Retained Liabilities;

(l)     all insurance policies of Seller, and all benefits, rights and claims and proceeds thereunder relating to any Excluded Assets or Retained Liabilities;

(m)     all refunds for prepaid insurance premiums or insurance prepayments;

(n)     all claims or causes of action of Seller;

(o)     any tangible personal property held by Seller pursuant to a Contract where Buyer does not assume the underlying Contract relating to such tangible personal property at the Closing;

(p)     any software or other item of intangible property (including Intellectual Property) held by Seller pursuant to a license or other Contract where Buyer does not assume the underlying Contract relating to such intangible personal property at the Closing;

(q)     all preference or avoidance claims and actions of Seller, including, without limitation, any such claims and actions arising under Sections 544, 547, 548, 549, and 550 of the Bankruptcy Code;

(r)     any tangible personal property held by Seller other than as described in Section 2.1(b); and

(s)     the assets specifically set forth on Schedule 2.2.

2.3     **Nonassignable Assets; Assigned Contracts Schedule; Additional Excluded Assets.**

(a)     Nonassignable Assets. Nothing in this Agreement, the Bill of Sale or the Contract Assignments or the consummation of the transactions contemplated hereby or thereby shall be construed as an attempt or agreement to assign or transfer any Purchased Asset (including any Assigned Contract, if any, or Permit) to Buyer which by its terms or by Law is not assignable or transferable without a consent or is cancelable by a third party in the event of an assignment or transfer (a "Nonassignable Asset"), unless and until such consent shall have been obtained (including by virtue of the effect of the Sale Order rendering certain consents to be unnecessary) or Law satisfied. Seller and Buyer shall use diligent and commercially reasonable efforts to obtain any consent that may be required and satisfy any Law necessary to the assignment or transfer of a Nonassignable Asset to Buyer, and Seller shall take all such commercially reasonable actions as may be necessary to effect the assignment or transfer of the Nonassignable Asset. Unless and until any such consent that may be required is obtained or Law satisfied, Seller shall establish an arrangement reasonably satisfactory to Buyer under which Buyer would obtain the claims, rights and benefits and assume the corresponding liabilities and obligations under such Nonassignable Asset

10

DocuSign Envelope ID: F57AEEC8-F9DF-483D-A358-8FCFDD3F0D02

(including by means of any subcontracting, sublicensing or subleasing arrangement) or under which Seller would enforce for the benefit of Buyer any and all claims, rights and benefits of Seller against a third party thereto; provided, that in no event shall Buyer be required to enter into any such arrangement with respect to any Nonassignable Asset for which a required consent is necessary. Seller shall promptly pay over to Buyer all payments received by such Seller in respect of all Nonassignable Assets. If and when the applicable consents or approvals, the absence of which caused the deferral of transfer of any Nonassignable Asset pursuant to this Section, are obtained, the transfer of the applicable Nonassignable Asset to Buyer shall automatically and without further action be effected in accordance with the terms of this Agreement.

(b)      Deemed Consents. As part of the Sale Motion (or, as necessary in one or more separate motions), Seller shall request that by providing adequate notice of its intent to assume and assign any Assigned Contract, if any, the Bankruptcy Court shall deem any non-debtor party to such Assigned Contract that does not file an objection with the Bankruptcy Court during the applicable notice period to have given any required consent to the assumption of the Assigned Contract by Seller and assignment to Buyer if, and to the extent that, pursuant to the Sale Order or other order of the Bankruptcy Court, Seller is authorized to assume and assign such Assigned Contract to Buyer and Buyer is authorized to accept such Assigned Contract pursuant to Section 365 of the Bankruptcy Code.

(c)      Additional Excluded Assets.

(i)      Notwithstanding any other provision of this Agreement to the contrary, until three (3) Business Days prior to the Closing, Buyer will have the right, in its sole and absolute discretion, to provide written notice to Seller of Buyer's election to designate any right, property, interest or other asset (or portion thereof) as an Excluded Asset (including any such asset that was immediately prior to such designation an Purchased Asset), and upon such designation such asset will constitute an Excluded Asset for all purpose of this Agreement. If Buyer exercises its rights in this Section to designate any right, property, interest or other asset (or portion thereof) as an Excluded Asset, then the Parties acknowledge and agree that there will be no increase or reduction in the Purchase Price, or any change in the Assumed Liabilities, as a result of such designation or change in designation, nor will there be any delay to the Closing.

(ii)      To the extent that Buyer makes a valid designation with respect to any asset pursuant to clause (i) above, the applicable Exhibits and Schedules to this Agreement will be deemed to have automatically been updated (without action of any Party or Person) to reflect such designation.

2.4      **Liabilities**.

(a)      Subject to the terms and conditions of this Agreement, at the Closing, Buyer shall assume and agree to perform, pursuant to the Bill of Sale and the Contract Assignments, as applicable, the following Liabilities of Seller (collectively, the "Assumed Liabilities"):

(i)      all of Seller's Liabilities under the Assigned Contracts if any, to the extent arising or attributable to any period after the Closing;

(ii)      all Cure Costs required to be paid pursuant to the Sale Order as a condition to Buyer's assumption of the Assigned Contracts, which will include no less than $7,000,000 in Cure Costs, inclusive of the 503(b)(9) Claims; and

(iii)      all Liabilities arising on or after the Closing Date with respect to the Purchased Assets or Buyer's operation of the Business.

11

DocuSign Envelope ID: F57AEEC8-F9DF-483D-A358-8FCFDD3F0D02

(b)      Except for the Assumed Liabilities described in <u>Section 2.4(a)</u>, Buyer shall not assume, nor shall it agree to pay, perform or discharge, any Liability of Seller or any Affiliate of Seller (collectively, the "<u>Retained Liabilities</u>").

2.5      <u>**Purchase Price**</u>.

(a)      Subject to the provisions of this Agreement, the aggregate consideration to be paid by Buyer to Seller for the Purchased Assets (the "<u>Purchase Price</u>") shall be (i) an amount of cash equal to the sum of (A) 16% of the book value of the Inventory as of the Closing ("<u>Closing Inventory Value</u>"), (B) $8,630,163 in respect of the Intellectual Property, intangible personal property, ANDAs and Permits and (C) $218,000 in respect of all rights of Seller in any raw materials (collectively, (A), (B) and (C) shall be referred to herein as the "<u>Cash Purchase Price</u>"), payable in accordance with <u>Section 3.2(a)</u>, (ii) payment of the 503(b)(9) Claims, and (iii) the assumption of the Assumed Liabilities, which will include not less than $7,000,000 in Cure Costs, inclusive of the 503(b)(9) Claims.  For the avoidance of doubt, if for whatever reason, Seller is unable to convey the raw materials to Buyer at Closing, there shall be no change in the Cash Purchase Price and the sum of $218,000 that was allocated to raw materials shall be reallocated to Intellectual Property.

(b)      By way of example, the book value of the Inventory as of June 19, 2023 was disclosed to Buyer as $32,198,988.  If the Closing Inventory Value is equal to this amount, then the Cash Purchase Price would be calculated as follows: 16% of $32,198,988, or $5,151,838, <u>plus</u> $8,630,163, <u>plus</u> $218,000, or $14,000,000 in aggregate.

(c)      Immediately prior to the Closing, Seller shall prepare in good faith and deliver to Buyer a statement, certified by the chief financial officer (or equivalent officer) of Seller, setting forth the Closing Inventory Value, which statement shall be acceptable to Buyer.

2.6      <u>**Withholding**</u>. Notwithstanding any provision hereof to the contrary, each of Buyer, Seller, and any of their Affiliates shall be entitled to deduct and withhold from any consideration otherwise payable under the terms of this Agreement such amounts as it is required to deduct and withhold pursuant to any provision of Law, including those related to or regarding Taxes; <u>provided</u>, <u>however</u>, that no such withholding shall apply to any payments to Seller hereunder unless Buyer has provided Seller with at least reasonable advance written notice of Buyer's intent to withhold and Buyer reasonably cooperates with Seller to minimize or eliminate such withholding. To the extent that amounts are so deducted and withheld such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made.

**ARTICLE III**
<u>**CLOSING**</u>

3.1      <u>**Closing**</u>. Unless this Agreement shall have been terminated in accordance with <u>Section 10.1</u>, the Parties shall consummate the transactions contemplated by this Agreement (the "<u>Closing</u>"), as promptly as practicable but in no event later than three (3) Business Days after the date on which all conditions set forth in <u>Article IX</u> (except those conditions that are to be satisfied at Closing) have been satisfied (or waived by the Party entitled to the benefit of the same), with such Closing to occur at 11:00 a.m., eastern standard time, or at such other place, date and time as the Parties shall mutually agree in writing (the date on which the Closing occurs, the "<u>Closing Date</u>"). The Closing shall take place via electronic exchange of executed documents and other closing deliveries via email on the Closing Date.

4891-8457-9180.2

DocuSign Envelope ID: F57AEEC8-F9DF-483D-A358-8FCFDD3F0D02

3.2  **Closing Deliveries**.

(a)  Payment of Cash Purchase Price.

(i)  Prior to the execution and delivery of this Agreement by Buyer, Buyer deposited with Pachulski Stang Ziehl & Jones LLP, pursuant to the Bidding Procedures, a "good faith deposit" in an amount equal to $1,000,000.00 (the "Deposit") by wire transfer of immediately available funds, which Pachulski Stang Ziehl & Jones LLP, on behalf of Seller, shall hold subject to the terms of the Bidding Procedures. Subject to the terms of this Section 3.2, at the Closing, the Deposit shall be credited and applied toward payment of the Cash Purchase Price (and paid to Seller). If Seller terminates this Agreement prior to Closing pursuant to Section 10.1(d) (a "Buyer Default Termination"), then the Deposit shall become nonrefundable and shall be paid to Seller for Seller's own account. If this Agreement is terminated prior to Closing for any reason other than a Buyer Default Termination, then the Deposit shall be returned to Buyer promptly. When the Deposit becomes payable to Buyer or Seller pursuant to this Agreement, Buyer and Seller shall jointly instruct Pachulski Stang Ziehl & Jones LLP, or obtain a final order of the Bankruptcy Court, to release the Deposit to Buyer or Seller, as applicable, in accordance with the terms of the Bidding Procedures. The Parties agree that the payment of the Deposit to Seller as a result of a Buyer Default Termination is not a penalty but is liquidated damages in a reasonable amount that will compensate Seller for a Buyer Default Termination, which amount would otherwise be impossible to calculate with precision, and that the Deposit shall be Seller's sole and exclusive remedy with respect to a Buyer Default Termination.

(ii)  At the Closing, Buyer shall pay and deliver to Seller, by wire transfer of immediately available funds to one or more accounts designated by Seller, an amount equal to the Cash Purchase Price (using the Closing Inventory Value to calculate the Cash Purchase Price), *minus* the Deposit.

(b)  Deliveries by Seller at the Closing. At the Closing, Seller shall deliver to Buyer the following:

(i)  a Bill of Sale, Assignment and Assumption Agreement or similar document, in a form acceptable to Buyer and Seller (the "Bill of Sale"), duly executed by Seller;

(ii)  one or more Assignment and Assumption Agreements or similar documents, in a form acceptable to Buyer and Seller, with respect to the Assigned Contracts, if any (collectively, the "Contract Assignments"), duly executed by Seller;

(iii)  an Assignment of Trademarks and Domain Names, in a form reasonably acceptable to Buyer, duly executed by Seller;

(iv)  the Seller Closing Certificate;

(v)  evidence of the consents, authorizations, and approvals set forth on Schedule 3.2(b)(v) (collectively, the "Material Consents");

(vi)  a copy of the Sale Order as entered by the Bankruptcy Court; and

(vii)  a properly completed and duly executed Internal Revenue Service Form W-9 from Athenex, on behalf of Seller; and

13

DocuSign Envelope ID: F57AEEC8-F9DF-483D-A358-8FCFDD3F0D02

(viii)    such other instruments of assignment or conveyance duly executed by the Seller as shall be customary and reasonably requested or reasonably necessary to transfer the Purchased Assets to Buyer in accordance with this Agreement.

(c)    <u>Deliveries by Buyer at the Closing</u>. At the Closing, Buyer shall deliver to Seller the following:

(i)    the Bill of Sale, duly executed by Buyer;

(ii)    the Contract Assignments, duly executed by Buyer;

(iii)    the Buyer Closing Certificate; and

(iv)    a copy of the resolutions of Buyer's governing body, certified by an appropriate authorized officer of Buyer as having been duly and validly adopted and being in full force and effect as of the Closing Date and authorizing the execution and delivery of this Agreement and the Ancillary Documents and performance by Buyer of the transactions contemplated hereby and thereby.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the Seller Disclosure Schedules, which exceptions or disclosures set forth therein will be deemed to be a part of the representations and warranties made hereunder, hereby represents and warrants to Buyer as follows:

4.1    **Existence and Power**. Seller is a limited liability company that is duly organized, validly existing, and in good standing under the Laws of the State of Delaware. Seller has all limited liability company power and authority required to own, lease, or, subject to the provisions of the Bankruptcy Code applicable to debtors in possession, operate the properties and assets now owned, leased or operated by it and to carry on its business as presently conducted. Seller is duly qualified to transact business as a limited liability company (or other entity, as applicable) and is in good standing (or the equivalent thereof, if applicable) as a limited liability company (or other entity, as applicable) authorized to transact business in each jurisdiction in which the nature of the business conducted by it requires such qualification.

4.2    **Authorization**. Subject to entry of the Sale Order, Seller has all requisite power and authority to execute and deliver, and to perform its obligations under, this Agreement and each Ancillary Document to which Seller is a party. The execution, delivery and performance by Seller of this Agreement and such Ancillary Documents and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all necessary limited liability company action on the part of Seller.

4.3    **Enforceability**. This Agreement has been duly executed and delivered by Seller. Upon entry of the Sale Order, this Agreement shall constitute (and each Ancillary Document to which Seller is or will be a party will constitute at or prior to the Closing) a valid and legally binding obligation of Seller, enforceable against Seller in accordance with its terms, assuming that this Agreement and such Ancillary Documents, where applicable, have been duly executed by the other parties thereto, except as enforcement may be limited by General Enforceability Exceptions.

4.4    **Noncontravention**. Subject to entry of the Sale Order, except as set forth on <u>Schedule 4.4(i)</u>, the execution, delivery and performance by Seller of this Agreement or any Ancillary Documents, and the consummation of the transactions contemplated hereby will not (a) violate or conflict with the Organizational Documents of Seller, (b) violate any Law or any Order, in each case applicable to Seller,

4891-8457-9180.2

DocuSign Envelope ID: F57AEEC8-F9DF-483D-A358-8FCFDD3F0D02

(c) constitute a default under, or give rise to termination, cancellation or acceleration of any right or obligation of Seller under, or to a loss of any benefit to which Seller is entitled under any Assigned Contract, if any, binding upon Seller, or (d) result in the creation or imposition of any Lien (other than Permitted Liens) on any asset of Seller. Except as set forth <u>Schedule 4.4(ii)</u> or as may be required under state securities Laws, no permit, consent, approval or authorization of, notice or declaration to, or filing or registration with any Governmental Entity is required to be made or obtained by Seller in connection with the consummation of the transactions contemplated by this Agreement or any Ancillary Document.

4.5 **Proceedings**. There are no Proceedings (other than the Bankruptcy Case) pending or, to Seller's Knowledge, threatened in writing by or against Seller affecting any of the Purchased Assets or the Business or that seek or otherwise are reasonably expected to (x) materially adversely affect the ability of Seller to consummate the transactions contemplated by this Agreement and the Ancillary Documents or (y) prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.

4.6 **Compliance with Laws; Title to Purchased Assets**. Seller is not in violation in any material respect of any Law (including any Environmental Law and the FDCA) to which it is subject. Seller has good and valid title to, or a valid leasehold interest in, all the Purchased Assets, and subject to entry of the Sale Order, may convey the Purchased Assets free and clear of any Lien (excluding any Permitted Liens).

4.7 <u>**Intellectual Property**</u>

(a) <u>Schedule 4.7(a)</u> contains a list as of the date hereof of all material agreements pursuant to which any Intellectual Property is (i) licensed to Seller (excluding generally commercially available, off the shelf software programs licensed pursuant to shrink-wrap or "click to accept" agreements), or (ii) licensed by Seller to any third party (excluding (x) non-exclusive licenses granted in the Ordinary Course of Business and (y) licenses for off-the-shelf software for the internal use of Seller).

4.8 <u>**Brokers**</u>. Except for any financial advisor identified on <u>Schedule 4.8</u> (whose fees shall be paid by Seller), no investment banker, broker, finder, financial advisor or other intermediary is or will be entitled to any fee or commission from Seller in connection with the transactions contemplated by this Agreement.

4.9 <u>**Exclusivity of Representations and Warranties**</u>. Except as set forth in <u>Article IV</u> of this Agreement, neither Seller nor any other Person is making any representation or warranty of any kind or nature whatsoever, oral or written, express or implied, relating to Seller, the Purchased Assets or the Business (including any relating to financial condition, results of operations, assets or liabilities of Seller), and Seller hereby disclaims any such other representations or warranties. Without limiting the generality of the foregoing, neither Seller nor any other Person on behalf of Seller has made or makes, and Seller hereby disclaims, any representation or warranty, whether express or implied, with respect to any projections, forecasts, estimates or budgets made available to Buyer, its Affiliates or any of their respective Representatives (including the reasonableness of the assumptions underlying any of the foregoing).

**ARTICLE V**

<u>**REPRESENTATIONS AND WARRANTIES OF BUYER**</u>

Buyer hereby represents and warrants to Seller as follows:

5.1 <u>**Existence and Power**</u>. Buyer is a corporation duly organized, validly existing, and in good standing under the Laws of the State of Wyoming.

4891-8457-9180.2

DocuSign Envelope ID: F57AEEC8-F9DF-483D-A358-8FCFDD3F0D02

5.2    **Authorization**. Buyer has all requisite power and authority to execute and deliver, and to perform its obligations under, this Agreement and each Ancillary Document to which Buyer is a party or subject. The execution, delivery, and performance by Buyer of this Agreement and such Ancillary Documents and the consummation of the transactions contemplated hereby and thereby (a) are within Buyer's corporate powers and (b) have been duly authorized by all necessary corporate action on the part of Buyer.

5.3    **Enforceability**. This Agreement has been duly executed and delivered by Buyer. This Agreement constitutes (and each Ancillary Document to which Buyer is or will be a party will constitute at or prior to the Closing) a valid and legally binding obligation of Buyer, enforceable against Buyer in accordance with its terms, assuming that this Agreement and such Ancillary Documents, where applicable, have been duly executed by the other parties thereto, except as enforcement may be limited by General Enforceability Exceptions.

5.4    **Governmental and Third Party Authorizations**. No consent, approval or authorization of, declaration to or filing or registration with, any Governmental Entity or any other Person is required to be made or obtained in connection with the execution, delivery and performance by Buyer of this Agreement or any Ancillary Document or the consummation by Buyer of the transactions contemplated by this Agreement or any Ancillary Document.

5.5    **Noncontravention**. The execution, delivery and performance by Buyer of this Agreement or any Ancillary Documents, and the consummation of the transactions contemplated hereby and thereby, will not (a) violate the Organizational Documents of Buyer, (b) violate any Law or Order, in each case applicable to Buyer, or (c) constitute a default under, or give rise to termination, cancellation or acceleration of any right or obligation of Buyer or to a loss of any benefit to which Buyer is entitled, under any contract, agreement, instrument, commitment or arrangement binding upon Buyer.

5.6    **Brokers**. No investment banker, broker, finder or other intermediary is or will be entitled to any fee or commission from Buyer or any of its Affiliates in connection with the transactions contemplated by this Agreement or any of the Ancillary Documents.

5.7    **Proceedings**. There are no Proceedings pending or, to the knowledge of Buyer, threatened against Buyer or any of its Affiliates that seek or otherwise are reasonably expected to (x) materially adversely affect the ability of Buyer to consummate the transactions contemplated by this Agreement and the Ancillary Documents or (y) prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.

5.8    **Financial Capability**.

(a)    Sufficient Funds. Buyer has, and will have on the Closing Date, unrestricted funds available sufficient to (i) consummate the transactions contemplated by this Agreement, including to make all payments at the Closing contemplated by Section 3.2(a), including payment of the Cash Purchase Price; and (ii) pay all costs and expenses and other amounts required to be paid by Buyer in connection with the Closing or otherwise. Buyer has, and at the Closing will have, the resources and capabilities (financial or otherwise) to perform its obligations hereunder, and Buyer has not incurred any Liability or restriction of any kind that would impair or adversely affect such resources and capabilities.

(b)    Obligations Not Conditioned on Financings. In no event shall the receipt or availability of any funds by Buyer or any Affiliate or any other financing be a condition to any of Buyer's obligations under this Agreement. Buyer understands and acknowledges and agrees that under the terms of this Agreement, Buyer's obligation to consummate the transactions contemplated by this Agreement is not

16

DocuSign Envelope ID: F57AEEC8-F9DF-483D-A358-8FCFDD3F0D02

in any way contingent upon or otherwise subject to Buyer's consummation of any financing arrangements, Buyer's obtaining any financing, or the availability, grant, provision or extension of any financing to Buyer.

5.9    **Solvency**. Buyer is solvent (a) as of the date of this Agreement and (b) at and immediately after the Closing, after giving effect to the transactions contemplated hereby (including the payment of the Cash Purchase Price and all other amounts required to be paid, borrowed or refinanced in connection with the consummation of the transactions contemplated by this Agreement and all related fees and expenses).

5.10    **Independent Investigation**. Buyer has conducted its own independent investigation, review and analysis of Seller, the Business, the Purchased Assets and the Assumed Liabilities, and acknowledges that it has been provided adequate access to the personnel, properties, premises, and other documents and data of Seller for such purpose. Buyer acknowledges and agrees that: (a) in making its decision to enter into this Agreement and consummate the transactions contemplated by this Agreement, Buyer has relied solely upon its own investigation and the express representations and warranties of Seller set forth in Article IV of this Agreement (including related portions of the Seller Disclosure Schedules); and (b) neither Seller nor any other Person has made any representation or warranty as to Seller, the Business, the Purchased Assets or the Assumed Liabilities, except as expressly set forth in Article IV of this Agreement. Buyer will accept the Purchased Assets at the Closing "AS IS", "WHERE IS," and "WITH ALL FAULTS." In connection with Buyer's investigation of Seller, Buyer and its Affiliates have received from or on behalf of Seller certain estimates, projections, forecasts and plans, including projected statements of operating revenues and income from operations of Seller and certain business plan information of Seller. Buyer acknowledges that there are uncertainties inherent in attempting to make such estimates, projections and other forecasts and plans, that Buyer is familiar with such uncertainties, that Buyer is taking full responsibility for making its own evaluation of the adequacy and accuracy of all estimates, projections and other forecasts and plans so furnished to it (including the reasonableness of the assumptions underlying such estimates, projections and forecasts), and that Buyer shall have no claim against Seller or any of its Affiliates or any Representatives of any of the foregoing with respect thereto.

5.11    **Exclusivity of Representations and Warranties** Except as set forth in Article V of this Agreement, neither Buyer nor any other Person is making any representation or warranty of any kind or nature whatsoever, oral or written, express or implied, relating to Buyer or its Affiliates, and Buyer hereby disclaim any such other representations or warranties.

## ARTICLE VI
## PRE-CLOSING COVENANTS

6.1    **Conduct of Business**. Except as set forth on Schedule 6.1, as contemplated by this Agreement, as required by Law, as prohibited or restricted by the Bankruptcy Code, to the extent Seller does not have adequate funding therefor in the Bankruptcy Case, as prohibited by any debtor-in-possession financing in the Bankruptcy Case, or as Buyer may otherwise consent to in writing (which consent (x) shall not be unreasonably withheld, conditioned or delayed and (y) shall be deemed to have been granted if not affirmatively withheld in writing within three (3) days of Seller's written request therefor), from the date hereof through the Closing:

(a)    Seller shall:

(i)    maintain the material items of tangible personal property in the same condition as they were on the date of this Agreement, subject to reasonable wear and tear and disposal consistent with the Ordinary Course of Business;

DocuSign Envelope ID: F57AEEC8-F9DF-483D-A358-8FCFDD3F0D02

(ii)     subject to any restrictions imposed by the filing and pendency of the Bankruptcy Case, perform all of its obligations under all Assigned Contracts, if any (but, specifically excluding the obligation to pay any Cure Costs owing to the counterparties thereto);

(iii)     maintain its Books and Records in accordance with past practice;

(iv)     comply in all material respects with all applicable Laws; or

(v)     agree to do any of the foregoing; and

(b)     Seller shall not:

(i)     sell, lease, transfer, or assign any of its material Purchased Assets, other than in the Ordinary Course of Business;

(ii)     make any material increase to the base compensation of any of its directors, managers, employees, or officers, except in the Ordinary Course of Business, except as may be required by any Law or Contract;

(iii)     enter into any employment Contract or collective bargaining agreement;

(iv)     terminate any Assigned Contract, if any (other than upon any expiration of the term of any Assigned Contract), materially amend any Assigned Contract, if any, or enter into any Contract that would be an Assigned Contract if such Contract was in effect on the date hereof, in each case, other than in the Ordinary Course of Business;

(v)     subject any of the Purchased Assets to any Liens, except for Permitted Liens;

(vi)     commence, settle or propose to settle any Proceedings (other than the Bankruptcy Case) that could reasonably be expected to materially diminish the value of the Purchased Assets or impair title thereto; or

(vii)     agree to do any of the foregoing.

The provisions of this Section 6.1 are not intended to be, nor will they be construed as, an endeavor on the part of Seller or Buyer to implement the transactions contemplated hereunder prior to the Closing (and satisfaction of the conditions in Article IX), and the Parties agree that Buyer will not prior to the Closing be entitled to exercise any control over the business or affairs of Seller.

6.2     **Pre-Closing Access to Information**.

(a)     From and after the date hereof until the earlier of the Closing Date or the termination of this Agreement in accordance with its terms, upon reasonable notice, and subject to restrictions contained in any confidentiality agreements to which Seller is subject, Seller shall provide to Buyer and its authorized representatives during regular business hours reasonable access to all books and records of and documents and other information regarding Seller (in a manner so as to not unreasonably interfere with the normal business operations of Seller). Notwithstanding anything to the contrary set forth in this Agreement, during the period from the date hereof until the Closing, neither Seller nor any of its Affiliates (including Seller) shall be required to disclose to Buyer or any of its representatives (i) any information (A) if doing so would violate any Contract, fiduciary duty or Law to which Seller or any of its

4891-8457-9180.2

DocuSign Envelope ID: F57AEEC8-F9DF-483D-A358-8FCFDD3F0D02

Affiliates (including Seller) is a party or is subject, (B) if Seller reasonably determined upon the advice of counsel that doing so could result in the loss of the ability to successfully assert attorney-client and work product privileges, (C) if Seller or any of its Affiliates, on the one hand, and Buyer or any of its Affiliates, on the other hand, are adverse parties in a litigation and such information is reasonably pertinent thereto, or (D) if Seller reasonably determines that such information should not be disclosed due to its competitively sensitive nature or (ii) any information relating to Taxes or Tax Returns other than information relating to Seller. For the avoidance of all doubt, nothing in this Section 6.1(a) shall be deemed to give rise to a contingency, condition or similar right regarding Buyer's satisfaction with any information of any kind to which Buyer is given access prior to the Closing Date.

(b)      All information disclosed pursuant to Section 6.2(a), together with the terms of this Agreement and the information disclosed on Seller Disclosure Schedules, shall be treated as "Confidential Information" pursuant to the terms of the Confidentiality Agreement, the provisions of which are by this reference hereby incorporated herein.

6.3      **Supplemental Disclosure**. From time to time prior to the Closing, Seller shall have the right (but not the obligation) to supplement or amend Seller Disclosure Schedules with respect to any matter arising after the date hereof or, with respect to representations and warranties qualified by Seller's Knowledge, of which Seller becomes aware after the date hereof (each a "Schedule Supplement"), and each such Schedule Supplement shall automatically be deemed to be incorporated into and to supplement and amend Seller Disclosure Schedules. Any disclosure in any such Schedule Supplement shall not be deemed to have cured any inaccuracy in or breach of any representation or warranty contained in this Agreement, including for purposes of termination rights contained in this Agreement or of determining whether or not the conditions in Article IX have been met; provided, however, that if as a result of matters disclosed in such Schedule Supplement, Buyer has the right to (pursuant to Section 10.1), but does not elect to, terminate this Agreement within three Business Days of its receipt of such Schedule Supplement, then Buyer shall be deemed to have waived all conditions to its obligations hereunder or rights to terminate this Agreement with respect to the matters disclosed therein under Section 9.1 and Section 10.1 or otherwise; provided such Schedule Supplements may be considered by Buyer in its consideration of future Schedule Supplements for purposes of determining whether or not the conditions in Article IX have been met.

6.4      **Efforts to Close**.

(a)      Subject to the terms of this Agreement, each of Buyer and Seller shall use their respective commercially reasonable efforts to cause the conditions to Closing to be satisfied and for the Closing to occur as promptly as practicable.

(b)      In the event any Proceeding by any Governmental Entity or other Person is commenced which challenges the validity or legality of the transactions contemplated hereby or seeks damages in connection therewith, the Parties agree to cooperate and use reasonable efforts to defend against such Proceeding and, if an injunction or other order is issued in any such action, suit or other proceeding, the Parties agree to take reasonable actions to have such injunction or other order lifted, in order to expeditiously consummate the consummation of the transactions contemplated by this Agreement prior to the Outside Date; provided, however, nothing in this Section 6.4(b) shall be deemed to extend or otherwise affect the Outside Date or the Parties' rights in connection therewith.

(c)      The Parties acknowledge that certain consents to and notices in respect of the transactions contemplated by this Agreement may be required from or to parties to contracts, leases, licenses or other agreements to which Seller is a party. During the period between the date hereof and the Closing Date, Seller will use its commercially reasonable efforts (but without any obligation to pay any fee or charge

4891-8457-9180.2

DocuSign Envelope ID: F57AEEC8-F9DF-483D-A358-8FCFDD3F0D02

or the like in connection with such efforts), and Buyer will reasonably cooperate with Seller, to obtain such consents.

(d)   Buyer acknowledges and agrees that (i) Seller and its Affiliates have no responsibility for any financing that Buyer may raise in connection with the consummation of the transactions contemplated by this Agreement and the Ancillary Documents, (ii) it is not a condition to Closing under this Agreement (nor to the consummation of the transactions contemplated by this Agreements and the Ancillary Documents), for Buyer to obtain any equity or debt financing, and (iii) Buyer does not have the right to terminate this Agreement for failure to obtain any equity or debt financing.

6.5    **Contact with Customers, Suppliers and Other Business Relations**. During the period from the date of this Agreement until the earlier of the Closing or the termination of this Agreement in accordance with its terms, Buyer hereby agrees that it is not authorized to and shall not (and shall not permit any of its Representatives or Affiliates to) contact any employee, customer, supplier, distributor or other material business relation of Seller, regarding Seller, its business or the transactions contemplated by this Agreement without the prior written (including by e-mail) consent of Seller, which consent will not be unreasonably withheld, conditioned or delayed.

6.6    **Bankruptcy Matters**. Seller has filed a motion (the "Sale Motion") for entry of a Sale Order from the Bankruptcy Court. If requested by Seller or the Bankruptcy Court, Buyer shall provide adequate assurance of future performance (satisfactory to the Bankruptcy Court) to the counterparties to the Assigned Contracts, if any, and, if Buyer fails to provide such adequate assurances to the satisfaction of the Bankruptcy Court, resulting in the exclusion of any one or more Assigned Contracts, if any, from the Purchased Assets, such exclusion shall not result in any reduction of the Purchase Price or give rise to any right of Buyer to terminate this Agreement pursuant to Section 10.1 or otherwise. Seller and Buyer shall use commercially reasonable efforts to obtain the Sale Order. As provided in Section 9.1(f) and Section 9.2(f), both Buyer's and Sellers' obligations to consummate the transactions contemplated in this Agreement are conditioned upon the Bankruptcy Court's entry of the Sale Order. To the extent of any conflict between this Agreement and the Sale Order, the terms of the Sale Order shall prevail.

**ARTICLE VII**
**ACCESS TO BOOKS AND RECORDS POST-CLOSING**

After the Closing, Buyer shall use reasonable efforts to maintain until the fifth anniversary of the Closing Date all Books and Records relating to Seller in the manner such Books and Records are maintained immediately prior to the Closing Date in all material respects. For a period of five years following the Closing, Buyer shall provide Seller and its Representatives (or any successor thereto, including any liquidating trustee) with such Books and Records as Seller or its Representatives (or any successor thereto, including any liquidating trustee) may reasonably request in connection with any Proceeding to which Seller is a party (including, without limitation, in connection with Seller's (or its successor's) administration of the Bankruptcy Case) or in connection with the requirements of any Laws applicable to Seller. Buyer shall not be obligated to provide the other party with access to any books or records (including personnel files) pursuant to this Article VII where such access would violate any Law or any attorney-client privilege. Buyer may require Seller and its Representatives (or any successor thereto, including any liquidating trustee) to execute a non-disclosure agreement prior to providing access to Books and Records.

**ARTICLE VIII**
**COVENANTS OF BUYER AND SELLERS**

8.1    **Public Announcements**. Neither Buyer nor Seller shall, nor shall any of their respective controlled Affiliates (including, with respect to Seller prior to the Closing, and Buyer after Closing, Seller),

4891-8457-9180.2

DocuSign Envelope ID: F57AEEC8-F9DF-483D-A358-8FCFDD3F0D02

without the prior written approval of both Buyer and Seller, issue any press release or otherwise make any public statement with respect to this Agreement or the transactions contemplated by this Agreement (any such press release or public statement so approved by the Parties, an "Agreed Statement"), provided that such restrictions on press releases and public statements shall not apply to (i) any disclosure as may be required by applicable Law or by obligations pursuant to any listing agreement with any national securities exchange or stock market, in which case the Party required to make the release or announcement shall allow the other Party reasonable time to comment on such release or announcement in advance of such issuance, (ii) any disclosure made in connection with the enforcement of any right or remedy relating to this Agreement or the Ancillary Documents or the transactions contemplated hereby or thereby, (iii) any disclosure that is consistent with (and does not reveal any information beyond what is already included in) a prior Agreed Statement, or (iv) any disclosure made in the Bankruptcy Case that is required in connection with the filing and pendency of the Bankruptcy Case or appropriate in the furtherance of such filing, of filings thereafter made in the Bankruptcy Case, or of the transactions contemplated herein (including, without limitation, the Sale Motion).

8.2   **Tax Matters**

(a)   Prorations. Personal property, ad valorem, use and intangible taxes and assessments, common area maintenance charges, utility charges and rental payments with respect to the Purchased Assets and any real property leased by the Company (collectively, "Charges") shall be prorated on a per diem basis and apportioned on a calendar year basis between Seller, on the one hand, and Buyer, on the other hand, as of the date of the Closing. Seller shall be liable for that portion of such Charges relating to, or arising in respect of, periods on or prior to the Closing Date, and Buyer shall be liable for that portion of such Charges relating to, or arising in respect of, any period after the Closing Date.

(b)   Transfer Taxes. Buyer shall pay all Transfer Taxes arising out of or in connection with the transactions contemplated by this Agreement. Buyer shall file all necessary Tax Returns and other documentation with respect to all such Transfer Taxes and if required by applicable Law, Seller shall join in the execution of any such Tax Returns and other documentation.

(c)   Allocation of Purchase Price. The Purchase Price and other items required to be included under Section 1060 of the Code shall be allocated among the Purchased Assets in accordance with the allocation principles set forth on Exhibit A (the "Allocation"). No later than 90 days following the Closing, Buyer shall, after consultation with Seller, prepare and provide to Seller an Allocation prepared pursuant to this Section 8.2(c). Such Allocation shall be binding on the Parties, including Seller so long as such Allocation is reasonable. Seller shall timely and properly prepare, execute, file and deliver all documents, forms and other information as Buyer may reasonably request to prepare the Allocation. In case of any adjustment to the Purchase Price, requiring an amendment to the Allocation, Buyer shall prepare and deliver such amended Allocation to Seller, which shall be prepared in a manner consistent with the Allocation, and if the Allocation is disputed by any Governmental Entity, the Party receiving notice of such dispute shall promptly notify the other Party.

8.3   **Assigned Contracts; Adequate Assurance and Performance**

(a)   With respect to each Assigned Contract, if any, Buyer will deliver within reasonable time after any request from Seller information it believes to be sufficient to demonstrate Buyer's adequate assurance of the future performance by Buyer of each such Assigned Contract, if any, as required under Section 365 of the Bankruptcy Code, which information Seller will be permitted to disseminate to any third party that is a party to any 365 Contract. In the event Buyer cannot demonstrate adequate assurance of future performance with respect to an Assigned Contract, if any, at Buyer's election, such Assigned Contract shall become an Excluded Contract.

4891-8457-9180.2

DocuSign Envelope ID: F57AEEC8-F9DF-483D-A358-8FCFDD3F0D02

(b)     From and after Closing, Buyer will pay, perform or satisfy the Assumed Liabilities, if any, from time to time and as such Assumed Liabilities become due and payable or are required to be performed or satisfied in accordance with their respective terms.

(c)     Without limiting the provisions of Section 8.3(a), Buyer acknowledges that neither Seller nor any Subsidiary of Seller will have any duty to maintain any bonds, letters of credit, guarantees, cash deposits or insurance to secure performance or payment under any Assigned Contracts, if any, after the Closing or otherwise with respect to the Business.

8.4     **Cure Costs; Accrued Liabilities**. Buyer shall pay, or shall cause to be paid, pursuant to Section 365 of the Bankruptcy Code and the Sale Order, any Cure Costs relating to the Assigned Contracts, if any, as and when finally determined by the Bankruptcy Court pursuant to the procedures set forth in the Sale Order.

8.5     **Wrong-Pocket**.

(a)     If, at any time following the Closing, either Party becomes aware that any Purchased Asset (including any accounts and notes receivable received by Seller after Closing) which should have been transferred to, or any Assumed Liability (whether arising prior to, at or following the Closing) which should have been assumed by, Buyer pursuant to the terms of this Agreement was not transferred to or assumed by Buyer as contemplated by this Agreement, then (i) Seller shall promptly transfer or cause its Affiliates to transfer such Purchased Asset to Buyer, and (ii) Buyer shall promptly assume or cause its Affiliates to assume such Assumed Liability, in each case for no consideration.

(b)     In the event that either Party receives any payment with respect to goods or services provided by the other Party following the Closing or that is otherwise for the account of the other Party or any Affiliate thereof, such Party shall hold such amounts in trust for the other Party, without interest thereon, and promptly, but no later than five (5) days, transfer or deliver to the other Party any cash, checks, electronic funds transfers or other such forms of payment so received.

(c)     If, at any time following the Closing, either Party becomes aware that any Excluded Asset which should have been retained by, or any Retained Liability (whether arising prior to, at or following the Closing) which should have been retained by, Seller pursuant to the terms of this Agreement was transferred to or assumed by Buyer, then (i) Buyer shall promptly transfer or cause its Affiliates to transfer such Excluded Asset to Seller, and (ii) Seller shall promptly assume or cause its Affiliates to assume such Retained Liability, in each case for no consideration.

8.6     **Intellectual Property License**.

(a)     Seller shall cause Athenex, Inc. to assign to Buyer, effective as of the Closing Date, all right, title and interest in, to and under the ACCURASEE, ACCURASEE PACKAGING AND LABELING (Stylized), SEECURE and SEECURE (Stylized) trademarks (collectively, the "Business Trademarks"), including but not limited to U.S. Trademark Reg. Nos. 6,824,862 and 6,824,861 and U.S. Trademark App. Serial Nos. 90/843,696 and 90/843,692, any all goodwill associated therewith, all registrations therefore, all common law rights therein, any and all trademark and/or service mark rights related thereto and all other rights associated with the Business Trademarks, and to any and all past, present and future causes of action (either in law or in equity), and the right to enforce any rights and file any causes of action, including the right to recover damages for any past, present or future infringement or misappropriation of the Business Trademarks.

22

DocuSign Envelope ID: F57AEEC8-F9DF-483D-A358-8FCFDD3F0D02

(b)     If (i) Seller used the ATHENEX® trademark (the "Athenex Trademark") with respect to the sale of products in the Ordinary Course of Business prior to the Closing, and (ii) after the Closing, Buyer is required to use the Athenex Trademark in connection with Inventory Sale Purposes, then Seller shall cause Athenex to grant to Buyer a non-exclusive, paid-up, royalty-free right and license to use the Athenex Trademark solely with respect to Inventory Sale Purposes, pursuant to a license agreement acceptable to Athenex and Buyer.  As used herein, "Inventory Sale Purposes" means (A) the marketing, advertising, distribution, sale and offer for sale of any inventory and stock in trade included in the Purchased Assets; and (B) the manufacture, packaging, marketing, advertising, distribution, sale and offer for sale of any other products of the Business purchased or ordered for purchase by Seller's customers on or before the date hereof.

## ARTICLE IX
## CONDITIONS TO CLOSING

9.1     **Conditions to Obligation of Buyer**.  The obligation of Buyer to consummate the transactions contemplated by this Agreement is subject to the satisfaction (or waiver by Buyer in its sole discretion) of the following conditions:

(a)     The representations and warranties of Seller contained in Article IV of this Agreement shall be true and correct in all respects as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects), except where the failure of such representations and warranties to be true and correct would not have a Material Adverse Effect.

(b)     Seller shall have performed or complied in all material respects with all obligations and covenants required by this Agreement to be performed or complied with by Seller, on or prior to the Closing Date.

(c)     Buyer shall have received a certificate, dated as of the Closing Date and signed by an authorized officer of Seller, to the effect that the conditions set forth in Sections 9.1(a) and 9.1(b) have been satisfied (the "Seller Closing Certificate").

(d)     All Material Consents shall have been obtained (including, in the case of consents to assignment of Assigned Contracts, if any, by virtue of the effect of the Sale Order rendering certain consents to be unnecessary) or made, as applicable.

(e)     No temporary restraining order, preliminary or permanent injunction or other Order preventing the consummation of the transactions contemplated by this Agreement shall be in effect, and there shall be no proceeding brought by any Governmental Entity pending before any court of competent jurisdiction seeking such an Order.

(f)     The Bankruptcy Court shall have entered the Sale Order in accordance with Section 6.6, and the Sale Order shall be unstayed and in full force and effect as of the Closing Date.

(g)     Seller has made or is prepared to immediately make all of the deliveries required by Section 3.2(b).

(h)     To the extent any ANDAs associated with the Assigned Contracts are held by an Affiliate of Seller, Seller has caused its applicable Affiliate(s), including Athenex, to assign such abbreviated new drug applications to Buyer, effective upon Closing.

4891-8457-9180.2

DocuSign Envelope ID: F57AEEC8-F9DF-483D-A358-8FCFDD3F0D02

9.2    <u>**Conditions to Obligation of Seller**</u>. The obligation of Seller to consummate the transactions contemplated by this Agreement is subject to the satisfaction (or waiver by Seller, in its sole discretion) of the following conditions:

(a)    The representations and warranties of Buyer set forth in <u>Article V</u> of this Agreement shall be true and correct in all respects as of the Closing Date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects), except where the failure of such representations and warranties to be true and correct would not have a not have a material adverse effect on Buyer's ability to consummate the transactions contemplated hereby.

(b)    Buyer shall have performed or complied in all material respects with all obligations and covenants required by this Agreement to be performed or complied with by Buyer on or prior to the Closing Date.

(c)    Seller shall have received a certificate dated as of the Closing Date by an authorized officer of Buyer to the effect that the conditions set forth in <u>Sections 9.2(a)</u> and <u>9.2(b)</u> have been satisfied (the "<u>Buyer Closing Certificate</u>").

(d)    All Material Consents shall have been obtained (including, in the case of consents to assignment of Assigned Contracts, if any, by virtue of the effect of the Sale Order rendering certain consents to be unnecessary) or made, as applicable.

(e)    No temporary restraining order, preliminary or permanent injunction or other Order preventing the consummation of the transactions contemplated by this Agreement shall be in effect, and there shall be no proceeding brought by any Governmental Entity pending before any court of competent jurisdiction seeking such an Order.

(f)    The Bankruptcy Court shall have entered the Sale Order in accordance with <u>Section 6.6</u>, and the Sale Order shall be unstayed and in full force and effect as of the Closing Date.

(g)    Buyer has made or is prepared to immediately make all of the deliveries required by <u>Sections 3.2(a)</u> and <u>3.2(c)</u>.

9.3    <u>**Frustration of Closing Conditions**</u>. No Party may rely on or assert the failure of any condition set forth in this <u>Article IX</u>, as the case may be, if such failure results from or was caused primarily by such Party's failure to comply with any provision of this Agreement.

9.4    <u>**Waiver of Conditions**</u>. All conditions set forth in this <u>Article IX</u> will be deemed to have been satisfied or waived from and after the Closing.

**ARTICLE X**
**<u>TERMINATION</u>**

10.1    <u>**Termination**</u>. This Agreement may be terminated, and the transactions contemplated herein may be abandoned, prior to the Closing solely as follows; <u>provided</u> that any Party desiring to terminate this Agreement pursuant to this <u>Section 10.1</u> shall give written notice of such termination to the other Parties to this Agreement:

(a)    by the mutual written consent of Seller and Buyer;

24

DocuSign Envelope ID: F57AEEC8-F9DF-483D-A358-8FCFDD3F0D02

(b)      by either Buyer or Seller:

(i)      if the Closing shall not have occurred on or before June 30, 2023 (the "Outside Date"); provided, if all conditions specified in Article IX have been satisfied or waived as of the initial Outside Date (or, with respect to those conditions which, by their nature can only be satisfied at the Closing, would reasonably be capable of satisfaction as of such date), other than the conditions set forth in Section 9.1(f) and Section 2.2(f), then the Outside Date shall be further extended by five (5) Business Days, if either Party notifies the other Party in writing on or prior to the initial Outside Date of its election to extend the Outside Date to such date (such election shall be at each Party's sole discretion, except as hereafter provided); provided, further, that a Party may not (A) terminate this Agreement pursuant to this Section 10.1(b), or (B) elect to extend the Outside Date pursuant to this Section 10.1(b)(i), if such Party is in material breach of any of its representations, warranties, covenants or agreements contained herein and such material breach is the primary cause that the Closing has not occurred by the Outside Date (as may be extended);

(ii)      if any Governmental Entity shall have issued an Order or taken any other action permanently enjoining, restraining or otherwise prohibiting the Closing and such Order or other action shall have become final and nonappealable; provided, that the Party seeking to terminate this Agreement pursuant to this Section 10.1(b)(i) shall have used reasonable efforts to remove such Order, injunction, restraint or prohibition, and such Order, injunction, restraint or prohibition shall not have been principally caused by the breach by such Party of its covenants or agreements under this Agreement;

(iii)      upon the closing of a Successful Bid other than the transactions contemplated by this Agreement; or

(iv)      if, after entry, either the Bidding Procedures Order, or Sale Order ceases to be in full force and effect.

(c)      by Buyer:

(i)      if any of the representations or warranties of Seller set forth in Article IV shall not be true and correct such that the condition to Closing set forth in Section 9.1(a) would not be satisfied and the breach or breaches causing such representations or warranties not to be true and correct is not cured within three (3) days after written notice thereof is delivered from Buyer to Seller; provided, that Buyer shall not have the right to terminate this Agreement pursuant to this Section 10.1(c) if Buyer is then in material violation or breach of any of its covenants, obligations, representations or warranties set forth in this Agreement and such violation or breach would give rise to the failure of a condition set forth in Section 9.2(a) or Section 9.2(b);

(ii)      if all of the conditions set forth in Section 9.1 (not including conditions which are to be satisfied by actions taken at the Closing; provided that such conditions shall have been capable of being satisfied as of the date of termination of this Agreement) have been satisfied or validly waived by Seller, Buyer has given notice to Seller in writing that Buyer is prepared to consummate the transactions contemplated by this Agreement (a "Buyer Closing Notice"), and Seller fails to consummate the transactions contemplated by this Agreement on the date the Closing should have occurred pursuant to Section 3.1, or, if later, on the Business Day immediately following the date of delivery of such Buyer Closing Notice;

(iii)      if Seller files a motion (without Buyer's consent) to have the Bankruptcy Court enter an Order dismissing or converting the Bankruptcy Case into a case under Chapter 7 of the Bankruptcy Code or appointing a trustee in the Bankruptcy Cases or appointing an examiner with enlarged

25

DocuSign Envelope ID: F57AEEC8-F9DF-483D-A358-8FCFDD3F0D02

power related to the operation of the Business (beyond those set forth in Section 1106(a)(3) or (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code or the occurrence of any of the foregoing; or

(iv)    if any creditor of Seller or its Affiliates obtains relief from the stay to foreclose on, or otherwise take possession of, a material portion of the Purchased Assets.

(d)    by Seller:

(i)    if any of the representations or warranties of Buyer set forth in Article V shall not be true and correct such that the condition to Closing set forth in Section 9.2(a) would not be satisfied and the breach or breaches causing such representations or warranties not to be true and correct is not cured within three (3) days after written notice thereof is delivered from Seller to Buyer; provided, that Seller shall not have the right to terminate this Agreement pursuant to this Section 10.1(d) if Seller is then in material violation or breach of any of its covenants, obligations, representations or warranties set forth in this Agreement; or

(ii)    if all of the conditions set forth in Section 9.2 (not including conditions which are to be satisfied by actions taken at the Closing; provided that such conditions shall have been capable of being satisfied as of the date of termination of this Agreement) have been satisfied or validly waived by Buyer, Seller has given notice to Buyer in writing that Seller is prepared to consummate the transactions contemplated by this Agreement (a "Seller Closing Notice"), and Buyer fails to consummate the transactions contemplated by this Agreement on the date the Closing should have occurred pursuant to Section 3.1, or, if later, on the Business Day immediately following the date of delivery of such Seller Closing Notice.

10.2    **Effect of Termination**. In the event of the termination of this Agreement pursuant to Section 10.1, this entire Agreement shall forthwith become void (and there shall be no liability or obligation on the part of Buyer, Seller or its officers, directors or equityholders) with the exception of (i) the provisions of Section 3.2(a)(i), Section 6.2(b), this Section 10.2 and Article XII, together with all applicable defined terms set forth in Article I, each of which provisions shall survive such termination and remain valid and binding obligations of the Parties and (ii) any Liability of any Party for any willful breach of this Agreement prior to such termination. For the avoidance of doubt, the Confidentiality Agreement shall survive any termination of this Agreement in accordance with its terms and shall automatically be extended until such date that is two years following the date of termination of this Agreement, and nothing in this Article X shall be construed to discharge or relieve any party to the Confidentiality Agreement of its obligations thereunder. In the event of termination pursuant to Section 10.1, the terminating Party must give written notice thereof, specifying the provision pursuant to which the Agreement is being terminated, to the other Party, and this Agreement will terminate (subject to this Section 10.2) and the purchase of the Purchased Assets hereunder will be abandoned without further action by Buyer or Seller.

## ARTICLE XI
## SURVIVAL AND RELEASE

11.1    **Survival**. The representations and warranties of the Parties and, except as provided in the last sentence of this Section 11.1, contained in this Agreement and in any certificate delivered pursuant to this Agreement shall terminate upon the Closing. Only the covenants and agreements in this Agreement that by their terms survive the Closing (or that contemplate action or impose obligations after the Closing) shall so survive the Closing in accordance with their respective terms.

26

DocuSign Envelope ID: F57AEEC8-F9DF-483D-A358-8FCFDD3F0D02

## ARTICLE XII
## <u>MISCELLANEOUS</u>

12.1     <u>Notices</u>. Any notice, request, demand, waiver, consent, approval or other communication which is required or permitted hereunder shall be in writing and shall be deemed given: (a) on the date established by the sender as having been delivered personally, (b) on the date delivered by a private courier as established by the sender by evidence obtained from the courier, (c) on the date delivered by email (if sent prior to 5:00 p.m. New York City time, or if sent later, then on the next Business Day), or (d) on the fifth Business Day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications, to be valid, must be addressed as follows:

If to Buyer, to:

Sagent Pharmaceuticals
1901 N. Roselle Road, Suite 450
Schaumburg, IL 60195
Attn: Brennan Bolt
Email: bbolt@sagentpharma.com

With a required copy (which shall not constitute notice) to:

Gray Reed & McGraw LLP
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Attn: Lydia Webb and Brock Niezgoda
Email: lwebb@grayreed.com and bniezgoda@grayreed.com

If to Seller, to:

Athenex, Inc.
Conventus Building
1001 Main Street, Suite 600
Buffalo, NY 14203
Attn: Legal Department
Email: legal-agreements@athenex.com

With a required copy (which shall not constitute notice) to:

Harter Secrest & Emery LLP
1600 Bausch & Lomb Place
Rochester, New York 14604-2711
Attn: Alexander R. McClean
Facsimile No.: (585) 232-2152
E-mail: amcclean@hselaw.com

and

DocuSign Envelope ID: F57AEEC8-F9DF-483D-A358-8FCFDD3F0D02

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd, Suite 1300
Los Angeles, CA 90067
Attn: Richard Pachulski
Email: rpachulski@pszjlaw.com
Attn: Richard Gruber
Email: rgruber@pszjlaw.com
Attn: Shirley Cho
E-mail: scho@pszjlaw.com

or to such other address or to the attention of such Person or Persons as the recipient Party has specified by prior written notice to the other Parties hereto.

12.2   **Waivers**. Neither the failure nor any delay by any Party in exercising any right, power or privilege under this Agreement or the documents referred to in this Agreement will operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege will preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege. To the maximum extent permitted by applicable Laws, (a) no waiver that may be given by a Party will be applicable except in the specific instance for which it is given, and (b) no notice to or demand on one Party will be deemed to be a waiver of any right of the party hereto that gives such notice or demand to take further action without notice or demand.

12.3   **Expenses**. Subject to Section 10.2, each of Seller, on the one hand, and Buyer, on the other hand, will bear its own respective expenses incurred in connection with the negotiation and execution of this Agreement, the other Ancillary Documents and the transactions contemplated hereby and thereby.

12.4   **Successors and Assigns**. This Agreement may not be assigned by any Party (whether by operation of law or otherwise) without the prior written consent of the other Parties; provided that this Agreement and the rights and obligations of Buyer hereunder may be assigned by Buyer, without the prior written consent of Seller, to one or more designees, so long as such person is designated in writing by Buyer to Seller prior to the Closing and Buyer continues to remain obligated in full hereunder; provided, further that Seller may assign some or all of its rights or delegate some or all of their obligations hereunder to successor entities pursuant to a plan of reorganization confirmed by the Bankruptcy Court. Subject to the foregoing, all of the terms and provisions of this Agreement shall inure to the benefit of and be binding upon the Parties and their respective permitted successors and assigns. Any attempted or purported assignment that is not in accordance with the terms of this Section 12.4 shall be void ab initio.

12.5   **Governing Law**. This Agreement and the exhibits and schedules hereto shall be governed by and interpreted and enforced in accordance with the Laws of the State of Delaware, without giving effect to any choice of Law or conflict of Laws rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware.

12.6   **Consent to Jurisdiction; Service of Process; Waiver of Jury Trial**. Any suit, action or other proceeding arising out of or relating to this Agreement or any transaction contemplated hereby shall be brought exclusively in the Bankruptcy Court. Each of the Parties hereby irrevocably submits to the exclusive jurisdiction of such court for the purpose of any such suit, action or other proceeding. A final judgment in any such suit, action or other proceeding may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law. Each Party irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement or the transactions contemplated hereby in such court, and hereby irrevocably and unconditionally waives and

28

DocuSign Envelope ID: F57AEEC8-F9DF-483D-A358-8FCFDD3F0D02

agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum. Each Party further agrees that service of any process, summons, notice or document by U.S. registered mail to such Party's respective address set forth herein shall be effective service of process for any such action, suit or proceeding. Nothing in this <u>Section 12.6</u>, however, shall affect the right of any Party to serve legal process in any other manner permitted by Law. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREBY OR THE ACTIONS OF SUCH PARTY IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE AND ENFORCEMENT HEREOF.

12.7   <u>**Counterparts**</u>.

(a)   This Agreement may be executed in counterparts, each of which when executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute but one and the same instrument. This Agreement shall become effective when each Party shall have received a counterpart hereof signed by the other Party. The Parties agree that the delivery of this Agreement, the Ancillary Documents and any other agreements and documents at the Closing may be effected by means of an exchange of facsimile signatures or other electronic delivery. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or scanned pages shall be effective as delivery of a manually executed counterpart to this Agreement.

(b)   No Party shall raise the use of a facsimile machine or electronic transmission to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or electronic transmission as a defense to the formation or enforceability of this Agreement and each Party forever waives any such defense. The words "execution," "executed", "signed," "signature," and words of like import in this Agreement shall include images of manually executed signatures transmitted by facsimile or other electronic format (including, without limitation, "pdf," "tif" or "jpg") and other electronic signatures (including, without limitation, SignNow and DocuSign).

12.8   <u>**No Third Party Beneficiaries**</u>. No provision of this Agreement is intended to or shall confer upon any Person other than the Parties any rights or remedies of any nature whatsoever under or by reason of this Agreement.

12.9   <u>**Entire Agreement; Amendment**</u>. This Agreement, the Ancillary Documents, schedules, including the Seller Disclosure Schedules and the other documents, instruments and agreements specifically referred to herein or therein or delivered pursuant hereto or thereto, together with the Confidentiality Agreement, set forth the entire understanding of the Parties with respect to the subject matter hereof and the transactions contemplated hereby. All schedules, including any Seller Disclosure Schedule, referred to herein are intended to be and hereby are specifically made a part of this Agreement and incorporated by reference herein. Any and all previous agreements and understandings between or among the Parties regarding the subject matter hereof, whether written or oral, are superseded by this Agreement, except for the Confidentiality Agreement which shall continue in full force and effect in accordance with its terms. Except as permitted under <u>Section 2.3(c)</u>, this Agreement, including all exhibits hereto, may not be amended, modified or supplemented, or the terms hereof waived, except by a written agreement executed by all of the Parties.

12.10   <u>**Disclosure Schedules**</u>. Except as otherwise provided in the Seller Disclosure Schedules, all capitalized terms therein shall have the meanings assigned to them in this Agreement. Matters reflected in the Seller Disclosure Schedules are not necessarily limited to matters required by this Agreement to be

4891-8457-9180.2

DocuSign Envelope ID: F57AEEC8-F9DF-483D-A358-8FCFDD3F0D02

disclosed. No disclosure made in the Seller Disclosure Schedules shall constitute an admission or determination that any fact or matter so disclosed is material, has had or could reasonably be expected to have a Material Adverse Effect, meets a dollar or other threshold set forth in this Agreement or would otherwise be required to be disclosed, and no Person shall use the fact of the setting of a threshold or the inclusion of such facts or matters in any dispute or controversy as to whether any obligation, amount, fact or matter is or is not material for purposes of this Agreement. Information disclosed in any Seller Disclosure Schedule delivered will qualify any representation and warranty in this Agreement to the extent that a reasonable buyer would infer, based solely on the face of the applicable disclosure, the relevance or applicability of the information disclosed to any such representation or warranty, notwithstanding the absence of a reference or cross-reference to such representation or warranty on any such Seller Disclosure Schedule or Seller Disclosure Schedule or the absence of a reference or cross reference to such Seller Disclosure Schedule in such representation or warranty. No disclosure in the Seller Disclosure Schedules relating to any possible breach or violation of any agreement or Law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred.

12.11   **Captions**. All captions and section headings contained in this Agreement are for convenience of reference only, do not form a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement.

12.12   **Remedies**. The Parties agree that irreparable damage could occur in the event that any of the Parties fails to take any action required of it hereunder to consummate the transactions contemplated by this Agreement in accordance with its specified terms. Accordingly, and notwithstanding anything herein to the contrary, the Parties explicitly agree that:

(a)      Each Party will be entitled to seek an injunction or injunctions without proof of damages or posting a bond or other security to prevent breaches of this Agreement or to enforce specifically the performance of the terms and provisions hereof, including specific performance of the covenants, promises or agreements contained in this Agreement or an Order enjoining the applicable Party from any threatened, or from the continuation of any actual, breach of such Party's covenants, promises or agreements, in each case in this sentence, in addition to any other remedy to which the non-breaching Party is entitled at law or in equity; *provided*, *that*, the right any Party to seek specific performance or other equitable remedies solely in connection with enforcing the other Party's obligation to consummate the Closing shall be subject to the requirement that (i) all of the conditions set forth in Article IX (in each case, other than conditions that by their nature are to be satisfied by the delivery of documents or taking of actions at the Closing) have been satisfied or waived, and (ii) such Party has irrevocably confirmed that if specific performance is granted, then it would take such actions required of it by this Agreement to cause the Closing to occur. Unless otherwise expressly stated in this Agreement, no right or remedy described or provided in this Agreement is intended to be exclusive or to preclude any Party from pursuing other rights and remedies to the extent available under this Agreement, at law or in equity.

(b)      The rights of specific performance and other equitable relief to the extent explicitly set forth and granted in this Section 12.12 are an integral part of the transactions contemplated by this Agreement and without that right, neither Seller nor Buyer would have entered into this Agreement.

12.13   **Severability**. Any provision of this Agreement which is invalid or unenforceable in any jurisdiction shall be ineffective to the extent of such invalidity or unenforceability without invalidating or rendering unenforceable the remaining provisions hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. Upon such determination that any term or other provision of this Agreement is invalid, illegal or unenforceable under applicable Law, the Parties shall negotiate in good faith to modify this Agreement so as to effect the

4891-8457-9180.2

DocuSign Envelope ID: F57AEEC8-F9DF-483D-A358-8FCFDD3F0D02

original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

12.14    **Interpretation**. The Parties have participated jointly in the negotiation and drafting of this Agreement, and any rule of construction or interpretation otherwise requiring this Agreement to be construed or interpreted against any Party by virtue of the authorship of this Agreement shall not apply to the construction and interpretation hereof. The Parties agree that any drafts of this Agreement or any Ancillary Document prior to the final fully executed drafts shall not be used for purposes of interpreting any provision thereof, and each of the Parties agrees that no Party or any Affiliate thereof shall make any claim, assert any defense or otherwise take any position inconsistent with the foregoing in connection with any Proceeding among any of the foregoing. For the purposes of this Agreement, except as otherwise expressly provided herein or unless the context otherwise requires: (a) the meaning assigned to each term defined herein shall be equally applicable to both the singular and the plural forms of such term and vice versa, and words denoting either gender shall include both genders as the context requires; (b) where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning; (c) the terms "hereof," "herein," "hereunder," "hereby" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement (including any exhibit or schedule hereto) as a whole and not to any particular provision of this Agreement; (d) when a reference is made in this Agreement to an Article, Section, paragraph, Exhibit or Schedule, such reference is to an Article, Section, paragraph, Exhibit or Schedule to this Agreement (provided that references to "Schedules" herein shall be deemed to refer to the applicable schedule of Seller Disclosure Schedule or the Seller Disclosure Schedule), unless otherwise specified; (e) the word "include," "includes," and "including" when used in this Agreement shall be deemed to be followed by the words "but not limited to," unless otherwise specified; (f) the word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other thing extends, and such phrase shall not mean simply "if" and (g) all accounting terms used and not defined herein have the respective meanings given to them under GAAP. All dollar or "$" amounts set forth in this Agreement shall refer to U.S. dollars unless explicitly indicated otherwise. Time is of the essence for each and every provision of this Agreement. In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" mean "to but excluding" and the word "through" means "to and including". Whenever the last day for the exercise of any privilege or the discharge of any duty hereunder shall fall upon a day that is not a Business Day, the Party having such privilege or duty may exercise such privilege or discharge such duty on the next succeeding day that is a Business Day. Any reference in this Agreement to "made available" means a document or other information that was provided or made available to Buyer and its Representatives in Seller's electronic or virtual data rooms, management presentations or in any other form.

12.15    **Prevailing Party**. In the event of any Proceeding in connection with this Agreement or any Ancillary Document, the prevailing Party in any such Proceeding shall be entitled to recover from the other Party its costs and expenses, including, without limitation, reasonable legal fees and expenses.

12.16    **Further Assurances**. Following the Closing, each of the Parties shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances, and take such further actions (at no material cost or expense to the Party to whom the request is directed) as may be reasonably required to carry out the provisions hereof and give effect to the Closing transactions contemplated by this Agreement; provided, however, neither Party shall be required by this Section 12.16 to initiate or join in any Proceeding.

* * * *

[Signature page follows]

31

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be duly executed on its behalf as of the date first above written.

SELLER:

ATHENEX PHARMACEUTICAL DIVISION, LLC

By: _____
   Name: Nicholas K. Campbell
   Title: Chief Restructuring Officer


BUYER:

Sagent Pharmaceuticals


By: _____
   Name: Jeffrey Greve
   Title:  EVP, Chief Financial Officer

[Signature Page to Asset Purchase Agreement]

DocuSign Envelope ID: F57AEEC8-F9DF-483D-A358-8FCFDD3F0D02

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be duly executed on its behalf as of the date first above written.

SELLER:

ATHENEX PHARMACEUTICAL DIVISION, LLC

By: _____
  Name:
  Title:

BUYER:

Sagent Pharmaceuticals

By: _____
  Name: Jeffrey Greve
  Title:  EVP, Chief Financial Officer

[Signature Page to Asset Purchase Agreement]

DocuSign Envelope ID: F57AEEC8-F9DF-483D-A358-8FCFDD3F0D02

<u>Exhibit A</u>

<u>Allocation of Purchase Price</u>

The Purchase Price (as increased by the amounts treated as assumed liabilities, if any, for federal income Tax purposes and other amounts treated as taxable sales consideration for federal income Tax purposes) shall be allocated among the Purchased Assets for all Tax purposes in accordance with their respective fair market values pursuant to the principles of Section 1060 of the Code and the regulations adopted thereunder and the principles of this <u>Exhibit A</u>.

The Allocation shall be made under the following principles:

| <u>Asset Class</u>* | <u>Allocation</u> |
|---|---|
| Class I Assets<br>(i.e. cash and cash equivalents): | Not applicable |
| Class II Assets<br>(i.e. marketable stock/securities and<br>actively traded personal property): | Not applicable |
| Class III Assets<br>(i.e. accounts receivable and similar rights to payment): | Not applicable |
| Class IV Assets<br>(i.e. inventory/stock in trade/property held<br>for sale in ordinary course of business): | 16% of Closing Inventory Value *plus*<br>$218,000 for raw materials (subject to<br>reallocation pursuant to <u>Section 2.5(a)</u>) |
| Class V Assets<br>(i.e. assets not classified in classes I through VII,<br>such as equipment and depreciable property used in business,<br>including buildings): | $0 |
| Class VI & VII Assets<br>(i.e. § 197 intangibles, goodwill<br>and going concern value): | Remainder |

\* Pursuant to Treasury Regulation Section 1.338-6.

4891-8457-9180.2

# DISCLOSURE SCHEDULES
## to the
## ASSET PURCHASE AGREEMENT
### by and among
## ATHENEX PHARMACEUTICAL DIVISION, LLC,
### and
## SAGENT PHARMACEUTICALS

These Schedules ("Disclosure Schedules") are made and given pursuant to the Asset Purchase Agreement (the "Agreement"), dated as of June 23, 2023, by and among Athenex Pharmaceutical Division, LLC, a Delaware limited liability company ("Seller") and Sagent Pharmaceuticals, a Wyoming corporation ("Buyer"). Except as otherwise provided herein, all capitalized terms used herein shall have the meanings assigned to them in the Agreement.

Matters reflected in these Disclosure Schedules are not necessarily limited to matters required by the Agreement to be disclosed. Matters reflected in these Disclosure Schedules are not necessarily limited to matters required by the Agreement to be disclosed.  No disclosure made in these Disclosure Schedules shall constitute an admission or determination that any fact or matter so disclosed is material, has had or could reasonably be expected to have a Material Adverse Effect, meets a dollar or other threshold set forth in the Agreement or would otherwise be required to be disclosed, and no Person shall use the fact of the setting of a threshold or the inclusion of such facts or matters in any dispute or controversy as to whether any obligation, amount, fact or matter is or is not material for purposes of the Agreement.  Information disclosed in any Disclosure Schedule delivered will qualify any representation and warranty in the Agreement to the extent that a reasonable buyer would infer, based solely on the face of the applicable disclosure, the relevance or applicability of the information disclosed to any such representation or warranty, notwithstanding the absence of a reference or cross-reference to such representation or warranty on any such Disclosure Schedule or the absence of a reference or cross reference to such Disclosure Schedule in such representation or warranty.  No disclosure in these Disclosure Schedules relating to any possible breach or violation of any agreement or Law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred.

**Schedule 1.1(b)**
**Permitted Liens**

None.

**Schedule 2.1(d)**
**Assigned Contracts**

| Legal Name | Legal Address | Debtor Name Listed on Contract | Contract Description | Product(s) |
|---|---|---|---|---|
| Alter Pharma NV (on behalf of Generic Pharma International Limited and Milla Pharmaceuticals, Inc.) | Marie Curie Square 50, 5th Buliding (4th Floor) 1070 Anderlecht, Belgium Attn: Managing Director | Athenex Pharmaceutical Division, LLC | License, Distribution and Supply Agreement | Dexmedetomidine HCL in 0.9% sodium chloride injectible |
| Amphastar Pharmaceuticals, Inc. | Amphastar Pharmaceuticals, Inc. 11570 6th Street Rancho Cucamonga, CA 91730 Attn: Genreal Counsel Attn: Sr. Vice President of Corporate Administration Center | Athenex, Inc. | Asset Purchase Agreement | |
| Beloteca, Inc. | Beloteca, Inc. 10525 Vista Sorrento Parkway, Suite 100 San Diego, CA 92121 Attn: Frederik Defesche | Athenex, Inc. | Term Sheet for a License and Supply Agreement | Thioplex and Tepadina |
| | Beloteca, Inc. 10525 Vista Sorrento Parkway, Suite 100 San Diego, CA 92121 Attn: Frederik Defesche | Athenex Pharmaceutical Division, LLC | Master Collaboration Agreement | Thiotepa |

| Legal Name | Legal Address | Debtor Name Listed on Contract | Contract Description | Product(s) |
|---|---|---|---|---|
| Chia Tai Tianqing Pharmaceutical Group Co., Ltd. | Chia Tai Tianqing Pharmaceutical Group Co., Ltd. Attn: Ms. Xiang Wenjing No. 16 Jinqiao Rd. Dapu Industrial Park 222069, Lianyungang Jiangsu Provence<br><br>With a copy to: wi.xiang@cttq.com gg@cctq-europe.com ghm@cttq.com | Athenex, Inc. | Exclusive Supply Agreement Term Sheet | Fosaprepitant Lyo 150mg/vial |
| | | Athenex Pharmaceutical Division, LLC | Supply Agreement Term Sheet | Fulvestrant prefilled syringe |
| | | | License and Supply Agreement | Fulvestrant prefilled syringe |
| Gland Pharma Limited | Gland Pharma Ltd. Sy. No. 143 to 148, 150 & 151, Near Gandimaisamma X Roads, D.P. Pally, Gandimaisamma-Dundigal Mandal, Hyderabad, Medchal-Malkajgiri District, Telangana – 500 043, India Attn: Chief Executive Officer | Athenex Pharmaceutical Division, LLC | Binding Term Sheet for License (2x) | Generic Injectables, various. |
| Hainan Shuangcheng Pharmaceuticals Inc. LTD | No. 16 Xingguo Road Xiuying District Haikou, China 570314 | Athenex Pharmaceutical Division, LLC | Binding Term Sheet for Development and Supply | Epitifibatide |
| | | | | Bivalrudin LYO |

| Legal Name | Legal Address | Debtor Name Listed on Contract | Contract Description | Product(s) |
|---|---|---|---|---|
| Hengrui | 7 Kunlunchan Road, Economic and Technological Development Zone Lianyungang 222047 China | Athenex Pharmaceutical Division, LLC | Binding Term Sheet for License | Dexmedetomidine 200mcg/2mL |
| Ingenus Pharmaceuticals LLC | Ingenus Pharmaceuticals LLC 4190 Millenia Blvd. Orlando, FL 32839 Attn: Matthew J Baumgartner | Athenex Pharmaceutical Division, LLC | Co-Marketing, Manufacture and Supply Agreement | Carmustine 100mg vial-kit |
| | | | Co-Marketing, Manufacture and Supply Agreement | Cyclophosomide |
| Istituto Biochimico Italiano Giovanni Lorenzini S.p.A. | Istituto Biochimico Italiano Giovanni Lorenzini S.p.A. Via Fossignano 2 04011 Aprilia (LT), Italy Attn: Johannes Khevenhuller , CEO Attn: Dr. Camilla Borghese, President | Athenex Pharmaceutical Division, LLC | Supply and Distribution Agreement | Nafcillin for Injection, USP; powder vial, 100 mL, 10 grams per vial Ampicillin for Injection, USP; powder vial 100 mL |
| | | | | Penicillin G Potassium for Injection, USP; powder vial, 20 and 100 mL |
| | | | | Piperacillin and Tazobactam for Injection; 20, 50, 30, and 250 mL |

| Legal Name | Legal Address | Debtor Name Listed on Contract | Contract Description | Product(s) |
|---|---|---|---|---|
| MAIA Pharmaceuticals, Inc. | MAIA Pharmaceuticals, Inc. 707 State Road, Suite 104 Princeton, NJ 08540 U.S.A. Attn: Bikram Malik, Operations<br><br>With a required copy to: Orrick, Herrington & Sutcliffe LLP 51 West 52nd Street New York, NY 10019-6142 U.S.A. Attn: R. King Milling, Jr. | Athenex Pharmaceutical Division, LLC | Amended and Restated Exclusinve Distribution and Supply Agreement, "License Agreement" | Levothyroxine, Bivalirudin RTU (Discontinued) |
| Maiva Pharma Private Limited | No 32, SIPOT Industrial Complex, Phase I Hosur, Krishnagiri, Tamil Nadu 635126 India Attention:  Dr. Bhaskar Krishna Email: bhaskarkrishna@ maivapharma.com | Athenex Pharmaceutical Division, LLC | Binding Term Sheet for Licence | Glycopyrrolate Inj 0,2mg.mL, 1, 2, 5, 20mL |
| Maiva Pharma Private Limited | | Athenex Pharmaceutical Division, LLC | Supply Agreement | Ketorolac Tromethamine 15mg, 30mg |
| Global Pharmatech Private Limited | | Athenex Pharmaceutical Division, LLC | Binding Term Sheet for Site Transfer | Bumetinide Inj 0.25mg/mL, 4 & 10mL |
| Global Pharmatech | | Athenex Pharmaceutical Division, LLC | Binding Term Sheet for Development and Supply | Mycophenolate Mofetil Injection |
| Global Pharmatech Private Limited | | | | Furosemide |
| Global Pharmatech | | Athenex Pharmaceutical Division, LLC | Binding Term Sheet for Development and Supply | Palonosetron Acetylcysteine |
| Global Pharmatech | | Athenex Pharmaceutical Division, LLC | Binding Term Sheet for Site Transfer | Dilt + Famot + Valpro |

| Legal Name | Legal Address | Debtor Name Listed on Contract | Contract Description | Product(s) |
|---|---|---|---|---|
| Global Pharmatech Private Limited | | Athenex Pharmaceutical Division, LLC | Binding Term Sheet for Site Transfer | Prochlorperazine edisylate injection, USP |
| Global Pharmatech LLC | | | | Rocuronium Bromide |
| Qilu Pharmaceutical Co., LTD. | Qilu Pharmaceutical Co., Ltd. 8888. Lvyou Road, High-tech Zone Jinan, Shandong, 250104, China Attn: Ms. Jing Zhang | Athenex Pharmaceutical Division, LLC | License, Supply, and Distribution Agreement | Decitabine for Inj (50mg) |
| HealthTrust Purchasing Group, L.P. | HealthTrust Purchasing Group, L.P. 1100 Dr. Martin L. King Jr. Blvd., Suite 1100 Nashville, TN 37203 | Athenex Pharmaceutical Division, LLC | Purchasing Agreement | Various products |
| Vizient Supply, LLC | Vizient Supply, LLC 290 East John Carpenter Freeway Irving, TX 75062 | Athenex Pharmaceutical Division, LLC | Pharmacy Supplier Agreement | Various products |
| Premier Healthcare Alliance, L.P. | Premier Healthcare Alliance, L.P. 13034 Ballantyne Corporate Place Charlotte, NC 28277 | Athenex Pharmaceutical Division, LLC | Group Purchasing Agreement-Pharmaceuticals | Various products |
| | | | Group Purchasing Agreement – Pharmacy Access Agreement | Various products |
| | | | Trademark License Agreement | |

| Legal Name | Legal Address | Debtor Name Listed on Contract | Contract Description | Product(s) |
|---|---|---|---|---|
| Apexus, LLC | Apexus, LLC 290 E. John Carpenter Freeway Irving, TX 75062 | Athenex Pharmaceutical Division, LLC | Sub-340B and Sub-WAC Pharmacy Supplier Agreement | Various products |

### Schedule 2.1(f)
### Permits

| Market Status | Active Ingredient | Proprietary Name | Application No. | Dosage Form | Route | Strength | Applicant Holder |
|---|---|---|---|---|---|---|---|
| RX | BUMETANIDE | BUMETANIDE | A074441 | INJECTABLE | INJECTION | 0.25MG/ML | ATHENEX INC |
| RX | DILTIAZEM HYDROCHLORIDE | DILTIAZEM HYDROCHLORIDE | A074617 | INJECTABLE | INJECTION | 5MG/ML | ATHENEX INC |
| RX | FAMOTIDINE | FAMOTIDINE | A075651 | INJECTABLE | INJECTION | 10MG/ML | ATHENEX INC |
| RX | FAMOTIDINE | FAMOTIDINE | A075684 | INJECTABLE | INJECTION | 10MG/ML | ATHENEX INC |
| RX | FAMOTIDINE | FAMOTIDINE PRESERVATIVE FREE | A075622 | INJECTABLE | INJECTION | 10MG/ML | ATHENEX INC |
| RX | FAMOTIDINE | FAMOTIDINE PRESERVATIVE FREE | A075825 | INJECTABLE | INJECTION | 10MG/ML | ATHENEX INC |
| RX | FUROSEMIDE | FUROSEMIDE | A214766 | INJECTABLE | INJECTION | 10MG/ML | ATHENEX INC |
| RX | GLYCOPYRROLATE | GLYCOPYRROLATE | A210083 | INJECTABLE | INJECTION | 0.2MG/ML | ATHENEX INC |
| RX | PROCHLORPERAZINE EDISYLATE | PROCHLORPERAZINE EDISYLATE | A040540 | INJECTABLE | INJECTION | EQ 5MG BASE/ML | ATHENEX INC |
| RX | VALPROATE SODIUM | VALPROATE SODIUM | A076295 | INJECTABLE | INJECTION | EQ 100MG BASE/ML | ATHENEX INC |

**Schedule 2.2**
**Excluded Assets**

None.

**Schedule 3.2(b)(v)**
**Material Consents**

Approval of the Bankruptcy Court is required for the transactions contemplated by the Agreement.

**Schedule 4.4(i)**
**<u>Noncontravention</u>**

Certain Assigned Contracts require notice to, or the consent of, the counterparties to the assignment of such Assigned Contracts.

**Schedule 4.4(ii)**
**<u>Government Authorizations</u>**

Approval of the Bankruptcy Court is required for the transactions contemplated by the Agreement.

**Schedule 4.7(a)**
**Licensed Intellectual Property**

Athenex, Inc., sole member of Seller, licenses its AccuraSEE, AccuraSEE Packaging & Labeling (Stylized), SEEcure and SEECure (Stylized) trademarks to Seller.

**Schedule 4.8**
**<u>Brokers</u>**

Cassel Salpeter & Co., LLC

**Schedule 6.1**
**<u>Conduct of Business</u>**

None.