**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| ATHENEX, INC., et al., | Case No. 23-90295 (DRJ) |
| Debtors. [1] | (Jointly Administered) |

**SAGENT PHARMACEUTICALS'**
**APPLICATION FOR ALLOWANCE AND**
**PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM**

> **If you object to the relief requested, you must respond in writing. Unless otherwise directed by the Court, you must file your response electronically at https://ecf.txsb.uscourts.gov/ within twenty-one days from the date this application was filed. If you do not have electronic filing privileges, you must file a written objection that is actually received by the clerk within twenty-one days from the date this motion was filed. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

Sagent Pharmaceuticals ("Sagent") states as follows in support of this application for allowance and payment of postpetition administrative expenses (the "Application"):

**Relief Requested**

1.      Sagent seeks entry of an order, substantially in the form attached to this Application (the "Order"), allowing its postpetition, administrative expense claim in an amount no less than $3,235,219.00 (the "Administrative Expense Claim"). In support of this Application, Sagent submits, and incorporates by reference herein, the declaration of Jeffrey Greve, which is attached hereto as **Exhibit A** (the "Greve Declaration").[2]

---

[1] A complete list of each of the debtors in these Chapter 11 Cases (the "Debtors") may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/athenex. The location of Athenex, Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 1001 Main Street, Suite 600, Buffalo, NY 14203.

[2] A breakdown of the calculation of the Administrative Expense Claim is provided as Schedule 1 to the Greve Declaration.

**Jurisdiction and Venue**

2.      The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The bases for the relief requested herein are sections 105 and 503(b)(1)(A) of title 11 of the United States Code (the "Bankruptcy Code") and rules 9013 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

**Background**

4.      Sagent's Administrative Expense Claim arises from a unique feature of how pharmaceutical products are sold in our country—the chargeback—and exacerbated by the unique consequence of how and when the Debtors sold the assets of Athenex Pharmaceutical Division, LLC ("APD").

**I.      Sale of Pharmaceutical Products on Credit and Chargebacks**

5.      As is customary in the pharmaceutical industry, pharmaceutical products are initially sold from manufacturers to wholesalers at a wholesale list price.  Wholesalers then generally re-sell these products to end users at a lower contract price previously established between the end user and the manufacturer.  Inventory that has been sold to wholesalers but has not yet been re-sold to an end user is referred to as inventory "in the channel."  When a wholesaler ultimately sells product in the channel, the wholesaler charges the manufacturer, or issues a chargeback, for the difference between the wholesale list price and the end-user contract price.

6.      For a wholesaler to apply a chargeback to the manufacturer, it must have a contract number associated with the product in its system.  If a wholesaler is unable to recoup

chargebacks against a given manufacturer, the manufacturer risks the wholesaler refusing to re-sell its products to end users.  Although the wholesaler knows the product lot which was sold to the end user, such information is not transmitted by the wholesaler to the manufacturer when a chargeback is issued.

7.     Debtor Athenex, Inc. operated a pharmaceutical company and conducted the commercial sale of pharmaceutical products through its wholly owned subsidiary, APD.[3]  APD's products were stored and distributed through its third-party logistics provider, Eversana Life Sciences Services, LLC ("Eversana").[4]  Eversana handled all aspects of APD's product logistics and related services, including warehousing and shipment services, order-to-cash services, contract administration services, and chargeback processing.[5]  APD primarily sold its products to three pharmaceutical wholesalers: Cardinal Health Inc., AmerisourceBergen Corp., and McKesson Corp. (collectively, the "Wholesalers").   In the ordinary course of the Debtors' business both pre and postpetition, APD would sell its inventory to the Wholesalers on credit at the wholesale list price, generating accounts receivable (the "APD-Wholesaler A/R Accounts").  When the Wholesalers re-sold the APD inventory to end users at the lower contract price, Eversana would apply the chargeback against the applicable APD-Wholesaler A/R Account.

8.     Sagent is a pharmaceutical company specializing in generic injectable pharmaceutical products.  Sagent also utilizes Eversana as its third-party logistics provider. Sagent distributes its products to the same Wholesalers for eventual sale to a wide variety of end users.  Sagent has its own contracts with the Wholesalers, pursuant to which the Wholesalers

---

[3] *See Declaration of Nicholas K. Campbell in Support of Debtors' Chapter 11 Petitions and First Day Relief* [Docket No. 18] (the "First Day Declaration"), at ¶ 32.

[4] *See id.* at ¶ 33.

[5] *See id.* at ¶ 112.

4887-9608-0767

acquire Sagent's inventory on credit, generating accounts receivable (the "Sagent-Wholesaler A/R Accounts").   When a chargeback is generated by re-sale of inventory in the channel, Eversana applies the chargeback against the applicable Sagent-Wholesaler A/R Account.



## II.     The Debtors' Bankruptcy and Sale of the APD Assets

9.      On May 14, 2023, each of the Debtors commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code (the "Petition Date").

10.     On May 17, 2023, the Court entered its *Order Approving (A) Bid Procedures; (B) the Form and Manner of Notice; (C) the Procedures for Determining Cure Amounts for Executory Contracts and Unexpired Leases; and (D) Granting Related Relief* [Docket No. 113] (the "Bid Procedures Order").

11.     On June 21, 2023, the Debtors conducted an auction (the "Auction") of APD's assets in accordance with the Bid Procedures Order.  The Debtors liquidated APD's assets in two lots: (i) the accounts receivable generated by APD's sale of product to the Wholesalers (the "A/R

Assets") and (ii) APD's non-accounts receivable assets, primarily its on-hand inventory of pharmaceutical products (the "Inventory Assets" or "Acquired Inventory").  The Auction resulted in two successful bidders: Oaktree Strategic Credit Asset Holdings, LLC ("Oaktree") was declared the high bidder for the A/R Assets, and Sagent was declared the high bidder for the Inventory Assets.

12.     On June 27, 2023, the Court entered its *Order (I) Authorizing (A) the Sale of Certain Assets of Debtor Athenex Pharmaceutical Division, LLC to Sagent Pharmaceuticals Free and Clear of Liens, Claims, and Encumbrances and (B) the Debtors to Enter into and Perform Under the Purchase Agreement and (II) Granting Related Relief* [Docket No. 351], which, among other things, approved an Asset Purchase Agreement (the "Sagent APA") dated June 23, 2023 between APD and Sagent (the "Inventory Sale").   In connection with the Inventory Sale, Sagent assumed APD's contract with Eversana; Sagent did not assume APD's contracts with the Wholesalers.  The Inventory Sale closed on June 30, 2023 (the "Inventory Sale Closing Date").

13.     Also on June 27, 2023, the Court entered its *Order (I) Authorizing (A) the Sale of Certain Assets of Debtor Athenex Pharmaceutical Division, LLC to Oaktree Strategic Credit Asset Holdings, LLC Free and Clear of Liens, Claims and Encumbrances and (B) the Debtors to Enter Into and Perform Under the Purchase Agreement and (II) Granting Related Relief* [Docket No. 352] (the "Oaktree Sale Order"), which, among other things, approved an Asset Purchase Agreement (the "Oaktree APA") dated June 20, 2023 between APD and Oaktree (the "A/R Sale").  The A/R Sale closed on July 28, 2023 (the "A/R Sale Closing Date").  Pursuant to the Oaktree APA and the Oaktree Sale Order, Oaktree assumed refunds, chargebacks, rebates, and discounts owed by APD as of the A/R Sale Closing Date to the extent related to the

"Purchased Assets" (as defined in the Oaktree APA).[6]  The "Purchased Assets" under the Oaktree APA consist of APD's accounts receivable held as of the A/R Sale Closing Date.

### III.   Channel Inventory and the Disputed Chargebacks

14.     The Debtors' sale of the A/R Assets to Oaktree separate and apart from the sale of the Inventory Assets to Sagent presented a problem.  Prior to the Inventory Sale Closing Date, and in the ordinary course of its business, APD sold inventory on credit to Wholesalers that had not yet been re-sold to end users (the "Channel Inventory").  Sagent did not acquire any rights to the Channel Inventory (or the associated accounts receivable generated by its initial sale by APD) pursuant to the Sagent APA; nor did Sagent assume any liabilities related to the Channel Inventory.[7]  Rather, depending on whether they arose on or after the A/R Sale Closing Date, rights and liabilities associated with the Channel Inventory either flowed to the Debtors' estates or to Oaktree.  Absent the split between the A/R Sale and the Inventory Sale, chargebacks associated with the Channel Inventory would have been applied to the APD-Wholesaler A/R Accounts.

15.     Around July 1, 2023, Sagent provided the Wholesalers with Sagent contract numbers and related end-user contract prices for the Acquired Inventory.  This ensured that chargebacks generated from the sale of the Acquired Inventory would be applied to the Sagent-Wholesaler A/R Accounts.  The Channel Inventory consisted of many of the same products acquired by Sagent as Acquired Inventory.  Sagent did not, and could not, control the removal of the APD contract numbers and related end-user contract prices for the portion of Channel Inventory that represented the same product acquired by Sagent as Acquired Inventory.

---

[6] *See* Oaktree APA § 2.3; Oaktree Sale Order ¶ 30.

[7] *See* Sagent APA §§ 2.1, 2.4.

16.     Between the Inventory Sale Closing Date and the A/R Sale Closing Date, the Wholesalers continued to re-sell the Channel Inventory to end users, generating chargebacks. Some of the chargebacks generated during this period were applied to Sagent-Wholesaler A/R Accounts rather than to the APD-Wholesaler A/R Accounts (the "Disputed Chargebacks").  This occurred even though Sagent did not sell the underlying Channel Inventory to the Wholesalers, and thus, did not receive the associated benefit of the accounts receivable generated by the sale. To date, Sagent has been improperly charged $3,235,219.00 on account of the Disputed Chargebacks.[8]

17.     The amount of the Disputed Chargebacks was exacerbated by the twenty-eight (28) days between the Inventory Sale Closing Date and to the A/R Sale Closing Date.  Oaktree has disclaimed liability for the Disputed Chargebacks, all of which arose prior to the A/R Sale Closing Date.  *See Reservation of Rights of Oaktree Fund Administration, LLC in Connection with Debtors' Combined Disclosure Statement and Plan of Liquidation* [Docket No. 577].

18.     Sagent is entitled to allowance and payment of the Administrative Expense Claim for the Disputed Chargebacks.  The Disputed Chargebacks arose postpetition due to APD's sale of the Channel Inventory prior to the Inventory Sale Closing Date and for which chargebacks were generated while APD still owned the related accounts receivable.  The application of the Disputed Chargebacks to the Sagent-Wholesaler A/R Accounts has benefitted the Debtors' bankruptcy estates during the administration of these Chapter 11 cases.  As a result, the Administrative Expense Claim is an actual and necessary expense of preserving the Debtors' estates.

---

[8] Sagent is still waiting to receive and analyze chargeback information from an additional wholesaler, Morris & Dickson Co.  The $3,236,697.00 sought by this Application does not include any amounts attributable to chargebacks generated by Morris & Dickson Co., which Sagent estimates to be no more than $200,000.  Sagent reserves the right to supplement this Application to seek allowance and payment of such additional chargeback amounts.

4887-9608-0767

## Basis for Relief

**A.**    **Standard for Allowance of Administrative Expense Claims**

19.    Section 507 of the Bankruptcy Code provides that administrative expenses allowed under section 503(b) of the Bankruptcy Code are entitled to priority.  11 U.S.C. § 507. Under section 503(b)(1)(A) of the Bankruptcy Code, a claim qualifies for allowance as an administrative expense if it is an actual and necessary cost or expense of preserving a debtor's bankruptcy estate.

20.    An expense is "actual and necessary" if it: (a) arises postpetition and as a result of actions taken by the debtor in possession, and (b) benefitted the debtor's bankruptcy estate.   *In re Whistler Energy II, L.L.C.*, 931 F.3d 432, 441 (5th Cir. 2019) (quoting *In re Jack/Wade Drilling, Inc.*, 258 F.3d 385, 387 (5th Cir. 2001)); *see also In re TransAmerican Nat. Gas Corp.*, 978 F.2d 1409, 1415 (5th Cir. 1992); *In re ATP Oil & Gas Corp.*, No. 12-36187, 2014 WL 1047818, at *3 (Bankr. S.D. Tex. Mar. 18, 2014).  Whether a particular expense is an "actual and necessary cost" is a question of fact to be determined "after notice and a hearing."  11 U.S.C. § 503(b).

21.    "[A]ctual and necessary costs should include costs ordinarily incident to operation of a business, and not be limited to costs without which rehabilitation would be impossible."  *Reading Co. v. Brown*, 391 U.S. 471, 483 (1968).  While a trustee or debtor in possession has an "implicit duty to preserve the estate, preservation may also include and be a means to other ends in the administration of an estate, such as the continuation of the business or an orderly liquidation."  *In re ATP Oil & Gas Corp.*, 2014 WL 1047818, at *3 (citing Lawrence P. King, ed., 4 Collier on Bankruptcy ¶ 503.06[1] (16th rev. ed. 2010) (citing *Reading Co. v. Brown*, 391 U.S. 471 at 475 (1968))).

4887-9608-0767

22.     As to the requirement that the expense arise postpetition as a result of the debtor's actions, an applicant may establish that its expense is attributable to the actions of the estate "through evidence of either a direct request from the debtor-in-possession *or* other inducement via the knowing and voluntary postpetition acceptance of desired goods or services." *In re Whistler Energy II, L.L.C.*, 931 F.3d at 443 (emphasis added).  The expenses simply must be a result of postpetition actions by the debtor in possession. *See id.*

23.     Additionally, the expense must benefit the estate.  The Fifth Circuit has stated that "[t]he 'benefit' requirement has no independent basis in the Code . . . but is merely a way of testing whether a particular expense was truly 'necessary' to the estate: If it was of no "benefit," it cannot have been "necessary." *In re ATP Oil & Gas Corp.*, 2014 WL 1047818, at *3 (citing *In re H.L.S. Energy Co., Inc.*, 151 F.3d 434, 437 (5th Cir. 1998)).  Benefits to the estate may come in different forms. *See In re Whistler Energy II, L.L.C.*, 931 F.3d at 443.  While some benefits can be measured by the costs of goods or services, an estate may also receive intangible, less readily calculable benefits, such as the ability to continue the debtor's business. *See id.* Moreover, in determining whether an expense aided in preserving the estate, the expense does not have to relate solely to the continuation of the debtor's business; rather, the bankruptcy court can consider whether the expense aided the debtor in achieving an orderly liquidation or abandonment. *See re ATP Oil & Gas Corp.*, 2014 WL 1047818, at *4.

**B.     The Administrative Expense Claim Is an Actual and Necessary Cost of Preserving the Debtors' Estates.**

*1.   Sagent's Administrative Expense Claim is a direct result of the Debtors' postpetition actions and were incident to operating the Debtors' business.*

24.     Sagent's Administrative Expense Claim arising from the Disputed Chargebacks is indisputably an actual and necessary expense of preserving the Debtors' estates.   The

9

Administrative Expense Claim arose postpetition due to the Debtors' actions and is ordinarily incident to the operation of the Debtors' business postpetition as it worked to develop a chapter 11 plan and preserve value for parties in interest.

25.     Sagent incurred the Disputed Chargebacks through a postpetition transaction. Specifically, the Disputed Chargebacks were incurred by APD postpetition through the sale of product to the Wholesalers, generating accounts receivable to the APD-Wholesaler A/R Accounts and creating Channel Inventory prior to the sale of the Acquired Inventory to Sagent.   But because the end users that ultimately purchased the Channel Inventory after the Inventory Sale Closing Date selected the Sagent contract number for the product in the Wholesalers' systems, the Disputed Chargebacks were applied to the Sagent-Wholesaler A/R Accounts.

26.     The Disputed Chargebacks are expenses owed by the Debtors' estates that the estates would eventually have to pay, whether to the Wholesalers or to Sagent.   Therefore, Sagent's Administrative Expense Claim does not include funds available to pay general unsecured creditors that could otherwise be distributed pursuant to the Debtors' plan.   Indeed, the Debtors knew about the customary chargeback process associated with its Wholesaler contracts, and the Debtors knew that chargeback costs assessed against the Debtors in accordance with the normal, ordinary course netting process could significantly reduce the amount of net proceeds to the estates.[9]

---

[9] *See Stipulation and Agreed Order Among the Debtors, McKesson Corporation, and Instituto Biochimico Italiano Giovanni Lorenzini S.P.A.* [Docket No. 279], ¶ 5; *Stipulation and Agreed Order Among the Debtors, McKesson Corporation, and Istituto Biochimico Italiano Giovanni Lorenzini S.P.A.* [Docket No. 315], ¶ 5 (both acknowledging that "chargebacks under the agreement between McKesson and APD will significantly reduce the amount of net proceeds pursuant to the normal, ordinary course netting process between the parties pursuant to the applicable McKesson contracts").

27.     Thus, the Disputed Chargebacks were intended to be charged directly against the Debtors' postpetition accounts receivable, and they were incident to the operation of the Debtors' business and the orderly wind down of the Debtors' estates pursuant to these bankruptcy cases.

### 2.     Sagent's Administrative Expense Claim benefitted the Debtors' estates.

28.     The Disputed Chargebacks also indisputably benefitted the Debtors' estates. Sagent's payment of the Disputed Chargebacks—expenses that did not arise out of Sagent's obligations pursuant to the Sagent APA or Sagent's contracts with the Wholesalers, but rather arose out of the Debtors' postpetition sales to, and contractual relationships with, the Wholesalers—allowed the Debtors to focus on maximizing value in favor of creditors, preserving the estates and the status quo of ongoing operations so the Debtors could negotiate and confirm an orderly chapter 11 plan with other constituents and parties in interests.[10]

29.     Moreover, but for APD's continued sale of products to the Wholesalers postpetition, the Debtors would not have generated sufficient working capital to fund the Debtors' operations and these chapter 11 cases.  The Debtors did not seek postpetition financing to fund these chapter 11 cases.  As a result, the Disputed Chargebacks are part and parcel of the Debtors' postpetition operations that benefited the Debtors' estates and are entitled to administrative claim status.  Allowing the Debtors to receive the benefit of the accounts receivable (cash) without the associated burden (the chargebacks) constitutes an improper windfall to the estates.

---

[10] Administrative expense claims have been allowed under section 503(b)(1) under similar facts. *See In re Midway Airlines, Inc.*, 221 B.R. 411 (Bankr. N.D. Ill. 1998) (allowing administrative expense claim under section 503(b)(1)(A) for credits due and owing for customer chargebacks postpetition which conferred a benefit on the debtor's estate).

4887-9608-0767

30.     Accordingly, Sagent is entitled to its Administrative Expense Claim as an actual and necessary cost of preserving the estates under section 503(b)(1)(A) of the Bankruptcy Code, which is entitled to priority status under section 507(a)(1) of the Bankruptcy Code.

### Conclusion

31.     Sagent requests that the Court enter the Order: (1) granting the Application; (2) allowing the Administrative Expense Claim in an amount no less than $3,235,219.00; (3) directing the payment of such Administrative Expense Claim within fourteen (14) days of the date of entry of the Order; and (4) granting Sagent such other relief as is just and proper.

Respectfully submitted this 21st day of September, 2023.

**GRAY REED**

By:  */s/ Lydia R. Webb*
    Lydia R. Webb
    Texas Bar No. 24083758
1300 Post Oak Boulevard, Suite 2000
Houston, Texas 77056
Telephone:    (713) 986-7127
Facsimile:    (713) 986-5966
Email:        lwebb@grayreed.com

*Counsel to Sagent Pharmaceuticals*

### Certificate of Service

I certify that on September 21, 2023, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Lydia R. Webb*
    Lydia R. Webb

4887-9608-0767